## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LAURA AND JAMES SAMPSON, ANTHONY VENTURA AND JOANNE FULGIERI VENTURA, ELIZABETH WHEATLEY, and SHIRLEY REINHARD ON HER OWN BEHALF AND ON BEHALF OF THE ESTATE OF KENNETH REINHARD, individually and on behalf of all others similarly situated, | Civil Action No. |
| Plaintiffs, | CLASS ACTION COMPLAINT |
| v. | JURY TRIAL DEMANDED |
| SUBARU OF AMERICA, INC. and SUBARU CORPORATION f/k/a FUJI HEAVY INDUSTRIES, LTD. | |
| Defendants. | |

## INTRODUCTION

1.    Plaintiffs Laura and James Sampson, Anthony Ventura and Joanne Fulgieri Ventura, Elizabeth Wheatley, and Shirley Reinhard, on her own behalf and on behalf of the Estate of Kenneth Reinhard, ("Plaintiffs") bring this action for themselves and on behalf of all persons in the United States who purchased or leased any 2013-2021 Subaru equipped with an autonomous emergency braking ("AEB") system that includes "Pre-Collision Braking" and "Reverse Automatic Braking" ("AEB Class Vehicles") and on behalf of all persons in the United States who purchased or leased any 2013-2021 Subaru equipped with Lane Keep Assist ("LKA

1

Class Vehicles"), against Subaru of America, Inc. ("SOA") and Subaru Corporation, formerly known as Fuji Heavy Industries, Ltd., ("Subaru Corp.") (together with SOA, "Subaru" or "Defendants").  The allegations herein are based on personal knowledge as to Plaintiffs' own experiences and are made as to other matters based on an investigation by counsel, including analysis of publicly available information.

2.     Autonomous emergency braking systems are one of the most highly touted advancements in automobile safety.  As described by Consumer Reports, with AEB systems installed, "[t]he vehicle stops independently when it senses a crash is imminent to avoid a crash, or to reduce the severity of a crash that can't be avoided."[1] Forward-oriented systems activate when the car is driving forward, and rearward-oriented systems activate when the car is in reverse.[2]  When working properly, these systems are intended to reduce the incidence of collisions and the resultant injuries.

3.     Subaru's Pre-Collision Braking, along with Lane Keep Assist, is a part of the "EyeSight Driver Assist Technology" suite of safety features.  As described by Subaru on its website[3]:

---

[1] https://www.consumerreports.org/car-safety/automatic-emergency-braking-guide/
[2] *See id*.
[3] *See* https://www.subaru.com/engineering/eyesight.html

# Subaru EyeSight

### AN EXTRA SET OF EYES ON THE ROAD AND, IF NEED BE, AN EXTRA FOOT ON THE BRAKE WHEN YOU DRIVE.

EyeSight® Driver Assist Technology[1] is the culmination of everything Subaru engineers know about safety, and Subaru has sold over 1 million EyeSight-equipped vehicles. Adding confidence to every trip, EyeSight monitors traffic movement, optimizes cruise control, and warns you if you sway outside your lane. EyeSight has been found to reduce the rate of rear-end crashes with injuries by up to 85%[2].

When equipped with EyeSight, all 2019 Subaru models receive the highest possible rating for front crash prevention by IIHS highest rated claim from 2019 to 2020. The Pre-Collision Braking feature can even apply full braking force in emergency situations, helping you avoid or reduce frontal impacts.

4.　　As further described by Subaru, Pre-Collision Braking, a forward-oriented system, "helps you avoid or reduce frontal impacts by alerting you and applying full braking force in emergency situations," and "can even bring you to a full stop if necessary."⁴  Similarly, Reverse Automatic Braking, a rearward-oriented system, "senses objects behind your Subaru when backing up at a low speed and applies the brakes when necessary."⁵

5.　　While Pre-Collision Braking relies on forward-facing cameras to monitor the area in front of the vehicle, Reverse Automatic Braking relies on 4 ultra-sonic sensors, or radar, to detect objects behind the vehicle.  For both systems, if an obstacle is detected, the system is supposed to sound an alarm and flash a warning, and then activate the brakes if the driver does not do so.

---

⁴ *See id.*
⁵ *See* "Subaru Reverse Automatic Braking Explained (2020 Updated)" by Subaru (Jun. 25, 2020), available at https://www.youtube.com/watch?v=gYTshupRY38.

6.     The front cameras are also employed by other EyeSight features, including Lane Keep Assist.  The cameras are supposed to monitor the road for lane markings and sound alarms if the vehicle strays over the lines or sways between them.  If the driver does not respond quickly enough, Lane Keep Assist is supposed to correct the vehicle's steering to keep the vehicle in the lane.

7.     Subaru has widely disseminated within the United States advertising alleging the superior safety of its EyeSight-equipped vehicles. Subaru particularly emphasized the Pre-Collision Braking or forward AEB system described *infra*. Indeed, Subaru's car commercials have become ubiquitous on television, promising consumers piece of mind that is said to come from Subaru's superior commitment to safety and development of the EyeSight systems, which can allegedly prevent your family from needing medical care or keep your easily distracted and inexperienced teenaged driver safe.

8.     For these systems to work as intended and advertised, Subaru is responsible for ensuring that its suppliers manufacture the component systems correctly and that they are installed properly at the factory.  Subaru is also responsible for ensuring that the AEB System itself has adequate programming to handle real-world driving conditions and that the components systems communicate properly with one another.  For example, the front-facing cameras or the rear-facing sensors must communicate information to the braking system and the ABS Control

Module to apply the brakes, they must communicate with the Transmission Control Module ("TCM") to shift the car into the proper gear, and they must communicate with the Engine Control Module ("ECM") to limit power from the engine so that car is no longer propelled forward if the system.  Calibrating these systems to work together properly is Subaru's responsibility.

9.     Subaru failed to inform Plaintiffs and members of the AEB Class (defined below in Class Action Allegations) before or during the time of sale that the AEB systems in Class Vehicles have manufacturing and workmanship defects including but not limited to poor calibration of the software from multiple control modules, including the ABS Control Module, such that they are prone to activating the brakes when there are no objects in front of the vehicle and/or behind the vehicle when it is backing up.  The AEB systems also sometimes fail entirely to activate when there are persons or objects in motion in front of the vehicle. This occurs due to miscommunication between all the systems involved in automatic braking, including the sensors, the brakes, and the transmission (the "AEB System Defect"). The AEB System Defect prevents the AEB Class Vehicles from behaving as designed and advertised in real-world driving conditions.

10.     As a result of the AEB System Defect, AEB Class Vehicles will abruptly slow down or stop entirely without driver input when there are no obstacles

in front of or behind the vehicle. This presents a clear-cut safety hazard, increasing the chances of a collision.

11.     Conversely, the AEB System also fails to activate in the situations it was designed to detect and mitigate, such as when a pedestrian or vehicle stops abruptly in front of or behind the AEB Class Vehicle.  Thus, the AEB System Defect makes the AEB System unpredictable and makes driving the vehicle unsafe. At the same time, the defect renders the system useless when it is most needed.

12.     The Lane Keep Assist feature is also defective. Subaru also failed to disclose to Plaintiffs and the members of the LKA Class, before or at the time of sale, that the Lane Keep Assist feature in LKA Class Vehicles has design, manufacturing and/or workmanship defects including but not limited to poor calibration of the software from multiple control modules, including the Power Steering Control Module, such that they attempt to correct the vehicle's steering when the driver is trying to change lanes, is driving on a road with construction barriers, or if the road has multiple lines due to construction.  Further, the Lane Keep Assist system will malfunction and shut down entirely while the vehicle is motion and cannot be used again until the car is restarted (the "LKA Defect" and, together with the AEB System Defect, the "Defects").  The LKA Defect prevents the Class Vehicles from behaving as designed and advertised in real-world driving conditions.

13.     As a result of the LKA Defect, the Lane Keep Assist system in the LKA Class Vehicles jerks the steering wheel without cause. Moreover, the system prevents the vehicle from change lanes and even steers the vehicle into other vehicles. On other occasions, it simply fails to function completely. Thus, the LKA Defect makes the Lane Keep Assist feature makes driving the vehicle unsafe and the operation of vehicle unpredictable for members of the LKA Class.

14.     Based on pre-production testing, including design failure mode analysis, quality monitoring team data, quality control audits, early warranty claims, replacement part orders, and consumer complaints to Subaru's authorized network of dealers, as well complaints to NHTSA, Defendants were aware of the Defects in the Class Vehicles as early as 2012. Despite being aware of the Defects and numerous complaints, Subaru knowingly, actively, and affirmatively failed to disclose the Defects. Further, Defendants actively concealed the existence of the Defects, including in advertising and manuals, which describe the EyeSight, "Pre-Collision Braking", Reverse Automatic Braking Systems and Lane Keep Assist. Defendants did this to increase profits by selling additional Class Vehicles at inflated prices.

15.     Discovery will show that AEB and LKA Class Vehicles utilize the same or substantially identical core vehicle components, and the Defects are the same for all Class Vehicles.

16.    For the AEB and LKA Class Vehicles, Subaru offers a 3-year or 36,000 miles, whichever comes first, New Vehicle Limited Warranty for new car purchasers and a 7-year or 100,000 mile Powertrain Warranty for Certified Pre-Owned vehicles. Despite knowing of the Defects, Subaru has not disclosed the existence of the Defects and has not fixed the Defects, exposing Plaintiffs, members of the Classes, and members of the general public to unsafe driving conditions for the AEB and LKA Class Vehicles arising from the Defects, which often occur without warning.

17.    The alleged AEB System Defect was inherent in each AEB Class Vehicle and was present in each vehicle at the time of sale.  Similarly, the alleged LKA Defect was inherent in each LKA Class Vehicle and was present in each vehicle at the time of sale.

18.    Subaru knew about the Defects present in every Class Vehicle, along with the attendant safety problems, and failed to disclose and actively concealed this information from Plaintiffs and members of the Classes at the time of sale, lease, repair, and thereafter. In fact, instead of repairing the AEB Class Vehicles and LKA Class Vehicles, Subaru has insisted that the vehicles are working correctly.

19.    If Plaintiffs and members of the Classes had known about the Defects at the time of sale or lease, Plaintiffs and members of the Classes would not have purchased or leased the AEB Class Vehicles or the LKA Class Vehicles, or would have paid less for them.

20.    As a result of their reliance on Defendants' omissions, owners and/or lessees of the AEB Class Vehicles and LKA Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defects, Plaintiffs and members of the Classes were harmed and suffered actual damages in that their vehicles are defective, they overpaid for defective vehicles, and the vehicles' driver assist technology systems increase their chances of being involved in a collision by activating without cause and failing to activate when they should.

## THE PARTIES

### **<u>Plaintiffs Laura and James Sampson</u>**

21.    Plaintiffs Laura and James Sampson ("the Sampsons") are citizens of and domiciled in the state of Illinois.  In or around May 2017, the Sampsons purchased a new 2017 Subaru Outback Limited from Green Dodge Kia Subaru Nissan ("Green Subaru"), an authorized Subaru dealership located in Springfield, Illinois.

22.    The Sampsons purchased their vehicle primarily for personal, family, or household use.

23.    Passenger safety and reliability were primary factors in the Sampsons' decision to purchase their vehicle.  The Sampsons researched the Outback on the internet, by "Googling" the vehicle and visiting Subaru's website.  They also test

drove a 2017 Outback prior to purchase. Additionally, they spoke with the salesperson at Green Subaru, who based on their recollection told them that Subaru was "top of the line in safety." Subaru could have and should have disclosed the AEB System Defect through each of these media and venues, but did not.

24.    Had Subaru disclosed the AEB System Defect before the Sampsons purchased their vehicle, the Sampsons would have seen such disclosures and been aware of them.  Indeed, Subaru's misstatements and omissions were material to the Sampsons.  Like all members of the Class, the Sampsons would not have purchased their Class Vehicle, or would have paid less for the vehicle, had they known of the AEB System Defect.

25.    In addition, at the time the Sampsons purchased their vehicle, and in purchasing their vehicle, they relied upon representations from Subaru and its authorized dealership that they saw during their internet research and heard from the salesperson at the dealership that the vehicle was fully functional, safe, durable, reliable, and/or the AEB system operated correctly and effectively.  The Sampsons relied on those representations, and the omission of a disclosure of the AEB System Defect, in purchasing the vehicle, and absent these representations and omissions, would not have purchased the vehicle or would have paid less for it.

26.    Within the first year of ownership, the Sampsons began to experience the AEB System Defect, when the AEB system would engage the brakes suddenly

while trying to back out of a driveway despite the fact that there were no obstacles in the way. When this occurred, the vehicle applied the brakes so abruptly that the seatbelt tensioners engaged, and it felt as though the front wheels actually lifted off the ground.

27.    Laura Sampson complained to Green Subaru when she took her vehicle in for routine service, but the dealership brushed off her complaints and indicated that the AEB System was functioning properly.

28.    Even though the Sampsons have complained, no repairs have ever been attempted by SOA or any authorized repair facility such as Green Subaru.

29.    The Sampsons continue to intermittently experience sudden, unnecessary braking when trying to back out of their driveway and have taken video demonstrating the same.

30.    As a result of the AEB System Defect, the Sampsons have lost confidence in the ability of the vehicle to provide safe and reliable transportation.

31.    At all times, the Sampsons, like all Class Members, have attempted to drive their vehicle in a foreseeable manner and in the manner in which it was intended to be used, in the sense that they did not use it for drag racing, for example.

**Plaintiffs Anthony Ventura and Joanne Fulgieri Ventura**

32.    Plaintiffs Anthony Ventura and Joanne Fulgieri Ventura ("the Venturas") are citizens of and domiciled in the state of New York.  In or around

11

September 2020, the Venturas leased a new 2020 Subaru Forester from North Coast Subaru, an authorized Subaru dealership located in Glen Cove, New York.

33.    The Venturas leased their vehicle primarily for personal, family, or household use.

34.    Passenger safety and reliability were primary factors in the Venturas' decision to lease their vehicle.  The Venturas researched the Forester on the internet, by "Googling" the vehicle and specifically researching safety considerations.  The Venturas also reviewed the window sticker (the "Monroney" sticker) and test drove a 2020 Forester prior to lease.  Additionally, they spoke with the salesperson at North Coast Subaru, who based on their recollection told them "you're not going to get a safer car than this."   Subaru could have and should have disclosed the Defects through each of these media and venues but did not.

35.    Had Subaru disclosed the AEB Systems Defect or the LKA Defect before the Venturas leased their vehicle, they would have seen such disclosures and been aware of them.  Indeed, Subaru's misstatements and omissions were material to the Venturas.  Like all members of the AEB Class and the LKA Class, the Venturas would not have leased their Class Vehicle, or would have paid less for the vehicle, had they known of the Defects.

36.    In addition, at the time the Venturas leased their vehicle, and in leasing their vehicle, they relied upon representations from Subaru and its authorized

dealership that they saw during internet research and heard from the salesperson at the dealership that the vehicle was fully functional, safe, durable, reliable, and/or the driver assistance systems operated correctly and effectively.  The Venturas relied on those representations, and the omission of a disclosure of the Defects, in leasing the vehicle, and absent these representations and omissions, would not have leased the vehicle or would have paid less for it.

37.     In or around January 2021, the Venturas experienced the LKA Defect. On two occasions while driving, the LKA System informed the Venturas that the Lane Departure monitoring was no longer available and remained so until the car was restarted.

38.     On or around February 25, 2021, Joanne Fulgieri Ventura began to experience the AEB System Defect.  Specifically, while the vehicle was going about 40 or 45 miles per hour, the AEB system engaged, lights illuminated indicating an obstacle warning, and the warning alarm sounded. Before she could react, the AEB system forced the vehicle to suddenly slow from 40 or 45 miles per hour to 10 or 15 miles per hours. There were no obstacles on the road when the AEB system engaged.

39.     The Venturas brought their vehicle in to North Coast Subaru and complained about their experiences with the vehicle's driver assistance systems. The dealership represented to them that the system was working fine, that no problem was found, and it was working as designed.

40.   Even though the Venturas have complained, no repairs have ever been attempted by SOA or any authorized repair facility.

41.   As a result of the Defects, the Venturas have lost confidence in the ability of the vehicle to provide safe and reliable transportation.

42.   At all times, the Venturas, like all Class Members, have attempted to drive their vehicle in a foreseeable manner and in the manner in which it was intended to be used, in the sense that they did not use it for drag racing, for example.

**Plaintiff Elizabeth Wheatley**

43.   Plaintiff Elizabeth Wheatley is a citizen of and domiciled in the Commonwealth of Pennsylvania.  In or around November 2018, Plaintiff Wheatley purchased a new 2019 Subaru Crosstrek from Subaru of Moon Township, an authorized Subaru dealership located in Moon Township, Pennsylvania.

44.   Plaintiff Wheatley purchased her vehicle primarily for personal, family, or household use.

45.   Passenger safety and reliability were primary factors in Plaintiff Wheatley's decision to purchase her vehicle.  Plaintiff Wheatley researched the Crosstrek by "Googling" the vehicle and visiting Subaru's website, as well as that of the dealership.  She also reviewed the window sticker (the "Monroney" sticker) and test drove a 2019 Crosstrek prior to purchase.  Plaintiff Wheatley also researched the vehicle on Edmunds, Kelley Blue Book, and other media sources and found the

Crosstrek received great vehicles, especially high safety ratings.  Additionally, she spoke with the salesperson at Subaru of Moon Township, who specifically recommended the EyeSight feature.  Subaru could have and should have disclosed the Defects through each of these media and venues, but did not.

46.    Had Subaru disclosed the AEB System Defect before Plaintiff Wheatley purchased her vehicle, she would have seen such disclosures and been aware of them.  Indeed, Subaru's misstatements and omissions were material to Plaintiff Wheatley.  Like all members of the AEB Class, Plaintiff Wheatley would not have purchased her AEB Class Vehicle, or would have paid less for the vehicle, had she known of the AEB System Defect.

47.    In addition, at the time Plaintiff Wheatley purchased her vehicle, and in purchasing her vehicle, she relied upon representations from Subaru and its authorized dealership that she saw during her internet research and heard from the salesperson at the dealership that the vehicle was fully functional, safe, durable, reliable, and/or the AEB system operated correctly and effectively.  Plaintiff Wheatley relied on those representations, and the omission of a disclosure of the AEB System Defect, in purchasing the vehicle, and absent these representations and omissions, would not have purchased the vehicle or would have paid less for it.

48.    Within the first year of ownership, Plaintiff Wheatley began to frequently experience the AEB System Defect.  While driving around 50 miles per

hour, and when the closest vehicle was over 200 feet away, the AEB system suddenly engaged and forced the vehicle to brake without cause.

49.     Plaintiff Wheatley has continued to experience sudden, forceful breaking multiple times when there are no obstacles on the road.

50.     Plaintiff Wheatley complained to Subaru of Moon Township when she took her vehicle in for routine service, but the dealership dismissed her concerns and represented that the AEB system was functioning properly.

51.     Even though Plaintiff Wheatley has complained, no repairs have ever been attempted by SOA or any authorized repair facility.

52.     As a result of the AEB System Defect, Plaintiff Wheatley has lost confidence in the ability of the vehicle to provide safe and reliable transportation.

53.     At all times, Plaintiff Wheatley, like all AEB Class Members, has attempted to drive her vehicle in a foreseeable manner and in the manner in which it was intended to be used, in the sense that they did not use it for drag racing, for example.

**Plaintiff Shirley Reinhard**

54.     Plaintiff Shirley Reinhard is a citizen of and domiciled in the state of Wisconsin.  In or around October 2017, Shirley and her husband Kenneth Reinhard (the "Reinhards") purchased a certified pre-owned 2015 Subaru Outback from Wilde

Chrysler Jeep Dodge RAM & Subaru ("Wilde Subaru"), an authorized Subaru dealership located in Waukesha, Wisconsin.

55.     The Reinhards purchased their vehicle primarily for personal, family, or household use.

56.     Passenger safety and reliability were primary factors in the Reinhards' decision to purchase their vehicle.  The Reinhards researched the Outback on the internet, by "Googling" the vehicle and visiting Subaru's website, as well as that of the dealership.   Additionally, they spoke with the salesperson at Wilde Subaru, who based on their recollection told them that the Outback was a great car. Subaru could have and should have disclosed the Defects through each of these media and venues but did not.

57.     Had Subaru disclosed the Defects before the Reinhards purchased their vehicle, the Reinhards would have seen such disclosures and been aware of them. Indeed, Subaru's misstatements and omissions were material to the Reinhards.  Like all members of the Classes, the Reinhards would not have purchased their vehicle, or would have paid less for the vehicle, had they known of the Defects.

58.     In addition, at the time the Reinhards purchased their vehicle, and in purchasing their vehicle, they relied upon representations from Subaru and its authorized dealership that they saw during their internet research and heard from the salesperson at the dealership that the vehicle was fully functional, safe, durable,

reliable, and/or the driver assistance systems operated correctly and effectively.  The Reinhards relied on those representations, and the omission of a disclosure of the Defects, in purchasing the vehicle, and absent these representations and omissions, would not have purchased the vehicle or would have paid less for it.

59.    Within the first month of ownership, the Reinhards began to experience the AEB System Defect, when the Pre-Collision Braking, the forward AEB system, would engage the brakes suddenly even though there were no obstacles in the way. The sudden engagement of the brakes without any obstacles or other issues would occur two or three times a month.

60.    The Reinhards mentioned it to an employee in the service department at Wilde Subaru when they brought the vehicle in to for an oil change but were only told that they may not see what the car sees, and this would only happen once in a while.

61.    Even though the Reinhards have complained, no repairs have ever been attempted by SOA or any authorized repair facility

62.    In or around September 2020, Shirley Reinhard was driving her vehicle through an intersection during which she had the green light to travel.  Another vehicle approached and ran a red light, entering the intersection and hitting her vehicle.   The EyeSight system did not engage until her vehicle had already flipped onto the roof.  In total, her vehicle rolled four times.

63.    In part, as a result of the AEB System Defect, the Reinhards lost complete use of their vehicle and have lost confidence in the ability of a Subaru branded vehicle to provide safe and reliable transportation.

64.    Subsequently, Kenneth Reinhard passed away on March 23, 2021 and Shirley Reinhard is the designated legal representative of his estate.

65.    At all times, the Reinhards, like all members of the Classes, attempted to drive their vehicle in a foreseeable manner and in the manner in which it was intended to be used, in the sense that they did not use it for drag racing, for example.

66.    Plaintiffs and every other member of the Classes suffered ascertainable losses, including but are limited to out-of-pocket losses by overpaying for the vehicles at the time of purchase and repair costs, decreased performance of the vehicles, loss of use of the vehicles, and diminished value of the vehicles. Accordingly, Plaintiffs bring claims individually and as representative of the Classes.

## Defendants

67.    Defendant Subaru Corporation f/k/a Fuji Heavy Industries Ltd.("Subaru Corp.") is a Japanese corporation located at The Subaru Building, 1-7-2 Nishishinjuku, Shinjuku-ku, Tokyo, 160-8316, Japan. Defendant Subaru Corp. is the parent company of SOA and is responsible for the design, manufacturing,

distribution, marketing, sales and service of Subaru vehicles, including the Vehicles, around the world, including in the United States.

68.     Defendant SOA is incorporated in New Jersey and has its principal place of business and headquarters in Camden, New Jersey. It is there that SOA has a 250,000 square foot headquarters campus, wherein approximately 600 employees, including its officers, and the sales, marketing, and distribution departments, among others, are based and carry out the business of SOA. There also is an approximately 100,000 square foot national service training center for SOA adjacent to its headquarters campus, which houses service training, service engineering and product engineering functions. SOA markets and distributes automobiles throughout the United States and is a division of the Japanese conglomerate Subaru Corp.

69.     SOA is the U.S. sales and marketing subsidiary of Subaru Corp. and is a wholly owned subsidiary responsible for distribution, marketing, sales and service of Subaru vehicles in the United States. SOA has a nationwide dealership network and operates offices and facilities throughout the United States.

70.     In order to sell vehicles to the general public, SOA enters into agreements with dealerships who are then authorized to sell Subaru-branded vehicles to consumers such as Plaintiffs.  In return for the exclusive right to sell new Subaru vehicles in a geographic area, authorized dealerships are also permitted to service and repair these vehicles under the warranties SOA provides directly to consumers.

These contracts give SOA a significant amount of control over the actions of the dealerships, including sale and marketing of vehicles and parts for those vehicles. All service and repairs at an authorized dealership are also completed according to SOA's explicit instructions, issued through service manuals, technical service bulletins ("TSBs"), and other documents. Per the agreements between SOA and the authorized dealers, consumers such as Plaintiffs can receive services under SOA's issued warranties at dealer locations that are convenient to them.

71.     SOA encourages its agents, the dealerships, to engage "Subaru Ambassadors," who then create and post pro-Subaru content on social media websites such as Facebook and Twitter. Subaru Ambassadors also reach out to consumers on the internet comment boards, answer questions on behalf of SOA, monitor other websites for content that is negative for Subaru, and can provide coupons good for hundreds of dollars off Subaru vehicles. Subaru Ambassadors also have direct access to SOA's customer support service teams.

72.     SOA and Subaru Corp. also develop and disseminate the owners' manuals, warranty booklets, maintenance schedules, advertising such as vehicle brochures, and other promotional materials relating to the Class Vehicles through the dealership network. SOA is also responsible for the production and content of the information on the Monroney Stickers.

73.     SOA is the designated liaison between Subaru Corp. and NHTSA for the purposes of reporting safety defects, including recalls, and for responding to NHTSA's requests, on behalf of the manufacturer, Subaru Corp.

74.     Subaru Corp. and SOA (collectively "Subaru") have common management. Indeed, SOA's sales, marketing and distribution efforts in the United States are headed by corporate officers of Subaru Corp. For example, Takeshi Tacihmori, the chairman and CEO of SOA is also a Director and Corporate Executive Vice President for Subaru Corp. in charge of the Subaru Global Marketing Division, Subaru Japan Sales and Marketing Division and Subaru Overseas Sales and Marketing Divisions 1 and 2. The incoming Chairman of SOA is also a Corporate Senior Vice President of Subaru Corp. who is Chief General Manager of Subaru Overseas and the Vice President in charge of Sales and Marketing, Division 1.

75.     Defendant Subaru Corp. communicates with Defendant SOA concerning virtually all aspects of the Subaru products it distributes within the United States.

76.     Defendants manufactured, marketed, sold and warranted the Class Vehicles, including Plaintiffs' vehicle.

**JURISDICTION**

77.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2).  Personal jurisdiction over Defendants is proper because Defendant SOA is incorporated here, and all Defendants have purposefully availed themselves of the privilege of conducting business activities in New Jersey, and throughout the United States, including, but not limited to, designing, marketing, warranting, distributing, and/or selling AEB Class Vehicles and LKA Class Vehicles and their components to Plaintiffs and prospective class  members.

78.     Members of the proposed Classes, which includes citizens of all 50 states, or in the alternative, are citizens of states other than New Jersey, where SOA is incorporated, and Japan, where Subaru Corp. is headquartered and located.

79.     On information and belief, aggregate claims of individual Class Members exceed $5,000,000 in value, exclusive of interest and costs.

## VENUE

80.     Subaru, through their business of distributing, warranting, selling, and leasing the Class Vehicles, has established sufficient contacts in this district such that personal jurisdiction is appropriate.   As such, Defendants are deemed to reside in this district pursuant to 28 U.S.C. § 1391(c)-(d).

81.     In addition, a substantial part of the events or omissions giving rise to these claims took place in this District because SOA incorporated in this District. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

82.   For years, Subaru has designed, manufactured, distributed, sold, leased and warranted the Class Vehicles.  Subaru has marketed and sold millions of Class Vehicles throughout the United States, including through its nationwide network of authorized dealers and service providers.

83.   Subaru has thousands of authorized dealerships across the United States, all of which are under are under Subaru's control. Subaru authorizes these dealerships to sell Subaru vehicles, parts, and accessories and to service and repair Subaru vehicles using Subaru parts, and to perform warranty repairs on Subaru's behalf.  Subaru's automotive sales through those dealerships for the United States for the fiscal year ending March 31, 2020 totaled 702,000 vehicles, or around 69% of its global automobile revenue of approximately $29,301,834.

84.   One of the most heavily advertised pieces of technology in Subaru vehicles is the EyeSight suite of safety features, as well as other driver assistance technologies such as Reverse Automatic Braking.  These prominently feature an autonomous braking system that is supposed to warn the driver of an obstacle in the road and also engage the brakes independently if the driver fails to react.  This system is a part of other collision avoidance systems installed in Class Vehicles, including Lane Keep Assist, which have the goal of preventing or reducing the severity of an impact.

85.     EyeSight was first introduced in Subaru vehicles in 2012, in the limited trims of the 2013 model Legacy and Outback models.  As with EyeSight in the current generation, it utilized cameras mounted behind the windshield near the roof of the vehicle to monitor the road in front of the vehicle.  Reverse Automatic Braking was not introduced until the 2017 model year.  Like EyeSight, it relies on a camera, the back-up camera, as well as rear-mounted sonic sensors.

86.     These cameras and sensors are shared with the various components of the Driver Assist Technologies, including Pre-Collision Braking, Lane Keep Assist, and Adaptive Cruise Control.

87.     As with other systems in a vehicle, the AEB system is run by a control module.  This module is equipped with a proprietary algorithm that takes the data acquired from camera and sensors, as well as other modules in the vehicle such as the transmission control module to determine the speed, acceleration, and distance for both the vehicle itself and the object ahead.

88.     In any given vehicle model, integration and calibration of the AEB system typically occurs near the end of the research and development process, so that the control module can be given final values for vehicle weight and configuration.  This is overseen by the vehicle manufacturer, often with assistance from suppliers' engineers.  Modules as provided by the suppliers must be "tuned"

both to achieve the desired goal of the vehicle manufacturer as well as to work with all the other modules in the vehicle.

89.    Discovery will show that the Defects are caused by defects in the design, materials, manufacturer, and/or workmanship in the manufacture and installation of system components, in the code underlying the algorithms which control the AEB System and Lane Keep Assist system response, and/or in the calibration and integration of the software controlling the driver assistance systems with the software that run related system in the vehicle including the steering, transmission, and braking system.

90.    Further, in order for the sensors and cameras used by the systems to function properly, impurities must be controlled during manufacture. They also must be installed and centered precisely.  Variations in materials or positioning cause these systems to malfunction.  Discovery will show that the Defects are caused in part by such manufacturing issues.

91.    Moreover, the software which controls the EyeSight or Reverse Automatic Braking response – the underlying coding and algorithm which discriminates between landscape and obstacles and then decides on the correct response – suffers from programming defects during manufacturing which differ from the intended design of the software.

92.     Subaru's represented that the AEB systems and the Lane Keep Assist function in the AEB and LKA Class Vehicles would prevent collisions and accidents, as opposed to merely reducing the severity of the impact.  However, Subaru overreached, improperly tuning the driver assistance systems to *fully* apply the brakes when the system detects anything it believes is stationary in front of the vehicle, even if the object is on the side of the road and regardless of its size. The result is that the systems activate unnecessarily early and with unnecessary force. Furthermore, the camera system shared by the AEB and Lane Keep Assist systems does not always accurately identify what items are stationary.

93.     These same systems fail to detect moving objects that cross in front of the car, in contrast to Subaru's commercials, which show its vehicles stopping autonomously when another car cuts suddenly in front of the vehicle.

94.     Moreover, Subaru's testing and validation procedures were inadequate to reproduce real-world conditions including driver reaction time, the existence of large objects on the side the road like garbage cans, metal guard rails, tunnels, the presence of extreme curves in certain roads including on and off-ramps to highways and freeways, the many parked cars in a parking lot, and the inclination of at the end of driveways and at entrances to parking lots.

95.     Despite this inadequate calibration and tuning process which fails to account for real world driving conditions, Subaru has touted its Driver Assistance

Technologies as providing superior safety for drivers and passengers, to "help protect you if the unpredictable happens."[6]

96.    In fact, Subaru's commercials often showcase exactly how fast this system can supposedly react to protect the driver.  For example, one early Subaru commercial for the EyeSight system shown in the major American television markets showcased Subaru's history of safety innovation "allowing Subaru to lead the world in peace of mind."[7]  In this commercial, entitled "A Life of Safety," Subaru heralds "a car that can see trouble and stop itself to avoid it" by launching a 2014 Subaru Legacy at a wall at speed.  The vehicle reacts by detecting the wall as an obstacle, sounding an alarm, and activating the brakes, saving the vehicle from even touching the wall.  The voiceover announces "nobody beats Subaru models with EyeSight" for front crash prevention.[8]  However, this advertising is deceptive, in that despite appearances, the vehicle in the commercial was never traveling more than 20 miles per hour.  In fact, EyeSight cannot prevent a collision when there is a more than 20 miles per hour difference between the vehicle and the object ahead.

97.    In another Subaru commercial shown in the major United States television markets, a man wakes up in the hospital after a collision.  He and his wife

---

[6] *See* "Pre Collision Braking" vehicle available on
https://www.subaru.com/engineering/safety.html.
[7] *See https://www.youtube.com/watch?app=desktop&v=spat4V_4oBk*
[8] *Id.*

get out of their hospital beds and are driven back to the scene of their car accident by an ambulance, where they get back into their Subaru Impreza. Once again, it speeds towards a suddenly stopped truck, but this time, the Impreza detects the obstacle and applies the brakes, preventing another collision. The character's voiceover asks, "What if this didn't have to happen? What if you could go back? What if our car could stop itself?"[9]

98.     In another commercial Subaru commercial shown in the major United States television markets, a man is distracted by his children in the back of his Subaru Ascent when the car in front them abruptly brakes to avoid a tractor trailer. As images from his life with his family and children flash before his eyes, the voice over announces, "Life doesn't give you many second chances…but a Subaru can." The Ascent flashes the Obstacle Detected warning and applies the brakes, preventing a collision.[10]

99.     These advertisements are just three of the many similar statements in press releases, brochures, websites, and commercials Subaru has caused to be disseminated within the United States regarding the safety, reliability, and functionality of the AEB systems installed in Class Vehicles.

