## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LAURA AND JAMES SAMPSON, ANTHONY VENTURA, ELIZABETH WHEATLEY, SHIRLEY REINHARD ON HER OWN BEHALF AND ON BEHALF OF THE ESTATE OF KENNETH REINHARD, LISA HARDING, JOHN ARMOUR, BARBARA MILLER, JEREMEY DONOVAN, DARRIN AND JANA DEGRAND, DANIELLE LOVELADY RYAN, ROBERT MCLAUGHLIN, and JACK ASBURY, individually and on behalf of all others similarly situated, | Civil Action No. 1:21-cv-10284-RMB-KMW |
| Plaintiffs, | SECOND AMENDED CLASS ACTION COMPLAINT |
| v. | |
| SUBARU OF AMERICA, INC., | JURY TRIAL DEMANDED |
| Defendant. | |

## INTRODUCTION

1.     Plaintiffs Laura and James Sampson, Anthony Ventura, Elizabeth Wheatley, Shirley Reinhard, on her own behalf and on behalf of the Estate of Kenneth Reinhard, Lisa Harding, John Armour, Barbara Miller, Jeremey Donovan, Darrin and Jana DeGrand, Danielle Lovelady Ryan, Robert McLaughlin, and Jack Asbury ("Plaintiffs") bring this action for themselves and on behalf of all persons in the United States who purchased or leased any 2013-2021 Subaru equipped with an autonomous emergency braking ("AEB") system that includes "Pre-Collision

1

Braking" and "Reverse Automatic Braking" ("AEB Class Vehicles") and on behalf of all persons in the United States who purchased or leased any 2013-2021 Subaru equipped with Lane Keep Assist ("LKA Class Vehicles"), against Subaru of America, Inc. ("SOA" or "Subaru" or "Defendant").  The allegations herein are based on personal knowledge as to Plaintiffs' own experiences and are made as to other matters based on an investigation by counsel, including analysis of publicly available information.

2.      Autonomous emergency braking systems are one of the most highly touted advancements in automobile safety. As described by Consumer Reports, with AEB systems installed, "[t]he vehicle stops independently when it senses a crash is imminent to avoid a crash, or to reduce the severity of a crash that can't be avoided."[1] Forward-oriented systems activate when the car is driving forward, and rearward-oriented systems activate when the car is in reverse.[2]  When working properly, these systems are intended to reduce the incidence of collisions and the resultant injuries.

3.      Subaru's Pre-Collision Braking, along with Lane Keep Assist, is a part of the "EyeSight Driver Assist Technology" suite of safety features. As described by Subaru on its website[3]:

―――――――――――――――

[1] https://www.consumerreports.org/car-safety/automatic-emergency-braking-guide/ (last visited August 2, 2021).
[2] *See id*.
[3] *See* https://www.subaru.com/engineering/eyesight.html (last visited August 2, 2021).

# Subaru EyeSight

## AN EXTRA SET OF EYES ON THE ROAD AND, IF NEED BE, AN EXTRA FOOT ON THE BRAKE WHEN YOU DRIVE.

EyeSight® Driver Assist Technology[1] is the culmination of everything Subaru engineers know about safety, and Subaru has sold over 1 million EyeSight-equipped vehicles. Adding confidence to every trip, EyeSight monitors traffic movement, optimizes cruise control, and warns you if you sway outside your lane. EyeSight has been found to reduce the rate of rear-end crashes with injuries by up to 85%[2].

When equipped with EyeSight, all 2019 Subaru models receive the highest possible rating for front crash prevention by IIHS highest rated claim from 2019 to 2020. The Pre-Collision Braking feature can even apply full braking force in emergency situations, helping you avoid or reduce frontal impacts.

4.     As further described by Subaru, Pre-Collision Braking, a forward-oriented system, "helps you avoid or reduce frontal impacts by alerting you and applying full braking force in emergency situations," and "can even bring you to a full stop if necessary."[4]  Similarly, Reverse Automatic Braking, a rearward-oriented system, "senses objects behind your Subaru when backing up at a low speed and applies the brakes when necessary."[5]

5.     While Pre-Collision Braking relies on forward-facing cameras to monitor the area in front of the vehicle, Reverse Automatic Braking relies on 4 ultra-sonic sensors, or radar, to detect objects behind the vehicle. For both systems, if an obstacle is detected, the system is supposed to sound an alarm and flash a warning, and then activate the brakes if the driver does not do so.

---

[4] *See id.*
[5] *See* "Subaru Reverse Automatic Braking Explained (2020 Updated)" by Subaru (Jun. 25, 2020), available at https://www.youtube.com/watch?v=gYTshupRY38. (last visited August 2, 2021).

6.      The front cameras are also employed by other EyeSight features, including Lane Keep Assist ("LKA"). The cameras are supposed to monitor the road for lane markings and sound alarms if the vehicle strays over the lines or sways between them. If the driver does not respond quickly enough, LKA is supposed to correct the vehicle's steering to keep the vehicle in the lane.

7.      Within the United States, Subaru has widely disseminated advertising alleging the superior safety of its EyeSight-equipped vehicles. Subaru particularly emphasized the Pre-Collision Braking or forward AEB system described *infra*. Indeed, Subaru's car commercials have become ubiquitous on television, promising consumers piece of mind that is said to come from Subaru's superior commitment to safety and development of the EyeSight systems, which can allegedly prevent your family from needing medical care or keep your easily distracted and inexperienced teenage driver safe.

8.      For these systems to work as intended and advertised, Subaru is responsible for ensuring that its suppliers manufacture the component systems correctly and that they are installed properly at the factory. Subaru is also responsible for ensuring that the AEB System itself has adequate programming to handle real-world driving conditions and that the components systems communicate properly with one another. For example, the front-facing cameras or the rear-facing sensors must communicate information to the braking system and the ABS Control Module

4

to apply the brakes, to the Transmission Control Module ("TCM") to shift the car into the proper gear, and to the Engine Control Module ("ECM") to limit power from the engine so that car is no longer propelled forward. Calibrating these systems to work together properly is Subaru's responsibility.

9.     Subaru failed to inform Plaintiffs and members of the AEB Class (defined below in Class Action Allegations) before or during the time of sale that the AEB systems in Class Vehicles have design, manufacturing, and workmanship defects including, but not limited to, poor calibration of the software from multiple control modules, including the ABS Control Module, such that they are prone to activating the brakes when there are no objects in front of the vehicle and/or behind the vehicle.  The AEB systems also sometimes fail entirely to activate when there are persons or objects in motion in front of the vehicle. This occurs due to miscommunication between all the systems involved in automatic braking, including the sensors, the camera, the brakes, and the transmission (the "AEB System Defect"). The AEB System Defect prevents the AEB Class Vehicles from behaving as designed and advertised in real-world driving conditions.

10.     As a result of the AEB System Defect, AEB Class Vehicles will abruptly slow down or stop entirely without driver input when there are no obstacles in front of or behind the vehicle. This presents a clear-cut safety hazard, increasing the chances of a collision.

11.     Conversely, the AEB System also fails to activate in the situations it was designed to detect and mitigate, such as when a pedestrian or vehicle stops abruptly in front of or behind the AEB Class Vehicle. Thus, the AEB System Defect makes the AEB System unpredictable and makes driving the vehicle unsafe. At the same time, the defect renders the system useless when it is most needed.

12.     The Lane Keep Assist feature is also defective. Subaru also failed to disclose to Plaintiffs and the members of the LKA Class, before or at the time of sale, that the Lane Keep Assist feature in LKA Class Vehicles has design, manufacturing, and/or workmanship defects including, but not limited to, poor calibration of the software from multiple control modules, including the Power Steering Control Module, such that they attempt to correct the vehicle's steering when the driver is trying to change lanes, is driving on a road with construction barriers, or if the road has multiple lines due to construction.  Further, the LKA system will malfunction and shut down entirely while the vehicle is in motion and cannot be used again until the car is restarted (the "LKA Defect" and, together with the AEB System Defect, the "Defects"). The LKA Defect prevents the Class Vehicles from behaving as designed and advertised in real-world driving conditions.

13.     As a result of the LKA Defect, the Lane Keep Assist system in the LKA Class Vehicles jerks the steering wheel without cause. Moreover, the system prevents the vehicle from changing lanes and even steers the vehicle into other

vehicles. On other occasions, it fails to function completely. Thus, the LKA Defect makes driving the vehicle unsafe and makes the operation of the vehicle unpredictable for the LKA Class.

14.    Based on pre-production testing, including design failure mode analysis, quality monitoring team data, quality control audits, early warranty claims, replacement part orders, and consumer complaints to Subaru's authorized network of dealers, as well as complaints to NHTSA, Defendant was aware of the Defects in the Class Vehicles as early as 2012. Despite being aware of the Defects and numerous complaints, Subaru knowingly, actively, and affirmatively failed to disclose the Defects. Further, Defendant actively concealed the existence of the Defects, including in advertising and manuals, which describe the EyeSight, "Pre-Collision Braking," Reverse Automatic Braking Systems and LKA. Defendant did this to increase profits by selling additional Class Vehicles at inflated prices.

15.    Discovery will show that AEB and LKA Class Vehicles utilize the same or substantially identical core vehicle components, and the Defects are the same for all Class Vehicles.

16.    For the AEB and LKA Class Vehicles, Subaru offers a 3-year or 36,000 miles, whichever comes first, New Vehicle Limited Warranty for new car purchasers and a 7-year or 100,000-mile, whichever comes first, Powertrain Warranty for Certified Pre-Owned vehicles. Despite knowing of the Defects, Subaru has not

disclosed the existence of the Defects and has not fixed the Defects, exposing Plaintiffs, Class members, and the general public to unsafe driving conditions for the AEB and LKA Class Vehicles arising from the Defects, which often occur without warning.

17.     The alleged AEB System Defect was inherent in each AEB Class Vehicle and was present in each vehicle at the time of sale. Similarly, the alleged LKA Defect was inherent in each LKA Class Vehicle and was present in each vehicle at the time of sale.

18.     Subaru knew about the Defects present in every Class Vehicle, along with the attendant safety problems, and failed to disclose and actively concealed this information from Plaintiffs and Class members at the time of sale, lease, repair, and thereafter. In fact, instead of repairing the AEB Class Vehicles and LKA Class Vehicles, Subaru has insisted that the vehicles are working correctly.

19.     If Plaintiffs and Class members had known about the Defects at the time of sale or lease, Plaintiffs and Class members would not have purchased or leased the AEB Class Vehicles or the LKA Class Vehicles or would have paid less for them.

20.     As a result of their reliance on Defendant's omissions, owners and/or lessees of the AEB Class Vehicles and LKA Class Vehicles suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defects, Plaintiffs and members of the Classes were harmed and

suffered actual damages in that their vehicles are defective, they overpaid for defective vehicles, and the vehicles' driver assist technology systems increase their chances of being involved in a collision by activating without cause and failing to activate when they should.

## THE PARTIES

### Plaintiffs Laura and James Sampson

21.     Plaintiffs Laura and James Sampson ("the Sampsons") are citizens of, and domiciled in, the state of Illinois. In or around May 2017, the Sampsons purchased a new 2017 Subaru Outback Limited from Green Dodge Kia Subaru Nissan ("Green Subaru"), an authorized Subaru dealership located in Springfield, Illinois.

22.     The Sampsons purchased their vehicle primarily for personal, family, or household use.

23.     Passenger safety and reliability were primary factors in the Sampsons' decision to purchase their vehicle. The Sampsons researched the Outback on the internet, by "Googling" the vehicle and visiting Subaru's website. They also test drove a 2017 Outback prior to purchase. Additionally, they spoke with the salesperson at Green Subaru, who based on their recollection told them that Subaru was "top of the line in safety." Subaru could have and should have disclosed the AEB System Defect through each of these media and venues but did not.

9

24.     Had Subaru disclosed the AEB System Defect before the Sampsons purchased their vehicle, the Sampsons would have seen such disclosures and been aware of them. Indeed, Subaru's misstatements and omissions were material to the Sampsons. Like all members of the Class, the Sampsons would not have purchased their Class Vehicle, or would have paid less for the vehicle, had they known of the AEB System Defect.

25.     In addition, at the time the Sampsons purchased their vehicle, and in purchasing their vehicle, they relied upon representations from Subaru and its authorized dealership that they saw during their internet research and heard from the salesperson at the dealership that the vehicle was fully functional, safe, durable, reliable, and/or the AEB system operated correctly and effectively. The Sampsons relied on those representations, and the omission of a disclosure of the AEB System Defect, in purchasing the vehicle, and absent these representations and omissions, would not have purchased the vehicle, or would have paid less for it.

26.     Within the first year of ownership, the Sampsons began to experience the AEB System Defect, when the AEB system would engage the brakes suddenly while trying to back out of a driveway, despite there being no obstacles in the way. When this occurred, the vehicle applied the brakes so abruptly that the seatbelt tensioners engaged, and it felt as though the front wheels actually lifted off the ground.

27.     Laura Sampson complained to Green Subaru when she took her vehicle in for routine service, but the dealership brushed off her complaints and indicated that the AEB System was functioning properly.

28.     Even though the Sampsons have complained, no repairs have ever been attempted by SOA or any authorized repair facility such as Green Subaru.

29.     The Sampsons continue to intermittently experience sudden, unnecessary braking when trying to back out of their driveway and have taken video demonstrating the same.

30.     As a result of the AEB System Defect, the Sampsons have lost confidence in the ability of the vehicle to provide safe and reliable transportation.

31.     At all times, the Sampsons, like all Class Members, have attempted to drive their vehicle in a foreseeable manner and in the manner in which it was intended to be used, in the sense that they did not use it for drag racing, for example.

32.     Although the Sampsons are interested in purchasing another Class Vehicle in the future, they will not do so because they will be unable to rely on Subaru's advertising for or labeling of the vehicles.

### Plaintiff Anthony Ventura

33.     Plaintiff Anthony Ventura is a citizen of and domiciled in the state of New York. In or around September 2020, Plaintiff Ventura leased a new 2020

Subaru Forester from North Coast Subaru, an authorized Subaru dealership located in Glen Cove, New York.

34.    Plaintiff Ventura leased his vehicle primarily for personal, family, or household use.

35.    Passenger safety and reliability were primary factors in Plaintiff Ventura's decision to lease his vehicle. Plaintiff Ventura researched the Forester on the internet, by "Googling" the vehicle and specifically researching safety considerations. Plaintiff Ventura also reviewed the window sticker (the "Monroney" sticker) and test drove a 2020 Forester prior to lease. Additionally, he spoke with the salesperson at North Coast Subaru, who based on his recollection said "you're not going to get a safer car than this."  Subaru could have and should have disclosed the Defects through each of these media and venues but did not.

36.    Had Subaru disclosed the AEB Systems Defect or the LKA Defect before Plaintiff Ventura leased his vehicle, he would have seen such disclosures and been aware of them. Indeed, Subaru's misstatements and omissions were material to Plaintiff Ventura. Like all members of the AEB Class and the LKA Class, Plaintiff Ventura would not have leased his Class Vehicle, or would have paid less for the vehicle, had he known of the Defects.

37.    In addition, at the time Plaintiff Ventura leased his vehicle, and in leasing his vehicle, he relied upon representations from Subaru and its authorized

dealership that he saw during internet research and heard from the salesperson at the dealership that the vehicle was fully functional, safe, durable, reliable, and/or the driver assistance systems operated correctly and effectively. Plaintiff Ventura relied on those representations, and the omission of a disclosure of the Defects, in leasing the vehicle, and absent these representations and omissions, would not have leased the vehicle or would have paid less for it.

38.    In or around January 2021, Plaintiff Ventura, and his wife, Joanne Fulgieri Ventura, experienced the LKA Defect.  On two occasions while driving, the LKA system informed the Venturas that the Lane Departure monitoring was no longer available and remained so until the car was restarted.

39.    On or around February 25, 2021, Joanne Fulgieri Ventura began to experience the AEB System Defect. Specifically, while the vehicle was going about 40 or 45 miles per hour, the AEB system engaged, lights illuminated indicating an obstacle warning, and the warning alarm sounded. Before she could react, the AEB system forced the vehicle to suddenly slow from 40 or 45 miles per hour to 10 or 15 miles per hours. There were no obstacles on the road when the AEB system engaged.

40.    On or about March 4, 2021, with approximately 4,422 miles on the odometer, the Venturas brought their vehicle in to North Coast Subaru and complained about their experiences with the vehicle's driver assistance systems.

The dealership represented to them that the system was working fine, that no problem was found, and it was working as designed.

41.     Even though the Venturas have complained, no repairs have ever been attempted by SOA or any authorized repair facility.

42.     As a result of the AEB System Defect and LKA Defect, Plaintiff Ventura has lost confidence in the ability of the vehicle to provide safe and reliable transportation.

43.     At all times, Plaintiff Ventura, like all Class Members, have attempted to drive their vehicle in a foreseeable manner and in the manner in which it was intended to be used, in the sense that they did not use it for drag racing, for example.

44.     Although Plaintiff Ventura is interested in purchasing another Class Vehicle in the future, he will not do so because he will be unable to rely on Subaru's advertising for or labeling of the vehicles.

**Plaintiff Elizabeth Wheatley**

45.     Plaintiff Elizabeth Wheatley is a citizen of and domiciled in the Commonwealth of Pennsylvania. In or around November 2018, Plaintiff Wheatley purchased a new 2019 Subaru Crosstrek from Subaru of Moon Township, an authorized Subaru dealership located in Moon Township, Pennsylvania.

46.     Plaintiff Wheatley purchased her vehicle primarily for personal, family, or household use.

47.     Passenger safety and reliability were primary factors in Plaintiff Wheatley's decision to purchase her vehicle.  Plaintiff Wheatley researched the Crosstrek by "Googling" the vehicle and visiting Subaru's website, as well as that of the dealership.  She also reviewed the window sticker (the "Monroney" sticker) and test drove a 2019 Crosstrek prior to purchase.  Plaintiff Wheatley also researched the vehicle on Edmunds, Kelley Blue Book, and other media sources and found the Crosstrek received great vehicles, especially high safety ratings.  Additionally, she spoke with the salesperson at Subaru of Moon Township, who specifically recommended the EyeSight feature.  Subaru could have and should have disclosed the Defects through each of these media and venues but did not.

48.     Had Subaru disclosed the AEB System Defect before Plaintiff Wheatley purchased her vehicle, she would have seen such disclosures and been aware of them.  Indeed, Subaru's misstatements and omissions were material to Plaintiff Wheatley.  Like all members of the AEB Class, Plaintiff Wheatley would not have purchased her AEB Class Vehicle, or would have paid less for the vehicle, had she known of the AEB System Defect.

49.     In addition, at the time Plaintiff Wheatley purchased her vehicle, and in purchasing her vehicle, she relied upon representations from Subaru and its authorized dealership that she saw during her internet research and heard from the salesperson at the dealership that the vehicle was fully functional, safe, durable,

reliable, and/or the AEB system operated correctly and effectively. Plaintiff Wheatley relied on those representations, and the omission of a disclosure of the AEB System Defect, in purchasing the vehicle, and absent these representations and omissions, would not have purchased the vehicle or would have paid less for it.

50.     Within the first year of ownership, Plaintiff Wheatley began to frequently experience the AEB System Defect. While driving around 50 miles per hour, and when the closest vehicle was over 200 feet away, the AEB system suddenly engaged and forced the vehicle to brake without cause.

51.     Plaintiff Wheatley has continued to experience sudden, forceful braking multiple times when there are no obstacles on the road.

52.     Plaintiff Wheatley complained to Subaru of Moon Township when she took her vehicle in for routine service, but the dealership dismissed her concerns and represented that the AEB system was functioning properly.

53.     Even though Plaintiff Wheatley has complained, no repairs have ever been attempted by SOA or any authorized repair facility.

54.     As a result of the AEB System Defect, Plaintiff Wheatley has lost confidence in the ability of the vehicle to provide safe and reliable transportation.

55.     At all times, Plaintiff Wheatley, like all AEB Class Members, has attempted to drive her vehicle in a foreseeable manner and in the manner in which it

was intended to be used, in the sense that they did not use it for drag racing, for example.

56.     Although Plaintiff Wheatley is interested in purchasing another Class Vehicle in the future, she will not do so because she will be unable to rely on Subaru's advertising for or labeling of the vehicles.

## Plaintiff Shirley Reinhard

57.     Plaintiff Shirley Reinhard is a citizen of and domiciled in the state of Wisconsin.  In or around October 2017, Shirley and her husband Kenneth Reinhard (the "Reinhards") purchased a certified pre-owned 2015 Subaru Outback from Wilde Chrysler Jeep Dodge RAM & Subaru ("Wilde Subaru"), an authorized Subaru dealership located in Waukesha, Wisconsin.

58.     The Reinhards purchased their vehicle primarily for personal, family, or household use.

59.     Passenger safety and reliability were primary factors in the Reinhards' decision to purchase their vehicle.  The Reinhards researched the Outback on the internet, by "Googling" the vehicle and visiting Subaru's website, as well as that of the dealership.   Additionally, they spoke with the salesperson at Wilde Subaru, who based on their recollection told them that the Outback was a great car. Subaru could have and should have disclosed the Defects through each of these media and venues but did not.

17

60.     Had Subaru disclosed the Defects before the Reinhards purchased their vehicle, the Reinhards would have seen such disclosures and been aware of them. Indeed, Subaru's misstatements and omissions were material to the Reinhards.  Like all members of the Classes, the Reinhards would not have purchased their vehicle, or would have paid less for the vehicle, had they known of the Defects.

61.     In addition, at the time the Reinhards purchased their vehicle, and in purchasing their vehicle, they relied upon representations from Subaru and its authorized dealership that they saw during their internet research and heard from the salesperson at the dealership that the vehicle was fully functional, safe, durable, reliable, and/or the driver assistance systems operated correctly and effectively.  The Reinhards relied on those representations, and the omission of a disclosure of the Defects, in purchasing the vehicle, and absent these representations and omissions, would not have purchased the vehicle or would have paid less for it.

62.     Within the first month of ownership, the Reinhards began to experience the AEB System Defect, when the Pre-Collision Braking, the forward AEB system, would engage the brakes suddenly even though there were no obstacles in the way. The sudden engagement of the brakes without any obstacles or other issues would occur two or three times a month.

63.     The Reinhards mentioned it to an employee in the service department at Wilde Subaru when they brought the vehicle in to for an oil change but were only

told that they may not see what the car sees, and this would only happen once in a while.

64.     Even though the Reinhards have complained, no repairs have ever been attempted by SOA or any authorized repair facility

65.     In or around September 2020, with approximately 35,000 miles on the odometer, Shirley Reinhard was driving her vehicle through an intersection during which she had the green light to travel.  Another vehicle approached and ran a red light, entering the intersection and hitting her vehicle.   The AEB system did not engage until her vehicle had already flipped onto the roof.  In total, her vehicle rolled four times.

66.     In part, as a result of the AEB System Defect, the Reinhards lost complete use of their vehicle and have lost confidence in the ability of a Subaru branded vehicle to provide safe and reliable transportation.

67.     Subsequently, Kenneth Reinhard passed away on March 23, 2021 and Shirley Reinhard is the designated legal representative of his estate.