---

[9] *See* https://www.youtube.com/watch?app=desktop&v=iYQsxXLdEeI
[10] *See* https://www.ispot.tv/ad/tFci/2021-subaru-ascent-important-moments-t2

100.    Similarly, Subaru has also advertised the functionality of the Lane Keep Assist feature, which is dependent on the same cameras that are used in Pre-Collision Braking and Adaptive Cruise control features. This feature "can help steer you back in" your lane if you fail to react to a lane departure warning.[11]

101.    Subaru also heavily advertised the functionality of other Driver Assistance Technologies, including Adaptive Cruise Control, which shares use of the cameras.  According this commercial, produced by Subaru Corp. and distributed on Facebook, among other places, the Adaptive Cruise Control allows the driver of a Subaru Forester to take his foot off the accelerator and brake while maintaining a speed of 60 kilometers per hour.  Further, the vehicle slows down to under 20 kilometers per hour without the driver's intervention when a person in a zebra costume on skates suddenly runs in front of the vehicle, because the system recognizes both the object in front of the vehicle and its relative speed and position.[12]

---

[11] *See*  https://www.youtube.com/watch?v=iSKuxOImduI

[12] *See* https://www.facebook.com/ShootingGalleryAsia/videos/tvc-subarus-eyesight-adaptive-cruise-control/2414147312163489/



102.   In contrast to the glowing recommendations provided by Subaru in its advertisements, such as these videos, commercials, and brochures, the AEB and Lane Keep Assist systems in Class Vehicles activate without cause, startling drivers with alarms and lights, and then applying the brakes or steering the vehicle in a way the driver does not intent.  These actions can cause collisions when the class vehicles suddenly stop in the road or swerve into barriers or other vehicles.  Conversely, the AEB systems can fail to activate when they are most needed – when obstacles or pedestrians suddenly appear in front of a vehicle and the driver requires assistance to avoid or mitigate a collision.  Both the AEB systems and the Lane Keep Assist features are also prone to malfunctions – they turn off unexpectedly and may fail to turn on again until the car is restarted.

103.   The Defects in AEB and LKA Class Vehicles are caused by the poor calibration of the systems, including their cameras and sensors, and faulty programming of the system control modules (particularly their ability to decide when to command other control modules including, for example, the antilock brake system control module and the TCM to apply the brakes and stop the vehicle in the middle of traffic).  Discovery will show that each supplier of the different vehicle components – the transmission, the brake system, etc. – has different software and provides a different electronic control module and/or software for their vehicle components.  Integration of software and controls modules for system components is responsibility of the car's manufacturer, in this case Subaru.  If those systems are not properly integrated, the driver assistance technology control modules may interfere with the normal operation of the vehicle.  For Subaru vehicles, some of the control modules involved include the TCM, the ECM, and the Vehicle Dynamic Control ("VDC")[13] Control Module.  Issues with these modules often has negative effects on the functionality of the driver assistance systems.

104.   Indeed, Subaru is aware that its systems are prone to malfunction and are not ready to be driven in real-world situations. Despite the prominence of its marketing campaigns, Subaru acknowledges in booklets provided to consumers after

---

[13] Vehicle Dynamic Control is the system which monitors driver input and road conditions and to adjust the system to help the prevent slipping of the brakes or the drive wheel, or control brake pressure to correct over or understeer.

they purchase their vehicles that the cameras and sensors may not function in inclement weather such as rain or snow, may not recognize patterns such as fences, and may not function in construction zones or other commonplace situations. Something Subaru does not disclose before a customer purchases a vehicle.

105.    Moreover, these listed "system limitations" are not a fulsome recitation of all the real-world conditions that Subaru's Driver Assistance Technologies are ill-designed and calibrated to recognize such as on and off ramps on highways, conditions when there is too much or too little sunlight, and driveways.  Further, these disclaimers also fail to acknowledge that the Driver Assistance Technologies often simply malfunction due to competing instructions and/or become disabled or unavailable.  As a result, Plaintiffs and members of the Classes have paid for a system that is defective and oftentimes simply inoperative.

106.    Subaru denies that any issues exist when Plaintiffs and members of the Classes complain about them, and Subaru instructs its dealerships to tell consumers that their vehicles are functioning normally or can fail to function properly in normal, everyday conditions like rain.  In part, this is because Subaru's network of dealers simply does not have the training or equipment to adjust the software in any vehicle, but instead must rely on Subaru and/or its supplies to provide software patches. Often, the only procedure that Subaru has given them to address consumer complaints about the AEB system is a "reset" or reboot of the relevant system control

modules, or a sensor or camera replacement.  However, since the programming of the system control module is insufficient to account for real-world driving conditions, this does not repair the Defects.

107.   Nor is the testing mandated by NHTSA sufficient to identify vehicles who have such systems that do not function well.  The only autonomous emergency brake system testing performed by NHTSA simply requires that the system reduce the vehicle's speed by 9.8 mph when approaching a stationary vehicle at 25 mph in order to pass.[14]  In fact, because many automakers have voluntarily agreed to put these vehicles into their vehicles by 2021 for light duty vehicles, and by 2025 for heavier vehicles, NHTSA has declined to institute further regulations on the AEB systems – which leaves automakers to fill in the gaps to ensure that these systems work properly and do not solve one problem by causing another.

108.   So far, automakers like Subaru have not produced vehicles with AEB systems that perform consistently or predictably.  While noting that manufacturers may include some warnings in owners' manuals, tests by *Car and Driver* revealed a shocking variation in results even in the same car. "***Driving the same car toward the same target at the same speed multiple times often produces different results***.

---

[14] *See* Tingwall, Eric, "*We Crash Four Cars Repeatedly to Test the Latest Automatic Braking Safety Systems*," Car and Driver (Nov. 5, 2018), available at https://www.caranddriver.com/features/a24511826/safety-features-automatic-braking-system-tested-explained/

Sometimes the car executes a perfectly timed last-ditch panic stop. Other times it brakes late, or less forcefully, or even periodically fails to do anything at all."[15]

109.   Included in this testing was a Subaru Impreza which, like the other models tested, failed to perform predictably.  "In our stationary-vehicle test, the Impreza's first run at 50 mph resulted in the hardest hit of the day, punting the inflatable target at 30 mph. It was only on the second attempt that the Subaru's EyeSight system impressively trimmed the speed to just 12 mph before the collision."[16]

### The Defects Pose an Unreasonable Safety Hazard

110.   These Defects cause unsafe conditions in the Class Vehicles, including, but not limited to, causing the vehicles to stop without cause in the middle of the road or unexpectedly in parking lots, veer into dividers, prevent drivers from changing lanes, distracting drivers with unnecessary warnings when no obstacles exist or if they are still in their lanes, incorrectly engaging the Lane Keep Assist feature, and/or failing to engage the braking system at all when the obstacles do appear in front of the vehicles.  This safety risk increases the risk of collisions and/or fails to reduce the incidence and severity of collisions as these systems were designed to do.

---

[15] *Id*. (emphasis added).
[16] *Id.*

111.   Complaints that numerous Class Vehicles' owners and lessees filed with NHTSA demonstrate that the Defects are widespread and dangerous and that it manifests without warning.  The complaints also indicate Defendants' awareness of the problems with the AEB systems and how potentially dangerous the defects are for consumers. Attached hereto as **Exhibit A** is just a sampling of dozens of safety-related complaints that describe the Defects in AEB Class Vehicles and LKA Class Vehicles (spelling and grammar mistakes remain as found in the original) (Safercar.gov, *Search for Complaints* (November 20, 2020), http://www-odi.nhtsa.dot.gov/complaints/).

112.   In fact, complaints were so prevalent about the AEB system malfunctions in Subaru models, among other vehicles, that NHTSA has opened an investigation into AEB systems in general.[17]

113.   Also, complaints posted by consumers in internet forums demonstrate that the Defects are widespread and dangerous and that they manifest without warning. The complaints also indicate Defendants' awareness of the problems with these systems and how potentially dangerous the Defects are for consumers. These complaints are listed on **Exhibit B** attached hereto.

---

[17] *See* Foldy, Ben, "*As Automatic Braking Becomes More Common in Cars, So Do Driver Complaints,*" The Wall Street Journal (Aug. 27, 2019), available at https://www.wsj.com/articles/as-automatic-brakes-become-common-so-do-driver-complaints-11566898205

114. The Defects pose an unreasonable safety risk for members of the Classes and other drivers and are safety hazards to the general public and increase the risk of automobile accidents.

**Subaru Had Superior and Exclusive Knowledge of the Defects**

115. Subaru had superior and exclusive knowledge of the Defects and knew or should have known that the Defects were not known or reasonably discoverable by Plaintiff and members of the Classes before they purchased or leased the AEB Class Vehicles and the LKA Class Vehicles.

116. Discovery will show that before Plaintiffs purchased or leased their vehicles, and as evidenced clearly by Subaru's post-sale booklets, that since at least 2012, Subaru knew about the Defects through sources not available to consumers, including the following: pre-release testing data; information from its Quality Monitoring Teams; early consumer complaints about the Defects to Defendants' dealers who are their agents for vehicle repairs; warranty claims data related to the Defects; aggregate data from dealers; consumer complaints to NHTSA and resulting notice from NHTSA; early consumer complaints on websites and internet forums; data from the Starlink system in consumers' vehicles; dealership repair orders; testing conducted in response to owner or lessee complaints; reports from its Ambassadors; quality control audits; and other internal sources of aggregate information about the problems.

117.   Subaru's internal consumer relations department and/or online reputation management services, including Subaru's Ambassadors, acting on Subaru's behalf routinely monitor the internet for complaints about its products, including complaints posted on consumer forums and other social media websites. These posts describe the defects at issue here.  *See generally* **Exhibit B**.  The fact that so many customers made similar complaints put Subaru on notice, no later than 2016, that the complaints were not the result of user error or anomalous incidents, but instead a systemic problem with the AEB and LKA Class Vehicles.

118.   Likewise, since 2012, if not earlier, Defendants have also constantly tracked the National Highway Traffic Safety Administration database to track reports of false activations with AEB systems and malfunctions of the Lane Keep Assist in Subaru cars.  *See generally* **Exhibit A**. From this source, Defendants would have known that the AEB Class Vehicles and the LKA Class Vehicles were experiencing unusually high levels of false activations.   Defendants have and continue to be under a legal obligation pursuant to federal law to monitor defects that can cause a safety issue and report them within five (5) days of learning of them. *See* Reporting of Information and Documents About Potential Defects Retention of Records That Could Indicate Defects for NHTSA, 67 Fed. Reg. 45822 (July 10, 2002) (*amending* 49 U.S.C. § 30166(e) (1994)). Therefore, Defendants monitor the

NHTSA–ODI website and the complaints filed therein in order to comply with their reporting obligations under federal law, and thus, had knowledge of the Defect.

119.   Subaru issues TSBs and Technical Tip newsletter bulletins, among other communications, to its dealers in order to provide instructions on how to repair Subaru vehicles or respond to particular consumer complaints.   These communications standardize service throughout Subaru's agent dealership network, explicitly are not meant for consumer review, and often have a prohibition on them against printing them out.  Indeed, it was only in 2012 when it became a requirement for manufacturers to provide NHTSA with a copy of these manufacturer communications.  Further, these communications often do not reveal the cause of a problem, only describe a complaint and a remedy, frequently in terms that a lay person would not understand.  Moreover, some of these communications were issued "in the interest of customer satisfaction," which is language that Subaru sometimes uses to indicate to its dealerships that the bulletin was drafted in response to consumer complaints.

120.   On September 21, 2012, Subaru issued a TSB entitled "EyeSight Acceptable Windshield Repair Areas."  This TSB was applicable to the very first vehicles with EyeSight, the 2013 Legacy and Outback vehicles.  It was later revised on August 5, 2013 to be applicable to later model years as well.  The TSB instructed dealerships on the areas of windshield where no repairs could be attempted and as

such, a full window replacement would be necessary because repairs in these areas would interfere with the EyeSight stereo camera and compromise operation of the system.   Later in the TSB, Subaru cautioned against using "glossy backed" labels, stickers or decals, which could create glare that would interfere with EyeSight system operation.

121.   On September 21, 2012, Subaru also issued a TSB entitled "ETC (Electronic Toll Collection) Device Mounting Guidelines."   This TSB was applicable to the very first vehicles with EyeSight, the 2013 Legacy and Outback vehicles.  It was later revised on August 5, 2013 to be applicable to later model years as well.  This TSB advised dealerships about the proper position of ETC devices, like EZ Pass, to ensure they did not interfere with the EyeSight's functioning.  The TSB also cautioned that GPS receivers or radar detectors could not be placed in the central zone of the dash because their physical reflection and/or the light emitted from them could reflect on the windshield and interfere the EyeSight stereo camera.

122.   On June 30, 2015, Subaru issued a Product Campaign Bulletin announcing a recall of certain 2015 model year Legacy, Outbacks, Impreza, and Crosstrek vehicles, and certain 2016 model year WRX vehicles due to problems with the EyeSight system.  As described by the bulletin, "[t]he programming of the Driver Assist System will not detect a fault in the associated system components.  In the event of a Brake Lamp Switch (BLS) failure, the Vehicle Dynamic Control (VDC)

correctly detects the BLS failure, but the Driver Assist System will be delayed in detecting the BLS failure.  Therefore, it will take longer for the multi information displays to inform the driver of a malfunction. In addition, the VDC will not receive the brake request from the Driver Assist System, resulting in no automatic braking, including Adaptive Cruise Control and PreCollision Braking."  The repair was to reprogram the Driver Assist System.

123.   On December 7, 2015, Subaru issued a TSB entitled "EyeSight System Cancel Code 60-ACH."  The TSB was applicable to 2016 Forester vehicles with EyeSight.   When addressing customer complaints about the system, the TSB instructed dealerships that Cancel Code 60-A0H had no effect on the EyeSight system, which is detected each time the ignition key is switched off.  However, later in the same TSB, Subaru informed dealerships that "[i]n a case where the only Cancel Code displayed is 60-A0H, and no Camera Temporary Stop Count are displayed, there is a remote chance Cancel Code 65-C0H may be the cause as it will set in the rare instance when EyeSight pre-collision secondary braking function is active 3 times during a single key cycle.  These codes could also be generated by Temporary Stop Counts, or issues with EyeSight camera, including "backlight, dirty window glass, fogged window glass, frost on the window glass, oil film on the window glass, raindrop adhering to the window glass, fingerprint adhering to the lens, deteriorated wiper, front of the camera is blocked by hand, object on the

dashboard reflected against the windshield glass, bad weather (heavy rain, snowstorm, dense fog), unpatterned wall, fence, wall with vertical strip, water drop raised by preceding vehicle, steep slope, banner, grass, preceding vehicle with large uneven surface (trailer, etc.), preceding vehicle driving in the night without illuminating the tail light"…   Some of the issues noted here are not given to consumers, particularly "deteriorated wiper," "grass," or "preceding vehicle with…trailer."

124.   On October 19, 2018, Subaru issued a TSB entitled "DTC C0075-Additional Diagnostic Procedures."  This TSB was applicable to 2013-2014 Legacy and Outback vehicles with EyeSight, 2015-2016 Impreza vehicles with EyeSight, and 2015-2017 Crosstrek vehicles with EyeSight.  The TSB directed dealerships to perform additional diagnostics when diagnosing a DTC C0075: WHEEL CYLINDER PRESSURE SENSOR OUTPUT on the EyeSight equipped models listed above…The additional diagnostics are intended to reduce unnecessary replacement of the Hydraulic Unit (H/U) Assembly."   Other potential causes of a difference between the right and left wheel cylinder pressure sensor signal values had to be ruled out, and the procedures involved included performing ABS Sequence Control and VDC Sequence Control procedures.

125.   On July 29, 2019, Subaru issued a TSB entitled "Rattle Sound from EyeSight Camera Cover Design Change."  This TSB was applicable to 2019 Forester

vehicles and announced two design changes to the EyeSight camera cover to prevent a rattling sound heard while driving.

126.   On August 15, 2019, Subaru issued a TSB entitled "DTC B280B-EyeSight Camera Reprogramming File Availability."  This TSB was applicable to 2015 Impreza, Crosstrek, Legacy, and Outback.  It announced to dealers the "availability of reprogramming files to optimize the EyeSight camera unit.  In some cases, when use the Adaptive Cruise Control feature, the EyeSight system may stop functioning, enter a fail-safe mode and store DTC B280B- VDC ABNORMAL.  When the EyeSight system is inoperative, the vehicle operates like a traditional vehicle not equipped with this feature. Normal EyeSight function is restored after cycling the ignition off and back on again."  The dealers were directed to reprogram the EyeSight Camera.  This TSB was subsequently revised and reissued on February 21, 2020 for the same condition, again directing the dealerships to reprogram the EyeSight Camera in 2015 Impreza, Crosstrek, Legacy and Outback vehicles.

127.   On December 13, 2019, Subaru issued a TSB entitled "ECM Reprogramming for DTC C1424," originally issued on December 10, 2019.  The TSB was applicable to 2019-2010 Ascent and 2020 Legacy and Outback vehicles.  The TSB informed dealerships "[i]n the interest of customer satisfaction" that a service campaign is being initiated to reprogram the Engine Control Module (ECM).  "In some vehicles, the current software may cause the sub learning value control to

operate improperly during the wake-up move of the ECM.  This could cause repeated erroneous learning of the accelerate position which can result in the disabling of the VDC function.  When the VDC function is disabled, EyeSight, Reverse Automatic Braking (RAB), and Electronic Brake (EPB) auto release functions are disabled by the VDC fail signal causing the VDC, EyeSight, RAB and EPB warning lamps to illuminate."  Dealers were directed to reprogram the ECM of approximately 115,729 vehicles.

128.   On January 10, 2020, Subaru issued a TSB entitled "EyeSight / Lane Departure Deactivate DTCs."  The TSB was applicable to 2020 Legacy, Outback, Impreza, and Ascent vehicles, and 2019 Forester and Crosstrek vehicles.  The TSB described the process for EyeSight system diagnosis when "specific DTCs relating the Lane Departure Prevention function are not found in the applicable Service Manual."  The TSB instructed dealerships that certain "Specific Lane Departure Prevention Deactivate Codes (a.k.a. "Stop Codes")" do not indicate the malfunctions in the EyeSight system and do not require further diagnosis.  These stop codes include "2D Lateral Acceleration is Large" and "2E Lane Recognition Prohibition (Environmental Factor)."  These stop codes were programmed into the EyeSight system to cancel the Lane Departure Prevention function during normal operations, and suggest that they were programmed into the system to prevent the Lane Keep Assist feature for activating improperly in response to real-world conditions.

129.   On February 21, 2020, Subaru issued a TSB entitled "Reprogramming File Availability for EyeSight DTC B280B: VDC Abnormal."   The TSB was applicable to 2013-2015 Legacy and Outback vehicles, and 2015 Impreza and Crosstrek vehicles.   It announced to dealers the "availability of reprogramming files to optimize the EyeSight camera assembly.   These new files will address concerns the Adaptive Cruise Control system going into fail-safe mode and setting a DTC B280B: VDC Abnormal.   When this condition occurs, normal operation is restored when cycling the ignition switch off / on."   The dealers were directed to reprogram the EyeSight Stereo Camera.

130.   On October 29, 2020, Subaru issued a TSB entitled "Vehicle Dynamic Control Module Optimization."   This TSB was applicable to 2020 Legacy and Outback vehicles.   The TSB directed dealerships to reprogram the VDC Control Module, to address concerns of the Auto Vehicle Hold (AVH) not operating properly and enhance the braking feel related to the Adaptive Cruise Control.

131.   Further, even prior to bringing the AEB and LKA Class Vehicles to market, Subaru was cognizant of the difficulty in integrating the software of all systems required for these systems to function as advertised and integrating the different modules involved, including the VDC control module, the driver assist control module, and the adaptive cruise control module.   As a result, despite producing commercials and brochures that overstate the effectiveness and

functionality of these systems, warnings in the owners' manuals for the AEB and LKA Class Vehicles are vague and incompletely describe the limitations of the systems.

132.   To the extent warnings are issued are issued in owners' manuals made available to consumers after the vehicle purchase or lease, they do not inform Plaintiffs and members of the Classes that the AEB systems and the Lane Keep Assist system in the AEB and LKA Class Vehicles will frequently engage without cause and leave the driver and passengers more suspectable to a collision from traffic.  These vague warnings, buried in Owners' Manuals hundreds of pages long, or in a thick booklet are not specific enough or prominent enough to overcome the perception of functionality at Subaru has promogulated in its brochures and commercials.  In addition, the purchasers do not receive the Owner's Manual until after they have already completed the sales transaction.

133.   Moreover, these warnings do not inform Plaintiffs and members of the Classes that their vehicles may react differently each time it encounters the same situation, so that they are unable to even learn when their vehicle may malfunction. These warnings do not inform Plaintiffs and members of the Classes that their AEB systems may stop the car unnecessarily when the car is performing such mundane tasks as driving past a home that has a trash can in front of it, exiting a driveway,

driving onto a freeway, or moving around a curve in the road, or that they may be unable to change lanes when necessary, without the vehicle jerking them back.

134.   Subaru has also been alerted to the widespread problems with these systems from various lawsuits filed both in the United States and in other countries where Subaru vehicles, with substantially similar systems installed, are sold.

135.   The alleged Defects were inherent in each AEB and LKA Class Vehicle and was present in each AEB and LKA Class Vehicle at the time of sale.

136.   The existence of the Defects are material facts that a reasonable consumer would consider when deciding whether to purchase or lease a Subaru vehicle that was equipped with the EyeSight or Reverse Automatic Braking systems. Had Plaintiffs and other members of the Classes known the vehicles had these Defects, they would not have purchased or leased their vehicles or would have paid less for them.

137.   Reasonable consumers, like Plaintiffs, reasonably expect that a vehicle's driver assistance systems will function in a manner that will not pose a safety hazard and is free from defects that actually interfere with its role as a safety feature and make the vehicle unsafe. Plaintiffs and members of the Classes further reasonably expect that Subaru will not sell or lease vehicles with known safety defects, such as the Defects, and will disclose any such defects to its consumers when

it learns of them.  They did not expect Subaru to fail to disclose the Defects to them and to continually deny the existence of the Defects.

## Subaru Has Actively Concealed the Defects

138.   While Subaru has been fully aware of the Defects in the AEB and LKA Class Vehicles, it actively concealed the existence and nature of the Defects from Plaintiffs and members of the Classes at the time of purchase, lease, repair, and thereafter.   Specifically, Subaru failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

a)      any and all known material defects or material nonconformity of the AEB and LKA Class Vehicles, including the defects relating to the driver assistance systems;

b)      that the AEB and LKA Class Vehicles, including their AEB systems, were not in good working order, were defective, and were not fit for their intended purposes; and

c)      that the AEB and LKA Class Vehicles were defective, despite the fact that Subaru learned of such defects through alarming failure rates, customer complaints, and other internal sources, as early as 2012.

139.   In fact, even before releasing the AEB and LKA Class Vehicles into the market, Subaru knew about the Defects due to its significant pre-production testing at its proving grounds and test tracks at Bifuka Research and Experimentation Center

in Hokkaido, Japan.  Nevertheless, Subaru never disclosed the Defects to members of the Classes.

140.   As a result of the Defects, Subaru and its authorized dealers were inundated with complaints regarding the Defects.  However Subaru has not made fixing the malfunctions a priority and instead instructed its dealerships and Ambassadors that consumers can turn the driver assistance systems off whenever they want.  However, this ignores the fact that the Defects exist and that consumers paid for functional systems and the promise that Subaru would correct any defects pursuant to the warranties it issued.

141.   Thus, when consumers present the AEB and LKA Class Vehicles to authorized Subaru dealers for repair of the Defects, rather than repair the problem under warranty, Subaru has instructed dealers to deny the Defects exist.  Moreover, because the Defects are software related, the Subaru-authorized dealerships are neither equipped nor trained to provide a remedy.

142.   To this day, Subaru still has not notified Plaintiffs and all members of the Classes that the AEB and LKA Class Vehicles suffer from systemic defects that causes the driver assist systems to malfunction, to the detriment of the safety of drivers, passengers, and the general public.

## CLASS ACTION ALLEGATIONS

143.   Plaintiffs brings this lawsuit as a class action on behalf of himself and all others similarly situated as members of the proposed Class and Sub-Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and/or 23(b)(3).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

144.   The Classes and Sub-Classes are defined  as:

**AEB Class**: All individuals residing in the United States of America, including its territories, who purchased or leased any model year 2013-2021 Subaru vehicle equipped with an Autonomous Emergency Braking system (the "AEB Class Vehicles").

**LKA Class**:   All individuals residing in the United States of America, including its territories, who purchased or leased any model year 2013-2021 Subaru vehicle equipped with a Lane Keep Assist system (the "LKA Class Vehicles").

**Illinois AEB Sub-Class**: All members of the AEB Class who purchased or leased their AEB Class Vehicles in the State of Illinois.

**New York AEB Sub-Class**: All members of the AEB Class who purchased or leased their AEB Class Vehicles in the State of New York.

**New York LKA Sub-Class:**  All members of the LKA Class who purchased or leased their LKA Class Vehicles in the State of New York.

**Pennsylvania AEB Sub-Class**: All members of the AEB Class who purchased or leased their AEB Class Vehicles in the Commonwealth of Pennsylvania.

**Wisconsin AEB Sub-Class**: All members of the AEB Class who purchased or leased their AEB Class Vehicles in the State of Wisconsin.[18]

145.   Excluded from the Classes and Sub-Classes are: (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Classes and Sub-Classes should be expanded or otherwise modified.

146.   There is a well-defined community of interest in the litigation and the Classes and Sub-Classes are readily ascertainable.

---

[18] The Illinois AEB Sub-Class, the New York AEB Sub-Class, Pennsylvania AEB Sub-Class, and the Wisconsin AEB Sub-Class are collectively referred to herein as the "AEB Sub-Classes."  The New York LKA Sub-Class is also referred to herein as the "LKA Sub-Class."

147.   <u>Numerosity</u>: Although the exact number of prospective class members is uncertain and can only be ascertained through appropriate discovery, upon information and belief, hundreds of thousands of the AEB and LKA Class Vehicles have been sold in the United States.  As such, the number of prospective class members is great enough such that joinder is impracticable. The disposition of prospective class members' claims in a single action will provide substantial benefits to all parties and to the Court.  The prospective class members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the departments of motor vehicles of the various  states.

148.   <u>Typicality</u>: Plaintiffs' claims are typical of the claims of all prospective class members in that Plaintiffs' and the prospective class members purchased and leased a Class Vehicle designed, manufactured, and distributed by Subaru and equipped with driver assistance systems. Plaintiffs and all prospective members of the Classes have been damaged by Defendants' misconduct in that the Class Vehicles all suffer from the AEB System or LKA Defects and Class Members have incurred or will incur the cost of overpaying for the AEB or LKA Class Vehicles and repairing or replacing AEB or LKA Class Vehicles that have been damaged as a result of the Defects.  Furthermore, the factual bases of Subaru's misconduct are common to all prospective class members and represent a common thread resulting in injury to all prospective class members.

149.   <u>Commonality</u>: There are numerous questions of law and fact common to Plaintiffs and the prospective class members that predominate over any question affecting individual prospective class members. These common legal and factual issues include the following:

a)   Whether the AEB and LKA Class Vehicles suffer from their respective Defects;

b)   Whether the Defects constitutes an unreasonable safety risk;

c)   Whether and when Defendants knew about the Defects;

d)   Whether Defendants knew or reasonably should have known of the Defects before selling and leasing the AEB and LKA Class Vehicles to prospective class members;

e)   Whether the Defects constitute material facts;

f)   Whether Defendants have a duty to disclose its knowledge of the Defects to Plaintiffs and prospective class members;

g)   Whether Defendants breached the implied warranty of merchantability and their written warranties pursuant to the Magnusson-Moss Warranty Act;

h)   Whether SOA breached its written warranties;

i)   Whether Defendants breached the implied warranty of merchantability under applicable state law;

j)    Whether Plaintiffs and the prospective class members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

k)    Whether Defendants should be declared financially responsible for notifying all prospective class members of the Defects and for expenses of repairing the Defects;

l)    Whether Defendants are obligated to inform prospective class members of their right to seek reimbursement for having paid to diagnose, repair, or replace the defective systems; and

m)    Whether damages, restitution, compulsory or other relief are warranted.

150.    Adequate Representation:  Plaintiffs will fairly and adequately protect prospective class members' interests. Plaintiffs have retained attorneys experienced in prosecuting class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

151.    Predominance and Superiority: Plaintiffs and the members of the Classes have all suffered and will continue to suffer harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Absent a class action, most members of the Classes would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.

Because of the relatively small size of the individual members of the Classes' claims, it is likely that only a few members of the Classes could afford to seek legal redress for Defendants' misconduct. Absent a class action, members of the Classes will continue to incur damages, and Defendants' misconduct will continue without remedy. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

152.   In the alternative, the Classes may be certified because:

a)   The prosecution of separate actions by the individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendant;

b)   the prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c)   Defendants have acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the members of the Classes as a whole.

## COUNTS

## <u>COUNT I</u>

Fraud by Omission or Fraudulent Concealment
(On behalf of the AEB Class, or in the Alternative,
on Behalf of all AEB Sub-Classes against All Defendants)

153.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 152 above as if fully set forth herein.

154.   Plaintiffs bring this cause of action on behalf of themselves and the nationwide AEB Class, or in the alternative, on behalf of each of the AEB Sub-Classes, against all Defendants.

155.   Subaru knew that the AEB Class Vehicles suffered from an inherent AEB System Defect, were defectively designed and/or manufactured and were not suitable for their intended use.

156.   Defendants concealed from and failed to disclose to Plaintiffs and AEB Class Members the defective nature of the AEB Class Vehicles.

157.   Defendants were under a duty to Plaintiffs and AEB Class Members to disclose the defective nature of the AEB Class Vehicles because:

a)   Defendants were in a superior position to know the true state of facts about the safety defect contained in the AEB Class Vehicles;

b) The omitted facts were material because they directly impact the safety of the AEB Class Vehicles;

c) Defendants knew the omitted facts regarding the AEB System Defect were not known to or reasonably discoverable by Plaintiffs and AEB Class Members;

d) Defendants made partial disclosures about the quality of the AEB Class Vehicles without revealing their true defective nature; and,

e) Defendants actively concealed the defective nature of the AEB Class Vehicles from Plaintiffs and AEB Class Members.

158.   The facts concealed or not disclosed by Defendants to Plaintiffs and the other AEB Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendants' AEB Class Vehicles or pay a lesser price for them. Whether a vehicle's AEB system operates correctly is a material safety concern. Had Plaintiffs and AEB Class Members known about the defective nature of the AEB Class Vehicles, they would not have purchased or leased the AEB Class Vehicles, or would have paid less for them.

159.   Defendants concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the AEB Class Vehicles to induce Plaintiffs and AEB Class Members to act thereon. Plaintiffs and the other AEB Class

Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiffs' and AEB Class Members' purchase or lease of Defendants' defective AEB Class Vehicles.

160.   Defendants continued to conceal the defective nature of the AEB Class Vehicles even after Class Members began to report the problems. Indeed, Defendants continue to cover up and conceal the true nature of the problem today.

161.   As a direct and proximate result of Defendants' misconduct, Plaintiffs and AEB Class Members have suffered and will continue to suffer actual damages. Plaintiffs and the AEB Class reserve their right to elect either to (a) rescind their purchase or lease of the defective AEB Class Vehicles and obtain restitution or (b) affirm their purchase or lease of the defective AEB Class Vehicles and recover damages.

162.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the AEB Class' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## **COUNT II**

Unjust Enrichment
(On Behalf of the AEB Class, or, in the Alternative, on Behalf of all AEB Sub-Classes against All Defendants)

163.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 152 above as if fully set forth herein.

164.   Plaintiffs bring this count on behalf of themselves and the nationwide AEB Class or, alternatively, on behalf of all AEB Sub-Classes against all Defendants.

165.   Subaru has received and retained a benefit from Plaintiffs and all AEB Class Members and inequity has resulted.

166.   Subaru has benefitted from selling and leasing defective cars whose value was artificially inflated by Subaru's concealment of the AEB System Defect, and Plaintiffs and AEB Class Members have overpaid for the cars and have been forced to pay other costs.

167.   As a result of its wrongful acts, concealments, and omissions of the AEB System Defect in its AEB Class Vehicles, as set forth above, Subaru charged higher prices for their vehicles than the vehicles' true value. Plaintiffs and AEB Class Members paid than higher price for their vehicles to Subaru's authorized distributors and dealers, which are in Subaru's control. Subaru also reaps huge profits from the sale of its vehicles through its authorized distributors and dealers, accounting for 66% of its global automobile sales, which netted $27,154,995 in sales for the fiscal year ended March 31, 2019.

168.   All AEB Class Members conferred a benefit on Subaru.

169.    It is inequitable for Subaru to retain these benefits.

170.    Plaintiffs and AEB Class Members were not aware of the true facts about the AEB Class Vehicles, and did not benefit from Subaru's conduct.

171.    Subaru knowingly accepted the benefits of its unjust conduct.

172.    As a result of Subaru's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

173.    Plaintiffs, individually and on behalf of all the members of the AEB Class, seek all relief permitted in accord with the proofs at trial.

## COUNT III

Violation of the Magnuson-Moss Warranty Act
(15 U.S.C. § 2301)
(On behalf of the AEB Class, or in the Alternative,
on Behalf of all AEB Sub-Classes against All Defendants)

174.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 152 above as if fully set forth herein.

175.    Plaintiffs bring this count on behalf of themselves and the nationwide AEB Class or, alternatively, on behalf of all AEB Sub-Classes against all Defendants.

176.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

177.    Subaru is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

178.   The AEB Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

179.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

180.   Defendants' implied warranty is an "implied warranty" within the meaning of 15 U.S.C. § 2301(7).

181.   Defendants' express warranty is a "written warranty" within the meaning of 15 U.S.C. §2301(6).

182.   Defendants breached the implied warranty and the express warranty by virtue of the above-described acts.

183.   Plaintiffs and the other AEB Class Members notified Defendants of the breach within a reasonable time and/or were not required to do so. Subaru was also on notice of the AEB System Defect from, among other sources, the complaints and service requests it received from AEB Class Members and its dealers.

184.   Defendants' breach of the implied warranty and express warranty deprived Plaintiff and AEB Class Members of the benefits of their bargains.

185.   Plaintiffs and the AEB Class Members have had sufficient direct dealings with either Subaru or its agents (dealerships and technical support) to establish privity of contract between Subaru, on one hand, and Plaintiffs and each of

the other AEB Class Members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other AEB Class Members are intended third-party beneficiaries of contracts between Subaru and its dealers, and specifically, of Subaru's implied warranties. The dealers were not intended to be the ultimate consumers of the AEB Class Vehicles and have no rights under the warranty agreements provided with the AEB Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

186.   Subaru breached these warranties, as described in more detail above. Without limitation, the AEB Class Vehicles contain a Defect that puts vehicle occupants' safety in jeopardy. The AEB Class Vehicles share a common defect in that they are manufactured with defective materials and/or with poor workmanship. Contrary to Subaru's representations about its vehicles, the AEB Class Vehicles are defective in manufacture, materials and/or workmanship and are unsafe. The AEB Class Vehicles share a common defect that causes the AEB system to activate the brakes when there are no obstacles on the road, or fails to activate when there are obstacles on the road.