68.     At all times, the Reinhards, like all members of the Classes, attempted to drive their vehicle in a foreseeable manner and in the manner in which it was intended to be used, in the sense that they did not use it for drag racing, for example.

69.     Although Plaintiff Reinhard is interested in purchasing another Class Vehicle in the future, she will not do so because she will be unable to rely on Subaru's advertising for or labeling of the vehicles.

### Plaintiff Lisa Harding

70.     Plaintiff Lisa Harding is a citizen of and domiciled in the state of New York.  In or around June 2020, Plaintiff Harding purchased a new 2020 Subaru Forester from West Herr Subaru, an authorized Subaru dealership located in Buffalo, New York.

71.     Plaintiff Harding purchased her vehicle primarily for personal, family, or household use.

72.     Passenger safety and reliability were primary factors in Plaintiff Harding's decision to purchase her vehicle.  Plaintiff Harding researched the Forester on the internet, by "Googling" the vehicle and visiting Subaru's website and the website for Van Bortel Subaru of Rochester.  Plaintiff Harding also reviewed the window sticker (the "Monroney" sticker). Plaintiff Harding also test drove a 2020 Forester prior to purchase at Van Bortel Subaru of Rochester. Additionally, she spoke with the salesperson at Van Bortel Subaru who said it was a reliable and safe vehicle. Subaru could have and should have disclosed the AEB System Defect through each of these media and venues but did not.

73.     Had Subaru disclosed the AEB System Defect before Plaintiff Harding purchased her vehicle, Plaintiff Harding would have seen such disclosures and been aware of them.   Indeed, Subaru's misstatements and omissions were material to Plaintiff Harding.   Like all members of the Class, Plaintiff Harding would not have purchased her Class Vehicle, or would have paid less for the vehicle, had she known of the AEB System Defect.

74.     In addition, at the time Plaintiff Harding purchased her vehicle, and in purchasing her vehicle, she relied upon representations from Subaru and its authorized dealership that they saw during their internet research and heard from the salesperson at the dealership that the vehicle was fully functional, safe, durable, reliable, and/or the AEB system operated correctly and effectively.   Plaintiff Harding relied on those representations, and the omission of a disclosure of the AEB System Defect, in purchasing the vehicle, and absent these representations and omissions, would not have purchased the vehicle or would have paid less for it.

75.     Within the first year of ownership, Plaintiff Harding and her husband, David Harding, began to experience the AEB System Defect.   On or around May 13, 2021, the Hardings were driving their vehicle at 45 miles per hour when the vehicle suddenly applied the brakes despite nothing on the road in front of them.

76.     Following this incident, on or around May 19, 2021, with approximately 7,088 miles on the odometer, the Hardings brought their vehicle in to

Van Bortel Subaru of Rochester to complain about the AEB system.  Based on their recollection, the service manager said they test drove the vehicle, did not find any problems, and indicated that the AEB system was functioning properly.  A service writer at the dealership said their experience may have been caused from dark shadows on the road.

77.    Even though the Hardings have complained, no repairs have ever been attempted by SOA or any authorized repair facility.

78.    As a result of the AEB System Defect, Plaintiff Harding has lost confidence in the ability of the vehicle to provide safe and reliable transportation.

79.    At all times, Plaintiff Harding, like all Class Members, has attempted to drive her vehicle in a foreseeable manner and in the manner in which it was intended to be used, in the sense that they did not use it for drag racing, for example.

80.    Although Plaintiff Harding is interested in purchasing another Class Vehicle in the future, she will not do so because she will be unable to rely on Subaru's advertising for or labeling of the vehicles.

**Plaintiff John Armour**

81.    Plaintiff John Armour is a citizen of and domiciled in the state of Florida.  On or about September 24, 2020, Plaintiff Armour leased a new 2020 Subaru Forester from New Motors Subaru, an authorized Subaru dealership located in Erie, Pennsylvania.

82. Plaintiff Armour leased his vehicle primarily for personal, family, or household use.

83. Passenger safety and reliability were primary factors in the Plaintiff Armour's decision to lease his vehicle. Plaintiff Armour and his partner, Janet Bauer, have owned Subaru vehicles since 1995 and knew they wanted to lease a new Subaru based on their prior experiences driving Subaru vehicles and prior research of Subaru vehicles, especially the Subaru's reputation for safety. Plaintiff Armour test drove a 2020 Forester prior to leasing. Additionally, he spoke with the salesperson at New Motors Subaru who said it was a safe and reliable vehicle. Subaru could have and should have disclosed the AEB System Defect through each of these media and venues but did not.

84. Had Subaru disclosed the AEB System Defect before Plaintiff Armour leased his vehicle, Plaintiff Armour would have seen such disclosures and been aware of them. Indeed, Subaru's misstatements and omissions were material to Plaintiff Armour. Like all members of the Class, Plaintiff Armour would not have leased his Class Vehicle, or would have paid less for the vehicle, had he known of the AEB System Defect.

85. In addition, at the time Plaintiff Armour leased his vehicle, and in leasing his vehicle, he relied upon representations from Subaru and its authorized dealership that he saw during his internet research and heard from the salesperson at

the dealership that the vehicle was fully functional, safe, durable, reliable, and/or the AEB system operated correctly and effectively.  Plaintiff Armour relied on those representations, and the omission of a disclosure of the AEB System Defect, in leasing the vehicle, and absent these representations and omissions, would not have leased the vehicle or would have paid less for it.

86.    On or about February 19, 2021, with approximately 3,000 miles on the odometer, Janet Bauer was driving the vehicle during a rainstorm when the AEB system activated despite there being no obstacles in the road. The dashboard lit up, the warnings sounded, and the brakes applied, nearly stopping the vehicle in the road. The system then disengaged, and a message flashed on the dashboard indicating that the AEB system was not working or had turned itself off.

87.    The following week, on or about February 23, 2021, Ms. Bauer took the vehicle to Bill Bryan Subaru, an authorized dealership in Leesburg, Florida, and complained about the AEB system, which was still not functioning. A representative of the dealership, Rachel, informed Ms. Bauer that the AEB system had functioned properly, that it can turn itself off during a rainstorm, and turned back on the system.

88.    On or about February 26, 2021, Ms. Bauer was driving in the middle lane of a highway when the vehicle crested over a bridge and the sunlight became especially bright. The AEB system flashed warnings and immediately applied full braking force, causing her vehicle to stop in the middle of traffic. The vehicle was

then rear-ended by another 2020 Subaru Forester equipped with the EyeSight system, damaging both vehicles. Ms. Bauer was able to drive the vehicle to her home but called Subaru Roadside Assistance to have it transported to Bill Bryan Subaru the following Monday. While being loaded onto the wrecker truck, the brakes in the vehicle automatically engaged on two more occasions.

89.     Ms. Bauer explained what had happened in detail to Bill Bryan Subaru and also alerted SOA. In response, SOA sent a Bosch representative to Bill Bryan Subaru to inspect the vehicle on or about April 19, 2021. Ms. Bauer was not allowed to observe the inspection and was told to go home when she arrived at Bill Bryan Subaru on the day of the inspection. She was later orally informed that the inspection showed that she pulled her parking brake while also depressing the accelerator, and then was sent a letter by SOA that their inspection revealed that there was no manufacturing defect.

90.     Plaintiff Armour's vehicle remained at Bill Bryan Subaru, for over three months for repairs, and did not have his vehicle returned to him until June 2021.

91.     Despite asking for the inspection report, as well as the data downloaded from the vehicle on multiple occasions, including through counsel, Subaru still has not provided any information from the inspection.

92.     As a result of the AEB System Defect, Plaintiff Armour and Ms. Bauer lost use of their vehicle and have lost confidence in the ability of a Subaru branded vehicle to provide safe and reliable transportation.

93.     At all times, Plaintiff Armour, like all Class Members, has attempted to drive his vehicle in a foreseeable manner and in the manner in which it was intended to be used, in the sense that he did not use it for drag racing, for example.

94.     Although Plaintiff Armour is interested in purchasing another Class Vehicle in the future, he will not do so because he will be unable to rely on Subaru's advertising for or labeling of the vehicles.

### Plaintiff Barbara Miller

95.     Plaintiff Barbara Miller is a citizen of and domiciled in the state of Florida.  On or around August 17, 2020, Plaintiff Miller purchased a new 2020 Subaru Forester from Schumacher Subaru, an authorized Subaru dealership located in West Palm Beach, Florida.

96.     Plaintiff Miller purchased her vehicle primarily for personal, family, or household use.

97.     Passenger safety and reliability were primary factors in Plaintiff Miller's decision to purchase her vehicle.  Plaintiff Miller previously owned a Subaru vehicle and knew she wanted to purchase a new Subaru based on her prior

experience driving a Subaru vehicle and prior research of Subaru vehicles.  Her prior research of Subaru vehicles included, "Googling" the vehicle and visiting Subaru's website, as well as that of the dealership, including learning of the new safety features in the 2020 Forester.  Plaintiff Miller also reviewed the window sticker (the "Monroney" sticker).  Subaru could have and should have disclosed the Defects through each of these media and venues but did not.

98.  Had Subaru disclosed the AEB System Defect before Plaintiff Miller purchased her vehicle, she would have seen such disclosures and been aware of them.  Indeed, Subaru's misstatements and omissions were material to Plaintiff Miller.  Like all members of the AEB Class, Plaintiff Miller would not have purchased her AEB Class Vehicle, or would have paid less for the vehicle, had she known of the AEB System Defect.

99.  In addition, at the time Plaintiff Miller purchased her vehicle, and in purchasing her vehicle, she relied upon representations from Subaru and its authorized dealership that she saw during her internet research and heard from the salesperson at the dealership that the vehicle was fully functional, safe, durable, reliable, and/or the AEB system operated correctly and effectively.  Plaintiff Miller relied on those representations, and the omission of a disclosure of the AEB System Defect, in purchasing the vehicle, and absent these representations and omissions, would not have purchased the vehicle or would have paid less for it.

100.   Within the first month of ownership, in or around August 2020, Plaintiff Miller began to experience the AEB System Defect, including the AEB system engaging when there are no obstacles on the road and shutting down when it rained.

101.   On or about August 31, 2020, when the mileage of the vehicle was approximately 100 miles, Plaintiff Miller complained to the dealership about the AEB System Defect and how the system would turn off when it rained.  Dealership said there was nothing wrong with the AEB system and recommended that Plaintiff Miller not drive in the rain.

102.   On or around May 2021, Plaintiff Miller was driving her vehicle when a vehicle turned in front of her, about 30 feet away, and the AEB system suddenly engaged and forced the vehicle to brake causing the vehicle to come to a complete stop and resulting in the tires screeching and skidding.  The vehicle behind her had a stop suddenly to avoid rear ending Plaintiff Miller's vehicle.

103.   Even though Plaintiff Miller has complained, no repairs have ever been attempted by SOA or any authorized repair facility.

104.   As a result of the AEB System Defect, Plaintiff Miller has lost confidence in the ability of the vehicle to provide safe and reliable transportation.

105.   At all times, Plaintiff Miller, like all AEB Class Members, has attempted to drive her vehicle in a foreseeable manner and in the manner in which it

was intended to be used, in the sense that they did not use it for drag racing, for example.

106.  Although Plaintiff Miller is interested in purchasing another Class Vehicle in the future, she will not do so because she will be unable to rely on Subaru's advertising for or labeling of the vehicles.

## Plaintiff Jeremey Donovan

107.  Plaintiff Jeremey Donovan is a citizen of and domiciled in the state of Vermont.  In or around March 2021, Plaintiff Donovan purchased a used 2019 Subaru Ascent with approximately 15,000 miles on the odometer, from Dan O'Brien Subaru, an authorized Subaru dealership located in Clairmont, New Hampshire.

108.  Plaintiff Donovan purchased his vehicle primarily for personal, family, or household use.

109.  Passenger safety and reliability were primary factors in Plaintiff Donovan's decision to purchase his vehicle.  Plaintiff Donovan researched the Ascent on the internet, by "Googling" the vehicle and visiting Subaru's website and the dealership's website.  Plaintiff Donovan also reviewed the window sticker (the "Monroney" sticker) and test drove a 2019 Ascent prior to purchase. Additionally, he spoke with the salesperson at the dealership who said the 2019 Subaru Ascent was extremely reliable and safe. Subaru could have and should have disclosed the

AEB System Defect or LKA Defect through each of these media and venues but did not.

110.   Had Subaru disclosed the AEB System Defect or LKA Defect before Plaintiff Donovan purchased his vehicle, Plaintiff Donovan would have seen such disclosures and been aware of them.  Indeed, Subaru's misstatements and omissions were material to Plaintiff Donovan.  Like all members of the AEB Class and the LKA Class, Plaintiff Donovan would not have purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Defects.

111.   In addition, at the time Plaintiff Donovan purchased his vehicle, and in purchasing his vehicle, his relied upon representations from Subaru and its authorized dealership that he saw during his internet research and heard from the salesperson at the dealership that the vehicle was fully functional, safe, durable, reliable, and/or the driver assistance systems operated correctly and effectively. Plaintiff Donovan relied on those representations, and the omission of a disclosure of the AEB System Defect, in purchasing the vehicle, and absent these representations and omissions, would not have purchased the vehicle or would have paid less for it.

112.   Within days of purchasing the vehicle, Plaintiff Donovan and his wife, Amber Donovan Ford, experienced the AEB system activating despite there being no obstacles on the road. This included the braking system suddenly engaging when

there were shadows on the road or when in reverse. The Donovans called their dealership which said that this was an ongoing issue with the EyeSight feature and advised the Donovans to disable the AEB system. The Donovans turned off the AEB system in their vehicle.

113.   Shortly after experiencing the AEB Defect, the Donovans also experienced the LKA Defect.  This included the LKA system engaging and their vehicle swerving when driving under an underpass, despite no other vehicles or obstacles nearby.  In another instance, when merging on the local interstate, the LKA system engaged, preventing their vehicle from crossing into the next lane by swerving back onto the entrance ramp.  The Donovans called their dealership again who said it was another issue with the EyeSight feature.  The Donovans turned off the LKA system in their vehicle.

114.   Even though the Donovans have complained, no repairs have ever been attempted by SOA or any authorized repair facility.

115.   As a result of the AEB System Defect and the LKA Defect, Plaintiff Donovan has lost confidence in the ability of the vehicle to provide safe and reliable transportation.

116.   At all times, Plaintiff Donovan, like all Class Members, has attempted to drive their vehicle in a foreseeable manner and in the manner in which it was intended to be used, in the sense that they did not use it for drag racing, for example.

117.   Although Plaintiff Donovan is interested in purchasing another Class Vehicle in the future, he will not do so because he will be unable to rely on Subaru's advertising for or labeling of the vehicles.

## **Plaintiffs Darrin and Jana DeGrand**

118.   Plaintiffs Darrin and Jana DeGrand ("the DeGrands") are citizens of and domiciled in the state of Texas.  On or around February 9, 2015, the DeGrands purchased a new 2015 Subaru Forester, from Huffines Kia Subaru of Corinth, an authorized Subaru dealership located in Corinth, Texas.

119.   The DeGrands purchased their vehicle primarily for personal, family, or household use.

120.   Passenger safety and reliability were primary factors in the DeGrands' decision to purchase their vehicle.  The DeGrands researched the Forester on the internet, by visiting Subaru's.  The DeGrands also reviewed the window sticker (the "Monroney" sticker) and test drove two 2015 Foresters prior to purchase, including one Forester with the Eyesight feature and one Forester without the Eyesight feature. Additionally, they spoke with the salesperson at the dealership who said the Forester was one of the safest and most reliable vehicles Subaru made. Subaru could have and should have disclosed the Defects through each of these media and venues but did not.

121.   Had Subaru disclosed the AEB Systems Defect or the LKA Defect before the DeGrands purchased their vehicle, they would have seen such disclosures and been aware of them.   Indeed, Subaru's misstatements and omissions were material to the DeGrands.  Like all members of the AEB Class and the LKA Class, the DeGrands would not have purchased their Class Vehicle, or would have paid less for the vehicle, had they known of the Defects.

122.   In addition, at the time the DeGrands purchased their vehicle, and in purchasing their vehicle, they relied upon representations from Subaru and its authorized dealership that they saw during internet research and heard from the salesperson at the dealership that the vehicle was fully functional, safe, durable, reliable, and/or the driver assistance systems operated correctly and effectively.  The DeGrands relied on those representations, and the omission of a disclosure of the Defects, in purchasing the vehicle, and absent these representations and omissions, would not have purchased the vehicle or would have paid less for it.

123.   In or around February 2015, within a month of purchasing the vehicle, Jana DeGrand was driving her vehicle over a two-lane bridge when the AEB system engaged without cause and stopped the vehicle.  When she could get the vehicle moving again, the LKA feature engaged without cause and jerked her steering wheel, forcing the vehicle into the adjacent counterflow lane and in the path of an on-

33

coming pick-up truck.  Jana DeGrand managed to maneuver her vehicle back into its lane and narrowly avoided a serious collision.

124.   In or around September 2015, with approximately 6,000 miles on the odometer, the DeGrands took their vehicle to Huffines Kia Subaru and complained about the functioning of the AEB system.  In response, the dealership told them that this was normal and there was nothing they could do about the system.

125.   Approximately a year later, in or around September 2016, with approximately 13,000 miles on the odometer, during which the AEB system in their vehicle would engage seemingly at random, warning of non-existent obstacles and applying the brakes without cause or activating the LKA without cause, the DeGrands took their vehicle back to Huffines Kia Subaru and complained again. They were told by the dealership that the system needed a software update and it was waiting for it.

126.   In or around April 2021, the DeGrands were driving on a highway at approximately 65 miles per hour with the vehicle on cruise control when it started raining.  The vehicle started hydroplaning, the cruise control did not turn off, and the vehicle drifted between the lanes without the AEB or LKA systems engaging.

127.   Even though the DeGrands have complained, no repairs have ever been attempted on by SOA or any authorized repair facility, including Huffines Kia Subaru.

128.   The DeGrands continue to intermittently experience sudden, unnecessary braking and forceful jerking of the steering wheel.

129.   As a result of the AEB System Defect and LKA Defect, the DeGrands have lost confidence in the ability of the vehicle to provide safe and reliable transportation.

130.   At all times, the DeGrands, like all Class Members, have attempted to drive their vehicle in a foreseeable manner and in the manner in which it was intended to be used, in the sense that they did not use it for drag racing, for example.

131.   Although the DeGrands are interested in purchasing another Class Vehicle in the future, they will not do so because they will be unable to rely on Subaru's advertising for or labeling of the vehicles.

### Plaintiff Danielle Lovelady Ryan

132.     Plaintiff Danielle Lovelady Ryan is a citizen of and domiciled in the State of California.  In or around November 28, 2020, Plaintiff Ryan purchased a new 2021 Subaru Ascent from Subaru of Antelope Valley, an authorized Subaru dealership located in Lancaster, California.

133.   Plaintiff Ryan purchased her vehicle primarily for personal, family, or household use.

134.   Passenger safety and reliability were primary factors in Plaintiff Ryan's decision to purchase her vehicle.   Plaintiff Ryan researched the Ascent by

"Googling" the vehicle and visiting Subaru's website, as well as that of the dealership. She also reviewed the window sticker (the "Monroney" sticker) and test drove a 2021 Ascent prior to purchase. In her research, Plaintiff Ryan found the Ascent received great vehicles, especially high safety ratings. Additionally, she spoke with the salesperson at Subaru of Antelope Valley, who specifically recommended the EyeSight feature. Plaintiff Ryan previously owned a Subaru Outback vehicle and trusted Subaru's reputation for safety and reliability Subaru could have and should have disclosed the Defects through each of these media and venues but did not.

135. Had Subaru disclosed the AEB System Defect before Plaintiff Ryan purchased her vehicle, she would have seen such disclosures and been aware of them. Indeed, Subaru's misstatements and omissions were material to Plaintiff Ryan. Like all members of the AEB Class, Plaintiff Ryan would not have purchased her AEB Class Vehicle, or would have paid less for the vehicle, had she known of the AEB System Defect.

136. In addition, at the time Plaintiff Ryan purchased her vehicle, and in purchasing her vehicle, she relied upon representations from Subaru and its authorized dealership that she saw during her internet research and heard from the salesperson at the dealership that the vehicle was fully functional, safe, durable, reliable, and/or the AEB system operated correctly and effectively. Plaintiff Ryan

relied on those representations, and the omission of a disclosure of the AEB System Defect, in purchasing the vehicle, and absent these representations and omissions, would not have purchased the vehicle or would have paid less for it.

137.   Soon after purchasing her vehicle, Plaintiff Ryan began to frequently experience the AEB System Defect and the LKA Defect.  The AEB system would not engage when obstacles were approaching and other instances the brakes would apply when there was no obstacle nearby.  The LKA system pulled Plaintiff Ryan's vehicle into oncoming traffic and vehicles driving next to her, including once almost within an inch of a semi-truck, resulting in her almost hitting those vehicles.

138.   After first experiencing the Defects, within a couple weeks of purchasing her vehicle, Plaintiff Ryan complained to Subaru of Antelope Valley and her salesperson said this issue was why he did not purchase this vehicle.

139.   On or around April 18, 2021, Plaintiff Ryan submitted an official complaint about her vehicle to NHTSA.

140.   On or around June 25, 2021, Plaintiff Ryan complained to Subaru of Antelope Valley about the Defects when she took her vehicle in for routine service, but the dealership dismissed her concerns stating they could not look into it because there was no recall or defect.

141.   Plaintiff Ryan complained again to Subaru of Antelope Valley in or around July 2021, when she discussed trading in her vehicle with the dealership. The dealership again said there was no repair to the AEB or LKA systems.

142.   Even though Plaintiff Ryan has complained, no repairs have ever been attempted by SOA or any authorized repair facility.

143.   As a result of the AEB System Defect, Plaintiff Ryan lost confidence in the ability of the vehicle to provide safe and reliable transportation.

144.   Because Plaintiff Ryan lost confidence in the ability of the vehicle to provide safe and reliable transportation, on or around August 12, 2021, Plaintiff Ryan traded in her Ascent for a different vehicle make and model, a 2017 Volkswagen Tiguan Wolfsburg Edition without any type of AEB features, resulting in a $5,800 loss on the vehicle.

145.   At all times, Plaintiff Ryan, like all AEB Class Members, attempted to drive her vehicle in a foreseeable manner and in the manner in which it was intended to be used, in the sense that she did not use it for drag racing, for example.

146.   Although Plaintiff Ryan is interested in purchasing another Class Vehicle in the future, she will not do so because she will be unable to rely on Subaru's advertising for or labeling of the vehicles.

### Plaintiff Robert McLaughlin

147.   Plaintiff Robert McLaughlin is a citizen of and domiciled in the

State of California.   In or around November 11, 2020, Plaintiff McLaughlin purchased a new 2020 Subaru Outback from Subaru of San Bernardino, an authorized Subaru dealership located in San Bernardino, California.