187.   Affording Subaru a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, Subaru has long been on notice of the claims of Plaintiffs and AEB Class members and has refused to provide

a remedy, instead placing the blame on customers or refusing to acknowledge the existence of the AEB System Defect.

188.   At the time of sale or lease of each AEB Class Vehicle, Subaru knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the AEB Class Vehicles' Defect and inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the AEB System Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Subaru a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

189.   Plaintiffs and the other AEB Class members would suffer economic hardship if they returned their AEB Class Vehicles but did not receive the return of all payments made by them. Because Subaru is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other AEB Class members have not re-accepted their AEB Class Vehicles by retaining them.

190.   Plaintiffs provided notice to Subaru of their intent to pursue class claims under the MMWA via letters dated February 25, 2021 and March 23, 2021.

191.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum

of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

192.   Plaintiffs, individually and on behalf of all members of the AEB Classes, seek all damages permitted by law, in an amount to be proven at trial.

## COUNT IV

Fraud by Omission or Fraudulent Concealment
(On behalf of the LKA Class, or in the Alternative,
on Behalf of all LKA Sub-Classes against All Defendants)

193.   Plaintiffs Anthony Ventura and Joanne Fulgieri Ventura (herein after "Plaintiffs" for this Count) repeat and re-allege each and every allegation contained in paragraphs 1 through 152 above as if fully set forth herein.

194.   Plaintiffs bring this cause of action on behalf of themselves and the nationwide LKA Class, or in the alternative, on behalf of the New York LKA Sub-Class, against all Defendants.

195.   Subaru knew that the LKA Class Vehicles suffered from an inherent LKA Defect, were defectively designed and/or manufactured and were not suitable for their intended use.

196.   Defendants concealed from and failed to disclose to Plaintiffs and LKA Class Members the defective nature of the LKA Class Vehicles.

197.   Defendants were under a duty to Plaintiffs and LKA Class Members to disclose the defective nature of the LKA Class Vehicles because:

a) Defendants were in a superior position to know the true state of facts about the safety defect contained in the LKA Class Vehicles;

b) The omitted facts were material because they directly impact the safety of the LKA Class Vehicles;

c) Defendants knew the omitted facts regarding the LKA Defect were not known to or reasonably discoverable by Plaintiffs and LKA Class Members;

d) Defendants made partial disclosures about the quality of the LKA Class Vehicles without revealing their true defective nature; and,

e) Defendants actively concealed the defective nature of the LKA Class Vehicles from Plaintiffs and LKA Class Members.

198.   The facts concealed or not disclosed by Defendants to Plaintiffs and the other LKA Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendants' LKA Class Vehicles or pay a lesser price for them. Whether a vehicle's LKA feature operates correctly is a material safety concern. Had Plaintiffs and LKA Class Members known about the defective nature of the LKA Class Vehicles, they would not have purchased or leased the LKA Class Vehicles, or would have paid less for them.

199.   Defendants concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the LKA Class Vehicles to induce Plaintiffs and LKA Class Members to act thereon. Plaintiffs and the other LKA Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiffs' and LKA Class Members' purchase or lease of Defendants' defective LKA Class Vehicles.

200.   Defendants continued to conceal the defective nature of the LKA Class Vehicles even after LKA Class Members began to report the problems. Indeed, Defendants continue to cover up and conceal the true nature of the problem today.

201.   As a direct and proximate result of Defendants' misconduct, Plaintiffs and LKA Class Members have suffered and will continue to suffer actual damages. Plaintiffs and the LKA Class reserve their right to elect either to (a) rescind their purchase or lease of the defective LKA Class Vehicles and obtain restitution or (b) affirm their purchase or lease of the defective LKA Class Vehicles and recover damages.

202.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the LKA Class' rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT V

Unjust Enrichment
(On Behalf of the LKA Class, or, in the Alternative, on Behalf of all LKA Sub-Classes against All Defendants)

203.   Plaintiffs Anthony Ventura and Joanne Fulgieri Ventura (herein after "Plaintiffs" for this Count)  repeat and re-allege each and every allegation contained in paragraphs 1 through 152 above as if fully set forth herein.

204.   Plaintiffs bring this count on behalf of themselves and the nationwide LKA Class or, alternatively, on behalf of the New York LKA Sub-Class against all Defendants.

205.   Subaru has received and retained a benefit from Plaintiffs and all LKA Class Members and inequity has resulted.

206.   Subaru has benefitted from selling and leasing defective cars whose value was artificially inflated by Subaru's concealment of the LKA Defect, and Plaintiffs and LKA Class Members have overpaid for the cars and have been forced to pay other costs.

207.   As a result of its wrongful acts, concealments, and omissions of the LKA Defect in its LKA Class Vehicles, as set forth above, Subaru charged higher prices for their vehicles than the vehicles' true value. Plaintiffs and LKA Class Members paid than higher price for their vehicles to Subaru's authorized distributors and dealers, which are in Subaru's control. Subaru also reaps huge profits from the

sale of its vehicles through its authorized distributors and dealers, accounting for 66% of its global automobile sales, which netted $27,154,995 in sales for the fiscal year ended March 31, 2019.

208.   All LKA Class Members conferred a benefit on Subaru.

209.   It is inequitable for Subaru to retain these benefits.

210.   Plaintiffs and LKA Class Members were not aware of the true facts about the LKA Class Vehicles, and did not benefit from Subaru's conduct.

211.   Subaru knowingly accepted the benefits of its unjust conduct.

212.   As a result of Subaru's conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

213.   Plaintiffs, individually and on behalf of all the members of the LKA Class, seek all relief permitted in accord with the proofs at trial.

## **COUNT VI**

Violation of the Magnuson-Moss Warranty Act
(15 U.S.C. § 2301)
(On behalf of the LKA Class, or in the Alternative,
on Behalf of all LKA Sub-Classes against All Defendants)

214.   Plaintiffs Anthony Ventura and Joanne Fulgieri Ventura (herein after "Plaintiffs" for this Count)  repeat and re-allege each and every allegation contained in paragraphs 1 through 152 above as if fully set forth herein.

215.   Plaintiffs bring this count on behalf of themselves and the nationwide LKA Class or, alternatively, on behalf of the New York LKA Sub-Class against all Defendants.

216.   Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

217.   Subaru is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

218.   The LKA Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

219.   15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

220.   Defendants' implied warranty is an "implied warranty" within the meaning of 15 U.S.C. § 2301(7).

221.   Defendants' express warranty is a "written warranty" within the meaning of 15 U.S.C. §2301(6).

222.   Defendants breached the implied warranty and the express warranty by virtue of the above-described acts.

223.   Plaintiffs and the other LKA Class Members notified Defendants of the breach within a reasonable time and/or were not required to do so. Subaru was also

on notice of the LKA Defect from, among other sources, the complaints and service requests it received from LKA Class Members and its dealers.

224.   Defendants' breach of the implied warranty and express warranty deprived Plaintiff and LKA Class Members of the benefits of their bargains.

225.   Plaintiffs and the LKA Class Members have had sufficient direct dealings with either Subaru or its agents (dealerships and technical support) to establish privity of contract between Subaru, on one hand, and Plaintiffs and each of the other LKA Class Members on the other hand. Nonetheless, privity is not required here because Plaintiffs and each of the other LKA Class Members are intended third-party beneficiaries of contracts between Subaru and its dealers, and specifically, of Subaru's implied warranties. The dealers were not intended to be the ultimate consumers of the LKA Class Vehicles and have no rights under the warranty agreements provided with the LKA Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

226.   Subaru breached these warranties, as described in more detail above. Without limitation, the LKA Class Vehicles contain a Defect that puts vehicle occupants' safety in jeopardy. The LKA Class Vehicles share a common defect in that they are manufactured with defective materials and/or with poor workmanship. Contrary to Subaru's representations about its vehicles, the LKA Class Vehicles are

defective in manufacture, materials and/or workmanship and are unsafe. The LKA Class Vehicles share a common defect that causes the LKA feature malfunction.

227.   Affording Subaru a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, Subaru has long been on notice of the claims of Plaintiffs and LKA Class members and has refused to provide a remedy, instead placing the blame on customers or refusing to acknowledge the existence of the LKA Defect.

228.   At the time of sale or lease of each LKA Class Vehicle, Subaru knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the LKA Class Vehicles' Defect and inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the LKA Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Subaru a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

229.   Plaintiffs and the other LKA Class members would suffer economic hardship if they returned their LKA Class Vehicles but did not receive the return of all payments made by them. Because Subaru is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and

the other LKA Class members have not re-accepted their LKA Class Vehicles by retaining them.

230.   Plaintiffs provided notice to Subaru of their intent to pursue class claims under the MMWA via letters dated February 25, 2021 and March 23, 2021.

231.   The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

232.   Plaintiffs, individually and on behalf of all members of the LKA Classes, seek all damages permitted by law, in an amount to be proven at trial.

## Claims on Behalf of the Illinois AEB Sub-Class

### COUNT VII

Breach of Express Warranty
810 ILL. COMP. STAT. §§ 5/2-313 AND 5/2A-210
(On Behalf of the Illinois AEB Sub-Class against SOA)

233.   Plaintiffs Laura and James Sampson (herein after "Sampson Plaintiffs" for this Count) repeat and re-allege each and every allegation contained above in paragraphs 1 through 152 as if fully set forth herein.

234.   The Sampson Plaintiffs bring this count on behalf of themselves and the Illinois AEB Sub-Class against SOA.

235.   SOA is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

236.   With respect to leases, SOA is and was at all relevant times a "lessor" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

237.   The AEB Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

238.   Defendants provided all purchasers and lessees of the AEB Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, SOA's express warranty is an express warranty under Illinois state law.

239.   In a section entitled "What Is Covered," SOA's Warranty provides in relevant part that "These warranties cover any repairs needed to correct defects in material or workmanship reported during the applicable warranty period and which occur under normal use: . . . in any part of the [Class Vehicle]…."

240.   According to SOA, "BASIC COVERAGE is 3 years or 36,000 miles, whichever comes first."

241.   The Warranty formed the basis of the bargain that was reached when the Sampson Plaintiffs and other members of the Illinois AEB Sub-Class purchased or leased their AEB Class Vehicles.

242.   SOA breached the express warranty through the acts and omissions described above.

243.   The Sampson Plaintiffs and members of the Class have had sufficient direct dealing with either SOA or its agents (i.e., dealerships and technical support) to establish privity of contract between SOA, on one hand, and the Sampson Plaintiffs and each of the other Class Members on the other hand.   Nonetheless, privity is not required here because the Sampson Plaintiffs and each of the other Class Members are the intended third-party beneficiaries of contracts between SOA and its distributors and dealers, and specifically, of SOA's express warranties.   The dealers were not intended to be the ultimate consumers of the AEB Class Vehicles and have no rights under the warranty agreements provided with the AEB Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

244.   Any attempt by SOA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.   Specifically, the warranty limitation is unenforceable because SOA knowingly sold or leased defective products without informing consumers about the AEB System Defect.   The

time limits are unconscionable and inadequate to protect the Sampson Plaintiffs and the members of the Illinois Sub-Class. Among other things, the Sampson Plaintiffs and members of the Illinois Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by SOA and unreasonable favored SOA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the AEB System Defect existed between SOA and members of the Class.

245. Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make the Sampson Plaintiffs and the members of the Illinois AEB Sub-Class whole, because SOA has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

246. The Sampson Plaintiffs were not required to notify SOA of the breach because affording SOA a reasonable opportunity to cure its breach of written warranty would have been futile. SOA was also on notice of the AEB System Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

247. Nonetheless, the Sampson Plaintiffs provided notice to SOA of the breach of express warranties when they took their vehicle to an authorized Subaru

dealership and complained of the AEB System Defect.   Further, the Sampson Plaintiffs provided written notice by letter dated February 25, 2021.

248.   As a result of SOA's breach of the applicable express warranties, owners and/or lessees of the AEB Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their AEB Class Vehicles. Additionally, as a result of the AEB Defect, the Sampson Plaintiffs and Illinois AEB Sub-Class Members were harmed and suffered actual damages in that the AEB Class Vehicles are substantially certain to fail before their expected useful life has run.

249.   As a result of SOA's breach of the express warranty, the Sampson Plaintiffs and Illinois AEB Sub-Class Members are entitled to legal and equitable relief against SOA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT VIII

Breach of the Implied Warranty of Merchantability
810 ILL. COMP. STAT. §§ 5/2-314 AND 5/2A-212
(On Behalf of the Illinois AEB Sub-Classes against All Defendants)

250.   Plaintiffs Laura and James Sampson (herein after "Sampson Plaintiffs" for this Count) repeat and re-allege each and every allegation contained in paragraphs 1 through 152 as if fully set forth herein.

251.   The Sampson Plaintiffs bring this count on behalf of themselves and the Illinois AEB Sub-Class against all Defendants.

252.   Subaru is and was at all relevant times a "merchant" with respect to motor vehicles under 810 Ill. Comp. Stat. §§ 5/2-104(1) and 5/2A-103(3), and a "seller" of motor vehicles under § 5/2-103(1)(d).

253.   With respect to leases, Subaru is and was at all relevant times a "lessor" of motor vehicles under 810 Ill. Comp. Stat. § 5/2A-103(1)(p).

254.   The AEB Class Vehicles are and were at all relevant times "goods" within the meaning of 810 Ill. Comp. Stat. §§ 5/2-105(1) and 5/2A-103(1)(h).

255.   A warranty that the AEB Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 810 Ill. Comp. Stat. §§ 5/2-314 and 5/2A-212.

256.   Subaru knew or had reason to know of the specific use for which the AEB Class Vehicles were purchased or leased. Subaru directly sold and marketed AEB Class Vehicles to customers through authorized dealers, like those from whom the Sampson Plaintiffs and members of the Illinois AEB Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Subaru knew that the AEB Class Vehicles would and did pass unchanged from the authorized dealers to the Sampson Plaintiffs and members of the Illinois AEB Sub-Class, with no modification to the defective AEB Class Vehicles.

257.   Subaru provided the Sampson Plaintiffs and members of the Illinois AEB Sub-Class with an implied warranty that the AEB Class Vehicles and their

components and parts are merchantable and fit for the ordinary purposes for which they were sold.

258. This implied warranty included, among other things: (i) a warranty that the AEB Class Vehicles that were manufactured, supplied, distributed, and/or sold by Subaru were safe and reliable for providing transportation; and (ii) a warranty that the AEB Class Vehicles would be fit for their intended use while the AEB Class Vehicles were being operated.

259. Contrary to the applicable implied warranties, the AEB Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the AEB Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Subaru knew of this defect at the time these sale or lease transactions occurred.

260. As a result of Subaru's breach of the applicable implied warranties, the Sampson Plaintiffs and members of the Illinois AEB Sub-Class suffered an ascertainable loss of money, property, and/or value of their AEB Class Vehicles. Additionally, as a result of the AEB System Defect, the Sampson Plaintiffs and members of the Illinois AEB Sub-Class were harmed and suffered actual damages in that the AEB Class Vehicles are substantially certain to fail before their expected useful life has run.

261.   Subaru's actions, as complained of herein, breached the implied warranty that the AEB Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

262.   The Sampson Plaintiffs and members of the Illinois AEB Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Subaru's conduct described herein.

263.   The Sampson Plaintiffs and members of the Illinois AEB Sub-Class were not required to notify Subaru of the breach because affording Subaru a reasonable opportunity to cure its breach of warranty would have been futile. Subaru was also on notice of the AEB System Defect from the complaints and service requests it received from the Sampson Plaintiffs and the Class Members and through other internal sources.

264.   Nonetheless, Plaintiff Sampson provided notice to Subaru of the breach of implied warranties when they took their vehicle to an authorized Subaru dealership and complained of the AEB System Defect.   Further, the Sampson Plaintiffs provided written notice by letter dated February 25, 2021.

265.   As a direct and proximate cause of Subaru's breach, the Sampson Plaintiffs and members of the Illinois AEB Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease

and diminution of value of their AEB Class Vehicles. Additionally, the Sampson Plaintiffs and members of the Illinois AEB Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

266.   As a direct and proximate result of Subaru's breach of the implied warranty of merchantability, the Sampson Plaintiffs and members of the Illinois AEB Sub-Class have been damaged in an amount to be proven at trial.

## COUNT IX

Violation of the Illinois Consumer Fraud and
Deceptive Business Practices Act
815 ILCS 505/1, *et seq.* and 720 ILCS 295/1A
(On Behalf of the Illinois AEB Sub-Class against All Defendants)

267.   Plaintiffs Laura and James Sampson (herein after "Sampson Plaintiffs" for this Count) repeat and re-allege each and every allegation contained in paragraphs 1 through 152 above as if fully set forth herein.

268.   The Sampson Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Illinois AEB Sub-Class.

269.   Subaru is a "person" as that term is defined in 815 ILCS 505/1(c).

270.   The Sampson Plaintiffs and the Illinois AEB Sub-Class members are "consumers" as that term is defined in 815 ILCS 505/1(e).

271.   The purpose of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") is to enjoin trade practices which confuse or deceive

the consumer. The Illinois CFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.  Subaru engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Illinois CFA.

272.   Subaru participated in unfair or deceptive trade practices that violated the Illinois CFA.  As described below and alleged throughout the Complaint, by failing to disclose the AEB System Defect, by concealing the AEB System Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the AEB Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the AEB Class Vehicles and the AEB System Defect in the course of its business.

273. Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment,

suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the AEB Class Vehicles.

274.   Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

275.   Subaru knew that the AEB Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

276.   Subaru knew or should have known that its conduct violated the Illinois CFA.

277.   Defendants were under a duty to the Sampson Plaintiffs and the Illinois AEB Sub-Class Members to disclose the defective nature of the AEB Class Vehicles because:

    a) Defendants were in a superior position to know the true state of facts about the safety defect in the AEB Class Vehicles;

    b) Defendants made partial disclosures about the quality of the AEB Class Vehicles without revealing the defective nature of the AEB Class Vehicles; and

c) Defendants actively concealed the defective nature of the AEB Class Vehicles from the Sampson Plaintiffs and the Illinois AEB Sub-Class Members at the time of sale and thereafter.

278.   By failing to disclose the AEB System Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

279.   The facts concealed or not disclosed by Defendants to the Sampson Plaintiffs and the Illinois AEB Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' AEB Class Vehicles, or to pay less for them. Whether a vehicle's AEB system operates correctly is a material safety concern. Had the Sampson Plaintiffs and the Illinois AEB Sub-Class Members known that the AEB Class Vehicles suffered from the AEB System Defect described herein, they would not have purchased or leased the AEB Class Vehicles or would have paid less for them.

280.   The Sampson Plaintiffs and the Illinois AEB Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the AEB System Defect. That is the reasonable and objective consumer expectation for vehicles.

281.   As a result of Defendants' misconduct, Illinois Plaintiffs and the Illinois AEB Sub-Class Members have been harmed and have suffered actual damages in that the AEB Class Vehicles are defective and require repairs or replacement.

282.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, the Sampson Plaintiffs and the Illinois AEB Sub-Class Members have suffered and will continue to suffer actual damages.

283.   Subaru's violations present a continuing risk to the Sampson Plaintiffs and the Illinois AEB Sub-Class Members as well as to the general public.  Subaru's unlawful acts and practices complained of herein affect the public interest.

284.   Pursuant to 815 ILCS 505/10a(a), the Sampson Plaintiffs and the Illinois AEB Sub-Class Members seek monetary relief against Subaru in the amount of actual damages, as well as punitive damages because Subaru acted with fraud and/or malice and/or was grossly negligent.

285.   The Sampson Plaintiffs and the Illinois AEB Sub-Class Members also seeks attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. § 505/1, *et seq*.

**Claims on Behalf of the New York AEB Sub-Class**

**<u>COUNT X</u>**

Breach of Express Warranty
N.Y. U.C.C. §§ 20314 and 2A-210
(On Behalf of the New York AEB Sub-Class against SOA)

286.   Plaintiffs Anthony Ventura and Joanne Fulgieri Ventura (herein after "Ventura Plaintiffs" for this Count) repeat and re-allege each and every allegation contained above in paragraphs 1 through 152 as if fully set forth herein.

287.   The Ventura Plaintiffs bring this count on behalf of themselves and the New York AEB Sub-Class against SOA.

288.   SOA is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC Law §§ 11-2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

289.   With respect to leases, SOA is and was at all relevant times a "lessor" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

290.   The AEB Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-15(1) and 2A-103(1)(h).

291.   Defendants provided all purchasers and lessees of the AEB Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, SOA's express warranty is an express warranty under New York state law.

292.   In a section entitled "What Is Covered," SOA's Warranty provides in relevant part that "These warranties cover any repairs needed to correct defects in material or workmanship reported during the applicable warranty period and which occur under normal use: . . . in any part of the [Class Vehicle]…."

293.   According to SOA, "BASIC COVERAGE is 3 years or 36,000 miles, whichever comes first."

294.   The Warranty formed the basis of the bargain that was reached when the Ventura Plaintiffs and other members of the New York AEB Sub-Class purchased or leased their AEB Class Vehicles.

295.   SOA breached the express warranty through the acts and omissions described above.

296.   The Ventura Plaintiffs and members of the Class have had sufficient direct dealing with either SOA or its agents (i.e., dealerships and technical support) to establish privity of contract between SOA, on one hand, and the Ventura Plaintiffs and each of the other Class Members on the other hand.  Nonetheless, privity is not required here because the Ventura Plaintiffs and each of the other Class Members are the intended third-party beneficiaries of contracts between SOA and its distributors and dealers, and specifically, of SOA's express warranties.  The dealers were not intended to be the ultimate consumers of the AEB Class Vehicles and have no rights under the warranty agreements provided with the AEB Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

297.   Any attempt by SOA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because SOA knowingly sold or leased

defective products without informing consumers about the AEB System Defect.  The time limits are unconscionable and inadequate to protect the Ventura Plaintiffs and the members of the New York AEB Sub-Class.  Among other things, the Ventura Plaintiffs and members of the New York AEB Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by SOA and unreasonable favored SOA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the AEB System Defect existed between SOA and members of the Class.

298.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make the Ventura Plaintiffs and the members of the New York AEB Sub-Class whole, because SOA has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

299.   The Ventura Plaintiffs were not required to notify SOA of the breach because affording SOA a reasonable opportunity to cure its breach of written warranty would have been futile. SOA was also on notice of the AEB System Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

300.   Nonetheless, the Ventura Plaintiffs provided notice to SOA of the breach of express warranties when they took their vehicle to an authorized Subaru dealership and complained of the AEB System Defect.

301.   As a result of SOA's breach of the applicable express warranties, owners and/or lessees of the AEB Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their AEB Class Vehicles. Additionally, as a result of the AEB System Defect, the Ventura Plaintiffs and New York AEB Sub-Class Members were harmed and suffered actual damages in that the AEB Class Vehicles are substantially certain to fail before their expected useful life has run.

302.   As a result of SOA's breach of the express warranty, the Ventura Plaintiffs and New York AEB Sub-Class Members are entitled to legal and equitable relief against SOA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XI

Breach of the Implied Warranty of Merchantability
N.Y. U.C.C. §§ 2-314 and 2A-212
(On Behalf of the New York AEB Sub-Classes against All Defendants)

303.   Plaintiffs Anthony Ventura and Joanne Fulgieri Ventura (herein after "Ventura Plaintiffs" for this Count)  repeat and re-allege each and every allegation contained in paragraphs 1 through 152 as if fully set forth herein.

304. The Ventura Plaintiffs bring this count on behalf of themselves and the New York AEB Sub-Class against all Defendants.

305. Subaru is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC Law §§ 11-2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

306. With respect to leases, Subaru is and was at all relevant times a "lessor" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

307. The AEB Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-15(1) and 2A-103(1)(h).

308. A warranty that the AEB Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.Y. UCC Law §§ 2-314 and 2A-212.

309. Subaru knew or had reason to know of the specific use for which the AEB Class Vehicles were purchased or leased. Subaru directly sold and marketed AEB Class Vehicles to customers through authorized dealers, like those from whom the Ventura Plaintiffs and members of the New York AEB Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Subaru knew that the AEB Class Vehicles would and did pass unchanged from the authorized dealers to the Ventura Plaintiffs and members of the New York AEB Sub-Class, with no modification to the defective AEB Class Vehicles.

310.   Subaru provided the Ventura Plaintiffs and members of the New York AEB Sub-Class with an implied warranty that the AEB Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

311.   This implied warranty included, among other things: (i) a warranty that the AEB Class Vehicles that were manufactured, supplied, distributed, and/or sold by Subaru were safe and reliable for providing transportation; and (ii) a warranty that the AEB Class Vehicles would be fit for their intended use while the AEB Class Vehicles were being operated.

312.   Contrary to the applicable implied warranties, the AEB Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the AEB Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Subaru knew of this defect at the time these sale or lease transactions occurred.

313.   As a result of Subaru's breach of the applicable implied warranties, the Ventura Plaintiffs and members of the New York AEB Sub-Class suffered an ascertainable loss of money, property, and/or value of their AEB Class Vehicles. Additionally, as a result of the AEB System Defect, the Ventura Plaintiffs and members of the New York AEB Sub-Class were harmed and suffered actual

damages in that the AEB Class Vehicles are substantially certain to fail before their expected useful life has run.

314.   Subaru's actions, as complained of herein, breached the implied warranty that the AEB Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

315.   The Ventura Plaintiffs and members of the New York AEB Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Subaru's conduct described herein.

316.   The Ventura Plaintiffs and members of the New York AEB Sub-Class were not required to notify Subaru of the breach because affording Subaru a reasonable opportunity to cure its breach of warranty would have been futile. Subaru was also on notice of the AEB System Defect from the complaints and service requests it received from the Ventura Plaintiffs and the Class Members and through other internal sources.

317.   Nonetheless, the Ventura Plaintiffs provided notice to Subaru of the breach of implied warranties when they took their vehicle to an authorized Subaru dealership and complained of the AEB System Defect.

318.   As a direct and proximate cause of Subaru's breach, the Ventura Plaintiffs and members of the New York AEB Sub-Class suffered damages and

continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their AEB Class Vehicles. Additionally, the Ventura Plaintiffs and members of the New York AEB Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

319.   As a direct and proximate result of Subaru's breach of the implied warranty of merchantability, the Ventura Plaintiffs and members of the New York AEB Sub-Class have been damaged in an amount to be proven at trial.

## **COUNT XII**

Violation of the New York General Business Law § 349
N.Y. Gen. Bus. Law § 349
(On Behalf of the New York AEB Sub-Class against All Defendants)

320.   Plaintiffs Anthony Ventura and Joanne Fulgieri Ventura (herein after "Ventura Plaintiffs" for this Count)  repeat and re-allege each and every allegation contained in paragraphs 1 through 152 above as if fully set forth herein.

321.   The Ventura Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the New York AEB Sub-Class.

322.   Subaru is a "person," "firm," "corporation," or "association" within the meaning of New York General Business Law ("New York GBL"), N.Y. Gen. Bus. Law § 349.

323.   The Ventura Plaintiffs and the New York AEB Sub-Class members are "persons" within the meaning of N.Y. Gen Bus. Law § 349.

324.   New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Subaru's conduct, as described in this Complaint, constitutes "deceptive acts or practices" within the meaning of the New York GBL. All of Subaru's deceptive acts and practices, which were intended to mislead consumers in a material way in the process of purchasing or leasing AEB Class Vehicles, constitute conduct directed at consumers and "consumer-oriented." Further, New York Plaintiffs and the New York AEB Sub-Class Members suffered injury as a result of the deceptive acts or practice.  Subaru engaged in unlawful deceptive act and/or practices that violated the New York GBL.

325.   Subaru's actions, as set forth above, occurred in the conduct of business, trade or commerce.

326.   Subaru participated in unfair or deceptive practices that violated the New York GBL.  As described below and alleged throughout the Complaint, by failing to disclose the AEB System Defect, by concealing the AEB System Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and

intentionally misrepresented and omitted material facts in connection with the sale or lease of the AEB Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the AEB Class Vehicles and the AEB System Defect in the course of its business.

327. Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the AEB Class Vehicles.

328. Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

329. Subaru knew that the AEB Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

330. Subaru knew or should have known that its conduct violated the New York CFA.

331. Defendants were under a duty to the Ventura Plaintiffs and the New York AEB Sub-Class Members to disclose the defective nature of the AEB Class Vehicles because:

a) Defendants were in a superior position to know the true state of facts about the safety defect in the AEB Class Vehicles;

b) Defendants made partial disclosures about the quality of the AEB Class Vehicles without revealing the defective nature of the AEB Class Vehicles; and

c) Defendants actively concealed the defective nature of the AEB Class Vehicles from the Ventura Plaintiffs and the New York AEB Sub-Class Members at the time of sale and thereafter.

332.   By failing to disclose the AEB System Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

333.   The facts concealed or not disclosed by Defendants to the Ventura Plaintiffs and the New York AEB Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' AEB Class Vehicles, or to pay less for them. Whether a vehicle's AEB system operates correctly is a material safety concern. Had the Ventura Plaintiffs and the New York AEB Sub-Class Members known that the AEB Class Vehicles suffered from the AEB System Defect described herein, they would not have purchased or leased the AEB Class Vehicles or would have paid less for them.

334.   The Ventura Plaintiffs and the New York AEB Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the AEB System Defect. That is the reasonable and objective consumer expectation for vehicles.

335.   As a result of Defendants' misconduct, New York Plaintiffs and the New York AEB Sub-Class Members have been harmed and have suffered actual damages in that the AEB Class Vehicles are defective and require repairs or replacement.

336.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, the Ventura Plaintiffs and the New York AEB Sub-Class Members have suffered and will continue to suffer actual damages.

337.   Subaru's violations present a continuing risk to the Ventura Plaintiffs and the New York AEB Sub-Class Members as well as to the general public. Subaru's unlawful acts and practices complained of herein affect the public interest. Specifically: (1) the number of consumers affected by Subaru's deceptive practices are in the hundreds of thousands nation-wide; (2) Subaru has significantly high sophistication and bargaining power with respect to the manufacture and sale of the AEB Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the AEB Class Vehicles continue to be sold and distributed with the defective AEB system, the likelihood of continued impact on other consumers is significant.

338.   Pursuant to N.Y. Gen. Bus. Law § 349(h), the Ventura Plaintiffs and each New York AEB Sub-Class Member seek actual damages or $50, whichever is greater, in addition to discretionary three times actual damages up to $1,000 for Defendant's willful and knowing violation of N.Y. Gen. Bus. Law § 349. Plaintiffs and New York Class members also seek attorneys' fees, an order enjoining Subaru's deceptive conduct, and any other just and proper relief available under the New York GBL.

## COUNT XIII

Violation of the New York General Business Law § 350
N.Y. Gen. Bus. Law § 350
(On Behalf of the New York AEB Sub-Class against All Defendants)

339.   Plaintiffs Anthony Ventura and Joanne Fulgieri Ventura (herein after "Ventura Plaintiffs" for this Count) repeat and re-allege each and every allegation contained in paragraphs 1 through 152 above as if fully set forth herein.

340.   The Ventura Plaintiffs bring this cause of action on behalf of themselves and the New York AEB Sub-Class against all Defendants.

341.   New York's General Business Law § 350, the New York False Advertising Act ("NY FAA"), makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts

material in the light of . . . representations [made] with respect to the commodity." N.Y. Gen. Bus. Law § 350-a.

342.   Subaru caused to be made or disseminated throughout New York, through advertising, marketing, and other publications, representations that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Subaru, to be untrue and misleading to consumers, including New York Plaintiffs and the New York AEB Sub-Class Members.

343.   Subaru violated the NY FAA because of the misrepresentations and omissions alleged herein, including, but not limited to, Subaru's failure to disclose the AEB System Defect, by concealing the AEB System Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the AEB Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the AEB Class Vehicles and AEB System Defect in the course of its business.

344.   In purchasing or leasing the AEB Class Vehicles, the Ventura Plaintiffs and the New York AEB Sub-Class Members were deceived by Subaru's failure to disclose the AEB System Defect.

345.   New York Plaintiffs and the New York AEB Sub-Class Members had no way of knowing that Subaru's representations and omissions were false and misleading, that an internal component part of the AEB Class Vehicles is defective and causes a safety hazard, that the AEBs will fail under normal and intended use of the AEB Class Vehicles, or that Subaru would refuse to repair, replace, or compensate New York Plaintiffs and the New York AEB Sub-Class Members for the failure of the defective AEBs and the known consequences of that failure to the AEB Class Vehicles.

346.  Subaru's   unfair   or   deceptive   acts   or   practices,   fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

347.   Subaru intentionally and knowingly misrepresented material facts regarding the AEB Class Vehicles with intent to mislead New York Plaintiffs and the New York AEB Sub-Class Members.

348.   Subaru knew or should have known that its conduct violated the NY FAA.

349.   New York Plaintiffs and the New York AEB Sub-Class Members reasonably relied on Subaru's misrepresentations and omissions of material facts in its advertisements of the AEB Class Vehicles and in the purchase of the AEB Class Vehicles.

350.   Had New York Plaintiffs and the New York AEB Sub-Class Members known that the AEB Class Vehicles would exhibit the AEB System Defect, they would not have purchased or leased the AEB Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Subaru's misconduct.

351.   Defendants were under a duty to the Ventura Plaintiffs and the New York AEB Sub-Class Members to disclose the defective nature of the AEB Class Vehicles because:

   a) Defendants were in a superior position to know the true state of facts about the safety defect in the AEB Class Vehicles;

   b) Defendants made partial disclosures about the quality of the AEB Class Vehicles without revealing the defective nature of the AEB Class Vehicles; and

   c) Defendants actively concealed the defective nature of the AEB Class Vehicles from the Ventura Plaintiffs and the New York AEB Sub-Class Members at the time of sale and thereafter.

352.   The Ventura Plaintiffs and the New York AEB Sub-Class Members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Subaru's conduct in that they overpaid for their AEB Class Vehicles and did not receive the benefit of their bargain, and their AEB Class

Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Subaru's misrepresentations, fraud, deceptive practices, and omissions.

353.   The Ventura Plaintiffs and the New York AEB Sub-Class Members are entitled to recover their actual damages or $500, whichever is greater. Because Subaru acted willfully or knowingly, the Ventura Plaintiffs and the New York AEB Sub-Class Members are entitled to recover three times actual damages, up to $10,000.

**Claims on Behalf of the New York LKA Sub-Class**

**COUNT XIV**

Breach of Express Warranty
N.Y. U.C.C. §§ 20314 and 2A-210
(On Behalf of the New York LKA Sub-Class against SOA)

354.   Plaintiffs Anthony Ventura and Joanne Fulgieri Ventura (herein after "Ventura Plaintiffs" for this Count) repeat and re-allege each and every allegation contained above in paragraphs 1 through 152 as if fully set forth herein.

355.   The Ventura Plaintiffs bring this count on behalf of themselves and the New York LKA Sub-Class against SOA.

356.   SOA is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC Law §§ 11-2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

357.   With respect to leases, SOA is and was at all relevant times a "lessor" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

358.   The LKA Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-15(1) and 2A-103(1)(h).

359.   Defendants provided all purchasers and lessees of the LKA Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, SOA's express warranty is an express warranty under New York state law.