148.   Plaintiff McLaughlin purchased his vehicle primarily for personal, family, or household use.

149.   Passenger safety and reliability were primary factors in Plaintiff McLaughlin's decision to purchase his vehicle.   Plaintiff McLaughlin researched the Outback by visiting Subaru's website, as well as that of the dealership.   He also reviewed the window sticker (the "Monroney" sticker) and other dealership documents regarding the Outback.   Plaintiff McLaughlin also researched the vehicle on Consumer Reports and viewed YouTube videos of Subaru vehicles, and other media sources and found the Outback received great vehicles, especially high safety ratings.   Plaintiff McLaughlin had previously owned 5 other Subaru vehicles and trusted its reputation for safety and reliability.   Subaru could have and should have disclosed the Defects through each of these media and venues but did not.

150.   Had Subaru disclosed the AEB System Defect before Plaintiff McLaughlin purchased his vehicle, he would have seen such disclosures and been aware of them.   Indeed, Subaru's misstatements and omissions were material to Plaintiff McLaughlin.   Like all members of the AEB Class, Plaintiff McLaughlin

would not have purchased his AEB Class Vehicle, or would have paid less for the vehicle, had he known of the AEB System Defect.

151.   In addition, at the time Plaintiff McLaughlin purchased his vehicle, and in purchasing his vehicle, he relied upon representations from Subaru and its authorized dealership that he saw during his internet research and heard from the salesperson at the dealership that the vehicle was fully functional, safe, durable, reliable, and/or the AEB system operated correctly and effectively.   Plaintiff McLaughlin relied on those representations, and the omission of a disclosure of the AEB System Defect, in purchasing the vehicle, and absent these representations and omissions, would not have purchased the vehicle or would have paid less for it.

152.   Beginning around February 2021, with less than 10,000 miles on the odometer, Plaintiff McLaughlin began to frequently experience the AEB System Defect.  The AEB system engages far before approaching any obstacles, especially when driving on local roads or changing lanes on a freeway.  When the AEB system engages, it slams on the brakes and makes a loud, distracting noise.   Plaintiff McLaughlin stopped driving he vehicle to work because the AEB system was engaged every time he drove.

153.   In one instance, on or around July 25, 2021, Plaintiff McLaughlin was changing lanes when his Outback suddenly braked, causing the vehicle to slow from 75 MPH to 30 MPH and causing several other vehicles to swerve around him.

154.   Again, on or around August 29, 2021, Plaintiff McLaughlin again was driving on a highway when his vehicle braked suddenly without cause.  A driver behind him thought Plaintiff McLaughlin was "brake checking" him, and engaged in aggressive road rage towards Plaintiff McLaughlin.

155.   On or around July 9, 2021, with approximately 12,000 miles on the odometer, Plaintiff McLaughlin complained to his dealership about the AEB Defect and requested to have the Eyesight System re-calibrated.  The dealership said he would need to reschedule an appointment for the re-calibration.

156.   On or around October 18, 2021, Plaintiff McLaughlin again complained to his dealership about the AEB Defect.  The dealership found a few drops of tree sap on the windshield and said that may have confused the Eyesight sensor.  The tree sap was scrapped off, but Plaintiff McLaughlin experienced the AEB Defect driving home from the dealership.

157.   On or around November 18, 2021, Plaintiff McLaughlin again complained to his dealership about the AEB Defect.  The dealership drove the vehicle but said it did not find any abnormalities.

158.   Even though Plaintiff McLaughlin has complained, no repairs have ever been attempted by SOA or any authorized repair facility.

159.   As a result of the AEB System Defect, Plaintiff McLaughlin has lost confidence in the ability of the vehicle to provide safe and reliable transportation.

160.   At all times, Plaintiff McLaughlin, like all AEB Class Members, has attempted to drive his vehicle in a foreseeable manner and in the manner in which it was intended to be used, in the sense that he did not use it for drag racing, for example.

161.   Although Plaintiff McLaughlin is interested in purchasing another Class Vehicle in the future, he will not do so because he will be unable to rely on Subaru's advertising for or labeling of the vehicles.

### Plaintiff Jack Asbury

162.    Plaintiff Jack Asbury is a citizen of and domiciled in the State of North Carolina.  In or around May 5, 2021, Plaintiff Asbury purchased a new 2021 Subaru Outback from Fairway Subaru, an authorized Subaru dealership located in Greenville, South Carolina.

163.   Plaintiff Asbury purchased his vehicle primarily for personal, family, or household use.

164.   Passenger safety and reliability were primary factors in Plaintiff Asbury's decision to purchase his vehicle.  Plaintiff Asbury researched the Outback by "Googling" the vehicle.  He also saw several TV commercials advertising the Outback vehicle.  Plaintiff Asbury reviewed the Kelley Blue Book and several dealership documents regarding the Outback.  Subaru could have and should have disclosed the Defects through each of these media and venues but did not.

42

165.   Had Subaru disclosed the AEB System Defect before Plaintiff Asbury purchased his vehicle, he would have seen such disclosures and been aware of them. Indeed, Subaru's misstatements and omissions were material to Plaintiff Asbury. Like all members of the AEB Class, Plaintiff Asbury would not have purchased his AEB Class Vehicle, or would have paid less for the vehicle, had he known of the AEB System Defect.

166.   In addition, at the time Plaintiff Asbury purchased his vehicle, and in purchasing his vehicle, he relied upon representations from Subaru and its authorized dealership that he saw during his internet research and heard from the salesperson at the dealership that the vehicle was fully functional, safe, durable, reliable, and/or the AEB system operated correctly and effectively.  Plaintiff Asbury relied on those representations, and the omission of a disclosure of the AEB System Defect, in purchasing the vehicle, and absent these representations and omissions, would not have purchased the vehicle or would have paid less for it.

167.   Within the first months of owning the vehicle, Plaintiff Asbury began to frequently experience the AEB System Defect.  This included the AEB system in Plaintiff Asbury's vehicle twice engaged the brakes while being driven despite no obstacle being in front of the vehicle.

168.   On or about July 7, 2021, Plaintiff took his vehicle to Prestige Subaru, an authorized Subaru dealership located in Asheville, North Carolina, and

complained about the AEB engaging without cause. Prestige Subaru failed to attempt any repairs.

169.     After the vehicle continued to engage its AEB at least two more times, causing the vehicle to brake despite the lack of obstacles in the road, Plaintiff returned his vehicle to Prestige Subaru on or about September 23, 2021.  Again, no repairs were attempted, but his complaint was documented.

170.   On or around November 6, 2021, Plaintiff Asbury brought his vehicle to Prestige Subaru for service and discussed his issues with the AEB engaging without anything in front of the vehicle.  The dealership test drove the vehicle and was able to experience the issue.  The dealership then pulled codes b282c and b2259 from the Eyesight and Cockpit Control and performed a radio update intended to fix the AEB braking issues.   However, since the update, the Eyesight system continues to malfunction, including turning off while Plaintiff Asbury was driving and not turning on until the vehicle restarted.

171.   Plaintiff Asbury continues to experience the AEB Defect, causing the AEB system to malfunction.

172.   Even though Plaintiff Asbury has complained, no repairs have ever been attempted by SOA or any authorized repair facility.

173.   As a result of the AEB System Defect, Plaintiff Asbury has lost confidence in the ability of the vehicle to provide safe and reliable transportation.

174.   At all times, Plaintiff Asbury, like all AEB Class Members, has attempted to drive his vehicle in a foreseeable manner and in the manner in which it was intended to be used, in the sense that he did not use it for drag racing, for example.

175.   Although Plaintiff Asbury is interested in purchasing another Class Vehicle in the future, he will not do so because he will be unable to rely on Subaru's advertising for or labeling of the vehicles.

176.   Plaintiffs and every other member of the Classes suffered ascertainable losses, including but are limited to out-of-pocket losses by overpaying for the vehicles at the time of purchase and repair costs, decreased performance of the vehicles, loss of use of the vehicles, and diminished value of the vehicles. Accordingly, Plaintiffs bring claims individually and as representative of the Classes.

**<u>Defendant</u>**

177.   Defendant SOA is incorporated in New Jersey and has its principal place of business and headquarters in Camden, New Jersey. It is there that SOA has a 250,000 square foot headquarters campus, wherein approximately 600 employees, including its officers, and the sales, marketing, and distribution departments, among others, are based and carry out the business of SOA. There also is an approximately 100,000 square foot national service training center for SOA adjacent to its

headquarters campus, which houses service training, service engineering and product engineering functions. SOA markets and distributes automobiles throughout the United States and is a division of the Japanese conglomerate, Subaru Corporation, formerly known as Fuji Heavy Industries, Ltd., ("Subaru Corp.").

178.   SOA is the U.S. sales and marketing subsidiary of Subaru Corp. and is a wholly owned subsidiary responsible for distribution, marketing, sales and service of Subaru vehicles in the United States. SOA has a nationwide dealership network and operates offices and facilities throughout the United States.

179.   In order to sell vehicles to the general public, SOA enters into agreements with dealerships who are then authorized to sell Subaru-branded vehicles to consumers such as Plaintiffs.  In return for the exclusive right to sell new Subaru vehicles in a geographic area, authorized dealerships are also permitted to service and repair these vehicles under the warranties SOA provides directly to consumers. These contracts give SOA a significant amount of control over the actions of the dealerships, including sale and marketing of vehicles and parts for those vehicles. All service and repairs at an authorized dealership are also completed according to SOA's explicit instructions, issued through service manuals, technical service bulletins ("TSBs"), and other documents.  Per the agreements between SOA and the authorized dealers, consumers such as Plaintiffs can receive services under SOA's issued warranties at dealer locations that are convenient to them.

180.   SOA encourages its agents, the dealerships, to engage "Subaru Ambassadors," who then create and post pro-Subaru content on social media websites such as Facebook and Twitter.  Subaru Ambassadors also reach out to consumers on the internet comment boards, answer questions on behalf of SOA, monitor other websites for content that is negative for Subaru, and can provide coupons good for hundreds of dollars off Subaru vehicles.  Subaru Ambassadors also have direct access to SOA's customer support service teams.

181.   SOA, in conjunction with Subaru Corp., develops and disseminates the owners' manuals, warranty booklets, maintenance schedules, advertising such as vehicle brochures, and other promotional materials relating to the Class Vehicles through the dealership network.  SOA is also responsible for the production and content of the information on the "Monroney" Stickers.

182.   Defendant marketed, sold and warranted the Class Vehicles, including Plaintiffs' vehicle.

## JURISDICTION

183.   This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2).  Personal jurisdiction over Defendant is proper because Defendant SOA is incorporated here, and Defendant has purposefully availed itself of the privilege of conducting business activities in New Jersey, and throughout the United States, including, but not limited to, designing, marketing, warranting, distributing, and/or

selling AEB Class Vehicles and LKA Class Vehicles and their components to Plaintiffs and prospective class members.

184.   Members of the proposed Classes, which includes citizens of all 50 states, or in the alternative, include citizens of states other than New Jersey, where SOA is incorporated.

185.   On information and belief, aggregate claims of individual Class Members exceed $5,000,000 in value, exclusive of interest and costs.

## VENUE

186.   Subaru, through their business of distributing, warranting, selling, and leasing the Class Vehicles, has established sufficient contacts in this district such that personal jurisdiction is appropriate.  As such, Defendant is deemed to reside in this district pursuant to 28 U.S.C. § 1391(c)-(d).

187.   In addition, a substantial part of the events or omissions giving rise to these claims took place in this District because SOA incorporated in this District. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

188.   For years, Subaru has designed, manufactured, distributed, sold, leased and warranted the Class Vehicles.  Subaru has marketed and sold millions of Class Vehicles throughout the United States, including through its nationwide network of authorized dealers and service providers.

189.   Subaru has thousands of authorized dealerships across the United States, all of which are under are under Subaru's control. Subaru authorizes these dealerships to sell Subaru vehicles, parts, and accessories and to service and repair Subaru vehicles using Subaru parts, and to perform warranty repairs on Subaru's behalf.  Subaru's automotive sales through those dealerships for the United States for the fiscal year ending March 31, 2020 totaled 702,000 vehicles, or around 69% of its global automobile revenue of approximately $29,301,834.

190.   One of the most heavily advertised pieces of technology in Subaru vehicles is the EyeSight suite of safety features, as well as other driver assistance technologies such as Reverse Automatic Braking.  These prominently feature an autonomous braking system that is supposed to warn the driver of an obstacle in the road and also engage the brakes independently if the driver fails to react.  This system is a part of other collision avoidance systems installed in Class Vehicles, including Lane Keep Assist, which have the goal of preventing or reducing the severity of an impact.

191.   EyeSight was first introduced in Subaru vehicles in 2012, in the limited trims of the 2013 model Legacy and Outback models.  As with EyeSight in the current generation, it utilized cameras mounted behind the windshield near the roof of the vehicle to monitor the road in front of the vehicle.  Reverse Automatic Braking

was not introduced until the 2017 model year.  Like EyeSight, it relies on a camera, the back-up camera, as well as rear-mounted sonic sensors.

192.   These cameras and sensors are shared with the various components of the Driver Assist Technologies, including Pre-Collision Braking, Lane Keep Assist, and Adaptive Cruise Control.

193.   As with other systems in a vehicle, the AEB system is run by a control module.  This module is equipped with a proprietary algorithm that takes the data acquired from camera and sensors, as well as other modules in the vehicle such as the transmission control module to determine the speed, acceleration, and distance for both the vehicle itself and the object ahead.

194.   In any given vehicle model, integration and calibration of the AEB system typically occurs near the end of the research and development process, so that the control module can be given final values for vehicle weight and configuration.  This is overseen by the vehicle manufacturer, often with assistance from suppliers' engineers.  Modules as provided by the suppliers must be "tuned" both to achieve the desired goal of the vehicle manufacturer as well as to work with all the other modules in the vehicle.

195.   Discovery will show that the Defects are caused by defects in the design, materials, manufacturer, and/or workmanship in the manufacture and installation of system components, in the code underlying the algorithms which

50

control the AEB System and Lane Keep Assist system response, and/or in the calibration and integration of the software controlling the driver assistance systems with the software that run related system in the vehicle including the steering, transmission, and braking system.

196.   Further, in order for the sensors and cameras used by the systems to function properly, impurities must be controlled during manufacture. They also must be installed and centered precisely.  The slightest of variations in materials or positioning cause these systems to malfunction.  Discovery will show that the Defects are caused in part by such manufacturing issues.

197.   Moreover, the software which controls the EyeSight or Reverse Automatic Braking response – the underlying coding and algorithm which discriminates between landscape and obstacles and then decides on the correct response – suffers from programming defects during manufacturing which differ from the intended design of the software.

198.   Subaru's represented that the AEB systems and the Lane Keep Assist function in the AEB and LKA Class Vehicles would prevent collisions and accidents, as opposed to merely reducing the severity of the impact.  However, Subaru overreached, improperly tuning the driver assistance systems to *fully* apply the brakes when the system detects anything it believes is stationary in front of the vehicle, even if the object is on the side of the road and regardless of its size. The

result is that the systems activate unnecessarily early and with unnecessary force. Furthermore, the camera system shared by the AEB and Lane Keep Assist systems does not always accurately identify what items are stationary.

199.   These same systems fail to detect moving objects that cross in front of the car, in contrast to Subaru's commercials, which show its vehicles stopping autonomously when another car cuts suddenly in front of the vehicle.

200.   Moreover, Subaru's testing and validation procedures were inadequate to reproduce real-world conditions including driver reaction time, the existence of large objects on the side the road like garbage cans, metal guard rails, tunnels, the presence of extreme curves in certain roads including on and off-ramps to highways and freeways, the many parked cars in a parking lot, and the inclination of at the end of driveways and at entrances to parking lots.

201.   Despite this inadequate calibration and tuning process which fails to account for real world driving conditions, Subaru has touted its Driver Assistance Technologies as providing superior safety for drivers and passengers, to "help protect you if the unpredictable happens."[6]

202.   In fact, Subaru's commercials often showcase exactly how fast this system can supposedly react to protect the driver.  For example, one early Subaru

---

[6]*See* "Pre Collision Braking" vehicle available on https://www.subaru.com/engineering/safety.html. (last visited August 2, 2021).

commercial for the EyeSight system that was shown in the major American television markets showcased Subaru's history of safety innovation "allowing Subaru to lead the world in peace of mind."[7]  In this commercial, entitled "A Life of Safety," Subaru heralds "a car that can see trouble and stop itself to avoid it" by launching a 2014 Subaru Legacy at a wall at a high speed.  The vehicle reacts by detecting the wall as an obstacle, sounding an alarm, and activating the brakes, saving the vehicle from even touching the wall.  The voiceover announces "nobody beats Subaru models with EyeSight" for front crash prevention.[8]  However, this advertising is deceptive, in that despite appearances, the vehicle in the commercial was never traveling more than 20 miles per hour.  In fact, EyeSight cannot prevent a collision when there is a more than 20 miles per hour difference between the vehicle and the object ahead.

203.  In another Subaru commercial shown in the major United States television markets, a man wakes up in the hospital after a collision.  He and his wife get out of their hospital beds and are driven back to the scene of their car accident by an ambulance, where they get back into their Subaru Impreza.  Once again, it speeds towards a suddenly stopped truck, but this time, the Impreza detects the

_____

[7] *See* https://www.youtube.com/watch?app=desktop&v=spat4V_4oBk (last visited August 2, 2021).
[8] *Id.*

obstacle and applies the brakes, preventing another collision. The character's voiceover asks, "What if this didn't have to happen? What if you could go back? What if our car could stop itself?"[9]

204. In another commercial Subaru commercial shown in the major United States television markets, a man is distracted by his children in the back of his Subaru Ascent when the car in front them abruptly brakes to avoid a tractor trailer. As images from his life with his family and children flash before his eyes, the voice over announces, "Life doesn't give you many second chances…but a Subaru can." The Ascent flashes the Obstacle Detected warning and applies the brakes, preventing a collision.[10]

205. These advertisements are just three of the many similar statements in press releases, brochures, websites, and commercials Subaru has caused to be disseminated within the United States regarding the safety, reliability, and functionality of the AEB systems installed in Class Vehicles.

206. Similarly, Subaru has also advertised the functionality of the Lane Keep Assist feature, which is dependent on the same cameras that are used in Pre-Collision

---

[9] *See* https://www.youtube.com/watch?app=desktop&v=iYQsxXLdEeI
[10] *See* https://www.ispot.tv/ad/tFci/2021-subaru-ascent-important-moments-t2 (last visited August 2, 2021).

Braking and Adaptive Cruise control features. This feature "can help steer you back in" your lane if you fail to react to a lane departure warning.[11]

207.   Subaru also heavily advertised the functionality of other Driver Assistance Technologies, including Adaptive Cruise Control, which shares use of the cameras.  According to this commercial, distributed on Facebook, among other places, the Adaptive Cruise Control allows the driver of a Subaru Forester to take his foot off the accelerator and brake while maintaining a speed of 60 kilometers per hour.  Further, the vehicle slows down to under 20 kilometers per hour without the driver's intervention when a person in a zebra costume on skates suddenly runs in front of the vehicle, because the system recognizes both the object in front of the vehicle and its relative speed and position.[12]

---

[11]  *See* https://www.youtube.com/watch?v=iSKuxOImduI (last visited August 2, 2021).
[12]*See*         https://www.facebook.com/ShootingGalleryAsia/videos/tvc-subaru-eyesight-adaptive-cruise-control/2414147312163489/ (last visited August 2, 2021).



208.   In contrast to the glowing recommendations provided by Subaru in its advertisements, such as these videos, commercials, and brochures, the AEB and Lane Keep Assist systems in Class Vehicles activate without cause, startling drivers with alarms and lights, and then applying the brakes or steering the vehicle in a way the driver does not intend.  These actions can cause collisions when the class vehicles suddenly stop in the road or swerve into barriers or other vehicles.  Conversely, the AEB systems can fail to activate when they are most needed – when obstacles or pedestrians suddenly appear in front of a vehicle and the driver requires assistance to avoid or mitigate a collision.  Both the AEB systems and the Lane Keep Assist features are also prone to malfunctions – they turn off unexpectedly and may fail to turn on again until the car is restarted.

209.   The Defects in AEB and LKA Class Vehicles are caused by the poor calibration of the systems, including their cameras and sensors, and faulty programming of the system control modules (particularly their ability to decide when to command other control modules including, for example, the antilock brake system control module and the TCM to apply the brakes and stop the vehicle in the middle of traffic).  Discovery will show that each supplier of the different vehicle components – the transmission, the brake system, etc. – has different software and provides a different electronic control module and/or software for their vehicle components.  Integration of software and controls modules for system components is responsibility of the car's manufacturer, in this case Subaru.  If those systems are not properly integrated, the driver assistance technology control modules may interfere with the normal operation of the vehicle.  For Subaru vehicles, some of the control modules involved include the TCM, the ECM, and the Vehicle Dynamic Control ("VDC")[13] Module.  Issues with these modules often has negative effects on the functionality of the driver assistance systems.

210.   Indeed, Subaru is aware that its systems are prone to malfunction and are not ready to be driven in real-world situations. Despite the prominence of its marketing campaigns, Subaru acknowledges in booklets provided to consumers

_____

[13] Vehicle Dynamic Control is the system which monitors driver input and road conditions and to adjust the system to help the prevent slipping of the brakes or the drive wheel, or control brake pressure to correct over or understeer.

*after* they purchase their vehicles that the cameras and sensors may not function in inclement weather such as rain or snow, may not recognize patterns such as fences, and may not function in construction zones or other commonplace situations. This is something that Subaru does not disclose before a customer purchases a vehicle.

211.   Moreover, these listed "system limitations" are not a fulsome recitation of all the real-world conditions that Subaru's Driver Assistance Technologies are ill-designed and calibrated to recognize such as on and off ramps on highways, conditions when there is too much or too little sunlight, and driveways.  Further, these disclaimers also fail to acknowledge that the Driver Assistance Technologies often simply malfunction due to competing instructions and/or become disabled or unavailable.  As a result, Plaintiffs and members of the Classes have paid for a system that is defective and oftentimes simply inoperative.

212.   Subaru denies that any issues exist when Plaintiffs and members of the Classes complain about them, and Subaru instructs its dealerships to tell consumers that their vehicles are functioning normally or can fail to function properly in normal, everyday conditions like rain.  In part, this is because Subaru's network of dealers simply does not have the training or equipment to adjust the software in any vehicle, but instead must rely on Subaru and/or its supplies to provide software patches. Often, the only procedure that Subaru has given them to address consumer complaints about the AEB system is a "reset" or reboot of the relevant system control

modules, or a sensor or camera replacement.  However, since the programming of the system control module is insufficient to account for real-world driving conditions, this does not repair the Defects.

213.   Nor is the testing mandated by NHTSA sufficient to identify vehicles who have such systems that do not function well.  The only autonomous emergency brake system testing performed by NHTSA simply requires that the system reduce the vehicle's speed by 9.8 mph when approaching a stationary vehicle at 25 mph in order to pass.[14]  In fact, because many automakers have voluntarily agreed to put these vehicles into their vehicles by 2021 for light duty vehicles, and by 2025 for heavier vehicles, NHTSA has declined to institute further regulations on the AEB systems – which leaves automakers to fill in the gaps to ensure that these systems work properly and do not solve one problem by causing another.