360.   In a section entitled "What Is Covered," SOA's Warranty provides in relevant part that "These warranties cover any repairs needed to correct defects in material or workmanship reported during the applicable warranty period and which occur under normal use: . . . in any part of the [Class Vehicle]…."

361.   According to SOA, "BASIC COVERAGE is 3 years or 36,000 miles, whichever comes first."

362.   The Warranty formed the basis of the bargain that was reached when the Ventura Plaintiffs and other members of the New York LKA Sub-Class purchased or leased their LKA Class Vehicles.

363.   SOA breached the express warranty through the acts and omissions described above.

364.   The Ventura Plaintiffs and members of the Class have had sufficient direct dealing with either SOA or its agents (i.e., dealerships and technical support) to establish privity of contract between SOA, on one hand, and the Ventura Plaintiffs and each of the other Class Members on the other hand.   Nonetheless, privity is not required here because the Ventura Plaintiffs and each of the other Class Members are the intended third-party beneficiaries of contracts between SOA and its distributors and dealers, and specifically, of SOA's express warranties.   The dealers were not intended to be the ultimate consumers of the LKA Class Vehicles and have no rights under the warranty agreements provided with the LKA Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

365.   Any attempt by SOA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.   Specifically, the warranty limitation is unenforceable because SOA knowingly sold or leased defective products without informing consumers about the LKA Defect.   The time limits are unconscionable and inadequate to protect the Ventura Plaintiffs and the members of the New York LKA Sub-Class.   Among other things, the Ventura Plaintiffs and members of the New York LKA Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by SOA and unreasonable favored

SOA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the LKA Defect existed between SOA and members of the Class.

366.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make the Ventura Plaintiffs and the members of the New York LKA Sub-Class whole, because SOA has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

367.   The Ventura Plaintiffs were not required to notify SOA of the breach because affording SOA a reasonable opportunity to cure its breach of written warranty would have been futile. SOA was also on notice of the LKA Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

368.   Nonetheless, the Ventura Plaintiffs provided notice to SOA of the breach of express warranties when they took their vehicle to an authorized Subaru dealership and complained of the LKA Defect.

369.   As a result of SOA's breach of the applicable express warranties, owners and/or lessees of the LKA Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their LKA Class Vehicles. Additionally, as a result of the LKA Defect, the Ventura Plaintiffs and New York

LKA Sub-Class Members were harmed and suffered actual damages in that the LKA Class Vehicles are substantially certain to fail before their expected useful life has run.

370.   As a result of SOA's breach of the express warranty, the Ventura Plaintiffs and New York LKA Sub-Class Members are entitled to legal and equitable relief against SOA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## **COUNT XV**

Breach of the Implied Warranty of Merchantability
N.Y. U.C.C. §§ 2-314 and 2A-212
(On Behalf of the New York LKA Sub-Classes against All Defendants)

371.   Plaintiffs Anthony Ventura and Joanne Fulgieri Ventura (herein after "Ventura Plaintiffs" for this Count)  repeat and re-allege each and every allegation contained in paragraphs 1 through 152 as if fully set forth herein.

372.   The Ventura Plaintiffs bring this count on behalf of themselves and the New York LKA Sub-Class against all Defendants.

373.   Subaru is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. UCC Law §§ 11-2-104(1), and a "seller" of motor vehicles under § 2-103(1)(d).

374.   With respect to leases, Subaru is and was at all relevant times a "lessor" of motor vehicles under N.Y. UCC Law § 2A-103(1)(p).

375. The LKA Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. UCC Law §§ 2-15(1) and 2A-103(1)(h).

376. A warranty that the LKA Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.Y. UCC Law §§ 2-314 and 2A-212.

377. Subaru knew or had reason to know of the specific use for which the LKA Class Vehicles were purchased or leased. Subaru directly sold and marketed LKA Class Vehicles to customers through authorized dealers, like those from whom the Ventura Plaintiffs and members of the New York LKA Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Subaru knew that the LKA Class Vehicles would and did pass unchanged from the authorized dealers to the Ventura Plaintiffs and members of the New York LKA Sub-Class, with no modification to the defective LKA Class Vehicles.

378. Subaru provided the Ventura Plaintiffs and members of the New York LKA Sub-Class with an implied warranty that the LKA Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

379. This implied warranty included, among other things: (i) a warranty that the LKA Class Vehicles that were manufactured, supplied, distributed, and/or sold by Subaru were safe and reliable for providing transportation; and (ii) a warranty

that the LKA Class Vehicles would be fit for their intended use while the LKA Class Vehicles were being operated.

380.   Contrary to the applicable implied warranties, the LKA Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the LKA Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Subaru knew of this defect at the time these sale or lease transactions occurred.

381.   As a result of Subaru's breach of the applicable implied warranties, the Ventura Plaintiffs and members of the New York LKA Sub-Class suffered an ascertainable loss of money, property, and/or value of their LKA Class Vehicles. Additionally, as a result of the LKA Defect, the Ventura Plaintiffs and members of the New York LKA Sub-Class were harmed and suffered actual damages in that the LKA Class Vehicles are substantially certain to fail before their expected useful life has run.

382.   Subaru's actions, as complained of herein, breached the implied warranty that the LKA Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

383.   The Ventura Plaintiffs and members of the New York LKA Sub-Class have complied with all obligations under the warranty, or otherwise have been

excused from performance of said obligations as a result of Subaru's conduct described herein.

384.   The Ventura Plaintiffs and members of the New York LKA Sub-Class were not required to notify Subaru of the breach because affording Subaru a reasonable opportunity to cure its breach of warranty would have been futile. Subaru was also on notice of the LKA Defect from the complaints and service requests it received from the Ventura Plaintiffs and the Class Members and through other internal sources.

385.   Nonetheless, the Ventura Plaintiffs provided notice to Subaru of the breach of implied warranties when they took their vehicle to an authorized Subaru dealership and complained of the LKA Defect.

386.   As a direct and proximate cause of Subaru's breach, the Ventura Plaintiffs and members of the New York LKA Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their LKA Class Vehicles. Additionally, the Ventura Plaintiffs and members of the New York LKA Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

387.   As a direct and proximate result of Subaru's breach of the implied warranty of merchantability, the Ventura Plaintiffs and members of the New York LKA Sub-Class have been damaged in an amount to be proven at trial.

## **COUNT XVI**

Violation of the New York General Business Law § 349
N.Y. Gen. Bus. Law § 349
(On Behalf of the New York LKA Sub-Class against All Defendants)

388.   Plaintiffs Anthony Ventura and Joanne Fulgieri Ventura (herein after "Ventura Plaintiffs" for this Count) repeat and re-allege each and every allegation contained in paragraphs 1 through 152 above as if fully set forth herein.

389.   The Ventura Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the New York LKA Sub-Class.

390.   Subaru is a "person," "firm," "corporation," or "association" within the meaning of New York General Business Law ("New York GBL"), N.Y. Gen. Bus. Law § 349.

391.   The Ventura Plaintiffs and the New York LKA Sub-Class members are "persons" within the meaning of N.Y. Gen Bus. Law § 349.

392.   New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Subaru's conduct, as described in this Complaint, constitutes "deceptive acts or practices" within the meaning of the New York GBL. All of Subaru's

deceptive acts and practices, which were intended to mislead consumers in a material way in the process of purchasing or leasing LKA Class Vehicles, constitute conduct directed at consumers and "consumer-oriented." Further, New York Plaintiffs and the New York LKA Sub-Class Members suffered injury as a result of the deceptive acts or practice. Subaru engaged in unlawful deceptive act and/or practices that violated the New York GBL.

393.   Subaru's actions, as set forth above, occurred in the conduct of business, trade or commerce.

394.   Subaru participated in unfair or deceptive practices that violated the New York GBL. As described below and alleged throughout the Complaint, by failing to disclose the LKA Defect, by concealing the LKA Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the LKA Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the LKA Class Vehicles and the LKA Defect in the course of its business.

395.   Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment,

suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the LKA Class Vehicles.

396.   Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

397.   Subaru knew that the LKA Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

398.   Subaru knew or should have known that its conduct violated the New York CFA.

399.   Defendants were under a duty to the Ventura Plaintiffs and the New York LKA Sub-Class Members to disclose the defective nature of the LKA Class Vehicles because:

a) Defendants were in a superior position to know the true state of facts about the safety defect in the LKA Class Vehicles;

b) Defendants made partial disclosures about the quality of the LKA Class Vehicles without revealing the defective nature of the LKA Class Vehicles; and

c) Defendants actively concealed the defective nature of the LKA Class Vehicles from the Ventura Plaintiffs and the New York LKA Sub-Class Members at the time of sale and thereafter.

400.   By failing to disclose the LKA Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

401.   The facts concealed or not disclosed by Defendants to the Ventura Plaintiffs and the New York LKA Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' LKA Class Vehicles, or to pay less for them. Whether a vehicle's LKA system operates correctly is a material safety concern. Had the Ventura Plaintiffs and the New York LKA Sub-Class Members known that the LKA Class Vehicles suffered from the LKA Defect described herein, they would not have purchased or leased the LKA Class Vehicles or would have paid less for them.

402.   The Ventura Plaintiffs and the New York LKA Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the LKA Defect. That is the reasonable and objective consumer expectation for vehicles.

403.   As a result of Defendants' misconduct, New York Plaintiffs and the New York LKA Sub-Class Members have been harmed and have suffered actual damages in that the LKA Class Vehicles are defective and require repairs or replacement.

404.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, the Ventura Plaintiffs and the New York LKA Sub-Class Members have suffered and will continue to suffer actual damages.

405.   Subaru's violations present a continuing risk to the Ventura Plaintiffs and the New York LKA Sub-Class Members as well as to the general public. Subaru's unlawful acts and practices complained of herein affect the public interest. Specifically: (1) the number of consumers affected by Subaru's deceptive practices are in the hundreds of thousands nation-wide; (2) Subaru has significantly high sophistication and bargaining power with respect to the manufacture and sale of the LKA Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the LKA Class Vehicles continue to be sold and distributed with the defective LKA system, the likelihood of continued impact on other consumers is significant.

406.   Pursuant to N.Y. Gen. Bus. Law § 349(h), the Ventura Plaintiffs and each New York LKA Sub-Class Member seek actual damages or $50, whichever is greater, in addition to discretionary three times actual damages up to $1,000 for Defendant's willful and knowing violation of N.Y. Gen. Bus. Law § 349. Plaintiffs and New York Class members also seek attorneys' fees, an order enjoining Subaru's deceptive conduct, and any other just and proper relief available under the New York GBL.

## COUNT XVII

Violation of the New York General Business Law § 350
N.Y. Gen. Bus. Law § 350
(On Behalf of the New York LKA Sub-Class against All Defendants)

407.   Plaintiffs Anthony Ventura and Joanne Fulgieri Ventura (herein after "Ventura Plaintiffs" for this Count) repeat and re-allege each and every allegation contained in paragraphs 1 through 152 above as if fully set forth herein.

408.   The Ventura Plaintiffs bring this cause of action on behalf of themselves and the New York LKA Sub-Class against all Defendants.

409.   New York's General Business Law § 350, the New York False Advertising Act ("NY FAA"), makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of . . . representations [made] with respect to the commodity." N.Y. Gen. Bus. Law § 350-a.

410.   Subaru caused to be made or disseminated throughout New York, through advertising, marketing, and other publications, representations that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Subaru, to be untrue and misleading to consumers, including New York Plaintiffs and the New York LKA Sub-Class Members.

411.   Subaru violated the NY FAA because of the misrepresentations and omissions alleged herein, including, but not limited to, Subaru's failure to disclose the LKA Defect, by concealing the LKA Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the LKA Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the LKA Class Vehicles and LKA Defect in the course of its business.

412.   In purchasing or leasing the LKA Class Vehicles, the Ventura Plaintiffs and the New York LKA Sub-Class Members were deceived by Subaru's failure to disclose the LKA Defect.

413.   New York Plaintiffs and the New York LKA Sub-Class Members had no way of knowing that Subaru's representations and omissions were false and misleading, that an internal component part of the LKA Class Vehicles is defective and causes a safety hazard, that the LKAs will fail under normal and intended use of the LKA Class Vehicles, or that Subaru would refuse to repair, replace, or compensate New York Plaintiffs and the New York LKA Sub-Class Members for

the failure of the defective LKAs and the known consequences of that failure to the LKA Class Vehicles.

414. Subaru's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

415. Subaru intentionally and knowingly misrepresented material facts regarding the LKA Class Vehicles with intent to mislead New York Plaintiffs and the New York LKA Sub-Class Members.

416. Subaru knew or should have known that its conduct violated the NY FAA.

417. New York Plaintiffs and the New York LKA Sub-Class Members reasonably relied on Subaru's misrepresentations and omissions of material facts in its advertisements of the LKA Class Vehicles and in the purchase of the LKA Class Vehicles.

418. Had New York Plaintiffs and the New York LKA Sub-Class Members known that the LKA Class Vehicles would exhibit the LKA Defect, they would not have purchased or leased the LKA Class Vehicles, or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Subaru's misconduct.

419.   Defendants were under a duty to the Ventura Plaintiffs and the New York LKA Sub-Class Members to disclose the defective nature of the LKA Class Vehicles because:

  a) Defendants were in a superior position to know the true state of facts about the safety defect in the LKA Class Vehicles;

  b) Defendants made partial disclosures about the quality of the LKA Class Vehicles without revealing the defective nature of the LKA Class Vehicles; and

  c) Defendants actively concealed the defective nature of the LKA Class Vehicles from the Ventura Plaintiffs and the New York LKA Sub-Class Members at the time of sale and thereafter.

420.   The Ventura Plaintiffs and the New York LKA Sub-Class Members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Subaru's conduct in that they overpaid for their LKA Class Vehicles and did not receive the benefit of their bargain, and their LKA Class Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Subaru's misrepresentations, fraud, deceptive practices, and omissions.

421.   The Ventura Plaintiffs and the New York LKA Sub-Class Members are entitled to recover their actual damages or $500, whichever is greater. Because

117

Subaru acted willfully or knowingly, the Ventura Plaintiffs and the New York LKA Sub-Class Members are entitled to recover three times actual damages, up to $10,000.

### Claims on Behalf of the Pennsylvania AEB Sub-Class

### COUNT XVIII

Breach of Express Warranty
13 Pa. Cons. Stat. §§ 2313 and 2A210
(On Behalf of the Pennsylvania AEB Sub-Class against SOA)

422.   Plaintiff Wheatley repeats and re-alleges each and every allegation contained above in paragraphs 1 through 152 as if fully set forth herein.

423.   Plaintiff Wheatley brings this count on behalf of herself and the Pennsylvania AEB Sub-Class against SOA.

424.   SOA is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and a "seller" of motor vehicles under § 2103(a).

425.   With respect to leases, SOA is and was at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

426.   The AEB Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. § 2105(a) and 2A103(a).

427.   Defendants provided all purchasers and lessees of the AEB Class Vehicles with an express warranty described herein, which became a material part

118

of the bargain. Accordingly, SOA's express warranty is an express warranty under Pennsylvania state law.

428.   In a section entitled "What Is Covered," SOA's Warranty provides in relevant part that "These warranties cover any repairs needed to correct defects in material or workmanship reported during the applicable warranty period and which occur under normal use: . . . in any part of the [Class Vehicle]…."

429.   According to SOA, "BASIC COVERAGE is 3 years or 36,000 miles, whichever comes first."

430.   The Warranty formed the basis of the bargain that was reached when Plaintiff Wheatley and other members of the Pennsylvania AEB Sub-Class purchased or leased their AEB Class Vehicles.

431.   SOA breached the express warranty through the acts and omissions described above.

432.   The Sampson Plaintiffs and members of the Class have had sufficient direct dealing with either SOA or its agents (i.e., dealerships and technical support) to establish privity of contract between SOA, on one hand, and Plaintiff Wheatley and each of the other Class Members on the other hand.  Nonetheless, privity is not required here because Plaintiff Wheatley and each of the other Class Members are the intended third-party beneficiaries of contracts between SOA and its distributors and dealers, and specifically, of SOA's express warranties.  The dealers were not

intended to be the ultimate consumers of the AEB Class Vehicles and have no rights under the warranty agreements provided with the AEB Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

433.   Any attempt by SOA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.   Specifically, the warranty limitation is unenforceable because SOA knowingly sold or leased defective products without informing consumers about the AEB System Defect.  The time limits are unconscionable and inadequate to protect Plaintiff Wheatley and the members of the Pennsylvania AEB Sub-Class.   Among other things, Plaintiff Wheatley and members of the Pennsylvania AEB Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by SOA and unreasonable favored SOA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the AEB System Defect existed between SOA and members of the Class.

434.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Plaintiff Wheatley and the members of the Pennsylvania AEB Sub-Class whole, because SOA has failed and/or has refused

to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

435.   Plaintiff Wheatley were not required to notify SOA of the breach because affording SOA a reasonable opportunity to cure its breach of written warranty would have been futile. SOA was also on notice of the AEB System Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

436.   Nonetheless, Plaintiff Wheatley provided notice to SOA of the breach of express warranties when she took her vehicle to an authorized Subaru dealership and complained of the AEB System Defect.

437.   As a result of SOA's breach of the applicable express warranties, owners and/or lessees of the AEB Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their AEB Class Vehicles. Additionally, as a result of the AEB System Defect, Plaintiff Wheatley and Pennsylvania AEB Sub-Class Members were harmed and suffered actual damages in that the AEB Class Vehicles are substantially certain to fail before their expected useful life has run.

438.   As a result of SOA's breach of the express warranty, Plaintiff Wheatley and Pennsylvania AEB Sub-Class Members are entitled to legal and equitable relief

against SOA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XIX

Breach of the Implied Warranty of Merchantability
13 Pa. Cons. Stat. §§ 2314 and 2A212
(On Behalf of the Pennsylvania AEB Sub-Classes against All Defendants)

439.   Plaintiff Wheatley repeats and re-alleges each and every allegation contained in paragraphs 1 through 152 as if fully set forth herein.

440.   Plaintiff Wheatley brings this count on behalf of herself and the Pennsylvania AEB Sub-Class against all Defendants.

441.   Subaru is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. §§ 2104 and 2A103(a), and a "seller" of motor vehicles under § 2103(a).

442.   With respect to leases, Subaru is and was at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. § 2A103(a).

443.   The AEB Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. § 2105(a) and 2A103(a).

444.   A warranty that the AEB Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 13 Pa. Cons. Stat. §§ 2314 and 2A212.

445.   Subaru knew or had reason to know of the specific use for which the AEB Class Vehicles were purchased or leased. Subaru directly sold and marketed AEB Class Vehicles to customers through authorized dealers, like those from whom Plaintiff Wheatley and members of the Pennsylvania AEB Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Subaru knew that the AEB Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiff Wheatley and members of the Pennsylvania AEB Sub-Class, with no modification to the defective AEB Class Vehicles.

446.   Subaru provided Plaintiff Wheatley and members of the Pennsylvania AEB Sub-Class with an implied warranty that the AEB Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

447.   This implied warranty included, among other things: (i) a warranty that the AEB Class Vehicles that were manufactured, supplied, distributed, and/or sold by Subaru were safe and reliable for providing transportation; and (ii) a warranty that the AEB Class Vehicles would be fit for their intended use while the AEB Class Vehicles were being operated.

448.   Contrary to the applicable implied warranties, the AEB Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe

transportation. Instead, the AEB Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Subaru knew of this defect at the time these sale or lease transactions occurred.

449. As a result of Subaru's breach of the applicable implied warranties, Plaintiff Wheatley and members of the Pennsylvania AEB Sub-Class suffered an ascertainable loss of money, property, and/or value of their AEB Class Vehicles. Additionally, as a result of the AEB System Defect, Plaintiff Wheatley and members of the Pennsylvania AEB Sub-Class were harmed and suffered actual damages in that the AEB Class Vehicles are substantially certain to fail before their expected useful life has run.

450. Subaru's actions, as complained of herein, breached the implied warranty that the AEB Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

451. Plaintiff Wheatley and members of the Pennsylvania AEB Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Subaru's conduct described herein.

452. Plaintiff Wheatley and members of the Pennsylvania AEB Sub-Class were not required to notify Subaru of the breach because affording Subaru a reasonable opportunity to cure its breach of warranty would have been futile. Subaru

was also on notice of the AEB System Defect from the complaints and service requests it received from Plaintiff Wheatley and the Class Members and through other internal sources.

453.   Nonetheless, Plaintiff Wheatley provided notice to Subaru of the breach of implied warranties when she took her vehicle to an authorized Subaru dealership and complained of the AEB System Defect.

454.   As a direct and proximate cause of Subaru's breach, Plaintiff Wheatley and members of the Pennsylvania AEB Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their AEB Class Vehicles. Additionally, Plaintiff Wheatley and members of the Pennsylvania AEB Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

455.   As a direct and proximate result of Subaru's breach of the implied warranty of merchantability, Plaintiff Wheatley and members of the Pennsylvania AEB Sub-Class have been damaged in an amount to be proven at trial.

## **COUNT XX**

Violation of the Pennsylvania Unfair Trade Practices
and Consumer Protection Law
73 P.S. § 201-2, *et seq.*
(On Behalf of the Pennsylvania AEB Sub-Class against All Defendants)

456. Plaintiff Wheatley repeats and re-alleges each and every allegation contained in paragraphs 1 through 152 above as if fully set forth herein.

457. Plaintiff Wheatley brings this cause of action on behalf of herself and on behalf of the members of the Pennsylvania AEB Sub-Class against all Defendants.

458. Plaintiff Wheatley and the Pennsylvania AEB Sub-Class Members purchased or leased their AEB Class Vehicles primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

459. All of the acts complained of herein were perpetrated by Subaru in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

460. The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (a) "Representing that goods or services have . . . characteristics, . . . [b]enefits or qualities that they do not have;" (b) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;" (c) "Advertising goods or services with intent not to sell them as advertised;" and (d) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4). Subaru engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated Pennsylvania CPL.

461.   Subaru participated in unfair or deceptive trade practices that violated the Pennsylvania CPL.  As described below and alleged throughout the Complaint, by failing to disclose the AEB System Defect, by concealing the AEB System Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the AEB Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the AEB Class Vehicles and the AEB System Defect in the course of its business.

462.   Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the AEB Class Vehicles.

463.   Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

464. Subaru knew that the AEB Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

465. Subaru knew or should have known that its conduct violated the Pennsylvania CPL.

466. Defendants were under a duty to Plaintiff Wheatley and the Pennsylvania AEB Sub-Class Members to disclose the defective nature of the AEB Class Vehicles because:

a) Defendants were in a superior position to know the true state of facts about the safety defect in the AEB Class Vehicles;

b) Defendants made partial disclosures about the quality of the AEB Class Vehicles without revealing the defective nature of the AEB Class Vehicles; and

c) Defendants actively concealed the defective nature of the AEB Class Vehicles from Plaintiff Wheatley and the Pennsylvania AEB Sub-Class Members at the time of sale and thereafter.

467. By failing to disclose the AEB System Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

468. The facts concealed or not disclosed by Defendants to Plaintiff Wheatley and the Pennsylvania AEB Sub-Class Members are material because a

reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' AEB Class Vehicles, or to pay less for them. Whether a vehicle's AEB system operates correctly is a material safety concern. Had Plaintiff Wheatley and the Pennsylvania AEB Sub-Class Members known that the AEB Class Vehicles suffered from the AEB System Defect described herein, they would not have purchased or leased the AEB Class Vehicles or would have paid less for them.

469.   Plaintiff Wheatley and the Pennsylvania AEB Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the AEB System Defect. That is the reasonable and objective consumer expectation for vehicles.

470.   As a result of Defendants' misconduct, Pennsylvania Plaintiffs and the Pennsylvania AEB Sub-Class Members have been harmed and have suffered actual damages in that the AEB Class Vehicles are defective and require repairs or replacement.

471.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff Wheatley and the Pennsylvania AEB Sub-Class Members have suffered and will continue to suffer actual damages.

472.   Subaru's violations present a continuing risk to Plaintiff Wheatley and the Pennsylvania AEB Sub-Class Members as well as to the general public. Subaru's unlawful acts and practices complained of herein affect the public interest.

473.   Subaru is liable to Plaintiffs and the Pennsylvania Class members for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs under 73 P.S. § 201-9.2(a).  Plaintiff Wheatley and the Pennsylvania AEB Sub-Class members are also entitled to an award of punitive damages given that Defendant's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

**Claims on Behalf of the Wisconsin AEB Sub-Class**

**COUNT XXI**

Breach of Express Warranty
Wis. Stat. §§ 402.313 and 411.210
(On Behalf of the Wisconsin AEB Sub-Class against SOA)

474.   Plaintiff Reinhard repeats and re-alleges each and every allegation contained above in paragraphs 1 through 152 as if fully set forth herein.

475.   Plaintiff Reinhard brings this count on behalf of herself, the Estate of Kenneth Reinhard, and the Wisconsin AEB Sub-Class against SOA.

476.   SOA is and was at all relevant times a "merchant" with respect to motor vehicles under Wis. Stat. §§ 402.104(3) and 411.103(1)(t), and a "seller" of motor vehicles under § 402.103(1)(d).

477.   With respect to leases, SOA is and was at all relevant times a "lessor" of motor vehicles under Wis. Stat. § 411.103(1)(p).

478.   The AEB Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

479.   Defendants provided all purchasers and lessees of the AEB Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, SOA's express warranty is an express warranty under Wisconsin state law.

480.   In a section entitled "What Is Covered," SOA's Warranty provides in relevant part that "These warranties cover any repairs needed to correct defects in material or workmanship reported during the applicable warranty period and which occur under normal use: . . . in any part of the [Class Vehicle]…."

481.   According to SOA, "BASIC COVERAGE is 3 years or 36,000 miles, whichever comes first."

482.   The Warranty formed the basis of the bargain that was reached when Plaintiff Reinhard and other members of the Wisconsin AEB Sub-Class purchased or leased their AEB Class Vehicles.

483.   SOA breached the express warranty through the acts and omissions described above.

484.  Plaintiff Reinhard and members of the Class have had sufficient direct dealing with either SOA or its agents (i.e., dealerships and technical support) to establish privity of contract between SOA, on one hand, and Plaintiff Reinhard and each of the other Class Members on the other hand.  Nonetheless, privity is not required here because Plaintiff Reinhard and each of the other Class Members are the intended third-party beneficiaries of contracts between SOA and its distributors and dealers, and specifically, of SOA's express warranties.  The dealers were not intended to be the ultimate consumers of the AEB Class Vehicles and have no rights under the warranty agreements provided with the AEB Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

485.  Any attempt by SOA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because SOA knowingly sold or leased defective products without informing consumers about the AEB System Defect.  The time limits are unconscionable and inadequate to protect Plaintiff Reinhard and the members of the Wisconsin AEB Sub-Class.  Among other things, Plaintiff Reinhard and members of the Wisconsin AEB Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by SOA and unreasonable favored SOA. A gross disparity in bargaining power and knowledge of the extent, severity, and

safety risk of the AEB System Defect existed between SOA and members of the Class.

486.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Plaintiff Reinhard and the members of the Wisconsin AEB Sub-Class whole, because SOA has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

487.   Plaintiff Reinhard was not required to notify SOA of the breach because affording SOA a reasonable opportunity to cure its breach of written warranty would have been futile. SOA was also on notice of the AEB System Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

488.   Nonetheless, Plaintiff Reinhard provided notice to SOA of the breach of express warranties when she took her vehicle to an authorized Subaru dealership and complained of the AEB System Defect.  Further, Plaintiff Reinhard provided written notice by letter dated March 23, 2021.

489.   As a result of SOA's breach of the applicable express warranties, owners and/or lessees of the AEB Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their AEB Class Vehicles.

Additionally, as a result of the AEB System Defect, Plaintiff Reinhard and Wisconsin AEB Sub-Class Members were harmed and suffered actual damages in that the AEB Class Vehicles are substantially certain to fail before their expected useful life has run.

490.    As a result of SOA's breach of the express warranty, Plaintiff Reinhard and Wisconsin AEB Sub-Class Members are entitled to legal and equitable relief against SOA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT XXII

Breach of the Implied Warranty of Merchantability
Wis. Stat. §§ 402.214 and 411.212
(On Behalf of the Wisconsin AEB Sub-Classes against All Defendants)

491.    Plaintiff Reinhard repeats and re-alleges each and every allegation contained in paragraphs 1 through 152 as if fully set forth herein.

492.    Plaintiff Reinhard brings this count on behalf of herself, the Estate of Kenneth Reinhard, and the Wisconsin AEB Sub-Class against all Defendants.

493.    Subaru is and was at all relevant times a "merchant" with respect to motor vehicles under Wis. Stat. §§ 402.104(3) and 411.103(1)(t), and a "seller" of motor vehicles under § 402.103(1)(d).

494.    With respect to leases, Subaru is and was at all relevant times a "lessor" of motor vehicles under Wis. Stat. § 411.103(1)(p).

495. The AEB Class Vehicles are and were at all relevant times "goods" within the meaning of Wis. Stat. §§ 402.105(1)(c) and 411.103(1)(h).

496. A warranty that the AEB Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Wis. Stat. §§ 402.314 and 411.212

497. Subaru knew or had reason to know of the specific use for which the AEB Class Vehicles were purchased or leased. Subaru directly sold and marketed AEB Class Vehicles to customers through authorized dealers, like those from whom Plaintiff Reinhard and members of the Wisconsin AEB Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Subaru knew that the AEB Class Vehicles would and did pass unchanged from the authorized dealers to Plaintiff Reinhard and members of the Wisconsin AEB Sub-Class, with no modification to the defective AEB Class Vehicles.

498. Subaru provided Plaintiff Reinhard and members of the Wisconsin AEB Sub-Class with an implied warranty that the AEB Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

499. This implied warranty included, among other things: (i) a warranty that the AEB Class Vehicles that were manufactured, supplied, distributed, and/or sold by Subaru were safe and reliable for providing transportation; and (ii) a warranty

that the AEB Class Vehicles would be fit for their intended use while the AEB Class Vehicles were being operated.

500.   Contrary to the applicable implied warranties, the AEB Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff Reinhard and Class Members with reliable, durable, and safe transportation. Instead, the AEB Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Subaru knew of this defect at the time these sale or lease transactions occurred.

501.   As a result of Subaru's breach of the applicable implied warranties, Plaintiff Reinhard and members of the Wisconsin AEB Sub-Class suffered an ascertainable loss of money, property, and/or value of their AEB Class Vehicles. Additionally, as a result of the AEB System Defect, Plaintiff Reinhard and members of the Wisconsin AEB Sub-Class were harmed and suffered actual damages in that the AEB Class Vehicles are substantially certain to fail before their expected useful life has run.

502.   Subaru's actions, as complained of herein, breached the implied warranty that the AEB Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

503.   Plaintiff Reinhard and members of the Wisconsin AEB Sub-Class have complied with all obligations under the warranty, or otherwise have been excused

from performance of said obligations as a result of Subaru's conduct described herein.

504.   Plaintiff Reinhard and members of the Wisconsin AEB Sub-Class were not required to notify Subaru of the breach because affording Subaru a reasonable opportunity to cure its breach of warranty would have been futile. Subaru was also on notice of the AEB System Defect from the complaints and service requests it received from Plaintiff Reinhard and the Class Members and through other internal sources.

505.   Nonetheless, Plaintiffs provided notice to Subaru of the breach of implied warranties when they took their vehicle to an authorized Subaru dealership and complained of the Defect.  Further, Plaintiff Reinhard provided written notice by letter dated March 23, 2021.

506.   As a direct and proximate cause of Subaru's breach, Plaintiff Reinhard and members of the Wisconsin AEB Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their AEB Class Vehicles. Additionally, Plaintiff Reinhard and members of the Wisconsin AEB Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

507.   As a direct and proximate result of Subaru's breach of the implied warranty of merchantability, Plaintiff Reinhard and members of the Wisconsin AEB Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XXIII

Violation of the Wisconsin Deceptive Trade Practices Act
815 ILCS 505/1, *et seq.* and 720 ILCS 295/1A
(On Behalf of the Wisconsin AEB Sub-Class against All Defendants)

508.   Plaintiff Reinhard repeats and re-alleges each and every allegation contained in paragraphs 1 through 152 above as if fully set forth herein.

509.   Plaintiff Reinhard brings this count on behalf of herself, the Estate of Kenneth Reinhard, and the Wisconsin AEB Sub-Class against all Defendants.

510.   Subaru is a "person, firm, corporation or association" within the meaning of Wis. Stat. § 100.18(1).

511.   Plaintiff Reinhard and the Wisconsin AEB Sub-Class members are members of "the public" within the meaning of Wis. Stat. § 100.18(1). Plaintiff Reinhard and the Wisconsin AEB Sub-Class purchased or leased one or more AEB Class Vehicles in Wisconsin.

512.   The Wisconsin Deceptive Trade Practices Act ("Wisconsin DTPA") prohibits an "assertion, representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18(1). By systematically concealing the defects in

the AEB Class Vehicles, Subaru's conduct, acts, and practices violated the Wisconsin DTPA.

513. Subaru participated in unfair or deceptive trade practices that violated the Wisconsin DPTA. As described below and alleged throughout the Complaint, by failing to disclose the AEB System Defect, by concealing the AEB System Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the AEB Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the AEB Class Vehicles and the AEB System Defect in the course of its business.

514. Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the AEB Class Vehicles.

515. Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

516.   Subaru knew that the AEB Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

517.   Subaru knew or should have known that its conduct violated the Wisconsin DPTA.

518.   Defendants were under a duty to Plaintiff Reinhard and the Wisconsin AEB Sub-Class Members to disclose the defective nature of the AEB Class Vehicles because:

a) Defendants were in a superior position to know the true state of facts about the safety defect in the AEB Class Vehicles;

b) Defendants made partial disclosures about the quality of the AEB Class Vehicles without revealing the defective nature of the AEB Class Vehicles; and

c) Defendants actively concealed the defective nature of the AEB Class Vehicles from Plaintiff Reinhard and the Wisconsin AEB Sub-Class Members at the time of sale and thereafter.

519.    By failing to disclose the AEB System Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

520.   The facts concealed or not disclosed by Defendants to Plaintiff Reinhard and the Wisconsin AEB Sub-Class Members are material because a

reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' AEB Class Vehicles, or to pay less for them. Whether a vehicle's AEB system operates correctly is a material safety concern. Had Plaintiff Reinhard and the Wisconsin AEB Sub-Class Members known that the AEB Class Vehicles suffered from the AEB System Defect described herein, they would not have purchased or leased the AEB Class Vehicles or would have paid less for them.

521.   Plaintiff Reinhard and the Wisconsin AEB Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the AEB System Defect. That is the reasonable and objective consumer expectation for vehicles.