214.   So far, automakers like Subaru have not produced vehicles with AEB systems that perform consistently or predictably.  While noting that manufacturers may include some warnings in owners' manuals, tests by *Car and Driver* revealed a shocking variation in results even in the same car. "***Driving the same car toward the same target at the same speed multiple times often produces different results***.

_____

[14] *See* Tingwall, Eric, "*We Crash Four Cars Repeatedly to Test the Latest Automatic Braking Safety Systems*," Car and Driver (Nov. 5, 2018), available at https://www.caranddriver.com/features/a24511826/safety-features-automatic-braking-system-tested-explained/ (last visited August 2, 2021).

Sometimes the car executes a perfectly timed last-ditch panic stop. Other times it brakes late, or less forcefully, or even periodically fails to do anything at all."[15]

215.   Included in this testing was a Subaru Impreza which, like the other models tested, failed to perform predictably.  "In our stationary-vehicle test, the Impreza's first run at 50 mph resulted in the hardest hit of the day, punting the inflatable target at 30 mph. It was only on the second attempt that the Subaru's EyeSight system impressively trimmed the speed to just 12 mph before the collision."[16]

### The Defects Pose an Unreasonable Safety Hazard

216.   These Defects cause unsafe conditions in the Class Vehicles, including, but not limited to, causing the vehicles to stop without cause in the middle of the road or unexpectedly in parking lots, veer into dividers, prevent drivers from changing lanes, distracting drivers with unnecessary warnings when no obstacles exist or if they are still in their lanes, incorrectly engaging the Lane Keep Assist feature, and/or failing to engage the braking system at all when the obstacles do appear in front of the vehicles.  This safety risk increases the risk of collisions and/or fails to reduce the incidence and severity of collisions as these systems were designed to do.

---

[15] *Id*. (emphasis added).
[16] *Id.*

217.   Complaints that numerous Class Vehicles' owners and lessees filed with NHTSA demonstrate that the Defects are widespread and dangerous and that it manifests without warning.  The complaints also indicate Defendant's awareness of the problems with the AEB systems and how potentially dangerous the defects are for consumers. Attached hereto as **Exhibit A** is just a sampling of dozens of safety-related complaints that describe the Defects in AEB Class Vehicles and LKA Class Vehicles (spelling and grammar mistakes remain as found in the original) (Safercar.gov, *Search for Complaints* (November 20, 2020), http://www-odi.nhtsa.dot.gov/complaints/).

218.   In fact, complaints were so prevalent about the AEB system malfunctions in Subaru models, among other vehicles, that NHTSA has opened an investigation into AEB systems in general.[17]

219.   Also, complaints posted by consumers in internet forums demonstrate that the Defects are widespread and dangerous and that they manifest without warning. The complaints also indicate Defendant's awareness of the problems with these systems and how potentially dangerous the Defects are for consumers. These complaints are listed on **Exhibit B** attached hereto.

---

[17] *See* Foldy, Ben, "*As Automatic Braking Becomes More Common in Cars, So Do Driver Complaints,*" The Wall Street Journal (Aug. 27, 2019), available at https://www.wsj.com/articles/as-automatic-brakes-become-common-so-do-driver-complaints-11566898205 (last visited August 2, 2021).

220.   The Defects pose an unreasonable safety risk for members of the Classes and other drivers and are safety hazards to the general public and increase the risk of automobile accidents.

## Subaru Had Superior and Exclusive Knowledge of the Defects

221.   Subaru had superior and exclusive knowledge of the Defects and knew or should have known that the Defects were not known or reasonably discoverable by Plaintiff and members of the Classes before they purchased or leased the AEB Class Vehicles and the LKA Class Vehicles.

222.   Discovery will show that before Plaintiffs purchased or leased their vehicles, and as evidenced clearly by Subaru's post-sale booklets, that since at least 2012, Subaru knew about the Defects through sources not available to consumers, including the following: pre-release testing data; information from its Quality Monitoring Teams; early consumer complaints about the Defects to Defendant's dealers who are their agents for vehicle repairs; warranty claims data related to the Defects; aggregate data from dealers; consumer complaints to NHTSA and resulting notice from NHTSA; early consumer complaints on websites and internet forums; data from the Starlink system in consumers' vehicles; dealership repair orders; testing conducted in response to owner or lessee complaints; reports from its Ambassadors; quality control audits; and other internal sources of aggregate information about the problems.

223. Subaru's internal consumer relations department and/or online reputation management services, including Subaru's Ambassadors, acting on Subaru's behalf routinely monitor the internet for complaints about its products, including complaints posted on consumer forums and other social media websites. These posts describe the defects at issue here. *See generally* **Exhibit B**. The fact that so many customers made similar complaints put Subaru on notice, no later than 2016, that the complaints were not the result of user error or anomalous incidents, but instead a systemic problem with the AEB and LKA Class Vehicles.

224. Likewise, since 2012, if not earlier, Defendant has also constantly tracked the National Highway Traffic Safety Administration database to track reports of false activations with AEB systems and malfunctions of the Lane Keep Assist in Subaru cars. *See generally* **Exhibit A**. From this source, Defendant would have known that the AEB Class Vehicles and the LKA Class Vehicles were experiencing unusually high levels of false activations. Defendant has and continues to be under a legal obligation pursuant to federal law to monitor defects that can cause a safety issue and report them within five (5) days of learning of them. *See* Reporting of Information and Documents About Potential Defects Retention of Records That Could Indicate Defects for NHTSA, 67 Fed. Reg. 45822 (July 10, 2002) (*amending* 49 U.S.C. § 30166(e) (1994)). Therefore, Defendant monitors the

NHTSA–ODI website and the complaints filed therein in order to comply with their reporting obligations under federal law, and thus, had knowledge of the Defect.

225.   Subaru issues TSBs and Technical Tip newsletter bulletins, among other communications, to its dealers in order to provide instructions on how to repair Subaru vehicles or respond to particular consumer complaints.   These communications standardize service throughout Subaru's agent dealership network, explicitly are not meant for consumer review, and often have a prohibition on them against printing them out.  Indeed, it was only in 2012 when it became a requirement for manufacturers to provide NHTSA with a copy of these manufacturer communications.  Further, these communications often do not reveal the cause of a problem, only describe a complaint and a remedy, frequently in terms that a lay person would not understand.  Moreover, some of these communications were issued "in the interest of customer satisfaction," which is language that Subaru sometimes uses to indicate to its dealerships that the bulletin was drafted in response to consumer complaints.

226.   On September 21, 2012, Subaru issued a TSB entitled "EyeSight Acceptable Windshield Repair Areas."  This TSB was applicable to the very first vehicles with EyeSight, the 2013 Legacy and Outback vehicles.  It was later revised on August 5, 2013 to be applicable to later model years as well.  The TSB instructed dealerships on the areas of windshield where no repairs could be attempted and as

such, a full window replacement would be necessary because repairs in these areas would interfere with the EyeSight stereo camera and compromise operation of the system.  Later in the TSB, Subaru cautioned against using "glossy backed" labels, stickers or decals, which could create glare that would interfere with EyeSight system operation.

227.  On September 21, 2012, Subaru also issued a TSB entitled "ETC (Electronic Toll Collection) Device Mounting Guidelines."  This TSB was applicable to the very first vehicles with EyeSight, the 2013 Legacy and Outback vehicles.  It was later revised on August 5, 2013 to be applicable to later model years as well.  This TSB advised dealerships about the proper position of ETC devices, like EZ Pass, to ensure they did not interfere with the EyeSight's functioning.  The TSB also cautioned that GPS receivers or radar detectors could not be placed in the central zone of the dash because their physical reflection and/or the light emitted from them could reflect on the windshield and interfere the EyeSight stereo camera.

228.  On June 30, 2015, Subaru issued a Product Campaign Bulletin announcing a recall of certain 2015 model year Legacy, Outbacks, Impreza, and Crosstrek vehicles, and certain 2016 model year WRX vehicles due to problems with the EyeSight system.  As described by the bulletin, "[t]he programming of the Driver Assist System will not detect a fault in the associated system components.  In the event of a Brake Lamp Switch (BLS) failure, the Vehicle Dynamic Control (VDC)

correctly detects the BLS failure, but the Driver Assist System will be delayed in detecting the BLS failure.  Therefore, it will take longer for the multi information displays to inform the driver of a malfunction. In addition, the VDC will not receive the brake request from the Driver Assist System, resulting in no automatic braking, including Adaptive Cruise Control and Pre-Collision Braking."  The repair was to reprogram the Driver Assist System.

229.   On December 7, 2015, Subaru issued a TSB entitled "EyeSight System Cancel Code 60-ACH."  The TSB was applicable to 2016 Forester vehicles with EyeSight.  When addressing customer complaints about the system, the TSB instructed dealerships that Cancel Code 60-A0H had no effect on the EyeSight system, which is detected each time the ignition key is switched off.  However, later in the same TSB, Subaru informed dealerships that "[i]n a case where the only Cancel Code displayed is 60-A0H, and no Camera Temporary Stop Count are displayed, there is a remote chance Cancel Code 65-C0H may be the cause as it will set in the rare instance when EyeSight pre-collision secondary braking function is active 3 times during a single key cycle.  These codes could also be generated by Temporary Stop Counts, or issues with EyeSight camera, including "backlight, dirty window glass, fogged window glass, frost on the window glass, oil film on the window glass, raindrop adhering to the window glass, fingerprint adhering to the lens, deteriorated wiper, front of the camera is blocked by hand, object on the

dashboard reflected against the windshield glass, bad weather (heavy rain, snowstorm, dense fog), unpatterned wall, fence, wall with vertical strip, water drop raised by preceding vehicle, steep slope, banner, grass, preceding vehicle with large uneven surface (trailer, etc.), preceding vehicle driving in the night without illuminating the tail light"…  Some of the issues noted here are not given to consumers, particularly "deteriorated wiper," "grass," or "preceding vehicle with…trailer."

230.  On October 19, 2018, Subaru issued a TSB entitled "DTC C0075-Additional Diagnostic Procedures."  This TSB was applicable to 2013-2014 Legacy and Outback vehicles with EyeSight, 2015-2016 Impreza vehicles with EyeSight, and 2015-2017 Crosstrek vehicles with EyeSight.  The TSB directed dealerships to perform additional diagnostics when diagnosing a DTC C0075: WHEEL CYLINDER PRESSURE SENSOR OUTPUT on the EyeSight equipped models listed above…The additional diagnostics are intended to reduce unnecessary replacement of the Hydraulic Unit (H/U) Assembly."   Other potential causes of a difference between the right and left wheel cylinder pressure sensor signal values had to be ruled out, and the procedures involved included performing ABS Sequence Control and VDC Sequence Control procedures.

231.  On July 29, 2019, Subaru issued a TSB entitled "Rattle Sound from EyeSight Camera Cover Design Change."  This TSB was applicable to 2019 Forester

vehicles and announced two design changes to the EyeSight camera cover to prevent a rattling sound heard while driving.

232.   On August 15, 2019, Subaru issued a TSB entitled "DTC B280B-EyeSight Camera Reprogramming File Availability."  This TSB was applicable to 2015 Impreza, Crosstrek, Legacy, and Outback.   It announced to dealers the "availability of reprogramming files to optimize the EyeSight camera unit.  In some cases, when use the Adaptive Cruise Control feature, the EyeSight system may stop functioning, enter a fail-safe mode and store DTC B280B- VDC ABNORMAL. When the EyeSight system is inoperative, the vehicle operates like a traditional vehicle not equipped with this feature. Normal EyeSight function is restored after cycling the ignition off and back on again."  The dealers were directed to reprogram the EyeSight Camera.  This TSB was subsequently revised and reissued on February 21, 2020 for the same condition, again directing the dealerships to reprogram the EyeSight Camera in 2015 Impreza, Crosstrek, Legacy and Outback vehicles.

233.   On December 13, 2019, Subaru issued a TSB entitled "ECM Reprogramming for DTC C1424," originally issued on December 10, 2019.  The TSB was applicable to 2019-2010 Ascent and 2020 Legacy and Outback vehicles. The TSB informed dealerships "[i]n the interest of customer satisfaction" that a service campaign is being initiated to reprogram the Engine Control Module (ECM). "In some vehicles, the current software may cause the sub learning value control to

operate improperly during the wake-up move of the ECM. This could cause repeated erroneous learning of the accelerate position which can result in the disabling of the VDC function. When the VDC function is disabled, EyeSight, Reverse Automatic Braking (RAB), and Electronic Brake (EPB) auto release functions are disabled by the VDC fail signal causing the VDC, EyeSight, RAB and EPB warning lamps to illuminate." Dealers were directed to reprogram the ECM of approximately 115,729 vehicles.

234. On January 10, 2020, Subaru issued a TSB entitled "EyeSight / Lane Departure Deactivate DTCs." The TSB was applicable to 2020 Legacy, Outback, Impreza, and Ascent vehicles, and 2019 Forester and Crosstrek vehicles. The TSB described the process for EyeSight system diagnosis when "specific DTCs relating the Lane Departure Prevention function are not found in the applicable Service Manual." The TSB instructed dealerships that certain "Specific Lane Departure Prevention Deactivate Codes (a.k.a. "Stop Codes")" do not indicate the malfunctions in the EyeSight system and do not require further diagnosis. These stop codes include "2D Lateral Acceleration is Large" and "2E Lane Recognition Prohibition (Environmental Factor)." These stop codes were programmed into the EyeSight system to cancel the Lane Departure Prevention function during normal operations and suggest that they were programmed into the system to prevent the Lane Keep Assist feature from activating improperly in response to real-world conditions.

235.   On February 21, 2020, Subaru issued a TSB entitled "Reprogramming File Availability for EyeSight DTC B280B: VDC Abnormal."   The TSB was applicable to 2013-2015 Legacy and Outback vehicles, and 2015 Impreza and Crosstrek vehicles.   It announced to dealers the "availability of reprogramming files to optimize the EyeSight camera assembly.  These new files will address concerns the Adaptive Cruise Control system going into fail-safe mode and setting a DTC B280B: VDC Abnormal.  When this condition occurs, normal operation is restored when cycling the ignition switch off / on."  The dealers were directed to reprogram the EyeSight Stereo Camera.

236.   On October 29, 2020, Subaru issued a TSB entitled "Vehicle Dynamic Control Module Optimization."   This TSB was applicable to 2020 Legacy and Outback vehicles.  The TSB directed dealerships to reprogram the VDC Control Module, to address concerns of the Auto Vehicle Hold (AVH) not operating properly and enhance the braking feel related to the Adaptive Cruise Control.

237.   Further, even prior to bringing the AEB and LKA Class Vehicles to market, Subaru was cognizant of the difficulty in integrating the software of all systems required for these systems to function as advertised and integrating the different modules involved, including the VDC control module, the driver assist control module, and the adaptive cruise control module.   As a result, despite producing commercials and brochures that overstate the effectiveness and

functionality of these systems, warnings in the owners' manuals for the AEB and LKA Class Vehicles are vague and incompletely describe the limitations of the systems.

238.   To the extent warnings are issued are issued in owners' manuals made available to consumers after the vehicle purchase or lease, they do not inform Plaintiffs and members of the Classes that the AEB systems and the Lane Keep Assist system in the AEB and LKA Class Vehicles will frequently engage without cause and leave the driver and passengers more susceptible to a collision from traffic. These vague warnings, buried in Owners' Manuals hundreds of pages long, or in a thick booklet are not specific enough or prominent enough to overcome the perception of functionality at Subaru has promulgated in its brochures and commercials.  In addition, the purchasers do not receive the Owner's Manual until after they have already completed the sales transaction.

239.   Moreover, these warnings do not inform Plaintiffs and members of the Classes that their vehicles may react differently each time it encounters the same situation, so that they are unable to even learn when their vehicle may malfunction. These warnings do not inform Plaintiffs and members of the Classes that their AEB systems may stop the car unnecessarily when the car is performing such mundane tasks as driving past a home that has a trash can in front of it, exiting a driveway,

driving onto a freeway, or moving around a curve in the road, or that they may be unable to change lanes when necessary, without the vehicle jerking them back.

240.   Subaru has also been alerted to the widespread problems with these systems from various lawsuits filed both in the United States and in other countries where Subaru vehicles, with substantially similar systems installed, are sold.

241.   The alleged Defects were inherent in each AEB and LKA Class Vehicle and was present in each AEB and LKA Class Vehicle at the time of sale.

242.   The existence of the Defects are material facts that a reasonable consumer would consider when deciding whether to purchase or lease a Subaru vehicle that was equipped with the EyeSight or Reverse Automatic Braking systems. Had Plaintiffs and other members of the Classes known the vehicles had these Defects, they would not have purchased or leased their vehicles or would have paid less for them.

243.   Reasonable consumers, like Plaintiffs, reasonably expect that a vehicle's driver assistance systems will function in a manner that will not pose a safety hazard and is free from defects that actually interfere with its role as a safety feature and make the vehicle unsafe. Plaintiffs and members of the Classes further reasonably expect that Subaru will not sell or lease vehicles with known safety defects, such as the Defects, and will disclose any such defects to its consumers when

it learns of them.  They did not expect Subaru to fail to disclose the Defects to them and to continually deny the existence of the Defects.

**Subaru Has Actively Concealed the Defects**

244.  While Subaru has been fully aware of the Defects in the AEB and LKA Class Vehicles, it actively concealed the existence and nature of the Defects from Plaintiffs and members of the Classes at the time of purchase, lease, repair, and thereafter.   Specifically, Subaru failed to disclose or actively concealed at and after the time of purchase, lease, or repair:

a)      any and all known material defects or material nonconformity of the AEB and LKA Class Vehicles, including the defects relating to the driver assistance systems;

b)      that the AEB and LKA Class Vehicles, including their AEB systems, were not in good working order, were defective, and were not fit for their intended purposes; and

c)      that the AEB and LKA Class Vehicles were defective, despite the fact that Subaru learned of such defects through alarming failure rates, customer complaints, and other internal sources, as early as 2012.

245.   In fact, even before releasing the AEB and LKA Class Vehicles into the market, Subaru knew about the Defects due to its significant pre-production testing at its proving grounds and test tracks at Bifuka Research and Experimentation Center

73

in Hokkaido, Japan.  Furthermore, manufacturers such as Subaru inspect vehicles as they come off the assembly and do systems checks on the vehicles to ensure they are working properly.  Japan goes a step forward, mandating under law that carmakers such as Subaru produce a safety certificate for each vehicle to show it has passed such an examination, in order for it be registered.  Although Subaru is empowered under Japanese law to decide what training must be completed and who may be authorized to work as a qualified inspectors, Subaru admitted in October 2017 that "company rules designated who was allowed to inspect cars had been inconsistent with government guidelines for 30 years."[18]

246.   Despite such procedures and pre-production testing, Subaru never informed Plaintiffs and members of the Class that the Defects existed or comprised the safety of the Class Vehicles.

247.   As a result of the Defects, Subaru and its authorized dealers were inundated with complaints regarding the Defects.  However, Subaru has not made fixing the malfunctions a priority and instead instructed its dealerships and Ambassadors that consumers can turn the driver assistance systems off whenever they want.  However, this ignores the fact that the Defects exist and that consumers

---

[18] Soble, Jonathan, "Subaru Admits Inspection Failings, in Another Blow to Japan's Carmakers," *The New York Times*, Oct. 27, 2017, available at https://www.nytimes.com/2017/10/27/business/subaru-inspection-japan.html (last visited August 2, 2021).

paid for functional systems and the promise that Subaru would correct any defects pursuant to the warranties it issued.

248.   Thus, when consumers present the AEB and LKA Class Vehicles to authorized Subaru dealers for repair of the Defects, rather than repair the problem under warranty, Subaru has instructed dealers to deny the Defects exist, as experienced by Plaintiffs.  Moreover, because the Defects are software related, the Subaru-authorized dealerships are neither equipped nor trained to provide a remedy.

249.   To this day, Subaru still has not notified Plaintiffs and all members of the Classes that the AEB and LKA Class Vehicles suffer from systemic defects that causes the driver assist systems to malfunction, to the detriment of the safety of drivers, passengers, and the general public.

### The Agency Relationship between Subaru of America, Inc. and its Network of Authorized Dealerships

250.   In order to sell vehicles to the general public, SOA enters into agreements with its nationwide network of authorized dealerships to engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new, Subaru branded vehicles, the authorized dealerships are also permitted under these agreements with SOA to service and repair these vehicles under the warranties SOA provides directly to consumers who purchased new vehicles from the authorized dealerships. Accordingly, SOA's authorized dealerships are SOA's agents, and the consumers who purchase or lease SOA vehicles are the third-party beneficiaries of

these dealership agreements, which allow the consumers to purchase and service their SOA vehicles locally. Because Plaintiffs and members of the Class there are third-party beneficiaries of the dealership agreements which create the implied warranty, they may avail themselves of the implied warranty. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty.

251.   Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of SOA's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by SOA. SOA's warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of SOA's express and implied warranties, and the consumers may therefore avail themselves of those warranties.

252.   SOA issued the express warranty to the Plaintiffs and the Class members. SOA also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. SOA also is responsible for the content of the Monroney Stickers on Subaru-branded vehicles. Because SOA issues the express warranty directly to the consumers, the consumers are in direct privity with SOA with respect to the warranties.

253.    In promoting, selling, and repairing its defective vehicles, SOA acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive SOA representatives and agents. That the dealers act as SOA's agents is demonstrated by the following facts:

(a)    The authorized Subaru dealerships complete all service and repair according to SOA's instructions, which SOA issues to its authorized dealerships through service manuals, technical service bulletins ("TSBs"), Technical Tip newsletter bulletins, and other documents, as well instructions that can be found only on Subaru proprietary software such as Select Monitor;

(b)    SOA advertises and promises that "[f]actory Trained Teams [who] know your vehicle better than anyone. *Ours* are certified to work specifically on the components that make up every Subaru, and they continually expand their knowledge with annual updates and hands-on training from highly advanced Subaru technical instructors, so you'll be in experienced hands too."[19]  As further described by "Subaru-U," which SOA describes as "a unique partnership between Subaru of America, the retailer, and high performing ASE Education Foundation

---

[19]*See* https://www.subaru.com/service-parts-accessories/auto/service-maintenance/factory-trained-technicians.html (emphasis in original). (last visited August 2, 2021).

secondary and post-secondary schools," there is "entry-level training that is required of all Subaru technicians," and "Subaru Level 2 Instructor Led Training."  Subaru-U "[s]tudents that are apprenticed at a Subaru retailer…are also eligible for additional training through Subaru";[20]

(c)     Consumers are able to receive services under SOA's issued New Vehicle Limited Warranty only at SOA's authorized dealerships, and they are able to receive these services because of the agreements between SOA and the authorized dealers. These agreements provide SOA with a significant amount of control over the actions of the authorized dealerships;

(d)     The warranties provided by SOA for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

(e)     SOA dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

(f)     SOA controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the

---

[20] *See* https://www.subaru-u.com/. (last visited August 2, 2021).

dealerships are able to perform repairs under warranty only with SOA's authorization.

(g)     SOA has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public, particularly the advertising, which is standardized and approved by SOA; and

(h)     SOA implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized SOA dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs cited herein.