522.   As a result of Defendants' misconduct, Plaintiff Reinhard and the Wisconsin AEB Sub-Class Members have been harmed and have suffered actual damages in that the AEB Class Vehicles are defective and require repairs or replacement.

523.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Plaintiff Reinhard and the Wisconsin AEB Sub-Class Members have suffered and will continue to suffer actual damages.

524.   Subaru's violations present a continuing risk to Plaintiff Reinhard and the Wisconsin AEB Sub-Class Members as well as to the general public.  Subaru's unlawful acts and practices complained of herein affect the public interest.

525.   Plaintiff Reinhard and Wisconsin AEB Sub-Class members seek actual damages, court costs, attorneys' fees, and other relief provided for under Wis. Stat. § 100.18(11)(b)(2).  Because Subaru's conduct was committed knowingly and/or intentionally, Plaintiff Reinhard and Wisconsin Class members are entitled to treble damages and any other such relief necessary to deter GM's unlawful conduct in the future.

## RELIEF REQUESTED

526.   Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

    (a)    An order certifying the proposed Classes and Sub-Classes, designating Plaintiffs as representatives of the Classes and Sub-Classes, and designating the undersigned as Class Counsel;

    (b)    A declaration that Defendants are financially responsible for notifying all members of the Classes about the defective nature of the AEB and LKA Class Vehicles and the existence of the Defects, including the need for repairs;

(c)     An order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to AEB and LKA Class Vehicles; compelling Defendants to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendants to remove, repair, and/or replace the Class Vehicles' with suitable alternative product(s) that do not contain the defects alleged herein; enjoining Defendants from selling the AEB and LKA Class Vehicles with the misleading information; and/or compelling Subaru to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all members of the Classes that such warranty has been reformed;

(d)     An award to Plaintiffs and the Classes for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial.

(e)     Any and all remedies provided pursuant to the Magnuson-Moss Warranty Act;

(f)     A declaration that Defendants must disgorge, for the benefit of the Classes, all or part of the ill-gotten profits it received from

the sale or lease of its Class Vehicles or make full restitution to

Plaintiffs and members of the Classes;

(g)     An award of attorneys' fees and costs, as allowed by law;

(h)     An award of pre-judgment and post-judgment interest, as

provided by law;

(i)     Leave to amend the Complaint to conform to the evidence

produced at trial; and

(j)     Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

527.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands

a trial by jury of all issues in this action so triable.


Dated: April 27, 2021                    Respectfully Submitted,


                                          /s/ Russell D. Paul
                                          Russell D. Paul (NJ Bar. No. 037411989)
                                          Amey J. Park (NJ Bar. No. 070422014)
                                          Abigail J. Gertner (NJ Bar. No. 019632003)
                                          Natalie Lesser (NJ Bar No. 017882010)
                                          **BERGER MONTAGUE PC**
                                          1818 Market Street
                                          Suite 3600
                                          Philadelphia, PA  19103
                                          Tel: (215) 875-3000
                                          Fax: (215) 875-4604
                                          rpaul@bm.net
                                          apark@bm.net
                                          agertner@bm.net

Steven Weinmann (N.J. Bar No.
033111989)
Tarek H. Zohdy (*pro hac vice pending*)
Cody R. Padgett (*pro hac vice pending*)
**CAPSTONE LAW APC**
1875 Century Park East
Suite 1000
Los Angeles, California 90067
Tel: (310) 556-4811
Fax: (310) 943-0396
steven.weinmann@capstonelawyers.com
tarek.zohdy@capstonelawyers.com
cody.padgett@capstonelaywers.com

*Attorneys for Plaintiffs and the Proposed
Class and Subclasses*

# EXHIBIT A

**NHTSA ID Number:** 11352881
**Incident Date** August 24, 2020
**Report Date** September 2, 2020
**Consumer Location** BETHESDA, MD
**Vehicle Identification Number** 4S3BWGN64L3****
**Summary of Complaint:**
I WAS DRIVING ON THE CAPITAL BELTWAY IN SILVER SPRING DURING EVENING RUSH
HOUR GOING APPROXIMATELY 60 MPH WHEN THE VEHICLE STARTED TO SLOW DOWN
ON ITS OWN AND THE WARNING LIGHTS ON THE DASH ASSOCIATED WITH THE
EMERGENCY BRAKING SYSTEM ( WHICH CAUSES THE CAR TO ABRUPTLY STOP IF YOU
ARE GOING TO CRASH) STARTED TO FLASH. IT LASTED ABOUT 5-10 SECONDS . I DID NOT
TAKE MY FOOT OFF THE GAS OR BRAKE THE CAR. THEN IT ACCELERATED ON ITS OWN
TO 60 MPH.

**NHTSA ID Number:** 11350346
**Incident Date** July 28, 2020
**Report Date** August 19, 2020
**Consumer Location** MINEOLA, NY
**Vehicle Identification Number** 4S4BSAFC0F3****
**Summary of Complaint:**
VEHICLE IS EQUIPPED WITH SUBARU'S "EYE SIGHT" SYSTEM, WHICH PROVIDES PRE-
COLLISION BRAKING AND IS INVOLVED WITH LANE DEPARTURE WARNING. THE EYE
SIGHT SYSTEM IN MY CAR IS INTERMITTENTLY INOPERATIVE WHILE THE CAR IS IN
MOTION. SOMETIMES, THE SYSTEM BEGINS WORKING AGAIN, THEN TURNS OFF, TURNS
ON, ETC.

IF EYE SIGHT IS INOPERATIVE AS THE CAR COMES TO A FULL STOP, THE INOPERATIVE
WARNING MESSAGE USUALLY DISAPPEARS, BUT THE MESSAGE RETURNS SHORTLY
AFTER THE CAR BEGINS MOVING AGAIN.

THIS HAS BEEN HAPPENING EVERY TIME THE CAR IS IN MOTION FOR THREE WEEKS.

**NHTSA ID Number:** 11349311
**Incident Date** January 1, 2017
**Report Date** August 14, 2020
**Consumer Location** MURRAY, KY
**Vehicle Identification Number** 4S4BSENC2H3****
**Summary of Complaint:**
TL* THE CONTACT OWNS A 2017 SUBARU OUTBACK. THE CONTACT STATED ON THREE
OCCASIONS WHILE DRIVING 25-35 MPH, THE AUTOMATIC COLLISION BRAKING SYSTEM
ENGAGED WHEN THERE WAS NO OBJECT PRESENT. THE CONTACT MENTIONED IT
HAPPENED WHILE APPROACHING A CURVE. ADDITIONALLY, THE BRAKE PEDAL WAS
DEPRESSED TO THE FLOORBOARD HOWEVER, AFTER PUMPING THE BRAKE PEDAL THE
BRAKES WORKED AS DESIGNED. THE AUTOMATIC COLLISION WARNING INDICATOR
WARNING LIGHT WAS ILLUMINATED. THE VEHICLE WAS TAKEN TO WYATT JOHNSON
SUBARU (2425 WILMA RUDOLPH BLVD, CLARKSVILLE, TN 37040, (931) 648-4300) WHERE
THE CONTACT WAS INFORMED THAT THE VEHICLE WORKED AS DESIGNED. THE

1

VEHICLE WAS NOT DIAGNOSED NOR REPAIRED. THE MANUFACTURER WAS NOT CONTACTED. THE FAILURE MILEAGE WAS APPROXIMATELY 18,000.

**NHTSA ID Number:** 11311846
**Incident Date** February 20, 2020
**Report Date** February 27, 2020
**Consumer Location** WILLOUGHBY HILLS, OH
**Vehicle Identification Number** JF2SKAECXKH****
**Summary of Complaint:**
WE HAVE A 2019 SUBARU FORESTER, PROBLEMS HAVE BEEN WITH THE EYESIGHT SLAMMING ON THE BRAKES FOR NO REASON, AND TURNING ON AND OFF AT RANDOM TIMES. THE MAJOR ISSUE HAS BEEN THE SLAMMED ON BRAKES WHEN THE ROAD AHEAD WAS CLEAR, JARRING ME AND PASSENGERS, MY WIFE LITERALLY HAD WHIPLASH AND A HEADACHE FROM THE EXTREME, UNEXPECTED BRAKING. THIS HAS HAPPENED WHEN A VEHICLE IN FROM OF US MADE A RIGHT TURN, ROAD AHEAD IS CLEAR, TRAVELING THE SPEED LIMIT OF 35 MPH, SENSORS MUST BE PICKING UP THE CORNER OF THE OTHER VEHICLE AS WE APPROACH, LOCKING UP THE BRAKES, THINKING IT IS STILL IN FRONT OF US. ANOTHER INCIDENT, EYESIGHT SENSING AN EMPTY PAPER BAG BEING BLOWN ACROSS THE HIGHWAY, SLAMMING ON THE BRAKES, THIS COULD HAVE CAUSED A REAR END COLLISION FROM A DRIVER BEHIND US IF THEY WERE FOLLOWING TO CLOSE, LIKE IS THE NORM IN RUSH HOUR TRAFFIC. ANOTHER EVENT, A DOG RAN ACROSS THE FREEWAY, EYESIGHT NEVER ACTIVATED, I THOUGHT I HAD BRAKED AND CLEARED THE DOG, HE KEPT RUNNING, NO IMPACT, FOUND DAMAGE TO FRONT END UPON INSPECTION. ANOTHER ISSUE UNRELATED TO EYESIGHT, THE DEFROSTER BLOWER MOTOR DOES NOT RESPOND TO HIGH SETTING WHEN FIRST TURNED TO HIGH TO CLEAR WINDOW FOG, IT TAKES 3 TO 5 MINUTES BEFORE IT RAMPS UP TO HIGH SPEED.

I HAVE BROUGHT THIS TO THE ATTENTION OF OUR SALESPERSON AND SERVICE DEPARTMENT OUR SUBARU DEALERSHIP, MAYBE BE A CALIBRATION ISSUE, PROGRAM ISSUE WITH THE EYESIGHT SENSORS, THEY REFUSED TO DOCUMENT ANYTHING I SHARED AND TOLD ME THEIR IS ABSOLUTELY NOTHING WRONG WITH THE SYSTEM WITHOUT EVEN LOOKING AT IT. THERE IS NO MORE LOVE IN OUR SUBARU, AND NO CONCERN FOR SAFETY AT THE DEALERSHIP. I HAVE SPOKEN WITH OTHER 2019 SUBARU FORESTER OWNERS EXPERIENCING THE SAME EYESIGHT ISSUES. THIS HAS BEEN HAPPENING SINCE WE LEASED THE VEHICLE OCTOBER 2018 TO RECENTLY ON 2/20/2020. I WAS INFORMED TO FILE THIS BY THE OHIO ATTORNEY GENERAL WHILE FILING A COMPLAINT WITH THEM.

**NHTSA ID Number:** 11308147
**Incident Date** February 7, 2020
**Report Date** February 10, 2020
**Consumer Location** BARRINGTON, RI
**Vehicle Identification Number** JF2SKAGC2KH****
**Summary of Complaint:**
TRAVELING FROM RI TO WESTERN NY. DEPARTED RI IN AM WITH MODERATE RAINFALL WHEN "EYESIGHT DISABLED" INDICATOR FLASHED SEVERAL TIMES OVER THE COURSE OF HALF HOUR. WHEN RAIN SUBSIDED, INDICATOR DISAPPEARED. SEVERAL HOURS LATER, WAS DRIVING 65-70MPH ON STRAIGHT SECTION OF MAJOR INTERSTATE WITH GOOD VISIBILITY, APPROACHING A HIGHWAY OVERPASS WHEN "OBSTACLE DETECTED" WARNING APPEARED DESPITE NO OBSTACLE IN ROAD, AND SHORTLY THEREAFTER CAR

2

WENT INTO A SLOW SPIN (FELT AS IF FLOATING) TOWARDS LEFT, STRIKING A GUARDRAIL UNDERNEATH THE OVERPASS HEAD-ON AND CONTINUING TO SPIN 360 DEGREES AT WHICH POINT I WAS ABLE TO RECOVER CONTROL OF THE CAR. IT FELT AS IF BRAKES HAD ENGAGED (? CRASH IMMINENT BRAKING SYSTEM) ALTHOUGH I DID NOT HAVE FOOT ON BRAKE PEDAL AND I DID NOT ATTEMPT TO BRAKE WHILE IN THE SPIN AS I FEARED ROLLING THE VEHICLE. DESPITE EXTENSIVE FRONT END DAMAGE, AIRBAGS DID NOT DEPLOY. HAD TO LEAVE THE VEHICLE IN ALBANY, NY AND CURRENTLY AWAITING EVALUATION BY INSURANCE ADJUSTER.

OF NOTE, 5 MONTHS EARLIER THE WINDSHIELD HAD CRACKED WHEN HIT WITH SMALL ROCK AND WAS REPLACED AT SUBARU DEALERSHIP WHERE THE VEHICLE WAS PURCHASED.

**NHTSA ID Number:** 11306471
**Incident Date** January 18, 2020
**Report Date** February 1, 2020
**Consumer Location** MINNEAPOLIS, MN
**Vehicle Identification Number** JF2SKAPC8KH****
**Summary of Complaint:**
WHILE DRIVING AND VEHICLE IN MOTION, INTERMITTENTLY THE FOLLOWING INDICATOR/WARNING LIGHTS COME ON, STAY ON, GO OFF, AND COME BACK ON AGAIN WITHOUT ANY PATTERN: THE BSD/RCTA WARNING, THE AUTO START STOP, HILL DESCENT CONTROL, ACCIDENT AVOIDANCE/BRAKING, LANE ASSIST, AND EYESIGHT. ONE OR MORE WARNING/INDICATOR LIGHT COMES ON AND THEN SOMETIMES GOES OFF EVERY TIME I DRIVE. STARTED ON JANUARY 18TH-STILL HAPPENING FEB 1, 2020.. HAPPENS REGARDLESS OF ROAD CONDITION (DRY, WET), TEMPERATURE (VERY COLD, WARM (40 DEGREES), OR SPEED (25 MPH TO 60 MPH). THIS HAS HAPPENED ON HIGHWAY, CITY, RURAL ROADS. THE DRIVER TOUCHES NOTHING AND DOES NOTHING TO BEGIN/END THESE. SOMETIMES THE LIGHTS STAY ON AND THEN WHEN TRIP IS ENDED, VEHICLE TURNED OFF AND RESTARTED, THE LIGHTS REMAIN ON. SOMETIMES NEXT TIME THE VEHICLE IS STARTED, THE LIGHTS ARE OFF. THE LANE ASSIST INDICATOR AND AUTO BRAKING IN PARTICULAR, ARE OF CONCERN. THE LANE ASSIST COMES ON (ON ITS OWN) AND IS WHITE—THEN, WHILE DRIVING, IT TURNS GREEN AND TRIES TO STEER THE CAR OFF TO THE RIGHT —THE DRIVER HAS TO HOLD ON TIGHT AND FIGHT THE STEERING WHEEL AND CAR. THIS SEEMS VERY UNSAFE. THE DRIVER HAS TRIED TURNING OFF THESE LIGHTS/FUNCTIONS WHEN THEY JUST POP UP—WHILE DRIVING— BUT IF IN HEAVY TRAFFIC, CANNOT ALLOW FOR THESE DISTRACTIONS. IF CLEAR/NO TRAFFIC, DRIVER ATTEMPTS SHUTTING OFF THESE FEATURES BY PRESSING THE BUTTONS WITH THESE ICONS —ON THE CENTER REAR VIEW MIRROR PANEL OR ON THE LOWER LEFT PANEL BELOW DASHBOARD. SOMETIMES THIS WORKS, SOMETIMES DOESN'T AND THEY REMAIN ON. THE UNEXPECTED NATURE OF WARNING LIGHTS GOING ON AND OFF AND DIFFICULTY CONTROLLING THE STEERING WHEEL ARE REALLY CAUSING CONCERN. IT IS LIKE THE CAR IS POSSESSED. THIS IS A NEW VEHICLE (5 MONTHS). DEALER CONTACTED FOR SERVICE BUT TOLD HAD TO WAIT 3 WEEKS FOR APPOINTMENT. TRYING NOT TO GET IN AN ACCIDENT UNTIL THEN...

**NHTSA ID Number:** 11298861
**Incident Date** December 11, 2019
**Report Date** January 12, 2020
**Consumer Location** MODESTO, CA
**Vehicle Identification Number** 4S4WMAFD6K3****

**Summary of Complaint**

IN A MATTER OF 3 WEEKS, THE ASCENT CAME TO A COMPLETE STOP IN THE MIDDLE OF THE ROAD WITH NO OBJECTS IN VIEW OF THE CAR ON 2 DIFFERENT OCCASIONS. THE ANTI-COLLISION BRAKING SYSTEM INITIATED FROM APPROXIMATELY 35 MPH TO A COMPLETE STOP, THINKING THE FOG WAS AN OBJECT. THIS IS EXTREMELY UNSAFE AS THE VEHICLE CAN STOP AT ANYTIME, IN THE FOG. IF THERE WAS TRAFFIC ON THE ROAD, WE WOULD HAVE BEEN REAR ENDED. DEALERSHIP COULD NOT REPLICATE PROBLEM, WILL BE CONTACTING SUBARU DIRECTLY NEXT. MILEAGE IS APPROXIMATELY 8,500.

**NHTSA ID Number:** 11296743
**Incident Date** January 2, 2020
**Report Date** January 2, 2020
**Consumer Location** STERLING, VA
**Vehicle Identification Number** 4S4BSENC5J3****
**Summary of Complaint**
I WAS DRIVING IN A 4 LANE (TWO ON EACH DIRECTION) PARKWAY TOWARD A RED STOPLIGHT WITH ONE CAR STOPPED AT MY LANE AT THE LIGHT, I WAS COASTING, SLOWING DOWN TOWARD THE CAR. WHEN I WAS ABOUT 30 FT AWAY THE LIGHT CHANGED, THE CAR IN FRONT STARTED DRIVING AND I APPLIED THE ACCELERATOR. THE DISTANCE TO THE CAR IN FRONT WAS DEFINITELY INCREASING HOWEVER MY CAR WENT INTO EMERGENCY BRAKING MODE, CANCELLING MY ACCELERATION PEDAL ACTION AND STOPPING THE CAR. LUCKILY NO ONE WAS BEHIND ME AS IT WOULD HAVE ALMOST CERTAINLY ENDED IN A REAR-END COLLISION.

**NHTSA ID Number:** 11271764
**Incident Date** October 6, 2019
**Report Date** October 29, 2019
**Consumer Location** DELAND, FL
**Vehicle Identification Number** 4S4BSENC5F3****
**Summary of Complaint**
BRAKES WERE MOMENTARY APPLIED BY SUBURU EYESIGHT BRAKING ASSIST SYSTEM WHILE DRIVING (IN MOTION AT APPROXIMATELY 65 MPH) ON A STRAIGHT PORTION OF AN INTERSTATE HIGHWAY WITH NO OBSTRUCTION APPARENT. THIS HAD ALSO HAPPENED ONE OTHER TIME IN THE SAME VEHICLE SEVERAL MONTHS BEFORE IN SIMILAR CIRCUMSTANCES. ON BOTH INSTANCES THE DRIVER HAD HER FOOT ON THE ACCELERATOR AND THE BRAKES RELEASED AFTER ONLY A SHORT DECELERATION. A QUICK FLASH OF THE BAS WARNING LIGHT WAS ALSO OBSERVED IN THE SECOND INSTANCE. A SECOND PERSON IN THE CAR AT THE TIME ALSO STATES THAT THERE WAS NO OBSTRUCTION SEEN ON THE ROAD AND THE DISTANCE TO ANY CAR AHEAD IN THE SAME LANE SHOULD NOT HAVE CAUSED THE PROBLEM BEING REPORTED. THERE WAS A REAL CONCERN THAT CARS FOLLOWING US ON THIS BUSY HIGHWAY COULD HAVE EASILY CAUSED A REAR-END COLLISION IF THE BRAKES HAD NOT RELEASED QUICKLY. THE DRIVER HAD NEVER TAKEN HER FOOT OFF THE ACCELERATOR AND WAS CAUGHT COMPLETELY BY SURPRISE.

**NHTSA ID Number:** 11271199
**Incident Date** September 27, 2019
**Report Date** October 26, 2019
**Consumer Location** COOPERSBURG, PA

4

**Vehicle Identification Number** 4S4BSAFC5H3****
**Summary of Complaint**
I OWN AND DRIVE A 2017 SUBARU OUTBACK PREMIUM. I LIKE THIS CAR AND ENJOY
DRIVING IT. MY CAR HAS THE FULL EYESIGHT SAFETY SYSTEM. ON SEPTEMBER 27 2019 I
WAS DRIVING SOUTHBOUND ON THE NORTHEAST EXTENSION OF THE PENNSYLVANIA
TURNPIKE. I WAS A FEW MILES SOUTH OF THE LANSDALE EXIT IN THE MIDDLE LANE OF
THREE. THE ROAD WAS DRY, THE WEATHER CLEAR AND TEMPERATURE ABOUT 80
DEGREES. I WAS DRIVING BETWEEN 65 AND 70 MPH. A CAR PASSED ME ON THE RIGHT
AT A HIGH RATE OF SPEED AND PULLED INTO MY LANE IN FRONT OF ME. MY SUBARU
PRE-COLLISION BRAKING SYSTEM SLAMMED ON THE BRAKES AND BROUGHT ME TO AN
ABRUPT STOP IN MY LANE. I HAD NO CONTROL OF THE VEHICLE. MY WIFE WAS
SCREAMING " WHAT ARE YOU DOING ? WHAT ARE YOU DOING ? "MY EYES WENT TO
THE REAR VIEW MIRROR TO SEE WHO WAS GOING TO HIT ME. MY FOOT STAYED ON THE
ACCELERATOR TRYING TO KEEP MOVING. THE PRE-COLLISION BRAKING SYSTEM
FINALLY RELEASED THE CAR AND I WAS ABLE TO MOVE AGAIN. I MOVED TO THE
RIGHT LANE AND PUT MY EMERGENCY FOUR WAY FLASHERS ON. IT HAPPENED TWO
MORE TIMES IN THE NEXT MILE. I PULLED OVER AND CALLED THE DEALERSHIP AND
THEY ADVISED HOW TO TURN OFF THE PRE-COLLISION BRAKING SYSTEM. ON OCTOBER
3RD I TOOK MY OUTBACK TO THE CIOCCA SUBARU DEALERSHIP IN ALLENTOWN PA.
THEY KEPT THE CAR FOR A WEEK AND CLAIMED THERE IS NOTHING WRONG WITH
THEIR EYESIGHT SYSTEM. I DON'T FEEL SAFE DRIVING THIS CAR.

**NHTSA ID Number:** 11268614
**Incident Date** October 13, 2019
**Report Date** October 15, 2019
**Consumer Location** ARLINGTON, VA
**Vehicle Identification Number** 4S3GTAU63H3****
**Summary of Complaint**
TL* THE CONTACT OWNS A 2017 SUBARU IMPREZA. WHILE THE CONTACT WAS
COASTING THE VEHICLE FORWARD IN THE DRIVEWAY, IT INDEPENDENTLY SURGED
FORWARD WITHOUT WARNING AND CRASHED INTO THE GARAGE DOOR. THE CONTACT
STATED THAT THE FAILURE OCCURRED TWICE BEFORE AND THAT THE EYESIGHT
AUTOMATIC BRAKING FEATURE FAILED TO ACTIVATE DURING EACH OCCURRENCE.
THE AIR BAGS DID NOT DEPLOY UPON IMPACT AND THERE WERE NO INJURIES. A
POLICE REPORT WAS NOT FILED. THE DEALER (BEYER SUBARU, 7416 RICHMOND HWY,
ALEXANDRIA, VA 22306, 703-768-5800) WAS NOTIFIED OF THE FAILURE AND INFORMED
THE CONTACT TO TAKE THE VEHICLE TO AN INDEPENDENT BODY SHOP FIRST AND
THEN BRING IT TO THEM FOR DIAGNOSTIC TESTING. THE CONTACT EMAILED THE
MANUFACTURER REGARDING THE FAILURE. THE VEHICLE REMAINED ON THE
CONTACT'S PROPERTY AND HAD NOT BEEN REPAIRED. THE FAILURE MILEAGE WAS
APPROXIMATELY 20,000. *TT*JB

**NHTSA ID Number:** 11256458
**Incident Date** September 7, 2019
**Report Date** September 18, 2019
**Consumer Location** WASHINGTON, DC
**Vehicle Identification Number** JF2SKAPC7KH****
**Summary of Complaint**
I HAVE EXPERIENCED TWO INSTANCES OF PHANTOM BRAKING, SIMILAR TO REPORTS
I'VE READ ABOUT NISSAN ROGUES. ONCE IN JULY, AND ONCE LAST WEEK. IN BOTH
CASES I WAS DRIVING AT LOW HIGHWAY SPEED ON A SUNNY AFTERNOON. THE CAR'S

"OBJECT DECTECTED" WARNING FLASHED AND BEEPED, AND THE CAR BRAKED AUTOMATICALLY, FOR NO REASON. I SUSPECT BRIGHT SUNLIGHT AND/OR A SHADOW ON THE HIGHWAY WAS TO BLAME

**NHTSA ID Number:** 11230315
**Incident Date** January 23, 2019
**Report Date** July 9, 2019
**Consumer Location** FAIR LAWN, NJ
**Vehicle Identification Number** JF2SKAWC8KH****
**Summary of Complaint**
WHEN I START MY CAR VIA SUBARU STARLINK THE FOLLOWING TECHNICAL ISSUES OCCUR VOICE OVER BLUETOOTH GETS DISTORTED, APPLE CARPLAY DOES NOT CONNECT OR AFFECTS RADIO FIRST WAS NOTICED JAN 23, 2019. ALSO, POWER REAR GATE DOOR WOULD FAIL AND WOULD NOT OPEN WITH REAR GATE BUTTON, DASH BUTTON OR VIA KEY FOB AS THIS ON AND OFF PROBLEM ALSO NOTICED AFTER CAR IS STARTED VIA REMOTE APP STARLINK. POWER GATE PROBLEM REPORTED FIRST ON JAN 23, 2019 AND CONTINUES THROUGH THE PRESENT DATE. EYESIGHT FAILED ON JUL 06, 2019 WHEN CAR WAS STARTED VIA STARLINK, JUL 07, 2019 EYESIGHT BACK ON AND FAILED AGAIN ON JUL 08, 2019 WHEN CAR WAS MANUALLY STARTED FROM PARKING POSITION. WHEN EYESIGHT FAILS IT EFFECT VEHICLE DYNAMIC CONTROL WHICH ANALYZES STEERING ANGLE, ENGINE SPEED AND BRAKING CONDITIONS. ALSO, CRUISE CONTROL FAILS TO WORK ANS WELL SUBARU REVERSE AUTOMATIC BREAKING. TOTAL MILES ON THE CAR 7321 AS OF JUL 08, 2019.

**NHTSA ID Number:** 11190303
**Incident Date** February 12, 2019
**Report Date** March 20, 2019
**Consumer Location** Unknown
**Vehicle Identification Number** 4S4WMARD4K3****
**Summary of Complaint**
TL* THE CONTACT OWNS A 2019 SUBARU ASCENT. WHILE DRIVING 14 MPH IN A PARKING LOT, THE CONTACT ATTEMPTED TO ENGAGE THE EYESIGHT PRE-COLLISION BRAKING SYSTEM; HOWEVER, IT FAILED AND THE VEHICLE CRASHED INTO A POLE. THE AIR BAGS DID NOT DEPLOY. A POLICE REPORT WAS NOT FILED. THERE WERE NO INJURIES. THE DEALER AND MANUFACTURER WERE NOT CONTACTED. THE CAUSE OF THE FAILURE WAS NOT DETERMINED. THE FAILURE MILEAGE WAS 5,400.

**NHTSA ID Number:** 11183351
**Incident Date** December 20, 2016
**Report Date** March 1, 2019
**Consumer Location** Unknown
**Vehicle Identification Number** 4S4BSENC9G3****
**Summary of Complaint**
I HAD AN ACCIDENT @ 5PM-ENTERING A BUSY ROAD FROM A DRIVEWAY-HIT THE SIDE DOOR OF A CAR RACING LEFTTORIGHT IN FRONT OF ME. MY FAULT OF COURSE. I HEARD NO BEEP WARNING FROM THE SO-CALLED COLLISION MITIGATION SYSEM (?), NOR DID I FEEL ANY BRAKING. SUBSEQUENTLY I TESTED THIS FEATURE IN MY DRIVEWAY WHERE I SLOWLY DROVE THE CAR FORWARD TOWARD MY LARGE GARAGE, I WOULD HAVE HIT THE GARAGE-NO BEEP-NO BRAKING. THEN, IN A SNOW STORM, I HAD TO BRAKE SOASTO NOT HIT A LARGE TRUCK SKIDDING IN FRONT OF ME. I MISSED HITTING HIM BY INCHES. AGAIN, I HEARD NO BEEP AND FELT NO BRAKING. DEALER

6

TESTED THIS FEATURE ON MY CAR BY LETTING IT GO TOWARDS BRUSHES IN A
CARWASH, I HEARD BEEP WARNING, BUT AGAIN FELT NO BRAKING. DEALER SAID
SYSTEM IS WORKING PROPERLY. AND SO-I CONCLUDE THAT WHENEVER I HEAR ANY
KIND OF WARNING BEEO, I SHOULD MANUALLY AND QUICKLY 'HIT THE BRAKES', NO
MATTER WHAT. AFTER ALL, I HAVE TO KEEP MY EYES ON THE ROAD FOR GOD'S SAKE. I
AM NOT HAPPY.

**NHTSA ID Number:** 11176385
**Incident Date** February 11, 2019
**Report Date** February 11, 2019
**Consumer Location** SPRINGFIELD, VA
**Vehicle Identification Number** 4S4WMAFD1K3****
**Summary of Complaint**
I WAS IN TRAFFIC AND THE DASH- STARTED FLASHING AND EVERYTHING AT ONCE
STARTED SHUTTING OFF AND THEN BRAKE WAS APPLIED ON ITS OWN. VERY SCARY
WHILE IN TRAFFIC- I HAVE BEEN WAITING FOR A TOW TRUCK FOR OVER 3 HOURS.

DIALS: AT OIL TEMP FLASHES, ALL ELECTRONIC THINGS IS ALL OFF AND LIT.
TRANSMISSION AND BRAKING ISSUES- ALL AT ONCE.

CITY STREET BRADDOCK RD AND I PULLED OFF AT KINGS PARK SHOPPING CENTER IN
FRONT OF WELLS FARGO AND CVS, STATIONARY.

**NHTSA ID Number:** 11092857
**Incident Date** March 8, 2018
**Report Date** May 10, 2018
**Consumer Location** BLUFFTON, SC
**Vehicle Identification Number** 4S4BSAFC5H3****
**Summary of Complaint**
BOUGHT A 2017 SUBARU OUTBACK WAGON 2.5I PREMIUM WITH OPT PACKAGE 14 LAST
FEB, 2017. THE OPTION PACKAGE WAS THE EYESIGHT DRIVER-ASSIST SYSTEM. TWICE SO
FAR, WHILE DRIVING IN GOOD WEATHER, THE BRAKES HAVE SLAMMED ON FOR NO
APPARENT REASON - LEAVING RUBBER ON THE ROAD AND THROWING MY WIFE AND I
FORWARD. THEY APPLY FOR APPROX 2-3 SECONDS AND THEN - THE CAR CONTINUES.
FORTUNATELY, THIS HAS HAPPENED ON ROADS THAT HAVE NOT BEEN BUSY AND NO
ONE BEHIND US.

I IMMEDIATELY TOOK THE CAR TO THE DEALER WHEN THIS HAPPENED ON 3/8/2018 AND
WAS INFORMED THEY WERE NOT AWARE OF ANY ISSUE THAT WOULD CAUSE THIS. THIS
CONTRADICTED WHAT THE SERVICE REP TOLD ME ON 1/8/2018 WHEN I TOOK IT IN FOR
THE 6,000 MILE SERVICE. HE TOLD ME A COMPUTER UPDATE HAD BEEN RUN TO
CORRECT THIS. I REQUESTED THAT THEY DOWNLOAD THE ONBOARD COMPUTER AFTER
THIS SECOND INCIDENT WHICH SHOULD SHOW SPEED, BRAKING, TURNING, ETC... WHEN
I DROPPED IT OFF. ON PICK UP, WE WERE TOLD THAT THE CAR COMPUTER DOES NOT
RECORD THIS INFORMATION, THEY TEST DROVE THE CAR AND COULD NOT DUPLICATE
THE ISSUE AND NO DEFECT FOUND.

I CONTACTED SUBARU OF AMERICA AND PROVIDED ALL OF THE INFORMATION TO
THEM. THEY ADVISED THEY WOULD CONTACT THE DEALER AND GET ALL OF THE
DETAILS. THEY LATER FOLLOWED UP WITH ME AND ADVISED THERE WERE NO STORED
FAILED CODES AND NO ISSUES FOUND WITH THE EYESIGHT SYSTEM AND NO

INFORMATION STORED ON THIS INCIDENT IN THE CAR. THEREFORE, NO ISSUE OR
DEFECT WITH THE EYESIGHT SYSTEM AND THEY COULD NOT RECOMMEND ANY
REPAIRS.

THIS LACK OF COMPUTER STORED INFORMATION CONTRADICTS WHAT THEIR OWN
MANUAL SAYS. IT STATES "EYESIGHT RECORDS AND STORES THE FOLLOWING DATA
WHEN THE PRE-COLLISION BRAKING SYSTEM IS OPERATED." IT THEN LISTS - STEREO
CAMERA IMAGE; DISTANCE FROM VEHICLE IN FRONT; VEHICLE SPEED; STEERING
WHEEL TURNING; BRAKE PEDAL OPERATION…ETC.

I NOW TURN EYESIGHT OFF WHEN DRIVING AS I HAVE NO TRUST/FAITH IN IT.

**NHTSA ID Number:** 11091101
**Incident Date** February 28, 2017
**Report Date** April 30, 2018
**Consumer Location** AGOURA HILLS, CA
**Vehicle Identification Number** 4S4BSANCXH3****
**Summary of Complaint**
THE AUTOMATIC REAR BRAKING IS OVERLY SENSITIVE AND SLAMS ON THE BRAKES
ANYTIME I BACK OUT OF A DRIVEWAY; UNLESS I COME TO A COMPLETE STOP AT THE
MOMENT THE TIRES MAKE CONTACT WITH THE STREET. THE DEALER TELLS POTENTIAL
CUSTOMERS THIS CAN BE ADJUSTED, BUT WHEN I TOOK THE CAR IN FOR AN
ADJUSTMENT, THE SERVICE DEPARTMENT TOLD ME IT WAS AGAINST THE LAW TO
ADJUST IT. SUBARU CLAIMS IT'S WORKING AS DESIGNED, BUT THEY'VE NEVER TESTED
IT ON THE ROAD. THE ONLY THING THEY DO IS PLUG IT IN TO THEIR COMPUTER; AND
THEY FIND NO ERROR CODES. THE 2018 SUBARU OUTBACK IS NOT AS SENSITIVE.