254.   Indeed, SOA's warranty booklets make it abundantly clear that SOA's authorized dealerships are its agents for vehicle sales and service. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at an "Authorized SUBARU Retailer." For example, the warranty booklets state, "[a]ny and all repairs must be performed by an Authorized SUBARU Retailer located in the United States." Further, these warranties "only apply if the vehicle was imported or distributed by SOA and sold to the first retail purchaser by an Authorized SUBARU Retailer in the United

States." Under the terms of the warranty, repairs will be performed "any Authorized SUBARU Retailer anywhere in the United States."

255.   SOA has also designated authorized Subaru dealerships to inspect and designate used Subaru vehicles as "Certified Pre-Owned," a decision which then obligates SOA itself to provide a "Factory-backed" "Certified Pre-Owned Powertrain Warranty" of 7 years or 100,000 miles with a $0 deductible, as well as 24/7 Roadside Assistance.  SOA advertises the certified pre-owned program on its website, at Subaru.com/vehicles/certified-pre-owned.html, where it promises "[e]very Certified Pre-Owned Subaru gets a 152-point safety inspection, where anything that doesn't meet our high standards is repaired or replaced."  The 152-point inspection list requires the Dealer Name, Dealer Code, a "Subaru Trained Technician" who attests "I certify that all mechanical items have been inspected," and a dealership Service Manager who attests "I certify that all mechanical repair standards have been met."

256.   Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of SOA. Plaintiffs and each of the members of the Class have had sufficient direct dealings with either SOA or its agent dealerships to establish privity of contract between SOA, on one hand, and Plaintiffs and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiffs and SOA.

## Subaru Has Unjustly Retained A Substantial Benefit

257.   Subaru unlawfully failed to disclose the AEB and LKA Defects to induce Plaintiffs and other Class Members to purchase or lease the Class Vehicles.

258.   Defendant thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiffs'.

259.   Subaru unlawfully induced Plaintiffs and class members to purchase their respective Class Vehicles by concealing a material fact (the defective AEB and LKA systems). Had Plaintiffs and class members known of the Defects, they would have paid less for the Class Vehicles or would or not have purchased them at all.

260.   Accordingly, Subaru's ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material omissions that did — and likely will continue to — deceive consumers, should be disgorged.

## CLASS ACTION ALLEGATIONS

261.   Plaintiffs brings this lawsuit as a class action on behalf of himself and all others similarly situated as members of the proposed Class and Sub-Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and/or 23(b)(3).  This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

262.   The Classes and Sub-Classes are defined  as:

**AEB Class**: All individuals residing in the United States of America, including its territories, who purchased or leased any model year 2013-2021 Subaru vehicle equipped with an Autonomous Emergency Braking system (the "AEB Class Vehicles").

**LKA Class**:   All individuals residing in the United States of America, including its territories, who purchased or leased any model year 2013-2021 Subaru vehicle equipped with a Lane Keep Assist system (the "LKA Class Vehicles").

**Illinois AEB Sub-Class**: All members of the AEB Class who purchased or leased their AEB Class Vehicles in the State of Illinois.

**New York AEB Sub-Class**: All members of the AEB Class who purchased or leased their AEB Class Vehicles in the State of New York.

**New York LKA Sub-Class:**  All members of the LKA Class who purchased or leased their LKA Class Vehicles in the State of New York.

**Pennsylvania AEB Sub-Class**: All members of the AEB Class who purchased or leased their AEB Class Vehicles in the Commonwealth of Pennsylvania.

**Wisconsin AEB Sub-Class**: All members of the AEB Class who purchased or leased their AEB Class Vehicles in the State of Wisconsin.

**Florida AEB Sub-Class**: All members of the AEB Class who purchased or leased their AEB Class Vehicles in the State of Florida.

**New Hampshire AEB Sub-Class**: All members of the AEB Class who purchased or leased their AEB Class Vehicles in the State of New Hampshire.

**New Hampshire LKA Sub-Class**: All members of the AEB Class who purchased or leased their LKA Class Vehicles in the State of New Hampshire.

**Texas AEB Sub-Class**: All members of the AEB Class who purchased or leased their AEB Class Vehicles in the State of Texas.

**Texas LKA Sub-Class:**  All members of the LKA Class who purchased or leased their LKA Class Vehicles in the State of Texas.

**California AEB Sub-Class**: All members of the AEB Class who purchased or leased their AEB Class Vehicles in the State of California.

**California LKA Sub-Class**: All members of the LKA Class who purchased or leased their LKA Class Vehicles in the State of California.

**CLRA AEB Sub-Class**:  All members of the California AEB Sub-Class who are "consumers" within the meaning of California Civil Code § 1761(d).

**CLRA LKA Sub-Class**:  All members of the California LKA Sub-Class who are "consumers" within the meaning of California Civil Code § 1761(d).

**North Carolina AEB Sub-Class**: All members of the AEB Class who purchased or leased their AEB Class Vehicles in the State of North Carolina.[21]

263.   Excluded from the Classes and Sub-Classes are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; (3) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (4) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Classes and Sub-Classes should be expanded or otherwise modified.

264.   There is a well-defined community of interest in the litigation and the Classes and Sub-Classes are readily ascertainable.

265.   <u>Numerosity</u>: Although the exact number of prospective class members is uncertain and can only be ascertained through appropriate discovery, upon information and belief, hundreds of thousands of the AEB and LKA Class Vehicles

---

[21]The Illinois AEB Sub-Class, the New York AEB Sub-Class, the Pennsylvania AEB Sub-Class, the Wisconsin AEB Sub-Class, the Florida AEB Sub-Class, the New Hampshire AEB Sub-Class, the Texas AEB Sub-Class, California AEB Sub-Class, and the North Carolina AEB Sub-Class are collectively referred to herein as the "AEB Sub-Classes."  The New York LKA Sub-Class, the Texas LKA Sub-Class, the New Hampshire LKA Sub-Class, and the California LKA Sub-Class are referred to herein as the "LKA Sub-Classes."

have been sold in the United States.  As such, the number of prospective class members is great enough such that joinder is impracticable. The disposition of prospective class members' claims in a single action will provide substantial benefits to all parties and to the Court.  The prospective class members are readily identifiable from information and records in Defendant's possession, custody, or control, as well as from records kept by the departments of motor vehicles of the various  states.

266.   <u>Typicality</u>: Plaintiffs' claims are typical of the claims of all prospective class members in that Plaintiffs' and the prospective class members purchased and leased a Class Vehicle designed, manufactured, and distributed by Subaru and equipped with driver assistance systems. Plaintiffs and all prospective members of the Classes have been damaged by Defendant's misconduct in that the Class Vehicles all suffer from the AEB System or LKA Defects and Class Members have incurred or will incur the cost of overpaying for the AEB or LKA Class Vehicles and repairing or replacing AEB or LKA Class Vehicles that have been damaged as a result of the Defects.  Furthermore, the factual bases of Subaru's misconduct are common to all prospective class members and represent a common thread resulting in injury to all prospective class members.

267.   <u>Commonality</u>: There are numerous questions of law and fact common to Plaintiffs and the prospective class members that predominate over any question

affecting individual prospective class members. These common legal and factual issues include the following:

a)   Whether the AEB and LKA Class Vehicles suffer from their respective Defects;

b)   Whether the Defects constitutes an unreasonable safety risk;

c)   Whether and when Defendant knew about the Defects;

d)   Whether Defendant knew or reasonably should have known of the Defects before selling and leasing the AEB and LKA Class Vehicles to prospective class members;

e)   Whether the Defects constitute material facts;

f)   Whether Defendant has a duty to disclose its knowledge of the Defects to Plaintiffs and prospective class  members;

g)   Whether Defendant breached the implied warranty of merchantability under applicable state law;

h)   Whether Defendant should be declared financially responsible for notifying all prospective class members of the Defects and for expenses of repairing the Defects;

i)   Whether Defendant is obligated to inform prospective class members of their right to seek reimbursement for having paid to diagnose, repair, or replace the defective systems; and

j)      Whether damages, restitution, compulsory or other relief are warranted.

268.   <u>Adequate Representation</u>:  Plaintiffs will fairly and adequately protect prospective class members' interests. Plaintiffs have retained attorneys experienced in prosecuting class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action vigorously.

269.   <u>Predominance and Superiority</u>: Plaintiffs and the members of the Classes have all suffered and will continue to suffer harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Absent a class action, most members of the Classes would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual members of the Classes' claims, it is likely that only a few members of the Classes could afford to seek legal redress for Defendant's misconduct. Absent a class action, members of the Classes will continue to incur damages, and Defendant's misconduct will continue without remedy.  Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that class treatment will conserve the resources of the courts and the litigants and will promote consistency and efficiency of adjudication.

270.   In the alternative, the Classes may be certified because:

a)      The prosecution of separate actions by the individual members of the Classes would create a risk of inconsistent or varying adjudication with respect to individual members of the Classes, which would establish incompatible standards of conduct for Defendant;

b)      the prosecution of separate actions by individual members of the Classes would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Classes not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c)      Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final and injunctive relief with respect to the members of the Classes as a whole.

## COUNTS

### Claims on Behalf of the AEB Class

### COUNT I
**Fraud by Omission or Fraudulent Concealment**
**(On behalf of the AEB Class, or in the Alternative,**
**on Behalf of the Illinois AEB Sub-Class, the New York AEB Sub-Class, the Pennsylvania AEB Sub-Class, the Florida AEB Sub-Class, the New Hampshire AEB Sub-Class, California AEB Sub-Class, and the North Carolina AEB Sub-Class against Defendant)**

271.   Plaintiffs Laura and James Sampson, Anthony Ventura, Elizabeth Wheatley, Lisa Harding, John Armour, Barbara Miller, Jeremey Donovan, Danielle Lovelady Ryan, Robert McLaughlin, and Jack Asbury (hereinafter the "AEB Plaintiffs") repeat and re-allege each and every allegation contained in paragraphs 1 through 260 above as if fully set forth herein.

272.   The AEB Plaintiffs bring this cause of action on behalf of themselves and the nationwide AEB Class, or in the alternative, on behalf of the Illinois AEB Sub-Class, the New York AEB Sub-Class, the Pennsylvania AEB Sub-Class, the Florida AEB Sub-Class, the New Hampshire AEB Sub-Class, California AEB Sub-Class, and the North Carolina AEB Sub-Class, against Defendant.

273.   Subaru knew that the AEB Class Vehicles suffered from an inherent AEB System Defect, were defectively designed and/or manufactured and were not suitable for their intended use.

274.   Defendant concealed from and failed to disclose to the AEB Plaintiffs and AEB Class Members the defective nature of the AEB Class Vehicles.

275.   Defendant was under a duty to the AEB Plaintiffs and AEB Class Members to disclose the defective nature of the AEB Class Vehicles because:

(a)   Defendant was in a superior position to know the true state of facts about the safety defect contained in the AEB Class Vehicles;

(b)   The omitted facts were material because they directly impact the safety of the AEB Class Vehicles;

(c)   Defendant knew the omitted facts regarding the AEB System Defect were not known to or reasonably discoverable by the AEB Plaintiffs and AEB Class Members;

(d)   Defendant made partial disclosures about the quality of the AEB Class Vehicles without revealing their true defective nature; and,

(e)   Defendant actively concealed the defective nature of the AEB Class Vehicles from the AEB Plaintiffs and AEB Class Members.

276.   The facts concealed or not disclosed by Defendant to the AEB Plaintiffs and the other AEB Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendant's AEB Class Vehicles or pay a lesser price for them. Whether a vehicle's AEB system operates correctly is a material safety concern. Had the AEB Plaintiffs and AEB Class Members known about the defective nature of the AEB Class Vehicles, they would not have purchased or leased the AEB Class Vehicles or would have paid less for them.

277.   Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the AEB Class Vehicles to induce the AEB Plaintiffs and AEB Class Members to act thereon. The AEB Plaintiffs and the

other AEB Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from the AEB Plaintiffs' and AEB Class Members' purchase or lease of Defendant's defective AEB Class Vehicles.

278.   Defendant continued to conceal the defective nature of the AEB Class Vehicles even after Class Members began to report the problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem today.

279.   As a direct and proximate result of Defendant's misconduct, the AEB Plaintiffs and AEB Class Members have suffered and will continue to suffer actual damages. The AEB Plaintiffs and the AEB Class reserve their right to elect either to (a) rescind their purchase or lease of the defective AEB Class Vehicles and obtain restitution or (b) affirm their purchase or lease of the defective AEB Class Vehicles and recover damages.

280.   Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the AEB Plaintiffs' and the AEB Class' rights and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

### Claims on Behalf of the LKA Class

### COUNT II
**Fraud by Omission or Fraudulent Concealment**
**(On behalf of the LKA Class, or in the Alternative,**
**on Behalf of the New York LKA Sub-Class, the New Hampshire LKA Sub-**

**Class, and then California LKA Sub-Class against Defendant**

281.    Plaintiffs Anthony Ventura, Jeremey Donovan, and Danielle Lovelady Ryan (hereinafter "LKA Plaintiffs") repeat and re-allege each and every allegation contained in paragraphs 1 through 260 above as if fully set forth herein.

282.    The LKA Plaintiffs bring this cause of action on behalf of themselves and the nationwide LKA Class, or in the alternative, on behalf of the New York LKA Sub-Class, the New Hampshire LKA Sub-Class, and then California LKA Sub-Class, against Defendant.

283.    Subaru knew that the LKA Class Vehicles suffered from an inherent LKA Defect, were defectively designed and/or manufactured and were not suitable for their intended use.

284.    Defendant concealed from and failed to disclose to the LKA Plaintiffs and LKA Class Members the defective nature of the LKA Class Vehicles.

285.    Defendant was under a duty to the LKA Plaintiffs and LKA Class Members to disclose the defective nature of the LKA Class Vehicles because:

(a)    Defendant was in a superior position to know the true state of facts about the safety defect contained in the LKA Class Vehicles;

(b)    The omitted facts were material because they directly impact the safety of the LKA Class Vehicles;

(c)     Defendant knew the omitted facts regarding the LKA Defect were not known to or reasonably discoverable by the LKA Plaintiffs and LKA Class Members;

(d)     Defendant made partial disclosures about the quality of the LKA Class Vehicles without revealing their true defective nature; and,

(e)     Defendant actively concealed the defective nature of the LKA Class Vehicles from LKA Plaintiffs and LKA Class Members.

286.   The facts concealed or not disclosed by Defendant to the LKA Plaintiffs and the other LKA Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendant's LKA Class Vehicles or pay a lesser price for them. Whether a vehicle's LKA feature operates correctly is a material safety concern. Had the LKA Plaintiffs and LKA Class Members known about the defective nature of the LKA Class Vehicles, they would not have purchased or leased the LKA Class Vehicles or would have paid less for them.

287.   Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the LKA Class Vehicles to induce the LKA Plaintiffs and LKA Class Members to act thereon. The LKA Plaintiffs and the other LKA Class Members justifiably relied on Defendant's omissions to their

detriment. This detriment is evident from the LKA Plaintiffs' and LKA Class Members' purchase or lease of Defendant's defective LKA Class Vehicles.

288.   Defendant continued to conceal the defective nature of the LKA Class Vehicles even after LKA Class Members began to report the problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem today.

289.   As a direct and proximate result of Defendant's misconduct, the LKA Plaintiffs and LKA Class Members have suffered and will continue to suffer actual damages. The LKA Plaintiffs and the LKA Class reserve their right to elect either to (a) rescind their purchase or lease of the defective LKA Class Vehicles and obtain restitution or (b) affirm their purchase or lease of the defective LKA Class Vehicles and recover damages.

290.   Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the LKA Plaintiffs' and the LKA Class' rights and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**Claims on Behalf of the Illinois AEB Sub-Class**

**COUNT III**
**Violation of the Illinois Consumer Fraud and**
**Deceptive Business Practices Act**
**815 Ill. Comp. Stat. Ann. § 505/1, *et seq.* and 720 Ill. Comp. Stat. Ann. 295/1A**
**(On Behalf of the Illinois AEB Sub-Class against Defendant)**

291.   Plaintiffs Laura and James Sampson (herein after "Illinois Plaintiffs") repeat and re-allege each and every allegation contained above in paragraphs 1 through 260 above as if fully set forth herein.

292.   The Illinois Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Illinois AEB Sub-Class.

293.   Subaru is a "person" as that term is defined in 815 Ill. Comp. Stat. Ann. § 505/1(c).

294.   The Illinois Plaintiffs and the Illinois AEB Sub-Class members are "consumers" as that term is defined in 815 Ill. Comp. Stat. Ann. § 505/1(e).

295.   The purpose of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") is to enjoin trade practices which confuse or deceive the consumer. The Illinois CFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression, or omission of any material fact, with intent that others rely upon the concealment, suppression, or omission of such material fact … in the conduct of trade or commerce … whether any person has in fact been misled, deceived or damaged thereby." 815 Ill. Comp. Stat. Ann. § 505/2.  Subaru engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Illinois CFA.

296.   Subaru participated in unfair or deceptive trade practices that violated the Illinois CFA.  As described below and alleged throughout the Complaint, by failing to disclose the AEB System Defect, by concealing the AEB System Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the AEB Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the AEB Class Vehicles and the AEB System Defect in the course of its business.

297.   Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the AEB Class Vehicles.

298.   Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

299.   Subaru knew that the AEB Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

300.   Subaru knew or should have known that its conduct violated the Illinois CFA.

301.   Defendant was under a duty to the Illinois Plaintiffs and the Illinois AEB Sub-Class Members to disclose the defective nature of the AEB Class Vehicles because:

(a)   Defendant was in a superior position to know the true state of facts about the safety defect in the AEB Class Vehicles;

(b)   Defendant made partial disclosures about the quality of the AEB Class Vehicles without revealing the defective nature of the AEB Class Vehicles; and

(c)   Defendant actively concealed the defective nature of the AEB Class Vehicles from the Illinois Plaintiffs and the Illinois AEB Sub-Class Members at the time of sale and thereafter.

302.    By failing to disclose the AEB System Defect, Defendant knowingly and intentionally concealed material facts and breached their duty not to do so.

303.   The facts concealed or not disclosed by Defendant to the Illinois Plaintiffs and the Illinois AEB Sub-Class Members are material because a

reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's AEB Class Vehicles, or to pay less for them. Whether a vehicle's AEB system operates correctly is a material safety concern. Had the Illinois Plaintiffs and the Illinois AEB Sub-Class Members known that the AEB Class Vehicles suffered from the AEB System Defect described herein, they would not have purchased or leased the AEB Class Vehicles or would have paid less for them.

304.   The Illinois Plaintiffs and the Illinois AEB Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the AEB System Defect. That is the reasonable and objective consumer expectation for vehicles.

305.   As a result of Defendant's misconduct, Illinois Plaintiffs and the Illinois AEB Sub-Class Members have been harmed and have suffered actual damages in that the AEB Class Vehicles are defective and require repairs or replacement.

306.   Illinois Plaintiffs provided written notice of their claims by letter dated February 25, 2021.

307.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, the Illinois Plaintiffs and the Illinois AEB Sub-Class Members have suffered and will continue to suffer actual damages.

308.   Subaru's violations present a continuing risk to the Illinois Plaintiffs and the Illinois AEB Sub-Class Members as well as to the general public.  Subaru's unlawful acts and practices complained of herein affect the public interest.

309.   Pursuant to 815 Ill. Comp. Stat. Ann. § 505/10a(a), the Illinois Plaintiffs and the Illinois AEB Sub-Class Members seek monetary relief against Subaru in the amount of actual damages, as well as punitive damages because Subaru acted with fraud and/or malice and/or was grossly negligent.

310.   The Illinois Plaintiffs and the Illinois AEB Sub-Class Members also seeks attorneys' fees, and any other just and proper relief available under 815 Ill. Comp. Stat. Ann. § 505/1, *et seq*.

### Claims on Behalf of the New York AEB Sub-Class

### COUNT IV
**Violation of the New York General Business Law § 349**
**N.Y. Gen. Bus. Law § 349**
**(On Behalf of the New York AEB Sub-Class against Defendant)**

311.   Plaintiffs Anthony Ventura and Lisa Harding (herein after "New York AEB Plaintiffs") repeat and re-allege each and every allegation contained in paragraphs 1 through 260 above as if fully set forth herein.

312.   The New York AEB Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the New York AEB Sub-Class against Defendant.

313.   Subaru is a "person," "firm," "corporation," or "association" within the meaning of New York General Business Law ("New York GBL"), N.Y. Gen. Bus. Law § 349.

314.   The New York AEB Plaintiffs and the New York AEB Sub-Class members are "persons" within the meaning of N.Y. Gen Bus. Law § 349.

315.   New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Subaru's conduct, as described in this Complaint, constitutes "deceptive acts or practices" within the meaning of the New York GBL. All of Subaru's deceptive acts and practices, which were intended to mislead consumers in a material way in the process of purchasing or leasing AEB Class Vehicles, constitute conduct directed at consumers and "consumer-oriented." Further, New York Plaintiffs and the New York AEB Sub-Class Members suffered injury as a result of the deceptive acts or practice.  Subaru engaged in unlawful deceptive act and/or practices that violated the New York GBL.

316.   Subaru's actions, as set forth above, occurred in the conduct of business, trade or commerce.

317.   Subaru participated in unfair or deceptive practices that violated the New York GBL.  As described below and alleged throughout the Complaint, by failing to disclose the AEB System Defect, by concealing the AEB System Defect,

by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the AEB Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the AEB Class Vehicles and the AEB System Defect in the course of its business.

318. Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the AEB Class Vehicles.

319. Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

320. Subaru knew that the AEB Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

321. Subaru knew or should have known that its conduct violated the New York CFA.

322.   Defendant was under a duty to the New York AEB Plaintiffs and the New York AEB Sub-Class Members to disclose the defective nature of the AEB Class Vehicles because:

(a)   Defendant was in a superior position to know the true state of facts about the safety defect in the AEB Class Vehicles;

(b)   Defendant made partial disclosures about the quality of the AEB Class Vehicles without revealing the defective nature of the AEB Class Vehicles; and

(c)   Defendant actively concealed the defective nature of the AEB Class Vehicles from the New York AEB Plaintiffs and the New York AEB Sub-Class Members at the time of sale and thereafter.

323.   By failing to disclose the AEB System Defect, Defendant knowingly and intentionally concealed material facts and breached their duty not to do so.

324.   The facts concealed or not disclosed by Defendant to the New York AEB Plaintiffs and the New York AEB Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's AEB Class Vehicles, or to pay less for them. Whether a vehicle's AEB system operates correctly is a material safety concern. Had the New York AEB Plaintiffs and the New York AEB Sub-Class Members known that the AEB Class Vehicles suffered from the AEB System Defect described herein,

they would not have purchased or leased the AEB Class Vehicles or would have paid less for them.

325.   The New York AEB Plaintiffs and the New York AEB Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the AEB System Defect. That is the reasonable and objective consumer expectation for vehicles.

326.   As a result of Defendant's misconduct, New York Plaintiffs and the New York AEB Sub-Class Members have been harmed and have suffered actual damages in that the AEB Class Vehicles are defective and require repairs or replacement.

327.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, the New York AEB Plaintiffs and the New York AEB Sub-Class Members have suffered and will continue to suffer actual damages.