**NHTSA ID Number:** 11083319
**Incident Date** November 25, 2017
**Report Date** April 4, 2018
**Consumer Location** CASPER, WY
**Vehicle Identification Number** 4S4BRDPC1E2****
**Summary of Complaint**
I WAS IN HEAVY TRAFFIC ON I-17 NORTH OF PHOENIX AZ. ADAPTIVE CRUISE CONTROL
(ACC) WAS SET AND I WAS FOLLOWING THE CAR AHEAD AT THE MAXIMUM DISTANCE
SET BY ACC. MY FOOT WAS NOT ON THE ACCELERATOR OR THE BRAKE.

I SAW THE PRECEDING CAR'S BRAKE LIGHTS COME ON, AND I FELT MY CAR START TO
SLOW. THE PRECEDING CAR STOPPED AND IT BECAME APPARENT THAT MY CAR WAS
NO LONGER BRAKING, OR IF IT WAS, NOT HARD ENOUGH TO STOP. I APPLIED THE
BRAKES BUT IT WAS TOO LATE AND WE HIT THE CAR IN FRONT OF US AT A SPEED
GREAT ENOUGH TO DO $7000 OF DAMAGE TO THE FRONT OF MY CAR. CURIOUSLY THE
AIR BAGS DID NOT DEPLOY.

PASSENGERS IN THE CAR INCLUDED MY WIFE IN THE FRONT SEAT, WHO WAS THROWN
INTO THE SEAT/SHOULDER HARNESS HARD ENOUGH TO KNOCK THE WIND OUT OF HER.
SHE COMPLAINED OF CHEST PAINS AND WAS TAKEN BY AMBULANCE TO THE
HOSPITAL. NO SERIOUS INJURIES WERE FOUND. MY DAUGHTER IN THE BACK SEAT AND
I WERE RESTRAINED PROPERLY BY THE SEAT BELT AND SUSTAINED NO INJURIES.

I CONTACTED SUBARU AND TOLD THEM ABOUT THE ACCIDENT. THEY RESPONDED BY

TELLING ME THAT THEY WERE SENDING TWO ENGINEERS TO INSPECT MY VEHICLE.
AFTER A MONTH OR 6 WEEKS THEY RESPONDED THAT THEIR INVESTIGATION WAS
COMPLETE. THEY FOUND THAT 5 SECONDS BEFORE THE CRASH I WAS TRAVELING AT 45
MPH. 1.5 SECONDS BEFORE THE CRASH THE BRAKES WERE APPLIED (DISABLING ACC).
THEY TOLD ME THAT THE EYESIGHT WAS FUNCTIONING NORMALLY AND WILL NOT
STOP ALL CRASHES. SO SORRY.

I BELIEVE THERE IS SOMETHING WRONG, EITHER WITH THE DESIGN OR THE
FUNCTIONING OF EYESIGHT AND ACC. MY CAR HAD 60,000 MILES ON THE ODOMETER
AT THE TIME OF THE CRASH. I HAVE USED ACC HUNDREDS (PERHAPS THOUSANDS) OF
TIMES IN HEAVY TRAFFIC. IT HAD ALWAYS PERFORMED AS ADVERTISED, I.E.
MAINTAINING A CONSTANT DISTANCE BETWEEN ME AND THE CAR AHEAD. IT SLOWED
AS NEEDED, AND CAME TO A STOP WHENEVER TRAFFIC STOPPED. THEN ONE DAY IT
DIDN'T

**NHTSA ID Number:** 11072782
**Incident Date** February 13, 2018
**Report Date** February 13, 2018
**Consumer Location** THORNTON, CO
**Vehicle Identification Number** 4S4BSETC4H3****
**Summary of Complaint**
LEASE DATE | 08/25/17

ON 01/17/18 AFTER SEVERAL DAYS OF THE EYE SIGHT SYSTEM TURNING ON AND OFF, I
NOTICE THAT A PIECE OF FOAM HAD FALLEN IN THE WAY OF THE PASSENGER CAMERA.
I NOTIFIED SUBARU OF AMERICA OF THIS THROUGH THEIR WEBSITE AND MIKE SHAW
SUBARU FIXED THE ISSUE. TODAY, AFTER TWO DAY OF EYE SIGHT SYSTEM TURNING
ON AND OFF, I NOTICE THAT A PIECE OF FOAM HAD NOW FALLEN IN THE WAY OF THE
DRIVER SIDE CAMERA. I HAVE NOT HAD THIS REPAIRED.

BOTH EVENTS SEVERELY INTERFERE WITH THE CARS SAFETY FEATURES FROM
OPERATING AND, IN THE CASE OF THE FIRST OCCURRENCE, THE
AUTO BRAKING SYSTEM DID DEPLOY INCORRECTLY AT TIMES.

**NHTSA ID Number:** 11060724
**Incident Date** January 1, 2018
**Report Date** January 5, 2018
**Consumer Location** ROCHESTER, MN
**Vehicle Identification Number** 4S4BSENCXF3****
**Summary of Complaint**
ATTEMPTED TO COME TO A STOP AT A PARKING SPOT IN FRONT OF A SHOP BUT CAR
SPED UP AND COLLIDED WITH A WALL 6 FEET IN FRONT OF THE CAR.
AUTOMATIC BRAKING SYSTEM DID NOT WORK OR ENGAGE AT SLOW SPEED.

**NHTSA ID Number:** 11031589
**Incident Date** April 1, 2017
**Report Date** October 3, 2017
**Consumer Location** PAYSON, AZ
**Vehicle Identification Number** 4S4BSENC8H3****
**Summary of Complaint**

TL* THE CONTACT OWNS A 2017 SUBARU OUTBACK. THE CONTACT STATED THAT THE REVERSE AUTOMATIC BRAKING SYSTEM INDEPENDENTLY APPLIED ITSELF. THE CONTACT STATED THAT THIS WAS DUE TO THE ASPHALT BEING AT AN ANGLE WHERE IT WAS CLOSE TO THE SENSORS OF THE VEHICLE. AUTONATION SUBARU SCOTTSDALE (15678 N NORTHSIGHT BLVD, SCOTTSDALE, AZ) INFORMED THE CONTACT THAT THEY WOULD NEED TO TEMPORARILY DISABLE THE FEATURE TO PREVENT FUTURE FAILURES WHEN REVERSING THE VEHICLE. THE MANUFACTURER WAS CONTACTED AND STATED THAT THE BRAKING SYSTEM WAS OPERATING AS DESIGNED. THE FAILURE MILEAGE WAS APPROXIMATELY 2,000.... .UPDATED 11/16/17 *BF

VEHICLE PURCHASE DATE SHOULD BE OR BEFORE INCIDENT DATE UPDATED 9/7/18*JB

**NHTSA ID Number:** 10938672
**Incident Date** November 19, 2016
**Report Date** December 29, 2016
**Consumer Location** ARLINGTON, VA
**Vehicle Identification Number** 4S4BSANC4F3****
**Summary of Complaint**
INVALID BRAKING INCIDENTS WITH SUBARU OUTBACK'S EYESIGHT PRE-COLLISION BRAKING SYSTEM. MY CAR HAS BRAKE SUDDENLY, WITHOUT CAUSE ON 3 OCCASIONS.

1) SUNNY MORNING ON A CROWDED RESIDENTIAL STREET GOING LESS THAN 25MPH WITH NO CARS DIRECTLY IN FRONT OF ME, CAR GAVE WARNING AND IMMEDIATELY BRAKED STOPPING THE CAR.

2) SUNNY AFTERNOON ON A WIDE RESIDENTIAL STREET GOING ABOUT 30MPH WITH NO CARS DIRECTLY IN FRONT OF ME, CAR GAVE WARNING AND IMMEDIATELY BRAKED SLOWING THE CAR SIGNIFICANTLY.

3) DARK AND RAINING ON A MAJOR HIGHWAY GOING 70MPH USING ADAPTIVE CRUISE CONTROL WITH NO CARS AROUND ME, CAR GAVE WARNING AND IMMEDIATELY APPLIED THE BRAKES HARD (NO SKIDDING OR SWERVING) SLOWING THE CAR TO ABOUT 25MPH BEFORE RELEASING CONTROL TO ME. VERY FORTUNATE THAT NO CARS WERE BEHIND ME.

AFTER EACH INCIDENT, I TOOK THE CAR INTO THE DEALERSHIP. THE DEALER WAS UNABLE TO RECREATE THE PROBLEM AND SAID THEY COULD NOT FIX THE CAR IF THEY COULD NOT RECREATE THE PROBLEM. AFTER REALIZING THE SIGNIFICANT SAFETY ISSUE FOLLOWING THE THIRD INCIDENT, I CALLED SUBARU CORPORATE CUSTOMER SERVICE. SUBARU SENT A CORPORATE ENGINEER TO LOOK AT THE CAR AND THE DATA RECORDINGS. THEY WERE UNABLE TO FIND ANY ISSUES WITH THE CAR AND AGAIN SAID THEY ARE UNABLE TO MAKE ANY REPAIRS WITHOUT RECREATING THE PROBLEM. IN THE 2+ YEARS AND OVER 30,000 MILES I'VE DRIVEN THE PROBLEM ONLY OCCURRED 3 TIMES, THE DEALER RECREATING THE PROBLEM SEEMS UNLIKELY GIVEN THEIR LIMITED TIME WITH THE CAR.

**NHTSA ID Number:** 10896525
**Incident Date** August 9, 2016
**Report Date** August 17, 2016
**Consumer Location** GLENWOOD, IA

**Vehicle Identification Number** JF2SJARC3FH****
**Summary of Complaint**
OUR 2015 SUBARU FOREST WILL RANDOMLY WHILE DRIVING HAVE ALL OF IT WARNING
LIGHTS COME ONE. EYESIGHT, HILL ASSIST, ABS, LANE DEPARTURE, ECT. IF YOU STOP
AND PUT IT IN PARK THEN IT WILL NOT COME OUT OF PARK UNLESS OVER RIDDEN. I
CALLED IN TO SUBARU AND THEY SAID "2015 SUBARU FORESTER RIGHT? IT PROBABLY
HAS A BAD BRAKE LIGHT SWITCH OR BRAKE LIGHT SENSOR, WHICH MEANS YOUR
BRAKES WILL NOT LIGHT UP WHILE DRIVING. THIS SEEMS TO BE A KNOWN ISSUE TO
SUBARU AS I HAVE SEEN MANY EXAMPLES OF THIS HAPPENING TO OTHER PEOPLE ON
SUBARU BOARDS. I WAS OUT OF WARRANTY AND THEY WANT ME TO PAY 170 DOLLARS
JUST TO DIAGNOSE THE ISSUE WHEN THEY CLEARLY KNOW WHAT THE ISSUE IS. THIS IS
A CRITICAL SAFETY HAZARD, IF MY BRAKE LIGHTS FAIL TO LIGHT UP WHILE DRIVING
DUE TO A KNOWN DEFECT, I OR SOMEONE ELSE COULD BE INJURED OR KILLED DUE TO
THEM NOT BEING ABLE TO RECOGNIZE MY BRAKING.

**NHTSA ID Number:** 11385178
**Incident Date** June 1, 2020
**Report Date** December 28, 2020
**Consumer Location** WINDSOR, CT
**Vehicle Identification Number** JF2SKAGC3KH****
**Summary of Complaint**
I NOTICED A SERIOUS SAFETY ISSUE WITH SUBARU'S LANE KEEP ASSIST SAFETY
FEATURE: WHEN DRIVING ON A BUSY HIGHWAY OVER AN AREA WHERE THE DOTTED
LINE HAD BEEN PAINTED OVER WITH DARK PAINT (BY ROAD WORKERS TO COVER IT UP
FOR A NEW LANE TO BE PAINTED) LANE KEEP ASSIST REGISTERED IT AS A LINE THAT
STILL EXISTS AND FORCEFULLY STEERED ME INTO THE LANE ON MY LEFT. TO AVOID
HITTING THE CAR IN THAT LANE, I FORCEFULLY TURNED TO THE WHEEL IN THE
OPPOSITE DIRECTION.

LUCKILY I AM A HEALTHY MAN WHO WAS ABLE TO STEER MYSELF BACK INTO MY
LANE, BUT IT TURNED MY WHEEL WITH ABOUT THREE TIMES THE FORCE OF REGULAR
LANE ASSIST: I THINK MANY PEOPLE INCLUDING YOUNGER PEOPLE AND THE ELDERLY
ARE AT AN EVEN HIGHER RISK LEVELS IF THEY ARE UNABLE TO TURN THE WHEEL LIKE
I DID. IT WAS A MUCH MORE FORCEFUL TURN THAN SUBARU'S REGULAR 'NON-URGENT'
LANE KEEP ASSIST.

THERE WERE NO VISUAL OBSTRUCTIONS PRESENT THAT THE EYESIGHT CAMERA WAS
PICKING UP: IT WAS REGISTERING THE OLD LINE THAT HAD BEEN PAINTED OVER. THIS
IS EXTREMELY IMPORTANT BECAUSE NOT ONLY IS THIS A SAFETY RISK FOR ANY TYPE
OF ROAD WORK THAT PAINTS OVER LINES DURING CONSTRUCTION OR REPAINTING,
BUT THIS ALSO POSES AN IMMEDIATE DANGER TO LIFE AND HEALTH TO PEOPLE
DRIVING ON ROADS WITH LINES THAT HAVE BEEN PAINTED OVER AND LEFT IN THAT
CONDITION. THE COMPUTER REGISTERED THE DARK LINE, MEANT TO VISUALLY COVER
UP THE OLD PAINT, AS A WHITE LINE!

I CONFIRMED THAT THIS IS A SYSTEMIC ISSUE AND NOT JUST INCIDENTAL WITH ME. I
FOUND A POST ON A SUBARU FORUM WHERE TWO PEOPLE DESCRIBE THE SAME
SITUATION I HAD. I WILL LINK THAT BELOW.

HTTPS://WWW.ASCENTFORUMS.COM/THREADS/LANE-KEEP-ASSIST-MALFUNCTION.9530/

I TRIED REACHING OUT TO SUBARU BUT THEY DID NOT REPLY. I BROUGHT THIS UP TO MY SUBARU DEALER WHO ONLY CHECKED FOR RECALLS. I NEED THIS TO GET THE ATTENTION IT DESERVES, PEOPLE ARE GOING TO DIE HERE. THEY PROBABLY ALREADY HAVE.

**NHTSA ID Number:** 11372535
**Incident Date** February 1, 2019
**Report Date** November 1, 2020
**Consumer Location** ALAMEDA, CA
**Vehicle Identification Number** JF2SJAWC3FH****
**Summary of Complaint**
EYESIGHT SYSTEM FAILS REGULARLY OR DOES NOT WORK AT ALL. THIS IMPACTS ALL PROXIMITY WARNINGS, AUTOMATIC SPEED CONTROL AND WHEEL SLIP CONTROL.

**NHTSA ID Number:** 11329157
**Incident Date** July 9, 2019
**Report Date** June 16, 2020
**Consumer Location** KANSAS CITY, MO
**Vehicle Identification Number** JF2GTANC4KH****
**Summary of Complaint**
THE WINDSHIELD CONTINUOUSLY ACCUMULATES SMALL CHIPS IN THE ROAD-FACING SURFACE OF THE GLASS. SOME CHIPS FROM LARGE ROCKS ARE TO BE EXPECTED, BUT THERE ARE FAR, FAR MORE SMALL CHIPS THAN CAN BE ACCOUNTED FOR BY LARGE ROCKS HITTING THE GLASS. THESE CHIPS APPEAR TO OCCUR WHEN SOMETHING AS SMALL AS GRIT FROM ROAD SANDING (DURING SNOW) HITS THE WINDSHIELD.

THIS CAUSES A SAFETY ISSUE BECAUSE THE VEHICLE IS EQUIPPED WITH EYESIGHT TECHNOLOGY. WHEN SUNLIGHT OR HEADLIGHTS CATCH THESE CHIPS AT CERTAIN ANGLES, LIGHT IS REFLECTED TOWARDS THE EYESIGHT CAMERAS. THIS CAUSES THE EYESIGHT SYSTEM TO SUDDENLY ALERT THAT AN OBJECT MAY BE IN FRONT OF THE VEHICLE. ON AT LEAST ONE OCCASION, THIS LIGHT REFLECTION OCCURRED FOR A LONG ENOUGH DURATION THAT THE CAR APPLIED THE BRAKES IN AN EFFORT TO STOP.

**NHTSA ID Number:** 11322418
**Incident Date** April 27, 2020
**Report Date** April 27, 2020
**Consumer Location** HUBER HEIGHTS, OH
**Vehicle Identification Number** 4S4BTAPC8L3****
**Summary of Complaint**
SUBARU EYESIGHT LANE CENTERING FAILURE.

DATE: 27APR 2020, TIME: ABOUT 9:45AM, LOCATION: I-75 SOUTH BOUND BETWEEN DAYTON AND CINCINNATE OHIO, ABOUT MILE MARKER 29.8. ROAD CONDITIONS: DRY, SUNNY AND BRIGHT.: ADAPTIVE CRUISE CONTROL ON, LANE CENTERING ON. VECHILE MILAGE ABOUT 7700 MILES.

WHILE PASSING A SEMI ON THE LEFT, AT THE REAR CORNER OF THE SEMI THE STEERING WHEEL TRIED TO MAKE A HARD SHARP RIGHT TURN.AS IF THE RIGHT SIDE OF THE LANE HAD MOVED WAY TO THE RIGHT. I HAD A HARD GRIP ON THE STEERING WHEEL WHICH WAS THE ONLY THING THAT KEPT ME FROM CRASHING INTO THE LEFT

REAR OF THE SEMI TRAILER.. I HAVE NOTICED IN THE PAST THAT THE LANE CENTERING HAS A TENDANCY TO STEER CLOSE TO SEMI'S WHILE PASSING EITHER ON THE RIGHT OR THE LEFT. FOR THIS REASON I TEND TO WATCH CLOSELY WHEN PASSING BUT THIS SUPRISED ME AT HOW HARD THE STEERING TRIED TO EXECUTE A LANE CHANGE, IT WAS ALMOST LIKE SOMEONE JERKED THE STEERING WHEEL TO THE RIGHT. AFTER BRINGING IT BACK ON COARSE THE LANE CENTERING STAYED IN THE PROPER LANE ABET, WANTING TO STAY TOWARDS THE RIGHT SIDE WHILE FINISHING PASSING. LANE CENTERING FUNCTIONED PROPERLY FOR THE NEXT FEW MILES AT WHICH TIME I TURNED IT OFF DUE TO APPROACHING SEVERAL SEMI'S. I DON'T BELIEVE THE SUBARA'S EYESIGHT LANE CENTERING FUNCTION IS RELIABLE.

THIS IS ALSO THE SECOND TIME THE LANE CENTERING HAS TRIED TO EXECUTE A LANE CHANGE SINCE OWNING THE VEHICLE.

**NHTSA ID Number:** 11319983
**Incident Date** November 30, 2018
**Report Date** April 1, 2020
**Consumer Location** FOND DU LAC, WI
**Vehicle Identification Number** 4S4BSATC4K3****
**Summary of Complaint**
I BELIEVE THE PROBLEM IS WITH THE EYESIGHT DRIVER ASSIST IF THIS IS ASSOCIATED WITH THE CRUISE CONTROL. I HAVE THE CAR SET AT 3 CAR LENGTHS & USE CRUISE ALWAYS. ON THE HIGHWAY WHEN CRUISE IS SET TO 70 - WITH OR WITHOUT FOLLOWING ANOTHER CAR - I WILL LOOK DOWN AND I FIND MYSELF GOING 85 MILES AN HOUR. THIS HAPPENS EVERY TIME I DRIVE ON THE HIGHWAY. OTHER PROBLEM IS THE SAFETY FEATURE OF STAYING IN ONE'S LANE. I HAVE NEVER HAD TO HOLD ONTO A STEERING WHEEL TO KEEP CONTROL OVER THE VEHICLE LIKE I DO NOW. IT OVER-CORRECTS AND I HAVE ACTUALLY BEEN THROWN INTO ANOTHER LANE. THIS IS MOST DANGEROUS ON THE HIGHWAY. I HAVE HAD THIS PROBLEM SINCE GETTING THE CAR AND HAVE REPORTED IT AND HAVE BEEN BLOWN OFF BY SUBARU DEALERSHIP WHERE I BOUGHT THE CAR AS WELL AS A LOCAL SUBARU REPAIR SHOP

**NHTSA ID Number:** 11309903
**Incident Date** February 5, 2020
**Report Date** February 18, 2020
**Consumer Location** FRESNO, CA
**Vehicle Identification Number** 4S4WMALD3L3****
**Summary of Complaint**
VEHICLE EYESIGHT SAFETY SYSTEM (ADAPATIVE CRUISE CONTROL), LANE DEPARTURE AND ANTI COLLISION SYSTEMS DEACTIVATED WHILE DRIVING. VEHICLE BACKUP CAMERA FAILED WHILE IN REVERSE.

**NHTSA ID Number:** 11307785
**Incident Date** February 7, 2020
**Report Date** February 7, 2020
**Consumer Location** SCOTLAND, CT
**Vehicle Identification Number** JF2SJAFCXGH****
**Summary of Complaint**
THE EYESIGHT HAS TURNED OFF SEVERAL TIMES RECENTLY AND WON'T TURN BACK ON UNTIL I STOP AND RESTART CAR. I HAVE HAD THE CAR FOR 3.5 YEARS AND THIS HAS NEVER HAPPENED BEFORE. THERE WAS NO SUNLIGHT AND VERY LIGHT MIST THIS LAST

TIME. THERE WAS NOTHING BLOCKING THE EYESIGHT CAMERA AT ALL. THIS IS NOT THE SAFETY FEATURE THAT I PAID EXTRA FOR.

**NHTSA ID Number:** 11292420
**Incident Date** December 30, 2019
**Report Date** January 1, 2020
**Consumer Location** BRONX, NY
**Vehicle Identification Number** JF2SJAGC1JH****
**Summary of Complaint**
ON SEVERAL OCCASIONS WHILE DRIVING ON THE HIGHWAY, MY EYESIGHT FEATURE SUDDENLY DISENGAGES AND MY CRUISE CONTROL CEASES TO WORK AND NO LANE ASSIST OR OTHER SAFETY FEATURES CONTAINED WITH THE "EYESIGHT PACKAGE" WORK FOR EXTENDED PERIODS OF TIME. THIS HAS OCCURRED WHEN IT IS RAINING OR SNOWING.

**NHTSA ID Number:** 11289740
**Incident Date** December 4, 2019
**Report Date** December 17, 2019
**Consumer Location** WARWICK, RI
**Vehicle Identification Number** JF2SKARC2LH****
**Summary of Complaint**
I WAS DRIVING MY 2020 SUBARU FORESTER SPORT IN THE LEFT LANE ALONG AN ON-RAMP TO THE HIGHWAY, WHICH CONSISTS OF A ROAD THAT CURVES TO THE RIGHT. THERE WAS SNOW ON THE GROUND BUT THE ROADS WERE CLEAR AND DRY. SUDDENLY AND IN A MATTER OF A FEW SECONDS, THE CAR BEGAN TO BEEP CONTINUOUSLY WHILE THE STEERING WHEEL VEERED TO THE LEFT AND LOCKED, AND THE ANTI-LOCK BRAKE SYSTEM KICKED IN AS I TRIED TO CORRECT THE WHEEL AND BRAKE THE CAR. I WAS SUDDENLY COMPLETELY OUT OF CONTROL OF THE VEHICLE AS THE CAR DROVE ME OFF THE ROAD AND DOWN INTO THE SNOWY MEDIAN, WHERE IT ROLLED AT LEAST ONCE BEFORE LANDING UPRIGHT. I BELIEVE THE ERROR WITH THE CAR MAY HAVE OCCURRED WITH SUBARU'S BRAND-NEW LANE CENTERING TECHNOLOGY, RELEASED WITH THE 2020 EDITION VEHICLES. THE TECHNOLOGY WILL PHYSICALLY DIRECT THE STEERING WHEEL TOWARDS THE CENTER OF THE LANE IF IT DETECTS THE VEHICLE IS GETTING TOO CLOSE TO EITHER LANE LINE. LANE CENTERING IS A FEATURE OF THE SUBARU'S DRIVER ASSIST TECHNOLOGY, CALLED EYESIGHT. I'M UNSURE IF THE MALFUNCTION OCCURRED WITH EYESIGHT OR WITH THE LANE CENTERING FUNCTION SPECIFICALLY.

**NHTSA ID Number:** 11221013
**Incident Date** April 2, 2019
**Report Date** June 28, 2019
**Consumer Location** ELGIN, SC
**Vehicle Identification Number** JF2GPANC7H8****
**Summary of Complaint**
TL* THE CONTACT OWNS A 2017 SUBARU CROSSTRAK. THE CONTACT STATED THAT WHILE DRIVING APPROXIMATELY 35 MPH IN THE RAIN, THE DRIVER PRESSED THE BRAKE PEDAL BUT THE VEHICLE DID NOT STOP CAUSING THE VEHICLE TO CRASH INTO THE REAR OF A SECOND VEHICLE. DURING THE INCIDENT THE COLLISION AVOIDANCE FEATURE( "EYESIGHT") MALFUNCTIONED AND DID NOT STOP THE VEHICLE. THE FRONT END WAS SEVERELY DAMAGED BUT THE AIR BAG DID NOT DEPLOY. A POLICE REPORT WAS TAKEN AT THE SCENE AND THE VEHICLE WAS DRIVEN AWAY. NO INJURIES WERE

REPORTED. THE CAUSE OF THE FAILURES WERE NOT DETERMINED. THE LOCAL DEALER AND MANUFACTURER WERE NOT YET NOTIFIED. THE FAILURE MILEAGE WAS 15,000.

**NHTSA ID Number:** 11207954
**Incident Date** May 15, 2019
**Report Date** May 16, 2019
**Consumer Location** GARLAND, TX
**Vehicle Identification Number** 4S4WMALD5K3****
**Summary of Complaint**
ALMOST 9500 MILES, RAINING OUTSIDE WIFE DRIVING NORMAL SPEED (HIGHWAY DRIVING) AND EYESIGHT STOPPED WORKING AND CHECK ENGINE LIGHT CAME ON. VEHICLE STILL RAN. SECONDLY TOOK TO LOCAL SUBRAU DEALERSHIP FOR 10,000 SERVICE THEY FOUND NOTHING WRONG AND DID SERVICE. WIFE LEFT DEALERSHIP AND NOTICED CAR PULLING TO LEFT AFTER TIRES ROTATED. RETURNED TO DEALERSHIP , THEY SAID IT WAS NORMAL FEATHERING OF TIRES.
WORRIED EYESIGHT AND ENGINE CAN BE AFFECTED WITH RAIN. ALSO AT A FEW HUNDRED MORE MILES WE NOW SMELL BURNING OIL ON AND OFF OUTSIDE OF CAR. WE HAVE ALSO EXPERIENCED HIGH REVVING MOTOR WITH NO FOOT ON GAS PEDAL.(STATIONARY WHEN SMELLING BURNT OIL SMELL AND MOTOR REVVING. ALSO ONCE HIGH REVVING WHILE MY 17 YEAR OLD WAS CITY DRIVING. LOVE TO DRIVE THE CAR, HOPE IT HOLDS UP!

**NHTSA ID Number:** 11207332
**Incident Date** May 13, 2019
**Report Date** May 13, 2019
**Consumer Location** GALVESTON, TX
**Vehicle Identification Number** JF2SJAWC7JH****
**Summary of Complaint**
EYESIGHT SHUTS OFF , IN RAIN WHEN MOST NEEDED. DEALER STATES IT IS OK.

**NHTSA ID Number:** 11205226
**Incident Date** April 27, 2019
**Report Date** May 2, 2019
**Consumer Location** LOMBARD, IL
**Vehicle Identification Number** JF1VA1N68H8****
**Summary of Complaint**
DRIVING AND ON A TURN BETWEEN 35-40 MPH MY WRX FREAKED OUT. THE DASH LIGHT UP LIKE A CHRISTMAS TREE, THE LANE TRACKING ALONG WITH THE ADAPTIVE CRUISE CONTROL INDICATORS FLASHED, AND THE DASH
SAID EYESIGHT UNAVAILABLE. IT FELT LIKE I COULDN'T CONTROL THE CAR AND ALMOST FELT AS IF IT ACCELERATED ON ITS OWN. I HIT THE BREAKS AND THE LOST CONTROL OF THE VEHICLE AND ENDED UP IN A DITCH. THE FRONT OF THE CAR RAN THROUGH BRUSH AND ENDED IN FRONT OF A TREE. THE AIRBAGS DEPLOYED ON THE SIDE BUT WERE DELAYED ON THE PASSENGER SIDE UNTIL THE CAR STOPPED. MY FIANCE WAS IN THE PASSENGER SEAT. FRONT AIRBAGS DID NOT GO OFF EVEN THOUGH IT WAS A FRONT COLLISION. THE CAR WAS ON A COUNTRY ROAD WITH OTHER TRAFFIC IN FRONT OF IT.

**NHTSA ID Number:** 11193964
**Incident Date** June 9, 2018
**Report Date** April 4, 2019

**Consumer Location** LINO LAKES, MN
**Vehicle Identification Number** JF2SJAGC1FH****
**Summary of Complaint**
EYESIGHT DRIVING ASSIST CAMERAS FAILED, INTERMITTENTLY AT FIRST THEN
COMPLETE FAILURE. THIS FAILURE ALSO TAKES OUT THE REAR BACKUP CAMERA AND
CRUISE CONTROL AND BRAKE ASSIST FUNCTIONS.

**NHTSA ID Number:** 11176202
**Incident Date** February 11, 2018
**Report Date** February 11, 2019
**Consumer Location** WOLCOTT, CT
**Vehicle Identification Number** JF2 SJAGC9J****
**Summary of Complaint**
THE EYESIGHT HAD BEEN MANIPULATED TO A WARNING EVEN WHEN THERE'S NO
OBSTRUCTION WHILE DRIVING FORWARD, WHILE BACKING UP IT GIVES A WARNING
THAT SOMEONE OR A VEHICLE IS ADJACENT TO MY CAR. THESE ARE JUST A FEW OF
THE PROBLEMS I ENCOUNTER. I HAVE AN IDEA WHO'S BEHIND THIS. BUT I CANNOT
PROVE IT. SOMEONE VERY KNOWLEDGEABLE IN COMPUTER SECURITY WITHIN MY
VICINITY. IT COMPROMISES THE SAFETY FEATURE OF THE CAR WHILE DRIVING AND
EVEN BACKING UP IN MY GARAGE.

**NHTSA ID Number:** 11139176
**Incident Date** September 9, 2018
**Report Date** October 9, 2018
**Consumer Location** PLYMOUTH, MN
**Vehicle Identification Number** 4S3BNBN60G3****
**Summary of Complaint**
EYESIGHT ADAPTIVE CRUISE CONTROL DOES NOT DETECT A STOPPED VEHICLE IN
FRONT AT ALL DIFFERENT SPEEDS. DRIVING ON HIGHWAY IF YOU COME UP ON A
COMPLETELY STOPPED VEHICLE THE EYESIGHT ADAPTIVE CRUISE CONTROL DOES NOT
DETECT THE VEHICLE A DRIVER ACTION IS NECESSARY TO STOP THE CAR.

THE SYSTEM WORKS FINE IF THE CAR IN FRONT IS MOVING.

**NHTSA ID Number:** 11132100
**Incident Date** September 25, 2018
**Report Date**  September 28, 2018
**Consumer Location** TIPP CITY, OH
**Vehicle Identification Number** 4S4BSAHCXG3****
**Summary of Complaint**
TL* THE CONTACT OWNS A 2016 SUBARU OUTBACK. WHILE DRIVING APPROXIMATELY
45 MPH ON A LOCAL ROADWAY, THE EYESIGHT PRE-COLLISION BRAKE ASSIST
SUDDENLY ACTIVATED AND CAUSED THE VEHICLE TO COMPLETELY STOP. THE BRAKES
RELEASED SHORTLY AFTER THE FAILURE. THE DEALER (SUBARU OF DAYTON, 995
MIAMISBURG CENTERVILLE RD, WASHINGTON TOWNSHIP, OH 45459, 1-(888) 431-9557)
WAS NOTIFIED OF THE FAILURE. THE SERVICE CENTER MANAGER INDICATED THAT THE
FAILURE WAS ESCALATED TO THE MANUFACTURER. THE VEHICLE WAS NOT
DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS NOTIFIED OF THE FAILURE AND
THE CONTACT WAS WAITING FOR A FOLLOW-UP RESPONSE. THE VIN WAS NOT
AVAILABLE. THE APPROXIMATE FAILURE MILEAGE WAS 54,000. *TT

16

CONSUMER STATED CAR WAS TAKEN INTO THE DEALER AND SO INCIDENT SINCE. UPDATED 12/20/18*JB

**NHTSA ID Number:** 11118736
**Incident Date** July 29, 2018
**Report Date** August 9, 2018
**Consumer Location** HILLSBORO, OR
**Vehicle Identification Number** 4S4WMALD4K3****
**Summary of Complaint**
TL* THE CONTACT OWNS A 2019 SUBARU ASCENT. WHILE DRIVING 45 MPH, THE VEHICLE BEGAN TO JERK VIOLENTLY TO THE POINT WHERE THE TIRES SCREECHED ACROSS THE ROAD. THERE WERE NO WARNING INDICATORS ILLUMINATED. WHEN THE BRAKE PEDAL WAS DEPRESSED, THE VEHICLE INDEPENDENTLY ACCELERATED RAPIDLY INTO THE DISTANCE. IN ADDITION, THE CONTACT STATED THAT THE BRAKES AND STEERING WHEEL SEIZED AFTER MINIMAL PRESSURE WAS APPLIED TO THE BRAKE PEDAL IN AN ATTEMPT TO STOP THE VEHICLE. FURTHERMORE, THE CONTACT STATED THAT THERE WAS A RUMBLING VIBRATION UNDERNEATH THE BRAKE PEDAL WHILE THE VEHICLE WAS IN MOTION. THE CONTACT WAS ABLE TO COAST THE VEHICLE TO A NEARBY GAS STATION AND CONTACTED ROADSIDE ASSISTANCE. THE VEHICLE WAS TOWED TO CARR SUBARU (11635 SOUTHWEST CANYON RD, BEAVERTON, OREGON 97006, (503) 672-3370) WHERE IT WAS DIAGNOSED THAT THE EYESIGHT ASSIST SAFETY FEATURE MALFUNCTIONED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE AND PROVIDED THE CONTACT WITH CASE NUMBER: 1-34973274988. THE FAILURE MILEAGE WAS 700.