328.   Subaru's violations present a continuing risk to the New York AEB Plaintiffs and the New York AEB Sub-Class Members as well as to the general public.  Subaru's unlawful acts and practices complained of herein affect the public interest.  Specifically: (1) the number of consumers affected by Subaru's deceptive practices are in the hundreds of thousands nation-wide; (2) Subaru has significantly high sophistication and bargaining power with respect to the manufacture and sale of the AEB Class Vehicles to Plaintiffs and individual Class members; and (3) so

long as the AEB Class Vehicles continue to be sold and distributed with the defective

AEB system, the likelihood of continued impact on other consumers is significant.

329.   Pursuant to N.Y. Gen. Bus. Law § 349(h), the New York AEB Plaintiffs

and each New York AEB Sub-Class Member seek actual damages or $50, whichever

is greater, in addition to discretionary three times actual damages up to $1,000 for

Defendant's willful and knowing violation of N.Y. Gen. Bus. Law § 349. Plaintiffs

and New York Class members also seek attorneys' fees and any other just and proper

relief available under the New York GBL.

**COUNT V**
**Violation of the New York General Business Law § 350**
**N.Y. Gen. Bus. Law § 350**
**(On Behalf of the New York AEB Sub-Class against Defendant)**

330.   The New York AEB Plaintiffs repeat and re-allege each and every

allegation contained in paragraphs 1 through 260 above as if fully set forth herein.

331.   The New York AEB Plaintiffs bring this cause of action on behalf of

themselves and the New York AEB Sub-Class against Defendant.

332.   New York's General Business Law § 350, the New York False

Advertising Act ("NY FAA"), makes unlawful "[f]alse advertising in the conduct of

any business, trade or commerce[.]" False advertising includes "advertising,

including labeling, of a commodity . . . if such advertising is misleading in a material

respect," taking into account "the extent to which the advertising fails to reveal facts

material in the light of . . . representations [made] with respect to the commodity."
N.Y. Gen. Bus. Law § 350-a.

333. Subaru caused to be made or disseminated throughout New York, through advertising, marketing, and other publications, representations that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Subaru, to be untrue and misleading to consumers, including New York Plaintiffs and the New York AEB Sub-Class Members.

334. Subaru violated the NY FAA because of the misrepresentations and omissions alleged herein, including, but not limited to, Subaru's failure to disclose the AEB System Defect, by concealing the AEB System Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the AEB Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the AEB Class Vehicles and AEB System Defect in the course of its business.

335. In purchasing or leasing the AEB Class Vehicles, the New York AEB Plaintiffs and the New York AEB Sub-Class Members were deceived by Subaru's failure to disclose the AEB System Defect.

336. New York Plaintiffs and the New York AEB Sub-Class Members had no way of knowing that Subaru's representations and omissions were false and misleading, that an internal component part of the AEB Class Vehicles is defective and causes a safety hazard, that the AEBs will fail under normal and intended use of the AEB Class Vehicles, or that Subaru would refuse to repair, replace, or compensate New York Plaintiffs and the New York AEB Sub-Class Members for the failure of the defective AEBs and the known consequences of that failure to the AEB Class Vehicles.

337. Subaru's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

338. Subaru intentionally and knowingly misrepresented material facts regarding the AEB Class Vehicles with intent to mislead New York Plaintiffs and the New York AEB Sub-Class Members.

339. Subaru knew or should have known that its conduct violated the NY FAA.

340. New York Plaintiffs and the New York AEB Sub-Class Members reasonably relied on Subaru's misrepresentations and omissions of material facts in its advertisements of the AEB Class Vehicles and in the purchase of the AEB Class Vehicles.

341.   Had New York Plaintiffs and the New York AEB Sub-Class Members known that the AEB Class Vehicles would exhibit the AEB System Defect, they would not have purchased or leased the AEB Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Subaru's misconduct.

342.   Defendant was under a duty to the New York AEB Plaintiffs and the New York AEB Sub-Class Members to disclose the defective nature of the AEB Class Vehicles because:

(a)   Defendant was in a superior position to know the true state of facts about the safety defect in the AEB Class Vehicles;

(b)   Defendant made partial disclosures about the quality of the AEB Class Vehicles without revealing the defective nature of the AEB Class Vehicles; and

(c)   Defendant actively concealed the defective nature of the AEB Class Vehicles from the New York AEB Plaintiffs and the New York AEB Sub-Class Members at the time of sale and thereafter.

343.   The New York AEB Plaintiffs and the New York AEB Sub-Class Members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Subaru's conduct in that they overpaid for their AEB Class Vehicles and did not receive the benefit of their bargain, and their AEB Class

Vehicles have suffered a diminution in value. These injuries are the direct and natural consequence of Subaru's misrepresentations, fraud, deceptive practices, and omissions.

344.   The New York AEB Plaintiffs and the New York AEB Sub-Class Members are entitled to recover their actual damages or $500, whichever is greater. Because Subaru acted willfully or knowingly, the New York AEB Plaintiffs and the New York AEB Sub-Class Members are entitled to recover three times actual damages, up to $10,000.

**Claims on Behalf of the New York LKA Sub-Class**

**COUNT VI**
**Violation of the New York General Business Law § 349**
**N.Y. Gen. Bus. Law § 349**
**(On Behalf of the New York LKA Sub-Class against Defendant)**

345.   Plaintiffs Anthony Ventura (herein after "New York LKA Plaintiff") repeat and re-allege each and every allegation contained in paragraphs 1 through 260 above as if fully set forth herein.

346.   The New York LKA Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the New York LKA Sub-Class, against Defendant.

347.   Subaru is a "person," "firm," "corporation," or "association" within the meaning of New York GBL, N.Y. Gen. Bus. Law § 349.

348.   The New York LKA Plaintiff and the New York LKA Sub-Class members are "persons" within the meaning of N.Y. Gen Bus. Law § 349.

349.   New York's General Business Law § 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Subaru's conduct, as described in this Complaint, constitutes "deceptive acts or practices" within the meaning of the New York GBL. All of Subaru's deceptive acts and practices, which were intended to mislead consumers in a material way in the process of purchasing or leasing LKA Class Vehicles, constitute conduct directed at consumers and "consumer-oriented." Further, New York Plaintiffs and the New York LKA Sub-Class Members suffered injury as a result of the deceptive acts or practice.  Subaru engaged in unlawful deceptive act and/or practices that violated the New York GBL.

350.   Subaru's actions, as set forth above, occurred in the conduct of business, trade or commerce.

351.   Subaru participated in unfair or deceptive practices that violated the New York GBL.  As described below and alleged throughout the Complaint, by failing to disclose the LKA Defect, by concealing the LKA Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally

misrepresented and omitted material facts in connection with the sale or lease of the LKA Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the LKA Class Vehicles and the LKA Defect in the course of its business.

352.   Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the LKA Class Vehicles.

353.   Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

354.   Subaru knew that the LKA Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

355.   Subaru knew or should have known that its conduct violated the New York GBL.

356.   Defendant was under a duty to the New York LKA Plaintiff and the New York LKA Sub-Class Members to disclose the defective nature of the LKA Class Vehicles because:

(a)     Defendant was in a superior position to know the true state of facts about the safety defect in the LKA Class Vehicles;

(b)     Defendant made partial disclosures about the quality of the LKA Class Vehicles without revealing the defective nature of the LKA Class Vehicles; and

(c)     Defendant actively concealed the defective nature of the LKA Class Vehicles from the New York LKA Plaintiff and the New York LKA Sub-Class Members at the time of sale and thereafter.

357.    By failing to disclose the LKA Defect, Defendant knowingly and intentionally concealed material facts and breached their duty not to do so.

358.    The facts concealed or not disclosed by Defendant to the New York LKA Plaintiff and the New York LKA Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's LKA Class Vehicles, or to pay less for them. Whether a vehicle's LKA system operates correctly is a material safety concern. Had the New York LKA Plaintiff and the New York LKA Sub-Class Members known that the LKA Class Vehicles suffered from the LKA Defect described herein, they would not have purchased or leased the LKA Class Vehicles or would have paid less for them.

359.   The New York LKA Plaintiff and the New York LKA Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the LKA Defect. That is the reasonable and objective consumer expectation for vehicles.

360.   As a result of Defendant's misconduct, New York Plaintiffs and the New York LKA Sub-Class Members have been harmed and have suffered actual damages in that the LKA Class Vehicles are defective and require repairs or replacement.

361.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, the New York LKA Plaintiff and the New York LKA Sub-Class Members have suffered and will continue to suffer actual damages.

362.   Subaru's violations present a continuing risk to the New York LKA Plaintiff and the New York LKA Sub-Class Members as well as to the general public.  Subaru's unlawful acts and practices complained of herein affect the public interest.  Specifically: (1) the number of consumers affected by Subaru's deceptive practices are in the hundreds of thousands nation-wide; (2) Subaru has significantly high sophistication and bargaining power with respect to the manufacture and sale of the LKA Class Vehicles to Plaintiffs and individual Class members; and (3) so long as the LKA Class Vehicles continue to be sold and distributed with the defective LKA system, the likelihood of continued impact on other consumers is significant.

363.   Pursuant to N.Y. Gen. Bus. Law § 349(h), the New York LKA Plaintiff and each New York LKA Sub-Class Member seek actual damages or $50, whichever is greater, in addition to discretionary three times actual damages up to $1,000 for Defendant's willful and knowing violation of N.Y. Gen. Bus. Law § 349. Plaintiffs and New York Class members also seek attorneys' fees and any other just and proper relief available under the New York GBL.

## COUNT VII
**Violation of the New York General Business Law § 350**
**N.Y. Gen. Bus. Law § 350**
**(On Behalf of the New York LKA Sub-Class against Defendant)**

364.   The New York LKA Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 260 above as if fully set forth herein.

365.   The New York LKA Plaintiff brings this cause of action on behalf of himself and the New York LKA Sub-Class against Defendant.

366.   New York's General Business Law § 350, the New York False Advertising Act ("NY FAA"), makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce[.]" False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in the light of . . . representations [made] with respect to the commodity." N.Y. Gen. Bus. Law § 350-a.

367.   Subaru caused to be made or disseminated throughout New York, through advertising, marketing, and other publications, representations that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Subaru, to be untrue and misleading to consumers, including New York Plaintiffs and the New York LKA Sub-Class Members.

368.   Subaru violated the NY FAA because of the misrepresentations and omissions alleged herein, including, but not limited to, Subaru's failure to disclose the LKA Defect, by concealing the LKA Defect, by marketing its vehicles as safe, reliable, easily operable, efficient, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, cleanliness, performance and efficiency, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the LKA Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the LKA Class Vehicles and LKA Defect in the course of its business.

369.   In purchasing or leasing the LKA Class Vehicles, the New York LKA Plaintiff and the New York LKA Sub-Class Members were deceived by Subaru's failure to disclose the LKA Defect.

370.   New York Plaintiffs and the New York LKA Sub-Class Members had no way of knowing that Subaru's representations and omissions were false and

misleading, that an internal component part of the LKA Class Vehicles is defective and causes a safety hazard, that the LKAs will fail under normal and intended use of the LKA Class Vehicles, or that Subaru would refuse to repair, replace, or compensate New York Plaintiffs and the New York LKA Sub-Class Members for the failure of the defective LKAs and the known consequences of that failure to the LKA Class Vehicles.

371.   Subaru's unfair or deceptive acts or practices, fraud, misrepresentations, suppression or omission of material facts were likely to and did in fact deceive reasonable consumers.

372.   Subaru intentionally and knowingly misrepresented material facts regarding the LKA Class Vehicles with intent to mislead New York Plaintiffs and the New York LKA Sub-Class Members.

373.   Subaru knew or should have known that its conduct violated the NY FAA.

374.   New York Plaintiffs and the New York LKA Sub-Class Members reasonably relied on Subaru's misrepresentations and omissions of material facts in its advertisements of the LKA Class Vehicles and in the purchase of the LKA Class Vehicles.

375.   Had New York Plaintiffs and the New York LKA Sub-Class Members known that the LKA Class Vehicles would exhibit the LKA Defect, they would not

have purchased or leased the LKA Class Vehicles or would have paid less for them. Plaintiffs did not receive the benefit of their bargain as a result of Subaru's misconduct.

376. Defendant was under a duty to the New York LKA Plaintiff and the New York LKA Sub-Class Members to disclose the defective nature of the LKA Class Vehicles because:

(a) Defendant was in a superior position to know the true state of facts about the safety defect in the LKA Class Vehicles;

(b) Defendant made partial disclosures about the quality of the LKA Class Vehicles without revealing the defective nature of the LKA Class Vehicles; and

(c) Defendant actively concealed the defective nature of the LKA Class Vehicles from the New York LKA Plaintiff and the New York LKA Sub-Class Members at the time of sale and thereafter.

377. The New York LKA Plaintiff and the New York LKA Sub-Class Members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Subaru's conduct in that they overpaid for their LKA Class Vehicles and did not receive the benefit of their bargain, and their LKA Class Vehicles have suffered a diminution in value. These injuries are the direct and

natural consequence of Subaru's misrepresentations, fraud, deceptive practices, and omissions.

378.   The New York LKA Plaintiff and the New York LKA Sub-Class Members are entitled to recover their actual damages or $500, whichever is greater. Because Subaru acted willfully or knowingly, the New York LKA Plaintiff and the New York LKA Sub-Class Members are entitled to recover three times actual damages, up to $10,000.

## Claims on Behalf of the Pennsylvania AEB Sub-Class

### COUNT VIII
### Breach of the Implied Warranty of Merchantability
### 13 Pa. Cons. Stat. Ann. §§ 2314 and 2A212
### (On Behalf of the Pennsylvania AEB Sub-Classes against Defendant)

379.   Plaintiffs Elizabeth Wheatley and John Armour (herein after "Pennsylvania Plaintiffs") repeat and re-allege each and every allegation contained in paragraphs 1 through 260 above as if fully set forth herein.

380.   Pennsylvania Plaintiffs bring this count on behalf of themselves and the Pennsylvania AEB Sub-Class against Defendant.

381.   Subaru is and was at all relevant times a "merchant" with respect to motor vehicles under 13 Pa. Cons. Stat. Ann. §§ 2104 and 2A103(a), and a "seller" of motor vehicles under § 2103(a).

382.   With respect to leases, Subaru is and was at all relevant times a "lessor" of motor vehicles under 13 Pa. Cons. Stat. Ann. § 2A103(a).

383.   The AEB Class Vehicles are and were at all relevant times "goods" within the meaning of 13 Pa. Cons. Stat. Ann. § 2105(a) and 2A103(a).

384.   A warranty that the AEB Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under 13 Pa. Cons. Stat. Ann. §§ 2314 and 2A212.

385.   Subaru knew or had reason to know of the specific use for which the AEB Class Vehicles were purchased or leased. Subaru directly sold and marketed AEB Class Vehicles to customers through authorized dealers, like those from whom Pennsylvania Plaintiffs and members of the Pennsylvania AEB Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Subaru knew that the AEB Class Vehicles would and did pass unchanged from the authorized dealers to Pennsylvania Plaintiffs and members of the Pennsylvania AEB Sub-Class, with no modification to the defective AEB Class Vehicles.

386.   Subaru provided Pennsylvania Plaintiffs and members of the Pennsylvania AEB Sub-Class with an implied warranty that the AEB Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

387.   This implied warranty included, among other things: (i) a warranty that the AEB Class Vehicles that were manufactured, supplied, distributed, and/or sold by Subaru were safe and reliable for providing transportation; and (ii) a warranty

that the AEB Class Vehicles would be fit for their intended use while the AEB Class

Vehicles were being operated.

388.   Contrary to the applicable implied warranties, the AEB Class Vehicles

at the time of sale and thereafter were not fit for their ordinary and intended purpose

of providing Plaintiffs and Class Members with reliable, durable, and safe

transportation. Instead, the AEB Class Vehicles were and are defective at the time

of sale or lease and thereafter as more fully described above. Subaru knew of this

defect at the time these sale or lease transactions occurred.

389.   As a result of Subaru's breach of the applicable implied warranties,

Pennsylvania Plaintiffs and members of the Pennsylvania AEB Sub-Class suffered

an ascertainable loss of money, property, and/or value of their AEB Class Vehicles.

Additionally, as a result of the AEB System Defect, Pennsylvania Plaintiffs and

members of the Pennsylvania AEB Sub-Class were harmed and suffered actual

damages in that the AEB Class Vehicles are substantially certain to fail before their

expected useful life has run.

390.   Subaru's actions, as complained of herein, breached the implied

warranty that the AEB Class Vehicles were of merchantable quality and fit for such

use in violation of the Uniform Commercial Code and relevant state law.

391.   Pennsylvania Plaintiffs and members of the Pennsylvania AEB Sub-

Class have complied with all obligations under the warranty, or otherwise have been

excused from performance of said obligations as a result of Subaru's conduct described herein.

392.   Pennsylvania Plaintiffs and members of the Pennsylvania AEB Sub-Class were not required to notify Subaru of the breach because affording Subaru a reasonable opportunity to cure its breach of warranty would have been futile. Subaru was also on notice of the AEB System Defect from the complaints and service requests it received from Pennsylvania Plaintiffs and the Class Members and through other internal sources.

393.   Nonetheless, Pennsylvania Plaintiffs provided notice to Subaru of the breach of implied warranties when they took their vehicles to an authorized Subaru dealership and complained of the AEB System Defect.  Further, Plaintiff Armour provided written notice by letter dated May 13, 2021.

394.   As a direct and proximate cause of Subaru's breach, Pennsylvania Plaintiffs and members of the Pennsylvania AEB Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their AEB Class Vehicles. Additionally, Pennsylvania Plaintiffs and members of the Pennsylvania AEB Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

395.   As a direct and proximate result of Subaru's breach of the implied warranty of merchantability, Pennsylvania Plaintiffs and members of the Pennsylvania AEB Sub-Class have been damaged in an amount to be proven at trial.

**COUNT IX**
**Violation of the Pennsylvania Unfair Trade Practices**
**and Consumer Protection Law**
**73 Pa. Stat. Ann. § 201-2,** *et seq.*
**(On Behalf of the Pennsylvania AEB Sub-Class against Defendant)**

396.   Pennsylvania Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 260 above as if fully set forth herein.

397.   Pennsylvania Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Pennsylvania AEB Sub-Class against Defendant.

398.   Pennsylvania Plaintiffs and the Pennsylvania AEB Sub-Class Members purchased or leased their AEB Class Vehicles primarily for personal, family or household purposes within the meaning of 73 Pa. Stat. Ann. § 201-9.2.

399.   All of the acts complained of herein were perpetrated by Subaru in the course of trade or commerce within the meaning of 73 Pa. Stat. Ann. § 201-2(3).

400.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (a) "Representing that goods or services have … characteristics, … [b]enefits or qualities that they do not have;" (b) "Representing that goods or services are of a

particular standard, quality or grade ... if they are of another;" (c) "Advertising goods or services with intent not to sell them as advertised;" and (d) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 Pa. Stat. Ann. § 201-2(4). Subaru engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated Pennsylvania CPL.

401.    Subaru participated in unfair or deceptive trade practices that violated the Pennsylvania CPL.  As described below and alleged throughout the Complaint, by failing to disclose the AEB System Defect, by concealing the AEB System Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the AEB Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the AEB Class Vehicles and the AEB System Defect in the course of its business.

402.    Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the AEB Class Vehicles.

122

403.   Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

404.   Subaru knew that the AEB Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

405.   Subaru knew or should have known that its conduct violated the Pennsylvania CPL.

406.   Defendant was under a duty to Pennsylvania Plaintiffs and the Pennsylvania AEB Sub-Class Members to disclose the defective nature of the AEB Class Vehicles because:

(a)   Defendant was in a superior position to know the true state of facts about the safety defect in the AEB Class Vehicles;

(b)   Defendant made partial disclosures about the quality of the AEB Class Vehicles without revealing the defective nature of the AEB Class Vehicles; and

(c)   Defendant actively concealed the defective nature of the AEB Class Vehicles from Pennsylvania Plaintiffs and the Pennsylvania AEB Sub-Class Members at the time of sale and thereafter.

407.   By failing to disclose the AEB System Defect, Defendant knowingly and intentionally concealed material facts and breached their duty not to do so.

408.   The facts concealed or not disclosed by Defendant to Pennsylvania Plaintiffs and the Pennsylvania AEB Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's AEB Class Vehicles, or to pay less for them. Whether a vehicle's AEB system operates correctly is a material safety concern. Had Pennsylvania Plaintiffs and the Pennsylvania AEB Sub-Class Members known that the AEB Class Vehicles suffered from the AEB System Defect described herein, they would not have purchased or leased the AEB Class Vehicles or would have paid less for them.

409.   Pennsylvania Plaintiffs and the Pennsylvania AEB Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the AEB System Defect. That is the reasonable and objective consumer expectation for vehicles.

410.   As a result of Defendant's misconduct, Pennsylvania Plaintiffs and the Pennsylvania AEB Sub-Class Members have been harmed and have suffered actual damages in that the AEB Class Vehicles are defective and require repairs or replacement.

411.   Plaintiff Armour provided written notice of his claims by letter dated May 13, 2021.

412.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Pennsylvania Plaintiffs and the Pennsylvania AEB Sub-Class Members have suffered and will continue to suffer actual damages.

413.   Subaru's violations present a continuing risk to Pennsylvania Plaintiffs and the Pennsylvania AEB Sub-Class Members as well as to the general public. Subaru's unlawful acts and practices complained of herein affect the public interest.

414.   Subaru is liable to Plaintiffs and the Pennsylvania Class members for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs under 73 Pa. Stat. Ann. § 201-9.2(a).   Pennsylvania Plaintiffs and the Pennsylvania AEB Sub-Class members are also entitled to an award of punitive damages given that Defendant's conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

**Claims on Behalf of the Florida AEB Sub-Class**

**COUNT X**
**Violation of Florida Deceptive and Unfair Trade Practices Act**
**F.S.A. §§ 501.201-.213, *et seq.***
**(On Behalf of the Florida AEB Sub-Class against Defendant)**

415.   Plaintiff Barbara Miller (herein after "Florida Plaintiff") repeats and re-alleges each and every allegation contained in paragraphs 1 through 260 above as if fully set forth herein.

416.   Florida Plaintiff brings this count on behalf of herself and the Florida AEB Sub-Class against Defendant.

417.   Florida Plaintiff and the Florida AEB Sub-Class members are "consumers" within the meaning of F.S.A. § 501.203(7).

418.   Subaru engaged in "trade or commerce" within the meaning F.S.A. § 501.203(8).

419.   The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1).   Subaru engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the FDUTPA.

420.   Subaru participated in unfair or deceptive trade practices that violated the FDUTPA.  As described below and alleged throughout the Complaint, by failing to disclose the AEB System Defect, by concealing the AEB System Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the AEB Class Vehicles. Subaru systematically misrepresented,

concealed, suppressed, or omitted material facts relating to the AEB Class Vehicles and the AEB System Defect in the course of its business.

421.   Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the AEB Class Vehicles.