**NHTSA ID Number:** 11065808
**Incident Date** January 22, 2018
**Report Date** January 30, 2018
**Consumer Location** CLINTON, CT
**Vehicle Identification Number** JF2GPAFC8FH****
**Summary of Complaint**
TL* THE CONTACT OWNS A 2015 SUBARU CROSSTREK. WHILE DRIVING 65 MPH, THE EYESIGHT DRIVER ASSIST SYSTEM WARNING INDICATOR ILLUMINATED. THE CONTACT DROVE HOME, TURNED OFF AND RESTARTED THE VEHICLE, AND THE INDICATOR DIMMED. THE CONTACT STATED THAT THE FAILURE RECURRED SEVERAL TIMES. THE VEHICLE WAS TAKEN TO BERTERA SUBARU OF HARTFORD (111 WESTON ST, HARTFORD, CT 06120, (888) 865-1393) WHERE IT WAS DIAGNOSED THAT THE EYESIGHT SYSTEM NEEDED TO BE REPLACED. THE VEHICLE WAS NOT REPAIRED. THE MANUFACTURER WAS NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 30,000.

**NHTSA ID Number:** 11062145
**Incident Date** January 11, 2018
**Report Date** January 11, 2018
**Consumer Location** MARLTON, NJ
**Vehicle Identification Number** 4S4BSBNC8F3****
**Summary of Complaint**
THE EYESIGHT SYSTEM TURNS ON AND OFF INTERMITTENTLY. THE VEHICLE IS TRAVELING AT SPEED AND ALL OF SUDDEN IT IS NOT. THE WINDSHIELD WAS CLEAR AND IT WAS NOT RAINING. THE VEHICLE WAS TRAVELING IN A STRAIGHT LINE. THIS HAS BEEN AN ONGOING ISSUE WHICH THE DEALER IS UNABLE TO RESOLVE.

17

**NHTSA ID Number:** 11055994
**Incident Date** December 20, 2017
**Report Date** December 21, 2017
**Consumer Location** BOONE, NC
**Vehicle Identification Number** JF2SJAWC1JH****
**Summary of Complaint**
BRAND NEW VEHICLE. DRIVING ON AN INTERSTATE AT 55MPH AND MADE A SLIGHT
LEFT TURN AT A BEND IN THE ROAD, WELL WITHIN THE CLEARLY PAINTED LANE
MARKERS. CLEAR WEATHER, TEMP ABOUT 50 DEGREES F. HEARD ONE BEEP AND LOST
CONTROL OF THE STEERING FOR A SECOND WHILE THE CAR STEERED ITSELF SLIGHTLY
LEFT. MY HANDS WERE ON THE STEERING WHEEL AND I WAS ACTIVE OPERATING THE
VEHICLE. STARTLING! HAPPENED TWO MORE TIMES. TOOK IT TO A DEALER AND HE
EXPLAINED THAT I MIGHT NOT BE USED TO ELECTRONIC STEERING. THE SAME DAY, ON
A TWO LANE ROAD AT 35 MPH, AT A SLIGHT LEFT BEND IN THE ROAD, ONE BEEP AND
LOST STEERING FOR ABOUT A SECOND BUT ENOUGH TO TAKE THE VEHICLE TO THE
EDGE OF THE SHOULDER. I WAS STARTLED AGAIN AND TURNED SHARP LEFT, CROSSING
THE DOUBLE YELLOW LINE INTO THE ONCOMING LANE. FORTUNATELY, THERE WERE
NO VEHICLES IN THE LANE. THE CULPRIT SEEMS TO BE THE "LANE KEEP ASSIST"
FEATURE OF THE EYESIGHT SYSTEM WHERE THE VEHICLE'S COMPUTER TAKES OVER
CONTROL IF IT DETECTS A LANE DEPARTURE UNDER CERTAIN CONDITIONS.
OBVIOUSLY, IT IS NOT FUNCTIONING CORRECTLY AND COULD HAVE CAUSED AN
ACCIDENT OR WORSE. TURNED LKA OFF.

**NHTSA ID Number:** 11024079
**Incident Date** July 15, 2015
**Report Date** September 18, 2017
**Consumer Location** SPRINGFIELD, MA
**Vehicle Identification Number** JF2SJHPC7EH****
**Summary of Complaint**
ON SUMMER 2015, I HAD A PROBLEM WITH MY 2014 SUBARU FORESTER XT.

I'M A SUBARU FAN.

MY CAR IS EQUIPPED WITH EYESIGHT SYSTEM, WHICH WILL APPLY BRAKES FOR ME IN
CASE I DON'T OR WILL INCREASE BRAKE FORCE TO AVOID A COLLISION IN CASE I
DIDN'T. THIS IS ONE OF THE STRONGEST SELLING POINTS OF THE EYESIGHT SYSTEM:
FRONTAL COLLISION AVOIDANCE. THAT DAY ON A BUSY HIGHWAY, DURING RUSH
HOUR, I WAS NOTICING SOME SPONGE EFFECT IN THE BRAKE PEDAL SO I DECIDED TO
INCREASE THE DISTANCE BETWEEN ME AND THE CAR IN FRONT OF ME. SUDDENLY, THE
BRAKE PEDAL STOPPED RESPONDING TO MY PROPORTIONALITY (CONTROLLED FORCE
APPLIED) AND I END UP REAR-ENDING THE CAR IN FRONT OF ME. I WORK TESTING
LANDING GEARS FOR PLANES AND HELICOPTERS SO BRAKE FADE WAS NOT NEW TO
ME. I IMMEDIATELY RECOGNIZE THE PROBLEM AND REPORTED TO THE DEALER. THE
PROBLEM WAS REPRODUCED BY THE DEALER'S TECHNICIAN AND THE CAR WAS
INTERNED FOR FURTHER REVISIONS. 2 DAYS LATER, THEY TOLD ME THAT THE LACK OF
SERVICE IN THE BRAKE SYSTEM WAS THE CAUSE OF THE PROBLEM BUT THE SERVICE
WAS DONE IN ANOTHER DEALER ON TIME. THAT WAS THE LAST EXCUSE I HEARD FROM
SUBARU. CUSTOMER SERVICE TOLD ME THAT THEY WILL NOT REPLACE ANY PART IN
THE CAR IF A DEALER DOESN'T APPROVE IT, SO I TOOK THE CAR TO THE SAME DEALER
WHERE THE 20,000KM SERVICE WAS DONE, 1 HOUR AWAY FROM MY TOWN. BY THAT

TIME, THE AMBIENT TEMPERATURE WAS LOWER FROM SUMMER 33C TO AUTUMN 17C. THE DEALER PUT MORE THAN 20KM ON THE CAR JUST TO TELL ME THAT HE COULD NOT REPRODUCE THE FAILURE SO THERE'S NO FAILURE AT ALL. I EXPLAIN TO HIM THAT THE FAILURE CANNOT BE REPRODUCED AT 17C TEMPERATURE. I EVEN SHOW HIM THAT THE BRAKE FORCE IS SO WEAK, IT NEVER ACTIVATES THE ABS SYSTEM, BUT ALSO IN VAIN. SUBARU CANT EXPLAIN WHY AN EYESIGHT EQUIPPED CAR ENDS UP REAR-ENDING THE CAR IN FRONT OF IT, IN BUSY TRAFFIC CONDITIONS. THEY SIMPLY DIDN'T ANSWER ME ANYMORE.

**NHTSA ID Number:** 11004021
**Incident Date** July 7, 2017
**Report Date** July 10, 2017
**Consumer Location** TUCSON, AZ
**Vehicle Identification Number** 4S4BSANC9G3****
**Summary of Complaint**
EYESIGHT TECHNOLOGY WARNING SHOWED INOPERABLE ALONG WITH LANE DEPARTURE AND FRONT END COLLISION AVOIDANCE SYSTEM. THE CAR HAD BEEN RUNNING LESS THAN 3 MINUTES AFTER OVER 24 . PULLED OVER CALLED DEALER WHO ATTEMPTED TO WALK ME THROUGH RESET. UNSUCCESSFUL NO AVAILABILITY FOR SERVICE SO SCHEDULED AN APPOINTMENT 3 DAYS LATER. CAR WARNING LIGHTS CLEARED ON THEIR OWN. SHOWED ADVISOR EMAIL FROM AUTO MESS. FROM SUBARU INDICATING WARNING LIGHT WAS AN ISSUE. WAS TOLD CODE WOULD BE CHECKED BUT SUBARU WAS AWARE OF THE ISSUE WHEN SOME CARS WERE OVERHEATED. DEALERSHIP WAS ADVISED TO CLEAR THE CODE AND SEND PEOPLE ON THEIR WAY. NO CODES REGISTERED AT ALL IN THE SYSTEM AND WHEN I LET THEM KNOW THAT CAR WAS ABSOLUTELY NOT OVERHEATED, I WAS TOLD THERE WAS NOTHING THAT COULD BE DONE BECAUSE SUBARU KNOWS THAT WHEN CARS OVERHEAT IT SOMETIMES HAPPENS. NOTHING COULD BE DONE BUT THE GREATER CONCERN IS THAT THEIR PREMISE OF WHEN THE ISSUE IS OCCURRING IS INACCURATE AT LEAST IN OUR CAR'S CASE AND IT DID NOT APPEAR, DUE TO THE REPETITION OF THE COMPANY CONTENTION THAT OVERHEATING WAS THE CAUSE OF THE ISSUE NOR WERE THEY WILLING TO ENTERTAIN ANY OTHER SCENARIO THAN THAT WHICH SUBARU ALREADY DECIDED. SPOKE WITH SUBARU OF AMERICA WHO 7/10/17 CUSTOMER SERVICE WHO STATED NOT AWARE OF ANY ISSUES BUT WOULD LOOK IN TO IT. BY THE END OF DAY 7.13.17.

**NHTSA ID Number:** 10979958
**Incident Date** March 23, 2017
**Report Date** April 23, 2017
**Consumer Location** JACKSONVILLE, NC
**Vehicle Identification Number** JF2SJAWCXFH****
**Summary of Complaint**
PROBLEM IS WITH THE SUBARU "EYESIGHT" SYSTEM ON THIS VEHICLE. THE SYSTEM HAS BEEN SUTTING ITSELF OFF MORE AND MORE OVER THE PAST FEW WEEKS UNTIL NOW, IT SHUTS DOWN THE SYSTEM AND CRUISE CONTROL MULTIPLE TIMES DAILY EVEN AT NIGHT.DAYTIME OR WHENEVER IT WANTS TO. THE LOCAL DEALER CHECKED IT AND FOUND NO PROBLEM THAT HE COULD SEE FOR IT.

**NHTSA ID Number:** 10968330
**Incident Date** March 15, 2017
**Report Date** March 24, 2017

**Consumer Location** LAKE FOREST, IL
**Vehicle Identification Number** 4S3GTAM67H3****
**Summary of Complaint**
EYESIGHT SYSTEM KEEPS TURNING ITSELF OFF. REAR CAMERA HAS FAR MORE
PROBLEMS AFTER FEDERAL REAR CAMERA RECALL. CAMERA OFTEN DOESN'T APPEAR
AND LEAVES ME WITH A BLANK SCREEN. EYESIGHT SYSTEM SHUTS OFF RANDOMLY
AND RESETS AFTER A RESTART. NOTHING ELSE CHANGES BUY A RESTART, AND
PROBLEM IS SOLVED. SOUND ALSO CEASES TO COME OUT OF THE RADIO, TOTAL
SILENCE, REGARDLESS OF INPUT AND VOLUME SETTING. ALL OF THE ABOVE IS
RANDOM. CAR'S BATTERY RUNS DOWN AT TIMES, AS THE SCREEN STAYS ON ON THE
RADIO, EVEN WHEN TURNED OFF. TWICE THE CAR WOULD NOT START. WE NOW CARRY
A BATTERY JUMP BOX WITH US AT ALL TIMES. PROBLEMS HAPPEN WHEN IN MOTION OR
PARKED. SPEED OR TIME RUNNING NOT RELATIVE TO ISSUES. CAR HAS BEEN INTO
THREE DIFFERENT DEALERS AND HAS AN APPOINT FOR A FOURTH RIGHT NOW. CAR
WAS DELIVERED FEB 9, AND HAS BEEN A TOTAL ELECTRICAL DISASTER.


**NHTSA ID Number:** 10966529
**Incident Date** March 16, 2017
**Report Date** March 17, 2017
**Consumer Location** SAN JOSE, CA
**Vehicle Identification Number** 4S4BSAFC8H3****
**Summary of Complaint:**
THE EYESIGHT SYSTEM FAILED TO BRAKE THE CAR AUTOMATICALLY.


**NHTSA ID Number:** 10926585
**Incident Date** June 30, 2016
**Report Date** November 17, 2016
**Consumer Location** RENO, NV
**Vehicle Identification Number** 4S4BSAFC8G3****
**Summary of Complaint:**
THE SUBARU EYESIGHT SYSTEM IS DANGEROUS. I'VE HAD TWO INSTANCES WHERE THE
VEHICLE ACTIVATED THE FORWARD-COLLISION WARNING AND STARTED TO BREAK
FOR REASONS UNKNOWN TO ME. ONCE WAS IN THE MIDDLE OF AN INTERSECTION.
FORTUNATELY, THE CARS BEHIND ME WERE NOT TOO CLOSE TO REAR END ME. THIS
HAPPENED AROUND 2 P.M. IN THE MIDDLE OF SUMMER WITH THE SUN BEHIND THE
VEHICLE.

I BROUGHT THE VEHICLE IN FOR RECALL WORK TO THE LOCAL SUBARU DEALERSHIP
SEVERAL MONTHS LATER AND ASKED THEM TO PULL ANY RELEVANT DATA FOR THE
TWO INCIDENTS. BY THEN, THE SYSTEM CLEARED THOSE TWO EVENTS. THE DEALER
SAID I SHOULD PURCHASE A VIDEO CAMERA AND RUN IT IN THE CAR WHILE DRIVING
TO CAPTURE ANY FALSE ALARMS IN ORDER TO HELP THEM TROUBLESHOOT IT AS
ACCORDING TO THEM THE SYSTEM DOES NOT CAPTURE ANY VIDEO/IMAGE DATA
WHEN IT RECORDS AN EVENT. THIS IS ABSOLUTELY OUTRAGEOUS. SUBARU HAS
CAMERAS IN THE EYESIGHT SYSTEM AND FLASH MEMORY TO STORE DATA IN -
STORING AN IMAGE SNAPSHOT IS NOT OVERLY STORAGE INTENSIVE, AND YET I AM
SUPPOSED TO INVEST SEVERAL HUNDRED DOLLARS IN AN INDEPENDENT VIDEO
CAMERA TO HELP SUBARU DEBUG THEIR SYSTEM.

THE DEALERSHIP SUGGESTED NOT USING EYESIGHT ON SUNNY DAYS WHERE THE

20

CAMERA COULD BE BLINDED BY THE SUN. HELLO - I LIVE IN NEVADA, IT'S SUNNY HERE OVER 300 DAYS PER YEAR. THIS WOULD MAKE THE EYESIGHT SYSTEM PRACTICALLY USELESS AND I'LL LOSE CRUISE CONTROL. HOW AM I SUPPOSED TO KNOW WHEN IT'S TOO SUNNY FOR THE SYSTEM THAT IT WILL MALFUNCTION?

**NHTSA ID Number:** 10914934
**Incident Date** October 8, 2016
**Report Date** October 9, 2016
**Consumer Location** AVONDALE, AZ
**Vehicle Identification Number** JF2SJAGC5FH****
**Summary of Complaint:**
DRIVING WITH EYESIGHT ENABLED AT 75MPH IN HEAVY TRAFFIC ON LOOP 202 FREEWAY AT APPROXIMATELY 2:30PM LOCAL TIME. WEATHER WAS SUNNY AND DRY, APPROXIMATELY 97 DEGREES. NEARLY RESULTING IN A CRASH. FEET WERE NOT ON ANY PEDAL. VEHICLE SUDDENLY LOST POWER AND REVD TO REDLINE AS IF THE CAR WAS IN NEUTRAL, ENGINE THEN SHUT OFF. INSTRUMENT CLUSTER SHOWED EVERY WARNING LIGHT ILLUMINATED. EYESIGHT DISPLAY SHOWED A VEHICLE DIRECTLY IN FRONT YET THERE WAS NO VEHICLE PRESENT. I CHECKED TO MAKE SURE GEAR SELECTOR WAS STILL IN DRIVE. PRESSED THE ACCELERATOR WHICH HAD NO AFFECT, NO RPM CHANGE. WAS ABLE TO COAST A SHORT DISTANCE BUT STILL OBSTRUCTED TRAFFIC. POLICE HAD TO SHUT DOWN FREEWAY TO MOVE MY VEHICLE TO THE SHOULDER. ATTEMPTS TO RESTART VEHICLE FAILED, ALL WARNING LIGHTS ON INSTRUMENT CLUSTER ILLUMINATE ANY TIME THE KEY IS TURNED TO THE "ON" POSITION. SUBARU ROADSIDE ASSISTANCE TOWED VEHICLE TO LOCAL SUBARU DEALER, AWAITING DIAGNOSIS.

**NHTSA ID Number:** 10875555
**Incident Date** June 17, 2016
**Report Date** June 21, 2016
**Consumer Location** CHAMPLIN, MN
**Vehicle Identification Number** 4S3BNAF62G3****
**Summary of Complaint:**
FOLLOWING ARE TWO MAIN ISSUES, CAUSALITY/CORRELATION UNCERTAIN. AFTER THE "SUBARU EYESIGHT" FAILED FOR ABOUT TWO MINUTES WHILE UNDERWAY (DASHBOARD CLUSTER LIT UP IN NUMEROUS PLACES, TOO), THE EYESIGHT SYSTEM RESET WHILE DRIVING. THEREAFTER, THE VEHICLE BEGAN TO "BUCK (E.G. LURCH FORWARD SEVERAL INCHES WITH A LOT OF FORCE)" WHEN THE VEHICLE'S CVT WAS IN "DRIVE" AND I WAS STOPPED WITH THE BRAKE DEPRESSED AT NORMAL PRESSURE. THIS HAS HAPPENED ABOUT SIX TIMES IN THE LAST FOUR DAYS, AND I AM EXTREMELY CONCERNED. THE "BUCK" IS SO SEVERE THAT THE FIRST TIME IT HAPPENED, I FELT LIKE I WAS REAR-ENDED. THE MOST RECENT TIME THAT IT OCCURRED, MY BEST FRIEND COULD HAVE BEEN SEVERELY INJURED WHEN THE CAR LURCHED FORWARD AS HE WAS STANDING OUTSIDE OF THE RUNNING VEHICLE, GATHERING THINGS FROM THE FRONT SEAT (E.G. FOOT OR LEG RUN OVER HAD HE BEEN TAKING GROCERIES OUT OF THE BACK SEAT). AT THIS POINT, THE SUBARU DEALERSHIP IS BEING COY ABOUT SITUATION RESOLUTION. WHAT IS ESPECIALLY CONCERNING IS THAT THE EYESIGHT SYSTEM IS SUPPOSED TO "KILL" ACCELERATION WHEN THE VEHICLE IS STOPPED, AND AN OBJECT FORWARD OF THE CAR IS DETECTED. YET, THE VEHICLE TRIED TO PROCEED FORWARD WHEN STOPPED IN TRAFFIC?

**NHTSA ID Number:** 10825580

**Incident Date** February 2, 2016
**Report Date** February 11, 2016
**Consumer Location** NEWFIELD, NY
**Vehicle Identification Number** JF2SJGXC3H4****
**Summary of Complaint:**
EYESIGHT SYSTEM DID NOT PICK UP VEHICLE IN FROMT OF CAR AND PROCEED TO DRIVE STRAIGHT TOWARD AT 70MPH, I HAD TO BRAKE THE CAR. THIS HAPPENED TWICE IN ONE DAY. DEALER SAID THEY TESTED CAR AND SYSTEM WAS WORKING FINE. THE SYSTEM DID NOT DETECT THE LARGE VEHICLE IN FRONT.

**NHTSA ID Number:** 11403484
**Incident Date** March 16, 2021
**Report Date** March 17, 2021
**Consumer Location** PORT ORCHARD, WA
**Vehicle Identification Number** 4S4WMALD9M3****
**Summary of Complaint**
THE LANE ASSIST FEATURE (ONLY AN OPTION WHEN USING ADAPTIVE CRUISE CONTROL; NOT THE SAME AS LANE CENTERING WHEN NOT USING THE ADAPTIVE CRUISE CONTROL [THE BASICS LANE CENTERING WORKS JUST FINE]) SEEMS OVERLY AGGRESSIVE. EACH TIME I HAVE USED LANE ASSIST WITH CRUISE CONTROL, IT JERKS THE CAR VERY ABRUPTLY AT TIMES, ALMOST TO THE EXTENT OF SENDING IT INTO ANOTHER LANE IF I DO NOT INTERVENE. I NO LONGER FEEL SAFE USING LANE ASSIST, SO I TURN IT OFF WHEN USING CRUISE CONTROL. I AM VERY CONCERNED IT?S GOING TO CAUSE AND ACCIDENT. THIS HAS HAPPENED AT LEAST 5 TIMES NOW WHILE DRIVING ON THE FREEWAY (EVERY TIME I HAVE ATTEMPTED TO USE LANE ASSIST).

**NHTSA ID Number:** 11396190
**Incident Date** January 27, 2021
**Report Date** February 14, 2021
**Consumer Location** MCKINNEY, TX
**Vehicle Identification Number** 4S4BSAFC4K3****
**Summary of Complaint**
I REQUESTED MANY TIMES TO HAVE OUR CAR CHECKED FOR NHSTA CAMPAIGN : 19V493000. THE DEALERSHIP SAID OUR CAR WAS NOT INCLUDED IN THAT CASE. OUR LANE ASSIST  WAS TOO AGGRESSIVE FROM THE FIRST DAY WE DROVE THE CAR. THE DEALERSHIP SAID THE STEERING WAS SPEED SENSITIVE AND WE WERE DRIVING TOO FAST. WE EXPLAINED THAT WE COULD NOT KEEP THE CAR IN THE LANE WHEN DRIVING OVER 40 MPH. IN THE FIRST 24 MONTHS WE CARRIED THE CAR TO THE DEALERSHIP 20 TO 30 TIMES FOR THE UNSAFE STEERING ISSUE. TWENTY FOUR MONTHS LATER WE HAD A ROCK CHIP THE WINDSHIELD AND THE CHIP RAN INTO 3 CRACKS EACH OVER 8 INCHES LONG THAT AFTERNOON WHILE THE CAR WAS IN OUR HOME GARAGE. AFTER WE PAID A $500.00 DEDUCTIBLE AND THE DEALERSHIP REPLACED THE WINDSHIELD , THE CAR DROVE BETTER. THE BATTERY HAS BEEN REPLACED THREE TIMES, THE FUEL PUMP REPLACED, ALL THE SENSORS ON THE TAIL GATE HAVE BEEN, THE PASSENGER SIDE WINDOW WOULD STICK 1/2 UP, AND MANY OTHER PROBLEMS. A SCAN OF THE CAR SHOWS 10 MODULES FAILED WITH MANY ACTIVE CODES. THE CODES ARE THE SAME AS BEFORE THE THIRD BATTERY WAS INSTALLED. MANY OF THE CODES ARE SAFETY ISSUES.

**NHTSA ID Number:** 11327241

**Incident Date** May 25, 2020
**Report Date** June 4, 2020
**Consumer Location** OCALA, FL
**Vehicle Identification Number** JF2SKADC7LH****
**Summary of Complaint**
I LEASED MY 2020 FORESTER END OF MARCH AND MEMORIAL DAY DROVE TO MY
SISTER'S HOUSE 20 MILES AWAY. IT RAINED AS SOON AS I LEFT MY HOUSE. WHEN IT
WAS RAINING ON ME ALL THE SAFETY FEATURES STOPPED WORKING! LANE ASSIST /
LANE DEPARTURE. ISN'T THAT WHEN YOU NEED IT THE MOST. I COULD BEARLY SEE
THE ROAD IN FRONT OF ME AND NO SAFETY FEATURES WORKING! AS SOON AS IT
STOPPED THEY MAGICALLY CAME BACK ON. ALSO WHEN I USE THE CRUISE CONTROL
THE LANE ASSIST FEATURE GOES INTO HIGH GEAR. IT PUSHES THE VEHICLE TO THE
CENTER LINE EXTREMELY HARD. MORE SO THAN NORMAL. NOT AT ALL PLEASED WITH
THIS VEHICLE. I HAD HEARD SO MANY GOOD THINGS ABOUT SUBARU BUT AM NOT
EXPERIENCING THEM FIRST HAND. I WILL DEFINITELY NOT BE PURCHASING THIS
VEHICLE AT THE END OF MY LEASE AND WILL GET OUT OF THE LEASE IF AT ALL
POSSIBLE. *TR


**NHTSA ID Number:** 11287989
**Incident Date** November 27, 2019
**Report Date** December 9, 2019
**Consumer Location** BEAVERTON, OR
**Vehicle Identification Number** 4S4BSANC3J3****
**Summary of Complaint**
INTERMITTENTLY WHILE DRIVING, THE STEERING WHEEL WILL JERK TO THE RIGHT OR
LEFT. HAS HAPPENED ON STRAIGHT ROADS AND ON CURVED EXITS. SPEEDS FROM 30-
60MPH. DRY PAVEMENT, NO SAND/MUD/OTHER HAZARDS. HAS HAPPENED
APPROXIMATELY A DOZEN TIMES TOTAL. LANE ASSIST IS TURNED OFF.


**NHTSA ID Number:** 11280159
**Incident Date** November 9, 2019
**Report Date** November 14, 2019
**Consumer Location** HERNDON, VA
**Vehicle Identification Number** 4S4BSANC1H3****
**Summary of Complaint**
ON MULTIPLE OCCASIONS (WHEN STARTING IN DRIVEWAY - STOPPED, WHILE DRIVING
IN PARKING LOT - 5 MPH, DRIVING IN TOWN - 25 MPH, WHILE DRIVING ON HIGHWAY - 60
MPH) ALL ADVANCED SAFETY FEATURES ARE DISABLED INCLUDING (BUT NOT LIMITED
TO) EYE SIGHT (FAB - FORWARD AUTO BRAKE, ACC - ADAPTIVE CRUISE CONTROL, LAS
- LANE ASSIST STEERING), RAB - REAR AUTO BRAKE, REAR CROSS TRAFFIC ALERT,
BLIND SPOT DETECTION, PARK BRAKE, ABS, TRACTION CONTROL, POWER STEERING.

NOTE THAT THE FAILURE OF THESE SYSTEMS DOES NOT CAUSE A CHECK ENGINE
CONDITION AND NO ERROR CODES ARE LOGGED.

THE DEALER INDICATED THAT THE FIRST 4/5 FAILURES LEFT NO CODES.

THE NEXT FAILURE WAS DELIVERED TO DEALER WHILE RUNNING IN A FAILED STATE.

DEALER REPORTED NO CODES FOUND.

23

SINCE THE DEALER DID NOT REPORT THIS TO SUBARU I WILL BE REPORTING THIS PROBLEM TO SUBARU.

**NHTSA ID Number:** 11270549
**Incident Date** September 15, 2019
**Report Date** October 23, 2019
**Consumer Location** OJAI, CA
**Vehicle Identification Number** 4S4WMAFD2K3****
**Summary of Complaint**
I HAVE THE SAME STEERING TROUBLE'S AS THE COMPLAINT FILED ON MAR. 03/19. I WAS TOLD AT THE DEALERSHIP THAT THE LANE ASSIST HAS SOME STEERING CONTROL. (COMPUTER STEERING ME) THEY ALSO SHOWED ME HOW TO TURN LANE ASSIST OFF. I DID NOTICE THE DIFFERENCE IN CONTROL. NOW A FEW WEEKS INTO DRIVING WITH THE LANE CONTROL OFF, THE CAR HAS RETURNED TO CORRECTING ITSELF AND CONSTANTLY TELLS DRIVER THAT THIS SYSTEM HAS BEEN TURNED OFF. HAS SUBARU MADE A BOEING MISTAKE?

**NHTSA ID Number:** 11267281
**Incident Date** July 22, 2019
**Report Date** October 9, 2019
**Consumer Location** GREER, SC
**Vehicle Identification Number** JF2GTANC3KH****
**Summary of Complaint**
WHEN DRIVING, ESPECIALLY AT HIGHWAY SPEEDS, THE STEERING WILL UNEXPECTEDLY PUSH THE CAR ACROSS THE LANE, SOMETIMES HARSHLY, ESPECIALLY AROUND CURVES. THIS IS MORE THAN A SIMPLE NUDGE FOR LANE ASSIST, IT SCARES THE HECK OUT OF YOU AS YOU FIGHT THE STEERING WHEEL TO MAINTAIN CONTROL. AT LEAST ON OUR CAR IT'S ENOUGH TO CAUSE AN ACCIDENT! THE CAR HAS BEEN IN TO SUBARU THREE TIMES TO CORRECT THIS PROBLEM, WITHOUT SUCCESS. AFTER INFORMING SUBARU OF AMERICA AND OPENING A FORMAL COMPLAINT (CASE #148267253025) THEY DISMISS THIS AS THE EYE SIGHT/ LANE ASSIST WORKING, AND SAY THE REMEDY IS TO TURN THIS SAFETY FEATURE OFF...WHICH TO US IS RIDICULOUS AND NOT WHY WE PURCHASED THIS CAR. AS WE HAVE INFORMED SUBARU THE CAR SITS IN OUR GARAGE AS WE ARE SIMPLY TOO AFRAID TO DRIVE IT. OUR INITIAL COMPLAINT WAS IN JULY, AFTER OUR FIRST ROAD TRIP,AND THE PROBLEM RECURS IRREGULARLY AND WITHOUT WARNING. THE CAR NOW HAS 5725 MILES ON THE ODOMETER.

**NHTSA ID Number:** 11257727
**Incident Date** August 5, 2019
**Report Date** September 24, 2019
**Consumer Location** TWISP, WA
**Vehicle Identification Number** 4S4BSANC6J3****
**Summary of Complaint**
AT 13,000 MILES CAR STEERING PULLED TO THE RIGHT AND LEFT WITHOUT DRIVER PERFORMING THIS ACT. FEELS LIKE CAR IS HYDROPLANING OR AFFECTED BY HIGH WINDS WHEN NEITHER CONDITION IS PRESENT. PRESENTS DANGER AS DRIVER HAS NO CONTROL AS TO WHEN THIS HAPPENS OR WHAT DIRECTION IT WILL GO. OCCURS AT ALL SPEEDS BUT WORSENS AFTER 50MPH. RESEARCH SHOWS THERE ARE OTHER

COMPLAINTS OF THIS SAME SITUATION WITH OTHER SUBARU CARS. MY DEALERSHIP
CLAIMED THEY HAD NOT HEARD OF THE PROBLEM BUT SUGGESTED TO MANUAL TURN
OFF LANE ASSIST. I PERFORMED THIS ACTION TO NO AVAIL - THE PROBLEM CONTINUES
. HAPPENS ON CITY STREETS AT 25 MPH AS WELL AS ON HIGHWAYS. WHILE FIRST
INCIDENT WAS AUGUST 5, 2019 IT NEVER STOPPED.

**NHTSA ID Number:** 11210550
**Incident Date** May 27, 2019
**Report Date** May 29, 2019
**Consumer Location** Unknown
**Vehicle Identification Number** 4S4BSANC4J3****
**Summary of Complaint**
THE STEERING WHEEL OF THIS CAR RANDOMLY TAKES OVER, FOR NO OBVIOUS
REASON, AT HIGH SPEEDS (OVER 45 MPH). I HAVE NO CONTROL OVER THE STEERING
WHEEL WHEN THIS HAPPENS. DRIVING THIS CAR HAS BEEN TERRIFYING! WHILE
PASSING A TRACTOR TRAILER, THE STEERING WHEEL PULLED ME TOWARDS THE
TRUCK 3 TIMES!!! I THOUGHT I WOULD BE KILLED! THIS IS A LOANER CAR FROM THE
DEALERSHIP. I CALLED THE DEALERSHIP, COLONIAL SUBARU, IN COLONIAL HEIGHTS,
VA, TO TELL THEM THERE IS SOMETHING WRONG WITH THIS CAR. I WAS INSTRUCTED
TO TAKE IT OUT OF LANE ASSIST MODE. THIS, HOWEVER, DID NOT SOLVE THE ISSUE.
THE CAR RANDOMLY PULLS TO THE RIGHT OR TO THE LEFT, WHEN LANE DRIFTING
ISN'T AN ISSUE. WHY ISN'T SOMETHING BEING DONE ABOUT THIS? I SEE THERE ARE
ALREADY DOCUMENTED CASES OF THIS WITH THE 2019 VEHICLE MODEL.

**NHTSA ID Number:** 11203981
**Incident Date** April 26, 2019
**Report Date** April 26, 2019
**Consumer Location** MINNEAPOLIS, MN
**Vehicle Identification Number** JF2GTAEC7K8****
**Summary of Complaint**
THE LANE ASSIST IS SOMETIMES OVERLY AGGRESSIVE, WITHOUT WARNING. WHEN
TAKING AN EXIT RAMP TO THE RIGHT IT ONCE VIOLENTLY TRIED TO CORRECT TO THE
LEFT. IN CROSSWINDS IT'S LIKE TRYING TO STEER A MARIO CART GAME AND WILL JERK
YOU BACK AND FORTH IN THE LANE.

**NHTSA ID Number:** 11193481
**Incident Date** February 5, 2019
**Report Date** April 2, 2019
**Consumer Location** LINCOLN, CA
**Vehicle Identification Number** 4S4BSANC9J3****
**Summary of Complaint**
SUBARU LANE ASSIST STEERING ISSUE. WHEN YOU HAVE LANE ASSIST ON THE CAR
WILL TRY AND STEER FROM ONE LANE TO ANOTHER ON ITS OWN. THIS HAPPENS WHEN
YOU ARE ON THE FREEWAY AND STARTED AFTER 10,000 MILES WAS ON THE CAR.

**NHTSA ID Number:** 11143844
**Incident Date** October 29, 2018
**Report Date** October 29, 2018
**Consumer Location** PHILADELPHIA, PA
**Vehicle Identification Number** 4S4BSAFC8J3****
**Summary of Complaint**

25

AT LEAST 10 TIMES IN THE PAST WEEK WE HAVE ALMOST CRASHED DUE TO THE STEERING. WE WENT OFF THE ROAD TWICE.

THE CAR IS SERIOUSLY VEERING OFF TO THE RIGHT, ALMOST LIKE YOU ARE HYDROPLANING ON DRY LAND. YOU CAN'T EVEN STEER THE CAR BACK INTO THE LANE. IT JUST GOES BY ITSELF.