422.   Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

423.   Subaru knew that the AEB Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

424.   Subaru knew or should have known that its conduct violated the FDUTPA.

425.   Defendant was under a duty to Florida Plaintiff and the Florida AEB Sub-Class Members to disclose the defective nature of the AEB Class Vehicles because:

(a)   Defendant was in a superior position to know the true state of facts about the safety defect in the AEB Class Vehicles;

(b)     Defendant made partial disclosures about the quality of the AEB Class Vehicles without revealing the defective nature of the AEB Class Vehicles; and

(c)     Defendant actively concealed the defective nature of the AEB Class Vehicles from Florida Plaintiff and the Florida AEB Sub-Class Members at the time of sale and thereafter.

426.   By failing to disclose the AEB System Defect, Defendant knowingly and intentionally concealed material facts and breached their duty not to do so.

427.   The facts concealed or not disclosed by Defendant to Florida Plaintiff and the Florida AEB Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's AEB Class Vehicles, or to pay less for them. Whether a vehicle's AEB system operates correctly is a material safety concern. Had Florida Plaintiff and the Florida AEB Sub-Class Members known that the AEB Class Vehicles suffered from the AEB System Defect described herein, they would not have purchased or leased the AEB Class Vehicles or would have paid less for them.

428.   Florida Plaintiff and the Florida AEB Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the AEB System Defect. That is the reasonable and objective consumer expectation for vehicles.

128

429.   As a result of Defendant's misconduct, Florida Plaintiff and the Florida AEB Sub-Class Members have been harmed and have suffered actual damages in that the AEB Class Vehicles are defective and require repairs or replacement.

430.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Florida Plaintiff and the Florida AEB Sub-Class Members have suffered and will continue to suffer actual damages.

431.   Subaru's violations present a continuing risk to Florida Plaintiff and the Florida AEB Sub-Class Members as well as to the general public.  Subaru's unlawful acts and practices complained of herein affect the public interest.

432.   Florida Plaintiff and the Florida AEB Sub-Class Members seek, *inter alia*, actual damages in an amount to be determined at trial, reasonable attorneys' fees; and any other just and proper relief available under the FDUTPA. Because Subaru acted with willful and conscious disregard of the rights and safety of others, Subaru's conduct constitutes malice, oppression, and fraud warranting punitive damages.

## Claims on Behalf of the New Hampshire AEB Sub-Class

## COUNT XI
### Breach of the Implied Warranty of Merchantability
### N.H. Rev. Stat. Ann. §§ 382-A:2-314 and 382-A:2A-212
### (On Behalf of the New Hampshire AEB Sub-Classes against Defendant)

433.   Plaintiff Jeremey Ford Donovan (herein after "New Hampshire AEB Plaintiff") repeat and re-allege each and every allegation contained in paragraphs 1 through 260 above as if fully set forth herein.

434.   The New Hampshire AEB Plaintiff brings this count on behalf of himself and the New Hampshire AEB Sub-Class against Defendant.

435.   Subaru is and was at all relevant times a "merchant" with respect to motor vehicles under N.H. Rev. Stat. Ann. § 382-A:2-104(1), and a "seller" of motor vehicles under 382-A:2-103(1)(d).

436.   With respect to leases, Subaru is and was at all relevant times a "lessor" of motor vehicles under N.H. Rev. Stat. Ann. § 382-A:2A-103(1)(p).

437.   The AEB Class Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. Ann. §§ 382-A:2-105(1) and 2A-103(1)(h).

438.   A warranty that the AEB Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.H. Rev. Stat. Ann. §§ 382-A:2-314 and 382-A:2A-212.

439.   Subaru knew or had reason to know of the specific use for which the AEB Class Vehicles were purchased or leased. Subaru directly sold and marketed AEB Class Vehicles to customers through authorized dealers, like those from whom the New Hampshire AEB Plaintiff and members of the New Hampshire AEB Sub-Class bought or leased their vehicles, for the intended purpose of consumers

purchasing the vehicles. Subaru knew that the AEB Class Vehicles would and did pass unchanged from the authorized dealers to the New Hampshire AEB Plaintiff and members of the New Hampshire AEB Sub-Class, with no modification to the defective AEB Class Vehicles.

440.   Subaru provided the New Hampshire AEB Plaintiff and members of the New Hampshire AEB Sub-Class with an implied warranty that the AEB Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

441.   This implied warranty included, among other things: (i) a warranty that the AEB Class Vehicles that were manufactured, supplied, distributed, and/or sold by Subaru were safe and reliable for providing transportation; and (ii) a warranty that the AEB Class Vehicles would be fit for their intended use while the AEB Class Vehicles were being operated.

442.   Contrary to the applicable implied warranties, the AEB Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the AEB Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Subaru knew of this defect at the time these sale or lease transactions occurred.

443.   As a result of Subaru's breach of the applicable implied warranties, the New Hampshire AEB Plaintiff and members of the New Hampshire AEB Sub-Class suffered an ascertainable loss of money, property, and/or value of their AEB Class Vehicles. Additionally, as a result of the AEB System Defect, the New Hampshire AEB Plaintiff and members of the New Hampshire AEB Sub-Class were harmed and suffered actual damages in that the AEB Class Vehicles are substantially certain to fail before their expected useful life has run.

444.   Subaru's actions, as complained of herein, breached the implied warranty that the AEB Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

445.   The New Hampshire AEB Plaintiff and members of the New Hampshire AEB Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Subaru's conduct described herein.

446.   The New Hampshire AEB Plaintiff and members of the New Hampshire AEB Sub-Class were not required to notify Subaru of the breach because affording Subaru a reasonable opportunity to cure its breach of warranty would have been futile. Subaru was also on notice of the AEB System Defect from the complaints and service requests it received from the New Hampshire AEB Plaintiff and the Class Members and through other internal sources.

447.   Nonetheless, New Hampshire AEB Plaintiff provided notice to Subaru of the breach of implied warranties when he took his vehicle to an authorized Subaru dealership and complained of the AEB System Defect.  Further, the New Hampshire AEB Plaintiff provided written notice by letter dated June 1, 2021.

448.   As a direct and proximate cause of Subaru's breach, the New Hampshire AEB Plaintiff and members of the New Hampshire AEB Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their AEB Class Vehicles. Additionally, the New Hampshire AEB Plaintiff and members of the New Hampshire AEB Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

449.   As a direct and proximate result of Subaru's breach of the implied warranty of merchantability, the New Hampshire AEB Plaintiff and members of the New Hampshire AEB Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XII
**Violation of The New Hampshire Consumer Protection Act**
**N.H. Rev. Stat. Ann. § 358-A:1, *et seq*.**
**(On Behalf of the New Hampshire AEB Sub-Class against Defendant)**

450.   The New Hampshire AEB Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 260 above as if fully set forth herein.

451.   The New Hampshire AEB Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the New Hampshire AEB Sub-Class against Defendant.

452.   The New Hampshire AEB Plaintiff, the New Hampshire AEB Sub-Class members, and Subaru are "person" as that term is defined in N.H. Rev. Stat. Ann. § 358-A:1.

453.   Subaru's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. Ann. § 358-A:1.

454.   The New Hampshire Consumer Protection Act ("New Hampshire CPA") prohibits a person in the conduct of any trade or commerce from using "any unfair or deceptive act or practice," including "but … not limited to the following: . . . (V) Representing that goods or services have … characteristics, … uses, benefits, or quantities that they do not have," "(VII) Representing that goods or services are of a particular standard, quality, or grade, … if they are of another," and "(IX) Advertising goods or services with intent not to sell them as advertised." N.H. Rev. Stat. Ann. § 358-A:2.  Subaru engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the New Hampshire CPA.

134

455.   Subaru participated in unfair or deceptive trade practices that violated the New Hampshire CFA.   As described below and alleged throughout the Complaint, by failing to disclose the AEB System Defect, by concealing the AEB System Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the AEB Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the AEB Class Vehicles and the AEB System Defect in the course of its business.

456.   Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the AEB Class Vehicles.

457.   Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

458.   Subaru knew that the AEB Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

459.   Subaru knew or should have known that its conduct violated the New Hampshire CPA.

460.   Defendant was under a duty to the New Hampshire AEB Plaintiff and the New Hampshire AEB Sub-Class Members to disclose the defective nature of the AEB Class Vehicles because:

(a)   Defendant was in a superior position to know the true state of facts about the safety defect in the AEB Class Vehicles;

(b)   Defendant made partial disclosures about the quality of the AEB Class Vehicles without revealing the defective nature of the AEB Class Vehicles; and

(c)   Defendant actively concealed the defective nature of the AEB Class Vehicles from the New Hampshire AEB Plaintiff and the New Hampshire AEB Sub-Class Members at the time of sale and thereafter.

461.    By failing to disclose the AEB System Defect, Defendant knowingly and intentionally concealed material facts and breached their duty not to do so.

462.   The facts concealed or not disclosed by Defendant to the New Hampshire AEB Plaintiff and the New Hampshire AEB Sub-Class Members are

material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's AEB Class Vehicles, or to pay less for them. Whether a vehicle's AEB system operates correctly is a material safety concern. Had the New Hampshire AEB Plaintiff and the New Hampshire AEB Sub-Class Members known that the AEB Class Vehicles suffered from the AEB System Defect described herein, they would not have purchased or leased the AEB Class Vehicles or would have paid less for them.

463.   The New Hampshire AEB Plaintiff and the New Hampshire AEB Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the AEB System Defect. That is the reasonable and objective consumer expectation for vehicles.

464.   As a result of Defendant's misconduct, New Hampshire AEB Plaintiff and the New Hampshire AEB Sub-Class Members have been harmed and have suffered actual damages in that the AEB Class Vehicles are defective and require repairs or replacement.

465.   New Hampshire AEB Plaintiff provided written notice of his claims by letter dated June 1, 2021.

466.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, the New Hampshire AEB Plaintiff and the New Hampshire AEB Sub-Class Members have suffered and will continue to suffer actual damages.

467.   Subaru's violations present a continuing risk to the New Hampshire AEB Plaintiff and the New Hampshire AEB Sub-Class Members as well as to the general public.  Subaru's unlawful acts and practices complained of herein affect the public interest.

468.   Pursuant to N.H. Rev. Stat. Ann. § 358-A:10, New Hampshire AEB Plaintiff and the New Hampshire AEB Sub-Class members seek recovery of actual damages or $1,000, whichever is greater, treble damages, costs and reasonable attorneys' fees, and any other just and proper relief available under N.H. Rev. Stat. Ann. § 358-A:10.

**Claims on Behalf of the New Hampshire LKA Sub-Class**

**COUNT XIII**
**Breach of the Implied Warranty of Merchantability**
**N.H. Rev. Stat. Ann. §§ 382-A:2-314 and 382-A:2A-212**
**(On Behalf of the New Hampshire LKA Sub-Classes against Defendant)**

469.   Plaintiff Jeremey Ford Donovan (herein after "New Hampshire LKA Plaintiff") repeats and re-alleges each and every allegation contained in paragraphs 1 through 260 above as if fully set forth herein.

470.   The New Hampshire LKA Plaintiff brings this count on behalf of himself and the New Hampshire LKA Sub-Class against Defendant.

471.   Subaru is and was at all relevant times a "merchant" with respect to motor vehicles under N.H. Rev. Stat. Ann. § 382-A:2-104(1), and a "seller" of motor vehicles under 382-A:2-103(1)(d).

472.   With respect to leases, Subaru is and was at all relevant times a "lessor" of motor vehicles under N.H. Rev. Stat. Ann. § 382-A:2A-103(1)(p).

473.   The LKA Class Vehicles are and were at all relevant times "goods" within the meaning of N.H. Rev. Stat. Ann. §§ 382-A:2-105(1) and 2A-103(1)(h).

474.   A warranty that the LKA Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.H. Rev. Stat. Ann. §§ 382-A:2-314 and 382-A:2A-212.

475.   Subaru knew or had reason to know of the specific use for which the LKA Class Vehicles were purchased or leased. Subaru directly sold and marketed LKA Class Vehicles to customers through authorized dealers, like those from whom the New Hampshire LKA Plaintiff and members of the New Hampshire LKA Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Subaru knew that the LKA Class Vehicles would and did pass unchanged from the authorized dealers to the New Hampshire LKA Plaintiff and members of the New Hampshire LKA Sub-Class, with no modification to the defective LKA Class Vehicles.

476.    Subaru provided the New Hampshire LKA Plaintiff and members of the New Hampshire LKA Sub-Class with an implied warranty that the LKA Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

477.    This implied warranty included, among other things: (i) a warranty that the LKA Class Vehicles that were manufactured, supplied, distributed, and/or sold by Subaru were safe and reliable for providing transportation; and (ii) a warranty that the LKA Class Vehicles would be fit for their intended use while the LKA Class Vehicles were being operated.

478.    Contrary to the applicable implied warranties, the LKA Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the LKA Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Subaru knew of this defect at the time these sale or lease transactions occurred.

479.    As a result of Subaru's breach of the applicable implied warranties, the New Hampshire LKA Plaintiff and members of the New Hampshire LKA Sub-Class suffered an ascertainable loss of money, property, and/or value of their LKA Class Vehicles. Additionally, as a result of the LKA System Defect, the New Hampshire LKA Plaintiff and members of the New Hampshire LKA Sub-Class were harmed

140

and suffered actual damages in that the LKA Class Vehicles are substantially certain to fail before their expected useful life has run.

480.   Subaru's actions, as complained of herein, breached the implied warranty that the LKA Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

481.   The New Hampshire LKA Plaintiff and members of the New Hampshire LKA Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Subaru's conduct described herein.

482.   The New Hampshire LKA Plaintiff and members of the New Hampshire LKA Sub-Class were not required to notify Subaru of the breach because affording Subaru a reasonable opportunity to cure its breach of warranty would have been futile. Subaru was also on notice of the LKA System Defect from the complaints and service requests it received from the New Hampshire LKA Plaintiff and the Class Members and through other internal sources.

483.   Nonetheless, New Hampshire LKA Plaintiff provided notice to Subaru of the breach of implied warranties when he took his vehicle to an authorized Subaru dealership and complained of the LKA System Defect.  Further, the New Hampshire LKA Plaintiff provided written notice by letter dated June 1, 2021.

484.   As a direct and proximate cause of Subaru's breach, the New Hampshire LKA Plaintiff and members of the New Hampshire LKA Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their LKA Class Vehicles. Additionally, the New Hampshire LKA Plaintiff and members of the New Hampshire LKA Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

485.   As a direct and proximate result of Subaru's breach of the implied warranty of merchantability, the New Hampshire LKA Plaintiff and members of the New Hampshire LKA Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XIV
### Violation of The New Hampshire Consumer Protection Act
### N.H. Rev. Stat. Ann. § 358-A:1, *et seq.*
### (On Behalf of the New Hampshire LKA Sub-Class against Defendant)

486.   The New Hampshire LKA Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 260 above as if fully set forth herein.

487.   The New Hampshire LKA Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the New Hampshire LKA Sub-Class against Defendant.

488.   The New Hampshire LKA Plaintiff, the New Hampshire LKA Sub-Class members, and Subaru are "person" as that term is defined in N.H. Rev. Stat. Ann. § 358-A:1.

489.   Subaru's actions as set forth herein occurred in the conduct of trade or commerce as defined under N.H. Rev. Stat. Ann. § 358-A:1.

490.   The New Hampshire Consumer Protection Act ("New Hampshire CPA") prohibits a person in the conduct of any trade or commerce from using "any unfair or deceptive act or practice," including "but … not limited to the following: . . . (V) Representing that goods or services have … characteristics, … uses, benefits, or quantities that they do not have," "(VII) Representing that goods or services are of a particular standard, quality, or grade, … if they are of another," and "(IX) Advertising goods or services with intent not to sell them as advertised." N.H. Rev. Stat. Ann. § 358-A:2.  Subaru engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the New Hampshire CPA.

491.   Subaru participated in unfair or deceptive trade practices that violated the New Hampshire CFA. As described below and alleged throughout the Complaint, by failing to disclose the LKA System Defect, by concealing the LKA System Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold,

Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the LKA Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the LKA Class Vehicles and the LKA System Defect in the course of its business.

492.   Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the LKA Class Vehicles.

493.   Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

494.   Subaru knew that the LKA Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

495.   Subaru knew or should have known that its conduct violated the New Hampshire CPA.

496.   Defendant was under a duty to the New Hampshire LKA Plaintiff and the New Hampshire LKA Sub-Class Members to disclose the defective nature of the LKA Class Vehicles because:

(a)  Defendant was in a superior position to know the true state of facts about the safety defect in the LKA Class Vehicles;

(b)  Defendant made partial disclosures about the quality of the LKA Class Vehicles without revealing the defective nature of the LKA Class Vehicles; and

(c)  Defendant actively concealed the defective nature of the LKA Class Vehicles from the New Hampshire LKA Plaintiff and the New Hampshire LKA Sub-Class Members at the time of sale and thereafter.

497.   By failing to disclose the LKA System Defect, Defendant knowingly and intentionally concealed material facts and breached their duty not to do so.

498.   The facts concealed or not disclosed by Defendant to the New Hampshire LKA Plaintiff and the New Hampshire LKA Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's LKA Class Vehicles, or to pay less for them. Whether a vehicle's LKA system operates correctly is a material safety concern. Had the New Hampshire LKA Plaintiff and the New Hampshire LKA Sub-Class Members known that the LKA Class Vehicles suffered from the LKA System Defect described herein, they would not have purchased or leased the LKA Class Vehicles or would have paid less for them.

499.   The New Hampshire LKA Plaintiff and the New Hampshire LKA Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the LKA System Defect. That is the reasonable and objective consumer expectation for vehicles.

500.   As a result of Defendant's misconduct, New Hampshire LKA Plaintiff and the New Hampshire LKA Sub-Class Members have been harmed and have suffered actual damages in that the LKA Class Vehicles are defective and require repairs or replacement.

501.   New Hampshire LKA Plaintiff provided written notice of his claims by letter dated June 1, 2021.

502.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, the New Hampshire LKA Plaintiff and the New Hampshire LKA Sub-Class Members have suffered and will continue to suffer actual damages.

503.   Subaru's violations present a continuing risk to the New Hampshire LKA Plaintiff and the New Hampshire LKA Sub-Class Members as well as to the general public. Subaru's unlawful acts and practices complained of herein affect the public interest.

504.   Pursuant to N.H. Rev. Stat. Ann. § 358-A:10, New Hampshire LKA Plaintiff and the New Hampshire LKA Sub-Class members seek recovery of actual damages or $1,000, whichever is greater, treble damages, costs and reasonable

attorneys' fees, and any other just and proper relief available under N.H. Rev. Stat. Ann. § 358-A:10.

### Claims on Behalf of the Texas AEB Sub-Class

### COUNT XV
**Breach of the Implied Warranty of Merchantability**
**Tex. Bus. & Com. Code §§ 2.314 and 2A.212**
**(On Behalf of the Texas AEB Sub-Classes against Defendant)**

505.    Plaintiffs Darrin and Jana DeGrand (herein after "Texas AEB Plaintiffs" for this Count) repeat and re-allege each and every allegation contained in paragraphs 1 through 260 above as if fully set forth herein.

506.    The Texas AEB Plaintiffs bring this count on behalf of themselves and the Texas AEB Sub-Class against Defendant.

507.    Subaru is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

508.    With respect to leases, Subaru is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

509.    The AEB Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

510.   A warranty that the AEB Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Texas Bus. & Com. Code §§ 2.314 and 2A.212.

511.   Subaru knew or had reason to know of the specific use for which the AEB Class Vehicles were purchased or leased. Subaru directly sold and marketed AEB Class Vehicles to customers through authorized dealers, like those from whom the Texas AEB Plaintiffs and members of the Texas AEB Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Subaru knew that the AEB Class Vehicles would and did pass unchanged from the authorized dealers to the Texas AEB Plaintiffs and members of the Texas AEB Sub-Class, with no modification to the defective AEB Class Vehicles.

512.   Subaru provided the Texas AEB Plaintiffs and members of the Texas AEB Sub-Class with an implied warranty that the AEB Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

513.   This implied warranty included, among other things: (i) a warranty that the AEB Class Vehicles that were manufactured, supplied, distributed, and/or sold by Subaru were safe and reliable for providing transportation; and (ii) a warranty that the AEB Class Vehicles would be fit for their intended use while the AEB Class Vehicles were being operated.

514.   Contrary to the applicable implied warranties, the AEB Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the AEB Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Subaru knew of this defect at the time these sale or lease transactions occurred.

515.   As a result of Subaru's breach of the applicable implied warranties, the Texas AEB Plaintiffs and members of the Texas AEB Sub-Class suffered an ascertainable loss of money, property, and/or value of their AEB Class Vehicles. Additionally, as a result of the AEB System Defect, the Texas AEB Plaintiffs and members of the Texas AEB Sub-Class were harmed and suffered actual damages in that the AEB Class Vehicles are substantially certain to fail before their expected useful life has run.

516.   Subaru's actions, as complained of herein, breached the implied warranty that the AEB Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

517.   The Texas AEB Plaintiffs and members of the Texas AEB Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Subaru's conduct described herein.

518.   The Texas AEB Plaintiffs and members of the Texas AEB Sub-Class were not required to notify Subaru of the breach because affording Subaru a reasonable opportunity to cure its breach of warranty would have been futile. Subaru was also on notice of the AEB System Defect from the complaints and service requests it received from the Texas AEB Plaintiffs and the Class Members and through other internal sources.

519.   Nonetheless, the Texas AEB Plaintiffs provided notice to Subaru of the breach of implied warranties when they took their vehicles to an authorized Subaru dealership and complained of the AEB System Defect. Further, the Texas AEB Plaintiffs provided written notice by letter dated July 20, 2021.

520.   As a direct and proximate cause of Subaru's breach, the Texas AEB Plaintiffs and members of the Texas AEB Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their AEB Class Vehicles. Additionally, the Texas AEB Plaintiffs and members of the Texas AEB Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

521.   As a direct and proximate result of Subaru's breach of the implied warranty of merchantability, the Texas AEB Plaintiffs and members of the Texas AEB Sub-Class have been damaged in an amount to be proven at trial.

**Claims on Behalf of the Texas LKA Sub-Class**

## COUNT XVI
**Breach of the Implied Warranty of Merchantability**
**Tex. Bus. & Com Code §§ 2.314 and 2A.212**
**(On Behalf of the Texas LKA Sub-Classes against Defendant)**

522.    Darrin and Jana DeGrand (hereinafter "Texas LKA Plaintiffs" for this Count) repeat and re-allege each and every allegation contained in paragraphs 1 through 260 above as if fully set forth herein.

523.    The Texas LKA Plaintiffs bring this count on behalf of themselves and the Texas LKA Sub-Class against Defendant.

524.    Subaru is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

525.    With respect to leases, Subaru is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

526.    The LKA Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

527.    A warranty that the LKA Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Texas Bus. & Com. Code §§ 2.314 and 2A.212.

528.    Subaru knew or had reason to know of the specific use for which the LKA Class Vehicles were purchased or leased. Subaru directly sold and marketed LKA Class Vehicles to customers through authorized dealers, like those from whom the Texas LKA Plaintiffs and members of the Texas LKA Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. Subaru knew that the LKA Class Vehicles would and did pass unchanged from the authorized dealers to the Texas LKA Plaintiffs and members of the Texas LKA Sub-Class, with no modification to the defective LKA Class Vehicles.