I DID TAKE IT TO THE DEALER TODAY. THEY ARE SAYING THAT IT IS THE LANE ASSIST BEING ON AND TO TURN IT OFF. WE'VE HAD THE CAR FOR 5 MONTHS AND NOW ALL OF A SUDDEN THIS IS HAPPENING. IT IS NOT RIGHT AND SOMEONE IS GOING TO BE KILLED.

PLEASE INVESTIGATE THESE COMPLAINTS AND PLEASE DO A RECALL BEFORE INNOCENT PEOPLE ARE KILLED. THIS IS HAPPENING ON THE HIGHWAY AS WELL AS SMALLER STREETS

**NHTSA ID Number:** 11024931
**Incident Date** August 25, 2017
**Report Date** September 21, 2017
**Consumer Location** HIGHTSTOWN, NJ
**Vehicle Identification Number** JF2SJAWC0JH****
**Summary of Complaint**
WHILE DRIVING AT 60 MILES AN HOUR ON A 4 LANE HIGHWAY, I WAS GOING AROUND A SLIGHT CURVE WHEN THE LANE ASSIST CAME ON. I WAS IN THE LEFT LANE AND NOT NEAR THE LEFT LINE IN ROAD, BUT CENTERED IN THE MIDDLE OF LANE. I HEARD ONE BEEP AND THEN THE STEERING WHEEL BECAME VERY LOOSE IN MY HAND AND IT TOOK ME A FEW SECONDS TO GAIN CONTROL OF THE STEERING WHEEL. THIS ALSO HAPPENED WHILE GOING ON A SLIGHTLY CURVED CITY STREET GOING ABOUT 40 MILES AN HOUR. IT SCARED THE DICKENS OUT OF ME AS IT WAS NOT WHAT I EXPECTED THE LANE ASSIST TO DO. I WENT BACK TO DEALERSHIP AND TOLD THEM ABOUT THE STEERING AND THEY SAID I JUST NEEDED TO GET USED TO HOW THE ELECTRIC STEERING WORKED. AFTER IT HAPPENED A COUPLE MORE TIME I MADE APPOINTMENT FOR SOMEONE TO TAKE A TEST DRIVE. THE TECHNICIAN FELT A SLIGHT SWAYING BUT SAID IT WAS THE TYPE OF STEERING OF THE LANE ASSIST. HE SUGGESTED I TURN IT OFF AND NOT USE IT FOR A WHILE AND SEE HOW CAR THEN HANDLED. THE TECHNICIAN FILED CASE # 26296330423, NO PROBLEM FOUND WITH VEHICLE, SYSTEM IS OPERATING AS DESIGNED, NO REPAIR ATTEMPT PERFORMED. (EQMR WAS ALSO FILLED OUT AND SUBMITTED.) I HAVE NOT DRIVEN MY FORESTER WITH THE ASSIST ON SINCE THIS HAPPENED. I HAVE NOT HAD THIS LOOSE WHEEL STEERING HAPPEN AGAIN. I AM CONVINCED IT IS THE LANE ASSIST AND FEEL IT IS NOT WORKING PROPERLY IN MY VEHICLE. I WILL PROBABLY NEVER USE IT AGAIN. LANE DEPARTURE IS FINE, DOES WHAT IT'S SUPPOSED TO DO. I HAVE NO COMPLAINTS WITH THE DEALERSHIP OR THEIR TECHNICIAN, THEY WERE VERY THOROUGH AND KIND. THIS LANE ASSIST IS JUST AN ASPECT OF THIS SAFETY TECHNOLOGY THAT I DON NOT LIKE HOW IT WORKS. OR IS THERE SOMETHING WRONG WITH IT IN MY CAR THAT THIS HAS NOT HAPPENED TO OTHERS YET?

I DO UNDERSTAND HOW LANE ASSIST WORKS, I DID TEST DRIVES HAVING IT ON AND IT WOULD BRING ME BACK TO MY LANE IF I WENT OVER THE LINE WITHOUT A BLINKER ON.

## **EXHIBIT B**

### **SubaruOutback.org**

Obstruction Detected?

Anyone have THIS happen? 2020 Outback Premium >> In stop and go traffic SUDDENLY the warning appeared OBSTRUCTION DETECTED and the ABS braking system slammed on the brakes! There was NOTHING there!!!!! Luckily for me the car behind me was a sufficient distance behind that he didn't rear-end my car! – Bill E Bobb, August 28, 2020.

[]

Had a similar occurrence myself, going uphill, rounding a curve and a car (in his lane) appears headed downhill (driving normally) and my car panicked and slowed w braking like you described. Took me a minute to figure out the scenario that happened. No rain, no sun, no glare but plenty of trees and I guess the opposing car surprised my eyesight system and it thought something jumped out in front of me, which is good to know what the car would do if it were a deer jumping out in front of me! – Rori, August 31, 2020.[1]

Eyesight no stopping in time using ACC?

I was in stop and go traffic the other day using ACC and in one instance when everyone was slamming on the brakes the eysight obstacle on road warning was flashing but did not apply enough braking power. I waited until the last moment and slammed on my brakes. I wonder if i did not intervene would I have rear ended the car in front of me? Has this ever happened to you? I'm not sure if eyesight would have stopped in time.

I now use a follow distance of 3 because I don't trust eyesight 100% -- indestruct, December 6, 2015.[2]

Eyesight / RAB Issues

Edit: General thread about Eyesight / RAB issues and fixes.

I regularly get false detections on RAB when backing out of my garage onto asphalt driveway. The camera just shows spots on the asphalt. Until today, it was just

---

[1] https://www.subaruoutback.org/threads/obstruction-detected.524339/

[2] https://www.subaruoutback.org/threads/eyesight-not-stopping-in-time-using-acc.310449/

beeping so I ignored those as a nuisance, but today it actually applied the brakes. I am wondering if it is a common occurrence or is it something I need the dealer to take a look at?

It was a bit wet outside today but I doubt that sonar is affected by it.

PS: I searched the board but didn't find anything on it. – subie_newbie2017, January 14, 2020.[3]

### 2017 Outback: Strange Sudden Stop While Backing Up

As I was slowly backing out of a parking lot, my outback made a strange whirling sound and suddenly stopped while I was still in reverse. It totally freaked me out. (The car is new to me, just 2 weeks old.)

Is this a sensor issue with the rear automatic braking system? I'm really hoping it is, and is just overly sensitive. – ck94901, November 14, 2020.[4]

### Could EyeSight Pre-Collision Braking be triggered by exhaust "cloud"?

2018 2.5 Touring

Was approaching a line of cars at a red light this AM (pre-dawn, but not too dark). I was maybe within 150-175 feet, doing 15 to 20-ish MPH & braking. Outside temp was showing 29F. The light turned green and the cars ahead started moving. I lifted my foot from the brake and at about the same time a large "cloud" of exhaust appeared behind the last car in line (about ~50 feet / 3+ car lengths away and I was going even slower by then) and my car instantly locked the brakes & stopped with the dash flashing the EyeSight collision warning.

Is car exhaust known to trigger the Pre-Collision Braking? Or should I call my dealer this morning?

Thanks, -- psklenar, October 31, 2018.


i wouldnt be surprised, shadows from trees and stuff tend to set mine off randomly when driving before dusk. – paroxysym, October 31, 2018,


I am with @paroxysym on this one. I have not experienced exhaust causing an alert or automatic breaking, but I also would not be surprised t all.

I have had shadows and sun shining through trees give me an alert while driving in my neighborhood. I thought it was maybe a fluke until it happened a few days later; in the same stretch of road, at the same time of day. – KingBing, October 31, 2018.

---

[3] https://www.subaruoutback.org/threads/eyesight-rab-issues.518125/

[4] https://www.subaruoutback.org/threads/2017-outback-strange-sudden-stop-while-backing-up.526677/

[]

Happened this morning.
Had this same occurrence this morning in Boston. Brakes came on, and I'm sure it ticked off the guy behind me. After that, stayed back from exhaust in front of me.—TSquared, January 14, 2019.

[]

I had it happen a couple of weeks ago. Situation: Vehicle in left turn lane, waiting at the light, I proceeded in the lane to his immediate right - there was a large cloud of exhaust from his vehicle (probably not warmed up) - set off my EyeSight braking. I'm in Minnesota.—doug_B, January 14, 2019.

Same issue, on four-way stop my car started to brake from the exhaust of car that has already left the intersection.—byebye7cyl, January 14, 2019.[5]

     <u>Eyesight Camera Malfunction</u>
Hi- I have a 2015 Outback with 40,000 kms. Recently, we went through a polar vortex (-39 C with wind-chill -49 C). On day 4 of this weather, I warmed up the vehicle (about 15 minutes) and headed to work. Almost immediately, there was a short beep, and the Eyesight warning indicator came on (and has stayed on ever since). This was a few days ago and the outside temps have warmed up considerably but the Eyesight Camera is still in malfunction mode. (The pre-collision brake system and lane departure warnings also shut off and are lit up on the dash).
I live 4 hours from the nearest Subaru dealer. Does anyone have any ideas that I can try? I can probably live without the camera, but it has also stopped the cruise control from working. :crying:--veld6, February 1, 2019.[6]

     <u>Eyesight disabled/brake light flashing.</u>
Here is the scenario.
I have a 2015 Outback 3.6R with eyesight.
Yesterday on way home from work while stopped at a stoplight the Eyesight has been disabled/check manual light came on as well as the red brake light (the one that lights up for instance when you are holding on a hill) was flashing. Of course the check manual is useless. It says to have it checked/serviced.

---

[5] https://www.subaruoutback.org/threads/could-eyesight-pre-collision-braking-be-triggered-by-exhaust-cloud.501177/
[6] https://www.subaruoutback.org/threads/eyesight-camera-malfunction.505451/

I got home, turned off the engine then restarted. The system worked and I drove it around the block and back home. It was only on a few minutes.

This morning I started car up. Eyesight working but went off after about 5 minutes with same symptoms. I stopped and restarted. It worked for a bout 10 minutes (in stop and go traffic).

I turned if off again and got on the freeway. First part stop and go and drove about 25 miles up the freeway, the last part not stop and go. Took the exit and got in a drive through. It turned off again. Stopped and restarted and it worked the 2 miles or less I had to work.

I called the dealer and they didn't offer much, just bring it in.

I have seen the eyesight temporarily disabled before but it will then come back on. Never anything like this with the brake light flashing.

I notice no other symptoms other than the eyesight disabled and brake light flashing. Nothing seems to be operating out of normal. No check engine or anything either. Has anybody ever seen this and what was the resolution?

I hoping to get an idea of what I may be getting into. I do have an extended warranty but.... – hikejr, January 23, 2018.[7]

<u>Collision avoidance failed to initiate</u>

Long time reader, first time poster here. Anyway, last week, my wife was driving our 2017 Outback and she carelessly blew a stop sign and hit the rear fender of a vehicle passing through the intersection. The crash was 100% avoidable and she has taken full responsibility. Luckily she and my daughter, who was also in the car at the time, and the driver of the other vehicle, are totally fine.

As well as my wife remembers, EyeSight's collision avoidance never initiated. I've seen some of the potential cases where EyeSight may not function properly (sun glare, fog, etc.), but none of those were present at the time. This was also in a residential area, with a speed limit of 35 mph, so neither car was travelling at a high rate of speed. Add to all of this the fact that she hit the rear fender of the other vehicle, which would mean it would have been visible to EyeSight for some time before the collision occurred, and I don't understand why it didn't activate. Has anyone ever seen this happen before, or have any thoughts on why it didn't activate? Thanks! – bobchadwick, May 8, 2017.[8]

<u>Eyesight error messages</u>

---

[7] https://www.subaruoutback.org/threads/eyesight-disabled-brake-light-flashing.469545/

[8] https://www.subaruoutback.org/threads/collision-avoidance-failed-to-initiate.419778/

My eyesight system has been failing recently on my 2017 Outback Touring. When it happens, all of the warning lights come on and the safety systems no longer operate. Turning off the car for a few minutes and restarting is only a temporary solution until the lights reappear.

Obviously, I will be taking the car in to the dealer this coming week. Has anyone had similar issues? If so, what is the fix

Thank you.—Suberman, December 17, 2016.[9]

### Eyesight temporarily shuts down often

Hi, first time Subaru owner and poster here. I bought my Outlook in 1/2016 and have had multiple problems with Eyesight shutting down after I first start in the morning. My car sits in a garage and when I first start it around 630a, the usual warning lights come on and then go off as they should. About 30-60 sec later I get a warning light that Eyesight is unavailable. But then about 3 min later, its back on again and works fine for the rest of my 25 min trip to work. Its usually dark out but no fog, no rain, no nothing. Can happen on cold or warm days. It doesn't happen every day, maybe 40-50% of the time. Otherwise, Eyesight seems to work as billed in terms of lane avoidance, ACC, etc. I mentioned it to the dealer at the 6K maintenance and he said a software upgrade should help but it didn't. I am concerned that this is an early sign of worse problems to come. Any ideas? – jgossage, January 2, 2017.[10]

### Blindspot and Eyesight randomly diables when driving

Periodically when the vehicle is started and having driven several miles, the blind spot caution/warning system and eyesight randomly disables itself. This is confirmed by a caution light in the instrument panel. The only way to reactivate the system is to turn off the ignition and restart the engine. If the malfunction is not caught on starting the vehicle the system cannot be activated until the vehicle is stopped and the engine restarted. The problem has been ongoing. WTF?

Any constructive ideas? (don't tell me to "see a dealer" - they have no idea what's happening). This appears to be an electrical fault issue. This is a serious issue and a lawsuit waiting to happen. SOA - please answer. – WileyOne, December 5, 2017.[11]

### Eyesight problems

---

[9] https://www.subaruoutback.org/threads/eyesight-error-messages.393058/
[10] https://www.subaruoutback.org/threads/eyesight-temporarily-shuts-down-often.395521/
[11] https://www.subaruoutback.org/threads/blindspot-and-eyesight-randomly-diables-when-driving.460553/

I have a 2014 Outback 2.5I Limited. I've noticed that during a certain time of day when the sun is overhead and I'm trying to park in my garage the eyesight jams on my breaks and stops the car. The garage is dark and I do have my head lights on but I now have to disable the eyesight whenever I park. My worry is what happens if I'm driving into a tunnel on a highway and the eyesight thinks it's a wall and jams on my breaks? If it's recommended to disable the eyesight then I suggest there be a button on the steering wheel that creates a 30 second turn off time and then goes back to on automatically. It's a little distracting to reach up and find the right button and hold it down for 3 seconds to disable it. – Sally244, September 2, 2014.[12]

#### False Positive on Eyesight Pre-Collision Braking

If you have experienced incidents where your Subaru with Eyesight suddenly brakes without cause, please report your issue to safercar.gov.

Over the past two+ years, my 2015 Subaru Outback 2.5i Limited has suddenly applied the brake without cause 3 times. Each time it gave a warning, then immediately applied the brake. With each incident, I tried to take 'evasive' action by pressing the gas pedal (hoping to stop the braking). In my opinion, the braking didn't let up quickly enough.

Here are the 3 different scenarios: a crowded residential street not even going 25mph, the Eyesight completely stopped the car with nothing directly in front of me; in a less crowded residential area with a 30mph speed limit, the Eyesight suddenly braked, nothing in front or around me, slowing the car significantly; and finally on a major highway going 70mph, using Adaptive Cruise Control, the car suddenly braked slowing the car to about 25mph before releasing control to me. There were no cars in any of the lanes in front of me and fortunately there were no cars behind me. I took car in after each incident and the dealer found nothing. After the 3rd incident, they sent some corp reps out to look at the "black box" data - again found nothing.

The more incidents reported may help find and solve the problem. Thank you! – SubaruVida, December 29, 2016.[13]

#### Collision avoidance breaking system

A couple of times I must have gotten too close to a car in front of me and the above kicked in. It scared me to death... very noisy with the brakes screeching like a banshee. Is this normal?—edtx, May 26, 2020.

---

[12] https://www.subaruoutback.org/threads/eyesight-problems.178793/
[13] https://www.subaruoutback.org/threads/false-positive-on-eyesight-pre-collision-braking.394937/

[]

I turn it off. I haven't rear ended someone in almost 30 years in busy LA driving 20-30k a year. I have been rear ended a few times but never my doing. This system kicks in on me constantly in LA traffic and really disrupts driving, never mind passengers I have get pretty unnerved. Kicks in when I am changing lanes behind a car, where I have to speed up a bit to go through the spaces to get across busy LA freeways, where you are always near cars cause freeways are filled, but you have to give it gas when doing this to not make the traffic in the next lane have to slow down as you enter the lane, but I guess it thinks I am gunning for the car in front of me in the new lane - so it kicks in, but I was never going to hit the car, not even close. Ive even had it kick in 2 times when nothing was in front of me for a split second on a 2 lane road where I was the only car. not sure why it kicked in. I even had to pull over once cause I was very confused what happened in the front of my car (where I saw nothing).

So, I just turn it off. Maybe 10-20 years these systems will be more refined for my taste.—Sequoia225, June 30, 2020.[14]

Eyesight system concerns

I've had two instances where the vehicle activated the forward-collision warning and started to brake for reasons unknown to me. Once was in the middle of an intersection. Fortunately, the cars behind me were not too close to rear end me. This happened around 2 p.m. in the middle of summer with the sun behind the vehicle.

I brought the vehicle in for recall work to the local Subaru dealership several months later and asked them to pull any relevant data for the two incidents. By then, the system cleared those two events. The dealer said I should purchase a video camera and run it in the car while driving to capture any false alarms in order to help them troubleshoot it as according to them the system does not capture any video/image data when it records an event. This is absolutely outrageous. Subaru has cameras in the eyesight system and flash memory to store data in - storing an image snapshot is not overly storage intensive, and yet I am supposed to invest several hundred dollars in an independent video camera to help Subaru debug their system.

The dealership suggested not using eyesight on sunny days where the camera could be blinded by the sun. Hello - I live in Nevada, it's sunny here over 300 days per year. This would make the eyesight system practically useless and I'll lose cruise

---

[14] https://www.subaruoutback.org/threads/collision-avoidence-breaking-system.521755/

control. How am I supposed to know when it's too sunny for the system that it will malfunction?—hajihaji, November 17, 2016.[15]

[]

This situation is not unique to Outbacks. I have a 2017 Legacy with the same Eyesight system, and it has jammed on the brakes on three separate occasions when there was no object in front of me at all. I've had witnesses in the car when it happens, too.

The first time it happened I was going under a low (13 foot clearance) railroad bridge. Some chimes went off and it said something about detecting an object and immediately applied the brakes hard. The second and third times it applied brakes hard with no vehicles, persons, or objects at all in front of me.

I haven't considered if the sun could be in eyesight's "eyes", but I'll look for that next time it happens. Maybe we should consider sun glasses for Eyesight's "eyes".

It also does the chime and object detected bit when a vehicle is slowing and turning far in front of me, but the brakes aren't applied when that occurs. So that's just more of an annoyance.

Dealer always says the same thing. "it's performing as designed." Nothing was recorded. I am in the process of installing a dashcam that includes a rearview camera, too, because if there's ever anyone close behind me when this occurs, I want it recorded.

This 2017 also has issues with the brakes going to the floor and having to be pumped occasionally. But, that's for a different thread.—dmac3, November 17, 2016.[16]

[]

Since you have experienced an incident where your Subaru with Eyesight suddenly braked without cause, this is a safety issue for you and other drivers. Please report your issue to safercar.gov.

Over the past two+ years, my 2015 Subaru Outback 2.5i Limited has suddenly applied the brake without cause 3 times. Each time it gave a warning, then immediately applied the brake. With each incident, I tried to take 'evasive' action by pressing the gas pedal (hoping to stop the braking).

Here are the 3 different scenarios:in the morning on a crowded residential street not even going 25mph, the Eyesight completely stopped the car with nothing directly in

---

[15] https://www.subaruoutback.org/threads/eyesight-system-concerns.386777/

[16] https://www.subaruoutback.org/threads/eyesight-system-concerns.386777/page-2

front of me; in the afternoon on a less crowded residential area with a 30mph speed limit, the Eyesight suddenly braked, nothing in front or around me, slowing the car significantly; and finally at night in the rain on a major highway going 70mph, using Adaptive Cruise Control, the car suddenly braked slowing the car to about 25mph before releasing control to me. There were no cars in any of the lanes in front of me and fortunately there were no cars behind me. I took car in after each incident and the dealer found nothing. After the 3rd incident, they sent some corp reps out to look at the "black box" data - again found nothing.

The more incidents reported to safercar.gov may help find and solve the problem. Thank you! – SubaruVida, February 6, 2017.[17]


Eyesight Issue – Anybody else had this problem

First time owner of an Outback (2015 Limited 2.5I with eyesight) and had an issue with eyesight/pre-collision braking in first 100 miles. Wife was driving to work was at a red light, when it turned green she proceeded through and the car came to an abrupt stop in the middle of the intersection, there were no cars in any direction. She then went down the road about 1/4 mile and the pre-collision braking activated again going 25-30mph, no car in front or any objects. She then pulled over and turned off the pre-collision braking to keep it from happening again. There was no traffic in front of or behind her and both times she was accelerating. She is too scared to drive it now and is wanting to get a different Outback without eyesight. We took it back to the dealer and they did not find anything. Any help would be appreciated. – mlillypad194, November 19, 2014.[18]


2020 Pre-collision brake assist malfunction

Driving my second Outback, previous was a 2016 that also had Eyesight. This morning at an intersection in the dark, I took a right turn on a green arrow to enter a highway on ramp fairly well behind the person in front of me. Suddenly the brake assist activated and the car slammed the brakes. Needless to say, it surprised me and the person behind me was honking, understandably, as there was no reason for me to stop. I called the dealer, and they were completely unhelpful - they didn't even know how to turn off Eyesight on the 2020 (I figured it out). I don't trust the car or Eyesight right now. What if this had occurred at a higher speed, or the person behind couldn't stop fast enough. The dealer's response was, we would have to replicate the problem. Anyone else experience this? Any ideas other than disabling Eyesight

---

[17] https://www.subaruoutback.org/threads/eyesight-system-concerns.386777/page-4

[18] https://www.subaruoutback.org/threads/eyesight-issue-anybody-else-had-this-problem.202905/

every time I turn the car on? In looking thru the forums I see where a few people have said exhaust clouds might cause this. It was dark, but I think I would have noticed a lot of exhaust from that car who had gone ahead of me. Thanks for any thoughts. – Evergreen80, January 17, 2020.

[]

Yep - my father almost killed himself yesterday when he went to overtake a truck in his outback. The breaks jammed on and he lost control doing 70mph. He's hit the median railing and then skidded across the road into the ditch. Concussion, broken hip and the fright of his life. Could have been a lot worse but we're wondering if anyone else has had issues with the breaks locking on for no apparent reason ? Are their any class action groups as it seems this happens way to frequently ? Please email me on blackpearlpastoral@gmail.com if you would like to further discuss – Black Pearl, October 1, 2020.[19]

**SubaruForester.org**

<u>2019 - Eyesight Resets</u>
Does anyone have an issue where the lane detector icon in eyesight will "reset"? It'll beep that the lane detector is off, and then it comes back on.
Is that normal behavior with the system? Doesn't happen every time I drive the car, but has happened multiple times in the first 300 miles of the vehicle.
The owners manual states that this will happen when "the system cannot detect the lane". But it's happened a fair amount in a little over a week since owning the car. Has this happened to others? – SubiDad19, August 5, 2019.

It happens all the time with me too, I brought it back to Subaru and they said it was normal but I have driven many cars with it and that never happens, only on my 2019 Forester. I still believe it is an issue and will be addressed sometime in the future. – PearlWhite, August 5, 2019.[20]

<u>2014 Forester Eyesight Unexpected Braking Issue</u>
We have a 2014 Forester XT with the Eyesight System and ~ 21,000 Miles on the odometer.

---

[19] https://www.subaruoutback.org/threads/2020-pre-collision-brake-assist-malfunction.518224/
[20] https://www.subaruforester.org/threads/2019-eyesight-resets.804583/

We have gotten accustomed to the eyesight system's gentle warnings for lane departure (to dodge potholes), stopping too close to another car or object, slow starts in traffic, etc. Fortunately we have not had to test the emergency braking.

Overall we really like the vehicle - it is our first Subaru - and there have been no problems other than what I describe below.

On two occasions the car has unexpectedly braked hard - but not to a stop - from a low speed when there were no other cars in sight nor any other obstacles either noticed in the air or on the windshield. Both times the dash was lighted up with many different warning sensors - some we did not know were options (like hill holder) in a car with the CVT.

Mostly the car is used for trips around town of less than 60 miles. Oddly enough, both times the braking incident occurred within a few days after we had made the same 800 mile road trip. Additionally, these events both occurred on the same stretch of a rural two lane road within 1/4 mile of each other. Both times my wife was behind the wheel - she is a good driver and normally has very little trouble with cars. There is nothing notably unusual about this stretch of road.

The car was towed to the dealer both times. The first time no error codes were retained because the car was started/stopped too many times. The second time code P0244 was found - which the dealer stated was for an ECM update - which was completed.

We just got the car back today, and are hoping that the issue is behind us.

We are curious if any other Eyesight System owners have had similar experiences. Also we would appreciate knowing if any forum members have insight into the root cause.—Trekker7, March 31, 2015.[21]


Dangers of Subaru Eyesight

I've found that Subaru Eyesight can be dangerous.

1) Pre-Collision Braking: I've had this off since this engaged for the first time. I'd like to have it on, but it's too sensitive in my experience. (There is a discussion on this here: https://www.subaruforester.org/vbulletin/f281/eyesight-vs-tumbleweed-799405/#/topics/799405 )

2) Adaptive Cruise Control: In my experience, it's really rough when braking. I'm able to more smoothly adjust the speed myself. Also, it has seen a vehicle (and matched their speed), and ended up losing it when going around a curve (understandable), and then doesn't always see it again after the curve (unacceptable). So, if they slow down (for a turn), the Subaru will continue at it at full speed. I've stopped using this feature around traffic because it's dangerous and unpredictable.

---

[21] https://www.subaruforester.org/threads/2014-forester-eyesight-unexpected-braking-issue.461785/

3) Lane Keep Assist: This is my favorite feature. I'm not planning on turning it off. But, it's dangerous. There are situations that require you to leave the marked lane, and it tries to force you back in the lane, which can cause an accident. I don't mind the gentle adjustments, but if I'm clearly turning the wheel attempting to leave the lane, and it tries forcing me back, that's a huge safety concern. It has almost caused me to have an accident when passing a vehicle and also tried to push me towards a construction zone where they had cones to direct people to drive in the shoulder of the road.

In my opinion, this system is not ready. I'd like to see the current Subaru Eyesight get updated at each service visit (software, and hardware, as they are released).

What is your opinion of Subaru Eyesight? Do you think they should update each system, or just leave it as it is?—New_Suaru, July 10, 2019.[22]

### 2019 - Emergency Braking System Malfunction?

Hi there,

The emergency braking system on my 2019 Forrester fired while the car was operating at highway speeds, and there were no other vehicles that I noticed that were in range of Eyesight. The emergency braking system turned off after a second or two, and the sudden application of the brakes did not cause a rear end collision. Has anybody experienced an unexplainable emergency braking system malfunction?

Thank you. –Rcolin, February 14, 2020.

[]

I've only had my 2020 Forester for 3 weeks, and the emergency brake system definitely did something weird yesterday. I was driving slightly uphill and a car turned into my lane way in front of me - nowhere near close enough that I would've hit it. My Forester braked immediately. None of the usual sound/message pop up that I've had before coming in too hot at a traffic light. Fortunately no one was behind me, but I was thrown that the system activated when there was nothing that should've caused it to brake like that. – subie_newbie_CO, February 27, 2020.[23]

### Lane steering not always working?

---

[22] https://www.subaruforester.org/threads/dangers-of-subaru-eyesight.803447/
[23] https://www.subaruforester.org/threads/2019-emergency-braking-system-malfunction.810236/

I just purchased a 2018 Subaru Forester, in part because I absolutely wanted to have adaptive cruise control and lane keep assist.

I have the Lane Assist permanently turned on and, whenever I start the car, the first thing I do is to turn the cruise control on.

The Lane Keep Assist works perfectly when I drive on highways at 45mph or faster. I noticed that, typically, when I drive below 45mph with the cruise being set (to <45mph), even on roads with very visible lane markings on 1 or both sides, the lane markings do not show up on the dash display and only the lane departure assist (=beeping) works but not the active steering.

Yesterday, however, I was driving at 40mph (the cruise was set to 40mph) on a road with very visible lane markings which again did not show up on the dash display, active steering came on when I intentionally let the car veer over the center lane. I had tried that at the same spot in the past and only got the lane departure beeping but no active steering.

So, my question is: Is there a way to always have the active steering engaged instead of just the beeping when driving with the cruise engaged?

Please let me know what you think. – RudyG, January 4, 2019.[24]


**AscentForums.com**

Eyesight failure and all dash lights om

Second time all the warning lights on dash have come on and eyesight disabled. First time did not have full brake control. This time brakes were okay. Able to drive home. So disappointed in this vehicle. I no longer feel safe. Under 7000 miles. Third time will pursue lemon law and dump this pricey over rated vehicle. – Brennr, July 14, 2019.[25]


Eye sight

I have had my 2019 ascent for over a year. Yesterday the eye sight kept turning off and on constantly. I cleaned the windshield in and out but it is still doing it.

I called the dealer they told me it is prob because the lines on the road are faded. I have the lane assist turned off and have been driving the same roads for over a year. Does anyone have any suggestions or advice? –Frosty, August 7, 2020.[26]

---

[24] https://www.subaruforester.org/threads/lane-steering-not-always-working.792561/#post-7486351

[25] https://www.ascentforums.com/threads/eyesight-failure-and-all-dash-lights-om.8257/

[26] https://www.ascentforums.com/threads/eye-sight.10257/

<u>Eyesight Problems...Eeeek</u>
Hello everyone, we just purchased our ascent a week ago a Limited with KCC package and love it. We made the trade up from our 17 3.6r Legacy which we loved but with a growing family etc. We needed to upgrade. Well we're slightly concerned because we have less than 300 miles on our car and our eyesight is acting odd. Now we're use to eyesight with the legacy and how funny it can be at times,( sun glare,snow etc) but within the first 100 miles with our ascent it's has been a headache. So here is what we're facing. Intially we thought it was an Android Auto glitch as I drove our car on a back road here in NH which is very bumpy I hit a bump and Android auto shut down and all of the Eyesight systems turned off.Well, I pulled over shut the car down in hopes it was a new car bug. A week goes by my wife has the same thing but she wasn't using Android auto. She hit a bump and BAM eyesight disabled again even having starlink send me error email saying to take to dealer and read manual.
It has done it a handful of times and appears to be when hitting a good size bump. We have a great dealer team we're working with who will have it for a week but I know if a dealer can't reproduce that problem then it's tough to fix something when you can't see what's wrong. We have photos,codes and videos I'm curious has anyone else had this issue? – NewNewEnglander, February 26, 2019.

I've been driving a basic Ascent as a loaner on and off for a few weeks (due to outback issues) and I've noticed that the lane change has momentarily shown as off several times and also eyesight being disabled on a handful of occasions over 800 or so miles.
Does this ring any bells with you or anyone else? – ttrenberth, February 26, 2019.[27]

<u>Sudden Hard Braking While Driving</u>
Wondering if anyone else has had this problem. The other night I was driving and the car suddenly and without warning the car did a hard brake. No warnings, no lights, nothing, just a hard and sudden brake and then the car continued on like nothing happened for a bit and I heard a squeaking type noise from the rear wheels. I stopped and restarted the car and made it home fine. Figured it was a fluke and maybe something was on the road, checked it the next morning and no issues. The car has been fine all week until tonight, when my wife was driving our 4 month old and while going around 55mph the car started doing the exact same thing and almost caused her to lose control. This time though it continued to do it several times until

---

[27] https://www.ascentforums.com/threads/eyesight-problems-eeeek.6551/

she was able to get to a safe place to pull over. Only real thing of note that it has been night time both times it has happened.

Getting it to the dealership tomorrow to see what is going on, but I haven't seen anyone else mention this happening. – Coreye, December 14, 2018.[28]

Lane keep assist no longer working?

I've notice the ascent would pull me back to my lane when I would cross a line on the highway. But it's not pulling me any more. I don't know why. All features should be on because there no yellow lights on the dash saying anything is off. – Lukesit, July 23, 2018.[29]


**Reddit.com/r/SubaruAscent**

Subaru Ascent hard braking on it's own

Wondering if anyone else has had this problem. The other night I was driving and the car suddenly and without warning the car did a hard brake. No warnings, no lights, nothing, just a hard and sudden brake and then the car continued on like nothing happened for a bit and I heard a squeaking type noise from the rear wheels. I stopped and restarted the car and made it home fine. Figured it was a fluke and maybe something was on the road, checked it the next morning and no issues. The car has been fine all week until tonight, when my wife was driving our 4 month old and while going around 55mph the car started doing the exact same thing and almost caused her to lose control. This time though it continued to do it several times until she was able to get to a safe place to pull over. Only real thing of note that it has been night time both times it has happened.

Getting it to the dealership tomorrow to see what is going on, but I haven't seen anyone else mention this happening.—CoopsNPins, December 14, 2018.[30]

**SubaruXVForum.com**

Problems With Lane Assist Turning Off And On By Itself. Anyone else???

---

[28] https://www.ascentforums.com/threads/sudden-hard-braking-while-driving.5471/

[29] https://www.ascentforums.com/threads/lane-keep-assist-no-longer-working.2587/

[30] https://www.reddit.com/r/SubaruAscent/comments/a69lkx/subaru_ascent_hard_braking_on_its_own/

Happy new owner of a 2018 Limited with Eyesight and Lane Assist features. Learning Eyesight has been an adventure, but after the first month I really am liking it!

One area in which I'm having a problem is the Lane Assist. I can be driving down the road with Lane Assist on. Sometimes, if I just slightly go over a lane marking, the system will flash a message in the center screen that it has turned off. Moments later its back on. Has happened several times in a short period of time and is becoming a regular feature.

Has anyone else experienced this?

Is this something the dealer should take a look at?

Thanks in advance!

Rich

And to clarify: its not just the lane markings in the center of the dash screen changing from white to green. There is a Square Message in the box above the lane assist markings that says LANE ASSIST IS OFF. Then it flashes back on. I understand the side markings on the center screen flashing between green and white. This is not what I was talking about.

Also, a friend who owns a 2017 Outback Limited says his car does not do this. In fact, he pointed it out to me and thinks it is a malfunction in my car. –Richs10, April 4, 2018.[31]

---

[31] https://www.subaruxvforum.com/threads/problems-with-lane-assist-turning-off-and-on-by-itself-anyone-else.162698/