529.    Subaru provided the Texas LKA Plaintiffs and members of the Texas LKA Sub-Class with an implied warranty that the LKA Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

530.    This implied warranty included, among other things: (i) a warranty that the LKA Class Vehicles that were manufactured, supplied, distributed, and/or sold by Subaru were safe and reliable for providing transportation; and (ii) a warranty that the LKA Class Vehicles would be fit for their intended use while the LKA Class Vehicles were being operated.

531.    Contrary to the applicable implied warranties, the LKA Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe

transportation. Instead, the LKA Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Subaru knew of this defect at the time these sale or lease transactions occurred.

532.   As a result of Subaru's breach of the applicable implied warranties, the Texas LKA Plaintiffs and members of the Texas LKA Sub-Class suffered an ascertainable loss of money, property, and/or value of their LKA Class Vehicles. Additionally, as a result of the LKA Defect, the Texas LKA Plaintiffs and members of the Texas LKA Sub-Class were harmed and suffered actual damages in that the LKA Class Vehicles are substantially certain to fail before their expected useful life has run.

533.   Subaru's actions, as complained of herein, breached the implied warranty that the LKA Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

534.   The Texas LKA Plaintiffs and members of the Texas LKA Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Subaru's conduct described herein.

535.   The Texas LKA Plaintiffs and members of the Texas LKA Sub-Class were not required to notify Subaru of the breach because affording Subaru a reasonable opportunity to cure its breach of warranty would have been futile. Subaru

was also on notice of the LKA Defect from the complaints and service requests it received from the Texas LKA Plaintiffs and the Class Members and through other internal sources.

536.   Nonetheless, the Texas LKA Plaintiffs provided notice to Subaru of the breach of implied warranties when they took their vehicle to an authorized Subaru dealership and complained of the LKA Defect. Further, the Texas LKA Plaintiffs provided written notice by letter dated July 20, 2021.

537.   As a direct and proximate cause of Subaru's breach, the Texas LKA Plaintiffs and members of the Texas LKA Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their LKA Class Vehicles. Additionally, the Texas LKA Plaintiffs and members of the Texas LKA Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

538.   As a direct and proximate result of Subaru's breach of the implied warranty of merchantability, the Texas LKA Plaintiffs and members of the Texas LKA Sub-Class have been damaged in an amount to be proven at trial.

**Claims on Behalf of the California AEB Sub-Class**

**<u>COUNT XVII</u>**
**Breach of the Implied Warranty Pursuant to Song-Beverly Consumer Warranty Act California Civil Code §§ 1792 and 1791.1,** *et seq.***)**

**(On Behalf of the California AEB Sub-Classes against Defendant)**

539.    Plaintiffs Danielle Lovelady Ryan and Robert McLaughlin (hereinafter "California AEB Plaintiffs") incorporate by reference the allegations contained in paragraphs 1 through 260 of this Complaint.

540.    California AEB Plaintiffs bring this count on behalf of themselves and the California AEB Sub-Class against Defendant.

541.    Defendant was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the AEB Class Vehicles. Defendant knew or had reason to know of the specific use for which the AEB Class Vehicles were purchased or leased.

542.    Defendant provided California AEB Plaintiffs and the California AEB Sub-Class members with an implied warranty that the AEB Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

543.    Defendant impliedly warranted that the AEB Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a warranty that the AEB Class Vehicles, which were manufactured, supplied, distributed, and/or sold by Subaru, would provide safe and reliable transportation; and (ii) a warranty that the AEB Class Vehicles would be fit for their intended use.

544.   Contrary to the applicable implied warranties, the AEB Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the AEB Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Subaru knew of this defect at the time these sale or lease transactions occurred.

545.   As a result of Subaru's breach of the applicable implied warranties, California AEB Plaintiffs and California AEB Sub-Class members suffered an ascertainable loss of money, property, and/or value of their AEB Class Vehicles. Additionally, as a result of the AEB System Defect, California AEB Plaintiffs and California AEB Sub-Class members were harmed and suffered actual damages in that the AEB Class Vehicles are substantially certain to fail before their expected useful life has run.

546.   Defendant's actions, as complained of herein, breached the implied warranty that the AEB Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

547.   California AEB Plaintiffs and California AEB Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Subaru's conduct described herein.

548.   California AEB Plaintiffs and California AEB Sub-Class members were not required to notify Subaru of the breach because affording Subaru a reasonable opportunity to cure its breach of warranty would have been futile. Subaru was also on notice of the AEB System Defect from the complaints and service requests it received from California AEB Plaintiffs and the California AEB Sub-Class Members and through other internal sources.

549.   In addition, on or about July 26, 2021 and August 24, 2021, California AEB Plaintiffs gave notice to Defendant that they intended to pursue their warranty claims on behalf of a class of similarly situated consumers.

550.   Because California AEB Plaintiffs purchased their vehicle from authorized Subaru dealers, they are in privity with Subaru because (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims; and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties.

551.   As a direct and proximate cause of Subaru's breach, California AEB Plaintiffs and California AEB Sub-Class members suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their AEB Class Vehicles. Additionally, California AEB Plaintiffs and California AEB Sub-Class members have incurred or will incur

economic damages at the point of repair in the form of the cost of repair, as well as additional losses.

552.   As a direct and proximate result of Subaru's breach of the implied warranty of merchantability, California AEB Plaintiffs and the California AEB Sub-Class members have been damaged in an amount to be proven at trial.

**Claims on Behalf of the CLRA AEB Sub-Class**

**COUNT XVIII**
**Violations of California's Consumers Legal Remedies Act,**
**California Civil Code § 1750, *et seq*.**
**(On Behalf of the CLRA AEB Sub-Classes against Defendant)**

553.   California AEB Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 260 of this Complaint.

554.   California AEB Plaintiffs bring this count on behalf of themselves and the CLRA AEB Sub-Class against Defendant.

555.   Defendant is a "person" as defined by California Civil Code § 1761(c).

556.   California AEB Plaintiffs and the CLRA AEB Sub-Class members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased their Class Vehicles primarily for personal, family, or household use.

557.   By failing to disclose and concealing the defective nature of the AEB System in the AEB Class Vehicles from California AEB Plaintiffs and CLRA AEB Sub-Class members, Defendant violated California Civil Code § 1770(a) as it represented that the AEB Class Vehicles had characteristics and benefits that they

do not have, and represented that the AEB Class Vehicles were of a particular standard, quality, or grade when they were of another. *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

558. Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

559. Defendant knew that the AEB Class Vehicles suffered from an inherent defect, were defective, and were not suitable for their intended use.

560. As a result of their reliance on Defendant's omissions, owners and/or lessees of the AEB Class Vehicles, including California AEB Plaintiffs, suffered an ascertainable loss of money, property, and/or value of their AEB Class Vehicles. Additionally, as a result of the AEB System Defect, California AEB Plaintiffs and the CLRA AEB Sub-Class members were harmed and suffered actual damages in that the AEB Class Vehicles' AEB Systems did not operate correctly and were a material safety concern.

561. Defendant was under a duty to California AEB Plaintiffs and the CLRA AEB Sub-Class members to disclose the defective nature of the AEB Class Vehicles because:

    (a)    Defendant was in a superior position to know the true state of facts about the safety defect in the AEB Class Vehicles;

    (b)    Defendant made partial disclosures about the quality of the AEB Class Vehicles without revealing the defective nature of the AEB Class Vehicles; and

    (c)    Defendant actively concealed the defective nature of the AEB Class Vehicles from California AEB Plaintiffs and the CLRA AEB Sub-Class Members at the time of sale and thereafter.

562.   By failing to disclose the AEB System Defect, Defendant knowingly and intentionally concealed material facts and breached their duty not to do so.

563.   The facts Defendant concealed from, or failed to disclose to, California AEB Plaintiffs and the CLRA AEB Sub-Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease Defendant's AEB Class Vehicles, or to pay less for them. Whether a vehicle's AEB system operates correctly is a material safety concern. Had California AEB Plaintiffs and the CLRA AEB Sub-Class Members known that the AEB Class Vehicles suffered from the AEB System Defect described herein, they would not have purchased or leased the AEB Class Vehicles or would have paid less for them.

564.   California AEB Plaintiffs and the CLRA AEB Sub-Class members are reasonable consumers who do not expect that their vehicles will suffer from the AEB System Defect. That is the reasonable and objective consumer expectation for vehicles.

565.   As a result of Defendant's conduct, California AEB Plaintiffs and the CLRA AEB Sub-Class members were harmed and suffered actual damages in that the AEB Class Vehicles are defective and require repairs or replacement.

566.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, California AEB Plaintiffs and the CLRA AEB Sub-Class members suffered and will continue to suffer actual damages.

567.   California AEB Plaintiffs and the CLRA AEB Sub-Class seek to recover actual damages and any other just and proper relief available under the CLRA.

568.   In accordance with section 1782(a) of the CLRA, Plaintiffs' counsel, via letters dated July 26, 2021 and August 24, 2021, has served Subaru with notice of its alleged violations of Cal. Civ. Code § 1770(a) relating to the AEB Class Vehicles purchased by California AEB Plaintiffs and CLRA AEB Sub-Class Members, and demanded that Subaru, within thirty (30) days of such notice, correct or agree to correct the actions described therein and agree to reimburse associated out-of-pocket costs. Subaru has not responded to that letter and did not agree to

correct the actions described therein, to reimburse associated out-of-pocket costs, or otherwise to remedy the harm alleged.

**Claims on Behalf of the California LKA Sub-Class**

**COUNT XIX**
**Breach of the Implied Warranty Pursuant to Song-Beverly**
**Consumer Warranty Act**
**California Civil Code §§ 1792 and 1791.1,** *et seq.***)**
**(On Behalf of the California LKA Sub-Classes against Defendant)**

569.   Plaintiff Danielle Lovelady Ryan (hereinafter "California LKA Plaintiff") repeat and re-allege each and every allegation contained in paragraphs 1 through 260 above as if fully set forth herein.

570.   California LKA Plaintiff brings this count on behalf of herself and the California LKA Sub-Class against all Defendant.

571.   Defendant was at all relevant times the manufacturer, distributor, warrantor, and/or seller of the LKA Class Vehicles. Defendant knew or had reason to know of the specific use for which the LKA Class Vehicles were purchased or leased.

572.   Defendant provided California LKA Plaintiff and the California AEB Sub-Class members with an implied warranty that the LKA Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

573.   Defendant impliedly warranted that the LKA Class Vehicles were of merchantable quality and fit for their intended use. This implied warranty included, among other things: (i) a warranty that the LKA Class Vehicles, which were manufactured, supplied, distributed, and/or sold by Subaru, would provide safe and reliable transportation; and (ii) a warranty that the LKA Class Vehicles would be fit for their intended use.

574.   Contrary to the applicable implied warranties, the LKA Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the LKA Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. Subaru knew of this defect at the time these sale or lease transactions occurred.

575.   As a result of Subaru's breach of the applicable implied warranties, California Plaintiff and members of the California LKA Sub-Class suffered an ascertainable loss of money, property, and/or value of their LKA Class Vehicles. Additionally, as a result of the LKA Defect, California Plaintiff and members of the California LKA Sub-Class were harmed and suffered actual damages in that the LKA Class Vehicles are substantially certain to fail before their expected useful life has run.

576.   Defendant's actions, as complained of herein, breached the implied warranty that the LKA Class Vehicles were of merchantable quality and fit for such use in violation of California Civil Code §§ 1792 and 1791.1.

577.   California LKA Plaintiff and California LKA Sub-Class Members have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of Subaru's conduct described herein.

578.   California Plaintiff and members of the California LKA Sub-Class were not required to notify Subaru of the breach because affording Subaru a reasonable opportunity to cure its breach of warranty would have been futile. Subaru was also on notice of the LKA Defect from the complaints and service requests it received from California Plaintiff and the Class Members and through other internal sources.

579.   In addition, on or about August 24, 2021, California LKA Plaintiff gave notice to Defendant that she intended to pursue her warranty claims on behalf of a class of similarly situated consumers.

580.   Because California LKA Plaintiff purchased her vehicle from an authorized Subaru dealer, she is in privity with Subaru since (1) an agency relationship establishes privity for purposes of the breach of implied warranty claims

and (2) privity is not required where plaintiffs are intended third-party beneficiaries of a defendant's implied warranties.

581.   As a direct and proximate cause of Subaru's breach, California Plaintiff and California LKA Sub-Class members suffered and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their LKA Class Vehicles. Additionally, California LKA Plaintiff and California LKA Sub-Class members have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

582.   As a direct and proximate result of Subaru's breach of the implied warranty of merchantability, California LKA Plaintiff and California LKA Sub-Class Members have been damaged in an amount to be proven at trial.

### Claims on Behalf of the CLRA LKA Sub-Class

### COUNT XX
**Violations of California's Consumers Legal Remedies Act,
California Civil Code § 1750, *et seq*.
(On Behalf of the CLRA LKA Sub-Classes against Defendant)**

583.   California LKA Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 260 above as if fully set forth herein.

584.   California LKA Plaintiff brings this count on behalf of herself and the CLRA LKA Sub-Class against Defendant.

585.   Defendant is a "person" as defined by California Civil Code § 1761(c).

586.   California LKA Plaintiff and the CLRA LKA Sub-Class members are "consumers" within the meaning of California Civil Code § 1761(d) because they purchased their Class Vehicles primarily for personal, family, or household use.

587.   By failing to disclose and concealing the defective nature of the LKA System in the LKA Class Vehicles from California LKA Plaintiff and CLRA LKA Sub-Class members, Defendant violated California Civil Code § 1770(a) because it represented that the LKA Class Vehicles had characteristics and benefits they do not have, and represented that the LKA Class Vehicles were of a particular standard, quality, or grade when they were of another. *See* Cal. Civ. Code §§ 1770(a)(5) & (7).

588.   Defendant's unfair and deceptive acts or practices occurred repeatedly in Defendant's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

589.   Defendant knew that the LKA Class Vehicles suffered from an inherent defect, were defective, and were not suitable for their intended use.

590.   As a result of their reliance on Defendant's omissions, owners and/or lessees of the LKA Class Vehicles, including California Plaintiff, suffered an ascertainable loss of money, property, and/or value of their LKA Class Vehicles. Additionally, as a result of the LKA Defect, California LKA Plaintiff and the CLRA LKA Sub-Class members were harmed and suffered actual damages in that the LKA

Class Vehicles' LKA Systems did not operate correctly and was a material safety concern.

591.   Defendant was under a duty to California LKA Plaintiff and the CLRA LKA Sub-Class members to disclose the defective nature of the LKA Class Vehicles because:

(a)   Defendant was in a superior position to know the true state of facts about the safety defect in the LKA Class Vehicles;

(b)   Defendant made partial disclosures about the quality of the LKA Class Vehicles without revealing the defective nature of the LKA Class Vehicles; and

(c)   Defendant actively concealed the defective nature of the LKA Class Vehicles from California LKA Plaintiff and the CLRA LKA Sub-Class Members at the time of sale and thereafter.

592.   By failing to disclose the LKA Defect, Defendant knowingly and intentionally concealed material facts and breached their duty not to do so.

593.   The facts Defendant concealed from or failed to disclose to California LKA Plaintiff and the CLRA LKA Sub-Class members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase or lease Defendant's LKA Class Vehicles, or to pay less for them. Whether a vehicle's LKA system operates correctly is a material safety

concern. Had California LKA Plaintiff and the CLRA LKA Sub-Class members known that the LKA Class Vehicles suffered from the LKA Defect described herein, they would not have purchased or leased the LKA Class Vehicles or would have paid less for them.

594.   California LKA Plaintiff and the CLRA LKA Sub-Class members are reasonable consumers who do not expect that their vehicles will suffer from the LKA Defect. That is the reasonable and objective consumer expectation for vehicles.

595.   As a result of Defendant's conduct, California LKA Plaintiff and the CLRA LKA Sub-Class members were harmed and suffered actual damages in that the LKA Class Vehicles are defective and require repairs or replacement.

596.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, California LKA Plaintiff and the CLRA LKA Sub-Class members suffered and will continue to suffer actual damages.

597.   California LKA Plaintiff and the CLRA LKA Sub-Class seek to recover actual damages and any other just and proper relief available under the CLRA.

598.   In accordance with section 1782(a) of the CLRA, Plaintiffs' counsel, via letter dated August 24, 2021, has served Subaru with notice of its alleged violations of Cal. Civ. Code § 1770(a) relating to the LKA Class Vehicles purchased by California LKA Plaintiff and CLRA LKA Sub-Class Members, and demanded that Subaru, within thirty (30) days of such notice, correct or agree to correct the

actions described therein and agree to reimburse associated out-of-pocket costs. Subaru has not responded to that letter and did not agree to correct the actions described therein, to reimburse associated out-of-pocket costs, or otherwise to remedy the harm alleged.

**Claims on Behalf of the North Carolina AEB Sub-Class**

**<u>COUNT XXI</u>**
**Violation of North Carolina Unfair and Deceptive Acts and Practices Act**
**N.C. Gen. Stat. § 75-1.1, *et seq.***
**(On Behalf of the North Carolina AEB Sub-Class against Defendant)**

599.   Plaintiff Jack Asbury (herein after "North Carolina Plaintiff") repeats and re-alleges each and every allegation contained in paragraphs 1 through 260 above as if fully set forth herein.

600.   North Carolina Plaintiff brings this count on behalf of himself and the North Carolina AEB Sub-Class against Defendant.

601.   Subaru engaged in "commerce" within the meaning of the North Carolina Unfair and Deceptive Acts and Practices Act ("North Carolina UDTPA"), N.C. Gen. Stat. § 75-1.1(b).

602.   The North Carolina UDTPA broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). Subaru engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the UDTPA.

169

603.   Subaru participated in unfair or deceptive trade practices that violated the UDTPA.  As described below and alleged throughout the Complaint, by failing to disclose the AEB System Defect, by concealing the AEB System Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, Subaru knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the AEB Class Vehicles. Subaru systematically misrepresented, concealed, suppressed, or omitted material facts relating to the AEB Class Vehicles and the AEB System Defect in the course of its business.

604.   Subaru also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission in connection with the sale of the AEB Class Vehicles.

605.   Subaru's unfair and deceptive acts or practices occurred repeatedly in Subaru's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

606. Subaru knew that the AEB Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

607. Subaru knew or should have known that its conduct violated the UDTPA.

608. Defendant was under a duty to North Carolina Plaintiff and the North Carolina AEB Sub-Class Members to disclose the defective nature of the AEB Class Vehicles because:

(a)   Defendant was in a superior position to know the true state of facts about the safety defect in the AEB Class Vehicles;

(b)   Defendant made partial disclosures about the quality of the AEB Class Vehicles without revealing the defective nature of the AEB Class Vehicles; and

(c)   Defendant actively concealed the defective nature of the AEB Class Vehicles from North Carolina Plaintiff and the North Carolina AEB Sub-Class Members at the time of sale and thereafter.

609.   By failing to disclose the AEB System Defect, Defendant knowingly and intentionally concealed material facts and breached their duty not to do so.

610. The facts concealed or not disclosed by Defendant to North Carolina Plaintiff and the North Carolina AEB Sub-Class Members are material because a

reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's AEB Class Vehicles, or to pay less for them. Whether a vehicle's AEB system operates correctly is a material safety concern. Had North Carolina Plaintiff and the North Carolina AEB Sub-Class Members known that the AEB Class Vehicles suffered from the AEB System Defect described herein, they would not have purchased or leased the AEB Class Vehicles or would have paid less for them.

611.   North Carolina Plaintiff and the North Carolina AEB Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the AEB System Defect. That is the reasonable and objective consumer expectation for vehicles.

612.   As a result of Defendant's misconduct, North Carolina Plaintiff and the North Carolina AEB Sub-Class Members have been harmed and have suffered actual damages in that the AEB Class Vehicles are defective and require repairs or replacement.

613.   North Carolina Plaintiff provided written notice of his claims by letter dated September 28, 2021.

614.   As a direct and proximate result of Defendant's unfair or deceptive acts or practices, North Carolina Plaintiff and the North Carolina AEB Sub-Class Members have suffered and will continue to suffer actual damages.

615.   Subaru's violations present a continuing risk to North Carolina Plaintiff and the North Carolina AEB Sub-Class Members as well as to the general public. Subaru's unlawful acts and practices complained of herein affect the public interest.

616.   Because Subaru's actions and conduct were willful, Plaintiffs seek an order for treble their actual damages, court costs, attorneys' fees, and any other just and proper relief available under the North Carolina Act, N.C. Gen. Stat.§ 75-16.

## RELIEF REQUESTED

617.   Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendant, as follows:

(a)   An order certifying the proposed Classes and Sub-Classes, designating Plaintiffs as representatives of the Classes and Sub-Classes, and designating the undersigned as Class Counsel;

(b)   A declaration that Defendant is financially responsible for notifying all members of the Classes about the defective nature of the AEB and LKA Class Vehicles and the existence of the Defects, including the need for repairs;

(c)   An award to Plaintiffs and the Classes for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial.

(d)     A declaration that Defendant must disgorge, for the benefit of the

Classes, all or part of the ill-gotten profits it received from the

sale or lease of its Class Vehicles or make full restitution to

Plaintiffs and members of the Classes;

(e)     An award of attorneys' fees and costs, as allowed by law;

(f)     An award of pre-judgment and post-judgment interest, as

provided by law;

(g)     Leave to amend the Complaint to conform to the evidence

produced at trial; and

(h)     Such additional or different relief as may be appropriate at law

or in equity under the circumstances.

## DEMAND FOR JURY TRIAL

618.   Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands

a trial by jury of all issues in this action so triable.

Dated: November 29, 2021                    Respectfully Submitted,

                                            /s/ Russell D. Paul
                                            _____
                                            Russell D. Paul (NJ Bar. No. 037411989)
                                            Amey J. Park (NJ Bar. No. 070422014)
                                            Abigail J. Gertner (NJ Bar. No. 019632003)
                                            Natalie Lesser (NJ Bar No. 017882010)
                                            **BERGER MONTAGUE PC**
                                            1818 Market Street

Suite 3600
Philadelphia, PA  19103
Tel: (215) 875-3000
Fax: (215) 875-4604
rpaul@bm.net
apark@bm.net
agertner@bm.net
nlesser@bm.net

Tarek H. Zohdy (*pro hac vice*)
Cody R. Padgett (*pro hac vice*)
**CAPSTONE LAW APC**
1875 Century Park East
Suite 1000
Los Angeles, California 90067
Tel: (310) 556-4811
Fax: (310) 943-0396
tarek.zohdy@capstonelawyers.com
cody.padgett@capstonelaywers.com

Mark R. Rosen (NJ Bar. No. 003411980)
**BARRACK, RODOS & BACINE**
Suite 3300
2001 Market St.
Philadelphia, PA 19103
Phone: 215-963-0600
Fax: 215-963-0838
Tel: (973) 297-1484
Fax: (973) 297-1485
mrosen@barrack.com

John G. Emerson (*pro hac application to be filed*)
**EMERSON FIRM, PLLC**
2500 Wilcrest Drive, Suite 300
Houston, TX 77042
Tel: (800) 551-8649
Fax: (501) 286-4659
jemerson@emersonfirm.com

*Attorneys for Plaintiffs and the Proposed Class and Subclasses*